```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                        AT NASHVILLE

 3      UNITED STATES OF AMERICA        )
                                        )
 4                                      )
                                        )
 5      v.                              )    Case No.
                                        )    3:18-cr-00144
 6      MARK BRYANT                      )

 7

 8

 9      - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10      BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                         TRANSCRIPT

12                            OF

13                       PROCEEDINGS

14                    February 5, 2019

15                     Trial Volume 2

16      - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19             APPEARANCES ON THE FOLLOWING PAGE

20

21

22
        PREPARED BY:
23                  LISE S. MATTHEWS, RMR, CRR, CRC
                        Official Court Reporter
24                     801 Broadway, Room A839
                         Nashville, TN 37203
25                  lise_matthews@tnmd.uscourts.gov
```

```
 1              For the Government:  SARA E. MYERS
                                     U.S. Attorney's Office
 2                                   (Nashville Office)
                                     Middle District of Tennessee
 3                                   110 Ninth Avenue South
                                     Suite A961
 4                                   Nashville, Tennessee 37203-3870

 5                                   Michael J. Songer
                                     U.S. Department of Justice
 6                                   Criminal Division
                                     950 Pennsylvania Avenue, NW
 7                                   Washington, DC 20530

 8
                For the Defendant:   Peter J. Strianse
 9                                   Tune, Entrekin & White, P.C.
                                     31 Deaderick Street
10                                   Suite 1700
                                     Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              I N D E X

2         Tuesday, February 5, 2019

3

4             INDEX OF WITNESSES

5
WITNESSES:                                    PAGE

6

7  JOSH MARRIOTT
       (CONTINUED) DIRECT EXAMINATION BY MR. SONGER    10
8      CROSS-EXAMINATION BY MR. STRIANSE               40
       REDIRECT EXAMINATION BY MR. SONGER              54
9      RECROSS-EXAMINATION BY MR. STRIANSE             59

10 DANIEL BRATTON
       DIRECT EXAMINATION BY MS. MYERS                 61
11     CROSS-EXAMINATION BY MR. STRIANSE               94
       REDIRECT EXAMINATION BY MS. MYERS               97
12
   CAITLIN MARRIOTT
13     DIRECT EXAMINATION BY MS. MYERS                 98
       CROSS-EXAMINATION BY MR. STRIANSE              118
14     REDIRECT EXAMINATION BY MS. MYERS              123

15 STEVEN MICHAEL MONTGOMERY
       DIRECT EXAMINATION BY MR. SONGER               126
16     CROSS-EXAMINATION BY MR. STRIANSE              157
       REDIRECT EXAMINATION BY MR. SONGER             162
17
   GARY OLA
18     DIRECT EXAMINATION BY MR. SONGER               164
       CROSS-EXAMINATION BY MR. STRIANSE              219
19     REDIRECT EXAMINATION BY MR. SONGER             238

20 JOY CHRISTINE WRIGHT, FBI SPECIAL AGENT
       DIRECT EXAMINATION BY MS. MYERS                244
21     CROSS-EXAMINATION BY MR. STRIANSE              261

22

23

24

25

1                          EXHIBITS

| GOVERNMENT'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | CCSO Use of Force Policy | 174 | 174 | |
| 2 | Taser training Power Point slides | 187 | 187 | |
| 3 | Taser training legal materials | 194 | 194 | |
| 5 | Mark Bryant's Taser Training Certificate | 170 | 170 | |
| 6 | Jail surveillance video from Nov. 5, 2016, 6:55 p.m. | 79 | 79 | |
| 10 | Combined surveillance and Taser video from Nov. 5, 2016, 8:00 p.m. | 13 | 13 | |
| 14A | Photograph of Jordan Norris handcuffed to bar | 141 | 141 | |
| 14C | Photograph of restraints on Jordan Norris | 147 | 147 | |
| 15 | Combined surveillance and Taser video from Nov. 5, 2016, 10:20 p.m. | 143 | 143 | |
| 16 | Daniel Bratton's incident report Nov. 5, 2016, 18:55 | 87 | 87 | |
| 18 | Josh Marriott's incident report Nov. 5, 2016, 18:55 | 28 | 28 | |
| 19 | Mark Bryant's incident report Nov. 5, 2016, 18:55 | 33 | 33 | |
| 20 | Mark Bryant's incident report Nov. 5, 2016, 22:20 | 154 | 154 | |
| 22 | Steven Michael Montgomery's use of force report Nov. 5, 2016, 22:35 | 152 | 152 | |
| 23 | Taser logs | 203 | 203 | |

```
 1                      EXHIBITS (CONTINUED)

 2                                    MARKED   RECEIVED  WITH-
         DEFENDANT'S EXHIBIT          FOR I.D. IN EVD.   DRAWN
 3
         1    Caitlin Marriott's incident    122       122
 4            report

 5       2    Memo from Cheatham County      236       236
              Sheriff Mike Breedlove (July
 6            30, 2017)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        The above-styled cause came on to be heard on

2    February 5, 2019 before the Honorable Waverly D. Crenshaw,

3    Jr., District Judge, when the following proceedings were had,

4    to-wit:

5

6            (Jury not present.)

7            THE COURT:  All right.  Be seated.  Anything to

8    take up before we bring in the jury?  From the Government?

9            MR. SONGER:  Yes, Your Honor.  I'm sorry, I was

10   making sure the mike was on.

11           We want to bring to the Court's attention, make

12   sure you saw the motion in limine that the Government filed

13   yesterday.

14           THE COURT:  We did.

15           MR. SONGER:  Would you like any discussion on it

16   before we get started today?

17           THE COURT:  Well, first of all, do we need to get

18   into that with this witness?

19           MR. SONGER:  I certainly don't intend to, but I'm

20   not sure what topics the defense is going to going to go

21   into.

22           THE COURT:  Let's go ahead -- anything from the

23   defense?

24           MR. STRIANSE:  I think we could get into it with

25   this witness.

1          THE COURT:  On your cross?

2          MR. STRIANSE:  On my cross-examination.  I've not

3  really had a chance to read the motion in limine.  I think I

4  know what's it about.  On my iPhone, Your Honor, I've got a

5  problem.  When I access an ECF, I get just page 1.

6          But if I understand what the complaint it, I think

7  we satisfied the Court yesterday that bringing up the civil

8  lawsuit in no way violated the Government's omnibus motion in

9  limine.

10          I think the Court has seen, even in the first day

11  of the trial, that one of the central issues in the case is

12  going to be what was the training policy that was in place at

13  the jail on November 5, 2016.  My investigation, the

14  investigation that was conducted by Mr. Atkins with the TBI

15  and Joy Wright of the FBI -- they jointly conducted many

16  interviews of jail personnel -- indicate that there were

17  significant policy changes at the Cheatham County jail after

18  the filing of this civil lawsuit in the United States

19  District Court for the Middle District of Tennessee on

20  July 21, 2017.

21          And then that Channel 5 news coverage that you

22  heard about yesterday followed, I think within days of that.

23  I know that Ms. Wright and Mr. Atkins have interviewed

24  JJ Hannah, the jail administrator, who is a man who is on the

25  Government's witness list.

1          THE COURT:  Would who is Ms. Wright and Mr. --

2          MR. STRIANSE:  Ms. Wright is right here.  She is

3    the case agent.  She is an FBI agent, and she worked jointly

4    with Shawn Atkins, a TBI agent, in the investigation of this

5    case.  And they did some pretty extensive audio interviews of

6    many jail personnel in connection with this case.  Most of

7    those interviews were conducted in August of 2017.  I

8    referenced Mr. Hannah's interview yesterday in opening

9    statement.

10          At the time of -- this is what he told Ms. Wright

11   and Mr. Atkins on August 2nd, 2017.  And that's within days

12   of the civil lawsuit being filed in this case.  Hannah

13   said -- remember, he's the jail administrator, the number one

14   man then and now.  I wrote this down as carefully as I could

15   from the recording.  Quote (as read):

16              At the time of the incident -- meaning the

17              Norris incident -- we didn't have much of a policy

18              on Tasers, close quote.

19          "There was a five-second rule on prongs."  That's

20   another quote.

21          And again, prongs is not at work in this case;

22   this is a drive stun case.

23          THE COURT:  As I -- I read it quickly, and you

24   need to read it as well.  It looks like the Government's

25   saying it's hearsay from Mr. Hannah.

1          MR. STRIANSE:  How could it be hearsay from

2     Mr. Hannah?  He's the man that makes the policy.

3          THE COURT:  Well, it's an out-of-court statement

4     by Mr. Hannah being offered for the truth.

5          MR. STRIANSE:  Well, Mr. Hannah is going to

6     testify.  He's on the Government's list, and if they don't

7     call him, I'm going to call him.

8          THE COURT:  Okay.

9          MR. STRIANSE:  So it's our theory of defense --

10    and this is one of the central issues in the case -- that

11    Mr. Bryant was acting within the policy as it existed on

12    November 5, 2016.  It goes to the essential element of

13    willfulness in this case.  We are entitled to present a

14    complete defense, that this was not a gratuitous or excessive

15    use of the Taser under the then-existing policy.

16         THE COURT:  All right.  Well, let's get the jury

17    in, and we'll take another break before your

18    cross-examination.

19         You're not going to get into it, so we can at

20    least complete the direct.

21         MR. SONGER:  Certainly, Your Honor.

22         THE COURT:  So bring in the jury.

23         (Jury present.)

24         THE COURT:  Let's get the witness.

25         All right.  Be seated.

```
 1                    JOSH MARRIOTT,
 2   called as a witness by Government, was previously sworn and
 3   testified as follows:
 4
 5          THE COURT:  All right.  I remind you you're still
 6   under oath.
 7          Good morning.  We're going to continue with the
 8   direct examination of this witness.
 9
10              (CONTINUED) DIRECT EXAMINATION
11   BY MR. SONGER:
12   Q.   Good morning, Officer Marriott.
13   A.   Good morning.
14   Q.   Yesterday, when you were here yesterday afternoon, we
15   talked some about how a Taser can be used and the two
16   different modes it can be used in.
17          Do you remember that?
18   A.   Yes.
19   Q.   That's the prong mode and the drive stun mode?
20   A.   (Witness moves head up and down.)
21   Q.   Of those two, which mode was more common for officers to
22   use inside the Cheatham County jail?
23   A.   It's more common to use the drive stun inside the jail.
24   Q.   And we also talked a good bit about the standards for
25   when officers could use a Taser inside the jail.
```

1           Do you remember that?

2    A.    Yes.

3    Q.    Not using for more than three five-second bursts; is

4    that right?

5    A.    Yes.

6    Q.    Okay.  And do those standards that you talked about

7    apply to the Taser in drive stun mode?

8    A.    Yes.

9    Q.    All right.  Now, we also, when we left off yesterday, we

10   were, I think, starting to talk about the types of

11   surveillance cameras that are inside the jail to record what

12   happens?

13   A.    Yes.

14   Q.    And you were talking about those cameras, and could you

15   tell us, what is the perspective of the surveillance cameras

16   that are there?  Are they at eye level?  Are they overhead?

17   A.    Overhead.

18   Q.    And are there also cameras that are on Tasers that

19   officers carry?

20   A.    Yes.

21   Q.    Could you describe those for us?

22   A.    So on the underneath of the Taser, on the handle of the

23   Taser, there's a camera that shines out.  And I believe as

24   soon as you turn the switch on for the Taser, the camera will

25   start rolling.

1   Q.   And what direction is the camera facing?

2   A.   Whatever way the Taser's pointing.

3   Q.   And does the Taser camera also record audio when it's

4   turned on?

5   A.   It should, yes.

6   Q.   Now, do you know whether -- well, let me back up.

7             We were talking about November 5th, 2016.

8             Do you remember that?

9   A.   Yes.

10   Q.   And do you remember an incident with Mr. Norris that

11   night?

12   A.   I do.

13   Q.   And I think we talked about how he had been moved out of

14   the cell and placed into a restraint chair?

15   A.   We did.

16   Q.   Were those events captured by the surveillance cameras

17   and the Taser cameras?

18   A.   Yes.

19   Q.   All right.  Have you reviewed those videos?

20   A.   Yes, I have.

21   Q.   Okay.  Would you turn, please, in the exhibit book

22   that's in front of you to Tab Number 10.

23             Can you tell us what's there?

24   A.   There's a CD -- or a DVD, I should say.

25   Q.   Do you know what it's a DVD of?

1  A.   The video of the incident.

2  Q.   And how do you know that's what it is?

3  A.   I've watched this video.  My initials are on the CD

4  itself.

5  Q.   All right.  Now, is that DVD that you watched a fair and

6  accurate depiction of the events with Mr. Norris around 8:00

7  of November 5th, 2016?

8  A.   Yes, sir.

9          MR. SONGER:  Your Honor, the Government moves to

10  admit Exhibit 10.

11          MR. STRIANSE:  No objection.

12          THE COURT:  Admitted.

13          (Whereupon Plaintiff Exhibit 10 was marked for

14          identification and received in evidence.)

15          MR. SONGER:  And may we publish it to the jury?

16          THE COURT:  Yes.

17          MR. SONGER:  Ms. Hughes, will you please play the

18  clip starting at 2 minutes and 38 seconds to 3:03.

19          (Video played.)

20          MR. STRIANSE:  Your Honor, may we approach one

21  moment?

22          THE COURT:  Sure.

23          (Bench conference outside the hearing of the

24          jury.)

25          MR. STRIANSE:  Obviously, I can't tell the

1   Government how to try their case, but this is not in
2   chronological order.  And I think it is unfairly prejudicial
3   to Mr. Bryant.  They should start with the incident outside
4   of Cell 4 that precipitated this man getting in the restraint
5   chair.
6           MR. SONGER:  Your Honor, we did start with that.
7   We spent a good amount of time yesterday talking through how
8   he was removed from the cell and what officers did and how he
9   was placed into the cell, and now we're -- or into the chair,
10  excuse me --
11          THE COURT:  And that was on the video?
12          MR. SONGER:  And now we're ready to show what
13  happened when he got into the chair.
14          THE COURT:  But the first part is on the video
15  too.
16          MR. SONGER:  It is.  This officer was not present
17  for all of that incident.  We're actually planning to show
18  that part of the video with an officer who was present for
19  the whole thing.
20          THE REPORTER:  Can you slow down, please?
21          MR. SONGER:  Certainly.  I apologize.  Fast
22  talker.
23          THE COURT:  I'm going to let them present it, and
24  now that it's in evidence, you can certainly show it from
25  beginning to end.  But no, we're not going to just show it

1   multiple times.  At some point, enough is enough.  I know

2   sometimes parties want to show it, like, five or ten times.

3   We're not going to go that far.

4            MR. SONGER:  We're certainly not planning to do

5   that.

6            THE COURT:  I'll let them present it and you

7   can --

8            MR. STRIANSE:  Well, my concern is I'm concerned

9   about the timing of it, that they're showing something that

10  really has no contextual background, and it's unfairly

11  prejudicial to Mr. Bryant.

12           THE COURT:  I'm going to overrule that.  I think

13  he -- at least his opening question was he started 2 minutes

14  and something.  So that would tell the jury it's not at the

15  beginning of it.  But you can certainly bring that out too.

16           MR. STRIANSE:  I'm not sure they know that.

17           THE COURT:  Well, he said, "We'll start it at 2

18  minutes."  So --

19           MR. STRIANSE:  No, no.  He said the clip was two

20  minutes in length.

21           THE COURT:  Oh.

22           MR. SONGER:  I said, "Let's start at 2 minutes and

23  38 seconds into the video."

24           THE COURT:  Yeah.  That's what I heard.

25           MR. STRIANSE:  Well, I missed it.  I'm sure they

```
 1  missed it.
 2          THE COURT:  Yeah.  Well, you can bring it out on
 3  cross.
 4          MR. STRIANSE:  Would the Court instruct the jury
 5  that this is not the beginning of --
 6          THE COURT:  Yeah, I'm going to let them present
 7  it.  I'm going to let you do it as well.
 8          MR. STRIANSE:  Okay.
 9          THE COURT:  But while we're here, let's not be
10  late.  You know, the jury went out of its way to be here at
11  8:30, or really before 8:30.  They probably got here at 8:15.
12  You know, you can't come into court at 8:29 and think we're
13  going to wait ten minutes while y'all get it together.  So be
14  here ahead of time, not at 8:30.  There may be things I want
15  to talk about.
16          MR. SONGER:  Yes.
17          THE COURT:  Is that clear?
18          MS. MYERS:  That's very clear.
19          THE COURT:  All right.  Thank you.
20          MR. STRIANSE:  Thank you.
21          THE COURT:  Okay.  Let's proceed.
22          (Jury present.)
23  BY MR. SONGER:
24  Q.   Okay.  Officer Marriott, could you set the scene for us
25  here and tell us who the people that we can see in this shot
```

1    are?

2            And first, who is the individual in the black

3    shirt in the middle?

4    A.    That would be Jordan Norris.

5    Q.    Okay.  And what is Mr. Norris in?

6    A.    He's in a restraint chair.

7    Q.    Okay.  All right.

8            And who is the individual standing behind

9    Mr. Norris holding his head?

10    A.    That would be me.

11    Q.    And who is the individual to the left side of the scene

12    who is kneeling down?

13    A.    Jeff Key.

14    Q.    All right.  And who is kneeling right in front of

15    Jordan?

16    A.    Mark Bryant.

17    Q.    And we can see part of another person on the right side

18    of the screen.

19            Do you know who that is?

20    A.    Caitlin Johnson.

21    Q.    And are all -- all four of you who are in the green

22    shirts officers in the Cheatham County jail?

23    A.    Yes, sir.

24    Q.    And what's happening right now?

25    A.    Mr. Norris had gotten his arm out of the -- the right

1  arm out of the restraint of the chair.  And Jeff Key, Mark,

2  and myself are trying to -- well, Jeff and Mark are trying to

3  get his arm back in the restraint, and I'm holding his head

4  because he was thrashing around and trying to head butt Jeff

5  and Mark.

6  Q.    Okay.  And we started this video 2 minutes and 38

7  seconds, sort of into -- into it from the beginning of the

8  video.

9          Do you know what had been happening in the couple

10  minutes before this?

11  A.    A couple minutes, like, before?

12  Q.    Like, say for the previous five minutes, what had been

13  happening?

14  A.    I mean, he was put in the chair, you know.  He would --

15  been calm at points in time, and then he started to, like I

16  said, be combative again.  And he got his arm out of the

17  restraint, and that's when we came over to get his arm back

18  in the restraint.

19  Q.    Okay.  And this group of officers had been working to

20  get his one arm back into the restraint?

21  A.    Yes, sir.

22  Q.    Okay.  And is his arm all the way out of the restraint

23  or is it just loose?

24  A.    It was at one time, yes.

25  Q.    All right.  And can you -- the officer that's on the

1  right side of the screen, can you tell what -- what that

2  officer is holding?

3  A.    Are you talking about Caitlin?

4  Q.    Caitlin, yes.

5  A.    She had a Taser in her hand.

6  Q.    All right.  And what she's doing with it?

7  A.    Fixing to hand it to -- to Mark.

8  Q.    To Mark Bryant, the defendant?

9  A.    Yes.  Yes.

10 Q.    Do you know why she's bringing a Taser to the defendant?

11 A.    I believe Mark asked if he could get the Taser.

12 Q.    Now, again, can you sort of set the scene for us?  Where

13 is this taking place?

14 A.    In the booking room.

15 Q.    Is that inside the jail?

16 A.    Yes.  That's where all the intakes come in off the

17 street.  That's where they get -- their charges.  That's

18 where we do the processing of the inmates.

19 Q.    Is this a secure area inside the jail?

20 A.    Yes.

21 Q.    So inmates who are into this area, have they already

22 been booked in and searched?

23 A.    Yes.  Booked in and searched, yes.

24 Q.    And had Jordan been booked in and searched?

25 A.    Yes.

1  Q.   Did you have any reason to think that Jordan could be
2  armed?
3  A.   He was -- I mean, he was searched.  I didn't search him
4  personally, but he was searched.  I would assume that he was
5  unarmed.
6  Q.   Did you ever see any weapons on him?
7  A.   I never did, no.
8  Q.   All right.  Now, we can't see his feet very well, but do
9  you know, does he have any restraints over his feet?
10 A.   He should, yes.
11 Q.   What kind of restraints are those?
12 A.   They go around the ankle.  It's a Velcro tie that you
13 put around either the wrist or the ankle, and then it has a
14 strap that you cinch down to tighten over the Velcro.
15 Q.   And with those restraints in place now, can he kick
16 anyone?
17 A.   No, sir.
18 Q.   And where is his left arm and his left hand?
19 A.   It's in the restraint as well.
20 Q.   Okay.  Is there actually a restraint that's holding his
21 left hand in?
22 A.   There is.
23 Q.   And does he have straps over his shoulders?
24 A.   They're supposed to be over his shoulders, like over the
25 top.  And he had kind of wiggled out to where they come down

1  to the side.  But yes, they're -- they're -- he's secured in

2  there.

3  Q.   He's secured to the straps over maybe his upper arms

4  now?

5  A.   Yes.

6  Q.   And is there something on his head?

7  A.   Yeah, there's a spit mask.

8  Q.   All right.  Do you know how the spit mask got there?

9  A.   Jeff Key put it on.

10 Q.   Okay.  And we talked a little bit about that yesterday.

11 A.   Yes.

12 Q.   So is the mask on all the way over his head?

13 A.   It is.

14 Q.   Is he able to spit on officers in this posture?

15 A.   Not easily anyway.  So, no.

16 Q.   And you're the officer that's holding his head?

17 A.   That is correct.

18 Q.   What are you doing with your fingers?

19 A.   There's pressure points underneath the jawline, and I'm

20 applying pressure to those pressure points so he can't thrash

21 his head around.

22 Q.   With you holding his head like that, is he able to head

23 butt anyone?

24 A.   He is not.

25 Q.   Okay.  And now tell us what's happening with Jordan's

1  right arm right now.

2  A.   They are trying to put it back into the restraint.

3  Q.   All right.  Is Officer Key holding it?

4  A.   Yes.

5  Q.   Does Officer Key have both hands on his right arm?

6  A.   It appears so.

7  Q.   Is Officer Bryant also working with his arm?

8  A.   He is.  Yes.

9  Q.   And how big is Officer Key?

10 A.   Officer Key, 6 foot, 230 pounds maybe, something like

11 that.

12 Q.   Bigger than Jordan?

13 A.   Yes.

14 Q.   With Officer Key and Officer Bryant holding Jordan's

15 arm, is he able to hit anyone?

16 A.   Not at that particular moment, no.

17 Q.   So, in this posture, is Jordan posing a threat that

18 justifies tasing him?

19         MR. STRIANSE:  Objection.  It's going to be for

20 the jury to decide.

21 BY MR. SONGER:

22 Q.   Well, you were there.

23         Based on your training and experience, did you see

24 any threat that justified using a Taser?

25         MR. STRIANSE:  Judge, my objection is -- is on the

1  floor.

2        THE COURT:  Why don't you rephrase.  I thought he

3  had rephrased the question from your previous objection.

4        Go ahead.

5        MR. SONGER:  Certainly.

6  Q.   You testified earlier that officers were trained to use

7  a Taser only when they are confronted with a threat; is that

8  right?

9  A.   Yes.

10 Q.   And then they should only use a Taser for as long as

11 necessary to stop the threat; is that right?

12 A.   Yes.

13 Q.   So as an officer standing in this situation, did you see

14 a threat that justified using a Taser?

15 A.   No, sir.

16 Q.   All right.  Ms. Hughes, will you please play the next

17 minute and a half of the video.

18        (Video played.)

19 BY MR. SONGER:

20 Q.   Does you hear a clicking sound in that video?

21 A.   I did.

22 Q.   What does that sound mean?

23 A.   It's the Taser running.

24 Q.   That means the Taser's going?

25 A.   Uh-huh.

1  Q.    And which officer was tasing him?

2  A.    Officer Mark Bryant.

3  Q.    And what mode was he using the Taser in?

4  A.    That would be the drive stun mode.

5  Q.    How many different times did the defendant tase Jordan

6  in that video?

7  A.    I believe it was four or five.

8  Q.    And how long did those tases last?

9  A.    The first couple for five seconds, and I'm not sure of

10 the exact count on the last one.

11 Q.    How long did the longest one seem to you?

12 A.    Twenty seconds, roughly.

13 Q.    Were those tases based on -- consistent with the

14 training that you were given?

15 A.    No, sir.

16 Q.    I'm sorry?

17 A.    No, sir.

18 Q.    And why not?

19 A.    He exceeded the three times five-second bursts.

20 Q.    Now, what was Defendant Bryant's rank on this night?

21 A.    He was my corporal at the time.

22 Q.    Was he your supervisor that night?

23 A.    He was.

24 Q.    And did you try to stop him while he was going on for 20

25 seconds with that Taser?

1    A.    I did not.  But at the time I was control, you know, the

2    head.  I didn't count, you know, how long the Taser was

3    running.  It happened quickly.  So I did not say anything.

4    Q.    Thinking back about it now, do you wish you had done

5    anything differently?

6    A.    If I could have, yes.

7    Q.    And why is that?

8    A.    Because it was -- you know, it's -- it's a bad situation

9    on both ends.

10   Q.    Did you hear Defendant Bryant make any comments while he

11   was tasing Jordan this four times for repeated amount of

12   time?

13   A.    The one that I recall is "Do this until the batteries

14   run out."

15   Q.    That he would do this until the batteries run out?

16   A.    Yes, sir.

17   Q.    You heard him say that to Jordan?

18   A.    Yes.

19   Q.    Did you hear Defendant Bryant say, "You don't like this,

20   do you?"

21   A.    Yes, in the video.  But I don't recall him saying that,

22   you know, from being there.  But from the video, yes.

23   Q.    It sound like his voice on the video?

24   A.    Yes.

25   Q.    Now, based on your training and experience and just your

1  common sense, like, are those comments appropriate?

2  A.    No, sir.

3  Q.    Why not?

4  A.    Unprofessional, I guess you could say.

5  Q.    Okay.  Now, after this incident was finished with, did

6  you talk to Defendant Bryant about it?

7  A.    We -- we've had several conversations about this and

8  that, you know, about this particular incident and so on and

9  so forth.

10 Q.    What did he say when he talked to you about this?

11 A.    He was concerned.

12 Q.    Why was he concerned?

13 A.    Maybe he, you know, had went too far on it.  And I know

14 that he went to speak with the jail administration and. . .

15 Q.    Was -- okay.  And I just want to be clear.  I'm not

16 asking you, you know, about what jail administration said,

17 just what Mark Bryant said to you.

18 A.    Right.  But, like I said, he said he was going to go

19 talk to the administration.

20 Q.    And why was he going to talk to jail administration?

21 A.    Because he was concerned.

22 Q.    He was afraid he was going to get in trouble?

23 A.    Potentially, yes.

24 Q.    And that's because he thought he went too long?

25 A.    Potentially, yes.

1  Q.    That's what he said to you?

2  A.    Yes.

3  Q.    Okay.  All right.

4         Officer Marriott, I would like to step back now

5  for a minute.

6         When you were here yesterday, do you remember us

7  talking about an hour or so earlier than this, when officers

8  had to take Jordan out of his cell?

9  A.    Yes.

10 Q.    So, thinking back about that, did you submit a -- well,

11 let me ask first, did you use any physical force on Jordan

12 during that process?

13 A.    I mean, just restraints to try to get him, you know, in

14 cuffs.

15 Q.    And did you personally, like, use your hands to help him

16 get in those restraints?

17 A.    I mean, like I said, just to hold and try to put him in

18 cuffs, yes.

19 Q.    So did you file any incident reports or use of force

20 reports related to --

21 A.    I did.

22 Q.    -- your involvement?

23 A.    I did an incident report.

24 Q.    Would you look, please, at Tab Number 18 in that exhibit

25 binder?

1  A.    Did you say 18?

2  Q.    18, yes.

3        Do you recognize that?

4  A.    I do.

5  Q.    And what is it?

6  A.    It is an incident report.

7  Q.    Whose incident report is it?

8  A.    As far as -- mine.  It's my report, the one that I

9  wrote.

10  Q.    Okay.  Is it the one you wrote for November 5th, 2016,

11  at around 7:00 p.m.?

12  A.    Yes.

13  Q.    And does it appear to be an accurate version of the

14  incident report that you wrote that night?

15  A.    It does.

16        MR. SONGER:  The Government would move to admit

17  Exhibit 18.

18        MR. STRIANSE:  No objection.

19        THE COURT:  Admitted.

20        (Whereupon Plaintiff Exhibit 18 was marked for

21        identification and received in evidence.)

22        MR. SONGER:  May we publish it for the jury?

23        THE COURT:  Yes.

24  BY MR. SONGER:

25  Q.    Can you zoom in a little at the top?  Okay.  Thanks.

1    Officer Marriott, if you look first, what's the
2 time that you wrote on that report?
3 A.   1855.
4 Q.   That's 6:55 p.m.?
5 A.   It is.
6 Q.   Is that the time that you and other officers took Jordan
7 out of his cell?
8 A.   It is.
9 Q.   And what does the report describe happening?
10 A.   About when we extracted him out of the cell.
11 Q.   Okay.  Is the report accurate, to the best of your
12 recollection?
13 A.   It is.
14 Q.   Okay.  Now, if you would, please, if you'd start six
15 lines down.  Near the end of that line, could you read
16 starting with the sentence that starts Daniel Bratton?
17 A.   (As read):
18          Daniel Bratton came over, put the Taser to his
19          back, and warned him to stop resisting.
20 Q.   I'm sorry.  Could you keep going?
21 A.   Yes.  (As read):
22          Norris still did not comply.  Bratton drive
23          stunned him with the Taser.  We took him to the
24          restraint chair and started to buckle him in the
25          restraint chair -- or the chair, and he kept

```
 1              resisting.  Bratton stunned him with the Taser
 2              again.  We got him put into the restraint chair.
 3              He stopped resisting and he complied as we put him
 4              in the chair.
 5   Q.    So the report says that Daniel Bratton used his Taser
 6   while taking Jordan out of his cell around 7:00 p.m., right?
 7   Is that what happened based on your memory?
 8   A.    Yes.
 9   Q.    And does the report say that Defendant Bryant used his
10   Taser at 7:00 when officers were taking Jordan out of his
11   cell?
12   A.    It does not.
13   Q.    Did it say Defendant Bryant use his Taser at 7:00 when
14   officers were taking Jordan out of the cell?
15   A.    Not to my recollection, no.
16   Q.    Okay.  And, Cassidy, if we could zoom back out a little
17   bit.
18              There are two signatures at the bottom of the
19   report, right?
20   A.    There is.
21   Q.    The officer's signature and the supervisor's signature?
22   A.    There is.
23   Q.    Do you know whose signatures those are?
24   A.    The officer's signature is mine and the supervisor is
25   Cpl. Mark Bryant.
```

Q.    So what does that mean, that Mark Bryant signed this
report?
A.    He's -- he was the supervisor; so he checks over reports
and makes sure they're, you know, okay.
Q.    Looks at it and makes sure it's accurate and signs off?
A.    Right.
Q.    Okay.  Let's -- let's turn now to an hour later, the
8:00 incident, the one we just watched the video for.
            Now, did you, yourself, use some type of force
during that incident?
A.    I did.
Q.    What type of force did you use?
A.    Pressure points.
Q.    Using that type of pressure point force under the
policy, would that require you to file a report?
A.    It would.
Q.    Now, did you file a report about the 8:00 incident and
explaining what you did?
A.    I did not.
Q.    Why not?
A.    Mark said that he would take care of the report.
Q.    Would you have filed a report if Defendant Bryant had
not come to you and told you not to?
A.    I would have.
Q.    Okay.  And did Defendant Bryant tell you why you

1  shouldn't file a report?

2  A.    He just said he would take care of it.

3  Q.    He would take care of it?

4  A.    Yes.

5  Q.    Would you turn, please, to Tab 19.  It should be the

6  next one.

7           Do you recognize that document?

8  A.    From times that we had talked before, yes.

9  Q.    Does it appear to be an incident report from the jail?

10 A.    It is.

11 Q.    And what officer's name is on the top of the report?

12 A.    Bryant.

13 Q.    Are you listed as one of the officers involved?

14 A.    I am.

15 Q.    Okay.  And is that report signed, too?

16 A.    It is.

17 Q.    Who signed it?

18 A.    Cpl. Mark Bryant.

19 Q.    Does it look like the same signature that was on your

20 report?

21 A.    Yes.

22           MR. SONGER:  The Government would move Exhibit 19

23 into evidence.

24           THE WITNESS:  No objection.

25           THE COURT:  Admitted.

```
 1              (Whereupon Plaintiff Exhibit 19 was marked for
 2              identification and received in evidence.)
 3              MR. SONGER:  And may we publish it for the jury?
 4              THE COURT:  Yes.
 5              MR. SONGER:  Thank you.
 6  Q.   Okay.  Again, if you would look, please, first up at the
 7  top.
 8              What time did Officer Bryant write on this report?
 9  A.   1855.
10  Q.   So that's the same time as the report we just looked at
11  for you, right?
12  A.   Yes.
13  Q.   That's the time when you and other officers took Jordan
14  out of his cell?
15  A.   Yes.
16  Q.   We just talked about that Defendant Bryant didn't tase
17  anyone then, right?
18  A.   Right.
19  Q.   Okay.  If you would please go down nine lines.
20              See -- see the line that starts "Marriott
21  arrived"?
22  A.   Yes.
23  Q.   Could you start reading there for us, please?
24  A.   "So we forced" -- is that where you want me to start?
25  Q.   Yeah.  "Marriott arrived," and then after that.
```

1  A.   Okay.  (As read):
2            FTO Marriott arrived.  We forced him to comply
3            with joint locks and drive stun Taser applied by
4            Deputy Bratton upon his arrival --
5            THE COURT:  Not so fast.
6            THE WITNESS:  Sorry.  Let me find where --
7  BY MR. SONGER:
8  Q.   Just pick up there.  "We then placed him"?
9  A.   (As read):
10           We then placed him in the restraint chair with
11           handcuffs still applied.  Inmate Norris resisted
12           pressure points, and additional drive stun Taser
13           applications were utilized to achieve compliance.
14           Deputy Bratton and I tased; Deputy Key and FTO
15           Marriott applied pressure points techniques.
16           After approximately 15 minutes in the chair, I
17           moved his hands to soft restraints.
18  Q.   Okay.
19  A.   (As read):
20           Inmate Norris then stated that he wanted to
21           hurt others and hurt himself.  Mobile crisis and
22           Nurse Joshua were notified.  Mobile crisis arrived
23           at 2122.
24  Q.   Thank you.  So Defendant Bryant's report says, "Deputy
25  Bratton and I tased at 7:00," right?

```
1    A.    Yes.
2    Q.    Is that accurate?
3    A.    Not for that particular extraction of the cell, no, it's
4    not.
5    Q.    Did Defendant Bryant tase Jordan at the same time that
6    Officer Bratton did?
7    A.    No, he did not.
8              MR. STRIANSE:  Your Honor, I object to this.  This
9    is really misleading to the jury.  It starts 1855.  You see
10   the 2122.  This is a continuing narrative, and I think it's
11   misleading to characterize it that way.
12             THE COURT:  All right.  Overruled.
13             Go ahead.
14   BY MR. SONGER:
15   Q.    Was there any point that night when Defendant Bryant and
16   Deputy Bratton tased Jordan at the same time?
17   A.    Not at the same time, no.
18   Q.    Okay.  And what time did Defendant Bryant tase Jordan?
19   A.    I think it was roughly 8:00, right?
20   Q.    So about an hour after --
21   A.    Yes, sir.
22   Q.    Now, does this report say how many times Defendant
23   Bryant tased Jordan at 8:00?
24   A.    It does not.
25   Q.    Does it say how long those tases lasted?
```

```
1   A.    It does not.
2   Q.    Does it give any information about the tases that
3   Defendant Bryant actually did?
4   A.    Other than stating that he tased him, no.
5   Q.    Does it say what the justification was for each of the
6   different tases?
7   A.    It does not.
8   Q.    So, based on what you saw that night, is this report an
9   accurate picture of what happened?
10              MR. STRIANSE:  Objection.  He didn't write the
11  report.
12              THE COURT:  Go ahead.  Respond.
13              MR. SONGER:  Your Honor, I think it's still asking
14  him whether he was present and he observed it, so whether
15  this is an accurate description of what he saw.
16              THE COURT:  He can testify on his personal
17  knowledge.  Overruled.
18              THE WITNESS:  So what was the question again?  I'm
19  sorry.
20  BY MR. SONGER:
21  Q.    Sure.  Based on what you saw that night, is this report
22  an accurate description of what happened?
23  A.    Not completely, no.
24  Q.    Okay.  And I think you said when we first started
25  talking yesterday that you had been working at the jail -- at
```

1  the Cheatham County sheriff's office, either in the jail or
2  on patrol since fall of 2015; is that right?
3  A.   It is.
4  Q.   In your entire career there, what's the longest you've
5  ever seen anyone use a Taser for other than this night?
6  A.   The longest that I've seen other that this night, maybe
7  ten seconds at the most, maybe.
8  Q.   And were those -- is that ten seconds of once or, like,
9  two five-second stuns?
10 A.   Be two five-second stuns.
11 Q.   So you had never seen anyone use a Taser ever for more
12 than five seconds at a time?
13 A.   Correct.
14 Q.   And never seen anyone use a Taser more than twice, more
15 than two five-second cycles?
16 A.   Correct.
17 Q.   And that's your entire career at the jail?
18 A.   Yes.
19 Q.   Except for this night?
20 A.   Correct.
21          MR. SONGER:  Nothing further at this time.
22          THE COURT:  All right.  Okay.  Do you all want to
23 approach before you start.
24          (Bench conference outside the hearing of the
25           jury.)

1       THE COURT:  Have you had a chance to look at this?

2  Do we need to -- I gather you're going to get into it on your

3  cross?  Or not?

4       MR. STRIANSE:  I will.

5       THE COURT:  Okay.  You haven't read it.

6       MR. STRIANSE:  I assume it's -- it doesn't want me

7  to get into the fact that there was a civil lawsuit.

8       THE COURT:  No.  No.  This has to do with Hannah's

9  testimony being hearsay.

10      MR. SONGER:  Your Honor, if I could, just to be

11  clear, I think I can narrow the issues for us a little bit

12  here.

13      We have no objection to any questions about

14  training or guidance that was given to Defendant Bryant prior

15  to the time that he tased.  So whether it was JJ Hannah or

16  any other witness wants to say, "I trained Defendant Bryant

17  prior to this incident," told him something that's relevant

18  to his state of mind, we certainly recognize that.

19      What we think is inappropriate is for any after-

20  the-fact determinations, after-the-fact investigations,

21  anything that was said to him after the fact.

22      And that was our concern from the opening

23  statement yesterday, is defense counsel said that after the

24  fact, Lt. Hannah, who was in charge of the jail, told

25  Defendant Bryant that his tases were okay.  And that is not

1  relevant to his state of mind.

2          THE COURT:  You're objecting on that on what

3  basis?

4          MR. SONGER:  On the basis of relevance, also on

5  the basis of Rule 701.  It would be improper lay opinion

6  testimony for someone to give an after-the-fact

7  investigation.  There's --

8          MR. STRIANSE:  I'm not going to be asking this man

9  about JJ Hannah's internal investigation --

10          THE COURT:  Okay.

11          MR. STRIANSE:  -- and JJ Hannah's conclusion.  But

12  if Mr. Hannah testifies either for the Government or I call

13  him, I think it's very appropriate for him to say that it was

14  consistent with the policy that existed at the time.

15          MR. SONGER:  He has no personal knowledge and he's

16  not an expert witness.

17          THE COURT:  Well, it sounds like we're not going

18  to get to that issue now.

19          MR. SONGER:  As long as -- sorry, Your Honor.

20          THE COURT:  Go ahead.

21          MR. SONGER:  Yeah.  I don't think we have an issue

22  now, as long as you're not planning to ask any questions to

23  this witness about what happened after the fact, what anyone

24  at the jail came and told him after the fact.

25          THE COURT:  That's what I understood Mr. Strianse

1  to say.

2          MR. STRIANSE:  I certainly am not going to elicit

3  hearsay testimony from Mr. Hannah.

4          THE COURT:  We'll get there on Mr. Hannah.  I do

5  think it's relevant.  I think it's relevant to what the

6  jailer who's in charge of the jail has to say about this

7  incident.  If it was properly done or if it was not properly

8  done, the jailer who runs the jail would have knowledge that

9  would be helpful to the jury.  But I don't think you're at

10  that point.  We can get there later on.  I think Hannah --

11  okay.

12          Let's go with cross then.

13          MR. STRIANSE:  Thank you, Judge.

14          THE COURT:  Thanks.

15          (Jury present.)

16          THE COURT:  All right.  We'll have cross now.

17          MR. STRIANSE:  Thank you, Judge.

18

19                      CROSS-EXAMINATION

20  BY MR. STRIANSE:

21  Q.    Good morning, Mr. Marriott.

22  A.    Good morning, sir.

23  Q.    You had been working in the jail since the fall of 2015;

24  is that right?

25  A.    That is correct.

1  Q.    And do you remember being interviewed in connection with
2  this investigation in August of 2017?
3  A.    Yes.
4  Q.    And that would have been probably within five days or
5  so --
6              THE COURT:  Now, you need to put your --
7              MR. STRIANSE:  Forgive me, Judge.
8              THE COURT:  Yeah.
9  BY MR. STRIANSE:
10 Q.    That would have been within about five days or so of you
11 receiving a notice that you were placed on administrative
12 leave; is that right?
13 A.    Yes, sir.
14 Q.    And do you remember being interviewed by Special Agent
15 Shawn Atkins of the TBI?
16 A.    I do.
17 Q.    And I think he was accompanied by Ms. Wright of the FBI;
18 is that right?
19 A.    That is correct.
20 Q.    And do you remember telling them that Jordan Norris was
21 probably the most difficult individual that you had ever
22 dealt with in your career at the jail in Cheatham County?
23 A.    I do.
24 Q.    I think you told them that he was -- meaning no
25 disrespect -- acting very crazy are that night; is that

1  right?

2  A.    He was.

3  Q.    I think you told them that, having worked in the jail,

4  you got to see a lot of people that were under the influence

5  of drugs and alcohol; is that right?

6  A.    That is correct.

7  Q.    And you had never seen anybody as impaired as Jordan

8  Norris was that night; is that correct?

9  A.    What he appeared to be, yes.

10 Q.    Okay.  And I think you said it was either drugs or some

11 sort of a mental breakdown, may have been the words that you

12 used?

13 A.    Yes, sir.

14 Q.    Is that right?

15 A.    I believe so.  Yes.

16 Q.    Okay.  Now, you also in that interview -- and again,

17 this is five days or so after you received that notice that

18 you were going to be placed on administrative leave -- that

19 you said that "Everything we did that night was necessary";

20 is that right?

21 A.    To get him restrained and in the chair, yes, it was.

22 Q.    Okay.  Now, you're back working full time; is that

23 right?

24 A.    That is correct.

25 Q.    And you've been elevated to the position of a road

1  deputy; is that correct?

2  A.  That is correct.

3  Q.  When did you get that promotion up to road deputy?

4  A.  November 2018.

5  Q.  Yesterday you told the jury that you -- after this

6  incident that you stopped carrying a Taser; is that right?

7  A.  That is correct.

8  Q.  Now, you worked from November 5, 2016, up until around

9  July the 28th of 2017; is that right?

10 A.  That is correct.

11 Q.  And that's when you got that administrative notice that

12 you were placed on leave?

13 A.  That is correct.

14 Q.  Now, during that nine-month period of time, you

15 continued to carry your Taser at work; is that right?

16 A.  That is correct.

17 Q.  It was only after you returned to work at a much later

18 date that you were not carrying a Taser --

19 A.  Right.

20 Q.  -- correct?

21        You told the jury a few minutes ago that you felt

22 like the conduct of Mark Bryant on November 5th, 2016, at

23 around 8:00 was outside of the policy; is that right?

24 A.  Yes, sir.

25 Q.  Now, you get your letter in July of 2017.

1           Over that nine-month period, did you ever go up to
2   the second floor and knock on JJ Hannah's door and say that
3   you were troubled by this incident and what Mark Bryant had
4   done was outside of the policy?
5   A.   I never talked to JJ Hannah, no.
6   Q.   Did you ever stop Sheriff Breedlove in the hallway and
7   say, "I've got to get something off my chest.  What Mark
8   Bryant did on November 5, 2016, was just wrong"?
9   A.   I never did, no.
10  Q.   How about David Isherwood up on the second floor?  Did
11  you ever knock on his door?
12  A.   Never did.
13  Q.   And then, within days of being placed on administrative
14  leave, you told these investigators everything you all did
15  was correct and right?
16          MR. SONGER:  Object -- objection.
17  Mischaracterizes the underlying interview that he's
18  referencing and what the witness said earlier today.
19          THE COURT:  Overruled.  You can reask --
20  BY MR. STRIANSE:
21  Q.   You said it was necessary?
22  A.   There was -- I mean, he was uncontrollable.
23  Q.   You were asked about this "draining the batteries"
24  comment?
25  A.   I was.

Q.   Do you remember being interviewed and telling the
investigators that you thought that that comment was really
taken out of context?

A.   I believe it was.  Jordan Norris, you know, in the video
was -- I mean, it's hard to understand in this particular
video, but he was screaming, you know, "Tase me," you know,
"Tase me," you know.  He was -- he was saying some other
vulgar things as well.

        And what Mark Bryant said was taken out of context
in a sense, like, you know, which we talked about the news,
you know, and how the news portrayed it to be -- and that's
what I was describing, is how they -- you know, use that as
their headline, is -- how that was out of context.

Q.   And the way I think you described it was, "Hey,
Mr. Norris, if you're not going to comply, we've got plenty
of batteries.  We can continue to do this"?

A.   And that's how -- that's how it was -- that's how it was
said.  Yes.

Q.   And Mark Bryant is not that kind of a guy.

        He's not a malicious person, is he?

A.   He is not.

Q.   And Mark Bryant is the kind of person that had the
reputation in the jail of trying to talk to an inmate --

A.   Absolutely.

Q.   -- is that right?

1    A.    Absolutely.

2    Q.    And trying to talk the inmate down?

3    A.    Absolutely.

4    Q.    This not somebody that would immediately go to some

5    gratuitous act of violence?

6    A.    Absolutely.

7                THE COURT:  Let the lawyers approach, please.

8                (Bench conference outside the hearing of the

9                jury.)

10               THE COURT:  I want to make sure I was clear,

11   because twice now it's been said.  They can -- if you all

12   want to present evidence of the vulgar language that was

13   used, I'm not saying you can't do that.  I'm just saying we

14   don't need to repeat it.

15               So if that's something you all want to do, I'm not

16   precluding the use of vulgar language here that sometimes

17   needs to be said to paint the full picture of what occurred.

18   So I want to make sure I was clear on that.  I'm not

19   precluding, prohibiting you from doing that.

20               But once it's out there, all I'm saying is just we

21   don't need to keep using the word.  We can say "the F-word"

22   or "the B-word" or "the N-word" or whatever word it is.

23   Okay?

24               MR. STRIANSE:  I was not going there at all.

25               THE COURT:  I just heard the witness say twice --

```
1  I don't want to repeat -- I'm not precluding that; I am
2  precluding the repetition of it.  Are you all clear?
3            MR. SONGER:  Yes, I'm clear on that.
4            THE COURT:  Okay.
5            MR. SONGER:  One other issue while we're here,
6  Your Honor.  I just want to be clear, it's not appropriate to
7  elicit the defendant's statements.  There was a motion in
8  limine that you at plea reserved.  But simply, if he is
9  eliciting defendant's out-of-court statements from this
10 witness or any other witness, I think that's hearsay and
11 should not be permitted.
12           MR. STRIANSE:  I don't remember eliciting --
13           THE COURT:  Hold on.
14           MR. SONGER:  He talked about what Defendant Bryant
15 said was saying to the -- to Jordan, what -- you know, how he
16 was trying to talk him down and calm him down.
17           THE COURT:  Well, I don't -- I think --
18           MR. STRIANSE:  Your Honor, I think he can give
19 context to the statement.  They're making a very big deal
20 about this "We can run till the batteries run out."
21           THE COURT:  Right.  All of that came out in
22 direct.  So, again, he's still testifying from his personal
23 knowledge about what he did and what he observed others doing
24 and saying at the incident.
25           MR. SONGER:  That's perfectly -- no objection to
```

1   that, as long as he's not eliciting specific other statements
2   by the defendant that are not yet in evidence.
3             THE COURT:  Well, I don't know what he said, but I
4   think he can paint the picture of what occurred and what he
5   has personal knowledge of.  He said no to several questions
6   and he said yes to others.
7             MR. STRIANSE:  And there is certainly -- in the
8   context of an event like this, there is certain verbal acts
9   that are non-hearsay.
10            THE COURT:  Sure.
11            MR. STRIANSE:  So. . .
12            THE COURT:  Okay.  All right.  Let's continue.
13            (Jury present.)
14  BY MR. STRIANSE:
15  Q.   You just described for the jury a few minutes ago what
16  you were seeing occurring in the restraint chair at about
17  8:00 on November the 5th, 2016.
18            Were you able to tell if the audio from the Taser
19  camera, which has audio, was really synched up with the video
20  that was trained down, probably from the ceiling there in the
21  booking area?
22  A.   I mean, I don't know if it was 100 percent synched, but,
23  you know, it's hard to tell from the video.
24  Q.   Okay.  Did you think that there was some delay?
25  A.   Might have been, yeah, a little delay.

Q.    Now, during that time when Mr. Norris was in the
restraint chair, there was a problem with his right arm; is
that right?

A.    That is correct.

Q.    In fact, it was completely free at one point in time; is
that right?

A.    If I do recall, yes, it was.

Q.    And during the time that he was being tased by
Mr. Bryant, it was not fully secured; is that right?

A.    Not in the restraint, no.

Q.    Okay.  And wasn't the policy at that time that if an
individual was in the restraint chair and he was not fully
restrained that he could be tased?

A.    Yes.

Q.    You talked about the need to apply pressure points under
Mr. Norris's chin when he was first placed in that restraint
chair; is that right?

A.    Not when he was first placed, I don't believe.  It was
later on, once he got his arm out of the restraint.

Q.    So once he gets his arm free, then he starts wanting to
head butt?

A.    He was flashing around trying to head butt, yes.

Q.    And I think Sgt. Isherwood is the one who trained you
that if an individual trying to head butt somebody when
they're in the restraint chair that it's proper to get behind

1  them and apply pressure points to the neck; is that right?
2  A.    That is correct.
3  Q.    And consistent with that training, that's what you were
4  doing?
5  A.    Correct, yeah, correct.
6  Q.    And that was for the safety of the other officers; is
7  that right?
8  A.    That is correct.
9  Q.    And I guess also for the safety of Mr. Norris; is that
10 correct?
11 A.    Absolutely.
12 Q.    Now, that would be classified in the -- in the force
13 continuum as an open hard hand technique; is that right?
14 A.    I'm not sure, to be honest with you, if it's considered
15 hard hand or not.
16 Q.    Okay.  And you're familiar with that force continuum?
17 A.    As far as how much force is needed --
18 Q.    Yes, sir.
19 A.    Yes.
20 Q.    If you start off at the bottom, it would be, you know, a
21 verbal command?
22 A.    Yes.
23 Q.    And then it might be a soft hand, like an escort or
24 something like that?
25 A.    Yes.

1  Q.   Then you have the Taser is the next level?

2  A.   (Witness moves head up and down.)

3  Q.   Correct?

4  A.   Yes.

5  Q.   And then above the Taser is an example of the hard hand

6  technique, the open hard hand technique that you used on

7  Mr. Norris?

8  A.   Yes.

9  Q.   Because at that point in time he was really wild; is

10  that right?

11  A.   That is correct.

12  Q.   His arm was free?

13  A.   (Witness moves head up and down.)

14  Q.   He was trying to head butt the officers?

15  A.   (Witness moves head up and down.)

16  Q.   Correct?

17  A.   Yes.

18  Q.   He was spitting?

19  A.   (Witness moves head up and down.)

20  Q.   Cursing?

21  A.   (Witness moves head up and down.)

22  Q.   Stiffening up in the chair; is that right?

23  A.   Yes.

24  Q.   You talked about not doing your own use of force report

25  about the pressure points that you used in that 8:00

1 interval.

2      Did you think that there was anything sinister

3 when Mark Bryant said, "I'll take care of the use of force

4 report" for the 8:00 incident?

5 A.   Anything sinister?  What do you mean by that?

6 Q.   Yeah.  Sinister, meaning that Mark Bryant was trying to

7 cover something up by telling you don't do the report?

8 A.   I don't think --

9      MR. SONGER:  Objection, Your Honor.  He can't

10 speak to what's in Mark Bryant's head.

11      MR. STRIANSE:  He can talk about the impression

12 that it had on him.

13      THE COURT:  Overruled.

14      THE WITNESS:  I don't think so.

15 BY MR. STRIANSE:

16 Q.   Okay.

17 A.   Not at the time, no.

18 Q.   And could he be shown of -- I think it was Exhibit 19.

19      Do you recognize Exhibit 19?  You've already

20 identified it.

21 A.   Yes.

22 Q.   And it's been received as evidence.

23      Is it possible to zoom in just a little bit?

24      And if you take a look at the top of the Cheatham

25 County sheriff's office -- and this is an incident report,

1   correct?

2   A.   It is an incident report, yes.

3   Q.   Not a use of force report?

4   A.   Yeah, this is the incident report.

5   Q.   And it's got military time, 1855, 6:55 on November 5th,

6   2016; is that right?

7   A.   Correct.

8   Q.   And take a look at that paragraph.  I know you've had a

9   chance to read it.  I'm not asking you to read it out loud.

10  But see how it concludes at 2122?

11  A.   "Mobile crisis arrived at 2122," correct.

12  Q.   So 2122 is 9:22; is that correct?

13  A.   That is correct.

14  Q.   So does this appear to be a narrative of the events from

15  at least 6:55 to 9:22 p.m.?

16  A.   It does appear to be so, yes.

17  Q.   And not that I'm asking you to be an English teacher and

18  to critique Mr. Bryant's writing, but does that seem to be

19  what he's trying to convey?

20  A.   Yes.

21  Q.   And if you could look at -- is it possible to see the

22  bottom box.

23          And do you see the time that Mr. Bryant actually

24  finishes the written report, 2148?  What time would that be?

25  A.   9:48.

Q.    9:48 p.m.  So this would be a report that memorializes
the events of Saturday, November 5, 2016, from 6:55 p.m. to
9:48 p.m., correct?

A.    Yes.

            MR. STRIANSE:  Your Honor, may I have one moment?

            THE COURT:  Sure.

            MR. STRIANSE:  Those are my questions.

            THE COURT:  All right.  Redirect.


                    REDIRECT EXAMINATION

BY MR. SONGER:

Q.    Officer Marriott, I want to clear something up.  Defense
counsel asked you about a statement that you gave to the
Tennessee Bureau of Investigation and the FBI about -- I
guess a little over a year ago.  Right?  Do you remember
that?

A.    (Witness moves head up and down.)

Q.    And he, I think, suggested that you had told them that
you had said in that prior interview that everything you did
that night was necessary to get him into the chair; is that
right?

A.    I believe so.  Yeah.

Q.    All right.  And I just want to make sure the record's
clear, because there were two different incidents --
right? -- that night that you were involved in?

```
 1   A.    Correct.
 2   Q.    One at 7:00 and one at 8:00?
 3   A.    Correct.
 4   Q.    And when did you get him into the chair, get him out of
 5   the cell and restrained and into the chair?
 6   A.    Around 7:00.
 7   Q.    That was 7:00?
 8   A.    (Witness moves head up and down.)
 9   Q.    And was everything that officers did during that
10   sequence necessary?
11   A.    I believe so, yes.
12   Q.    Yes.  And then at 8:00, is that when Mark Bryant used
13   his Taser that we saw?
14   A.    Yes.
15   Q.    That was four times, one of them you said was least 20
16   seconds?
17   A.    Yes.
18   Q.    Okay.  But was there any threat at 8:00 that justified
19   the Taser?
20   A.    I mean, not with everybody holding, you know -- like
21   Jeff Key holding his arm, I'm holding his head, he's
22   restrained, you know.
23   Q.    And --
24   A.    You know, potentially it could have been, but at that
25   particular point in time, no.  You know, if he would have
```

1  slipped -- you know, got from Jeff's hand or, you know, I

2  would have -- he would have slipped out of my -- you know, my

3  lock on his -- on his chin, then maybe so.

4              But, I mean, at that particular time, no.

5  Q.   Sure.  There are hypothetical things that could have

6  happened that could have required something different?

7  A.   Right.

8  Q.   But based on what did happen and what you saw, was there

9  anything that justified tasing him at 8:00?

10  A.   No.

11  Q.   All right.  So when you said everything you did was

12  necessary to get him in the chair, that was at 7:00?

13  A.   Right.

14  Q.   Now, you also said that you thought the "drain the

15  batteries," "I'll keep doing this until I drain the

16  batteries" quote was taken out of context, and you didn't

17  like that it was the media headline.

18              Do you remember saying that?

19  A.   Right.

20  Q.   That's fair.  But is there any context in which it's

21  appropriate for an officer to tell someone who is being

22  tased, "I'll keep doing this until I drain the batteries"?

23  A.   No, there's not.

24  Q.   And you weren't asked about this, but you said you also

25  heard Officer Bryant say, "You don't like it, do you?"

```
 1   A.    I mean, in the video, yes.
 2   Q.    You heard his voice?
 3   A.    Yeah.
 4   Q.    Is there any context in which that's appropriate?
 5   A.    No, sir.
 6   Q.    Okay.  I think you were also asked whether at the time
 7   of this tasing, Jordan's arm, right arm, was fully secured in
 8   the restraint chair.  And you said it wasn't.
 9               Do you remember that?
10   A.    At the -- clarify your question, please.
11   Q.    Sure.  At the time -- at 8:00 --
12   A.    Yes.
13   Q.    -- thanks for the clarification.  At 8:00, when
14   Defendant Bryant tased him, you said his right arm was not
15   fully secured in the restraint chair; is that correct?
16   A.    Not in the restraint chair, correct.
17   Q.    Was it restrained in some other way?
18   A.    I mean, Jeff Key had ahold of his arm, yes.
19   Q.    During the entire time, through all four tases, these
20   long tases that Defendant Bryant did, was there any point
21   when Jordan got his arm up at all?
22   A.    No.
23   Q.    Not even for a second?
24   A.    Not that I seen.
25   Q.    Okay.  All right.
```

1          You also said that the policy at the time that
2     this happened was that if someone was not fully restrained
3     but they were in a restraint chair that it could be
4     permissible to use a Taser.
5          Do you remember saying that?
6     A.    If he's a threat.
7     Q.    All right.  I think you answered my question, but I just
8     want to make sure.
9          Is it right that even if, in theory, you could
10    tase someone who is in a restraint chair, there would still
11    have to be a justification for that tase that meets the
12    policy?
13    A.    Right.
14    Q.    Because that means the person would still have to
15    somehow be a threat to officers?
16    A.    Correct.
17    Q.    And then, even if there was a threat, it justified a
18    tasing, you would -- officers would still be limited by the
19    rule they couldn't tase more than three five-second bursts;
20    is that right?
21    A.    That's correct.
22    Q.    And that was the policy at the time?
23    A.    Right.
24    Q.    Okay.  You were also shown the report that Defendant
25    Bryant submitted about that night.  The time on the top of

1  the report was 6:55, and I think defense counsel pointed out
2  to you that at the end of the report it was 9:22 p.m.?
3  A.   Yes.
4  Q.   Do you remember that?
5  A.   Yeah.
6  Q.   So within that entire period covered by the report --
7          MR. STRIANSE:  Your Honor, I realize this is
8  redirect, but it's all leading.
9          THE COURT:  Sustain the leading.
10         MR. SONGER:  Certainly.
11 Q.   During the entire period covered by the report, was
12 there any time at which Officer Bratton and Officer Bryant
13 tased at the same time?
14 A.   I mean, not at the same time, no.
15 Q.   And did the report in the entire period that was listed
16 include any details about Defendant Bryant's tasings?
17 A.   No.
18         MR. SONGER:  Nothing further.  Thank you.
19         THE COURT:  All right.  You can step --
20         MR. STRIANSE:  Just -- I just had one question.
21         THE COURT:  Okay.
22         MR. STRIANSE:  Just one other point.
23                    RECROSS-EXAMINATION
24 BY MR. STRIANSE:
25 Q.   You were asked about the fact that Jeff Key had his

1   hands on Mr. Norris's right arm.

2          Do you remember those questions?

3   A.   Yes.

4   Q.   Jeff Key had his hands on Norris's right arm because

5   that Velcro restraint device was worn out and didn't work; is

6   that right?

7   A.   That was -- it was an old chair.

8   Q.   And he was struggling against Jeff Key when Jeff Key was

9   holding his arm; is that right?

10  A.   He was trying to fight Jeff Key, yes.

11  Q.   And didn't you all comment among yourselves the

12  unnatural strength that Mr. Norris was demonstrating that

13  night?

14         MR. SONGER:  Objection, Your Honor.  This is

15  hearsay.  And it's beyond the scope of redirect.

16         THE COURT:  Okay.  Overruled.

17         THE WITNESS:  What was the question again, sir?

18  BY MR. STRIANSE:

19  Q.   You were dealing with this man.

20         Did you find him to have unnatural strength for

21  somebody that's five-nine, five-ten, 170 pounds?

22  A.   I mean, he was very strong.  Yes.

23         MR. STRIANSE:  That's all.

24         THE COURT:  Okay.  Any redirect?

25         MR. SONGER:  No, Your Honor.  I think we've

1  covered it.

2          THE COURT:  All right.  You can step down.

3          THE WITNESS:  Thank you.

4                  (Witness excused.)

5          THE COURT:  Call your next witness.

6          MS. MYERS:  The United States calls Daniel

7  Bratton.

8          THE COURT:  All right.  If you'll stop there we'll

9  swear you in.

10         COURT DEPUTY:  Please raise your right hand.

11

12                  DANIEL BRATTON,

13  called as a witness by Plaintiff, was duly sworn and

14  testified as follows:

15

16         COURT DEPUTY:  Please be seated.

17         Please be sure to pull microphone close.  State

18  your full name and spell your last name.

19         THE WITNESS:  It's Daniel Bratton, B-r-a-t-t-o-n.

20

21                  DIRECT EXAMINATION

22  BY MS. MYERS:

23  Q.   Good morning, Mr. Bratton.

24  A.   Good morning.

25  Q.   Could you please state your full name for the Court?

```
 1   A.    Yes, ma'am.  It's Daniel Bratton.
 2   Q.    And what is your occupation?
 3   A.    I'm a jailer at Cheatham County jail.
 4   Q.    And how long have you been a jailer at Cheatham County
 5   jail?
 6   A.    September will be my three years.
 7   Q.    And were you in law enforcement before that?
 8   A.    Yes, ma'am.
 9   Q.    And where were you in law enforcement before that?
10   A.    In Louisiana.
11   Q.    And how long were you in law enforcement there?
12   A.    Two years.
13   Q.    And were you employed on Saturday, November the 5th,
14   2016, at the Cheatham County jail?
15   A.    Yes, ma'am.
16   Q.    And what was your position at the time?
17   A.    I was a jailer.
18   Q.    And what did your job entail as a jailer?
19   A.    Basically what I did was ensured the safety of the
20   facility, inmates, and other officers.
21   Q.    And what did that look like on a day-to-day basis?
22   Like, did you have paperwork?
23   A.    Yes, ma'am.
24   Q.    What sort of tasks did you have?
25   A.    It usually varies from day-to-day, but usually it's just
```

1  making sure that inmates are safe and secure.

2  Q.    Do you generally stay in one part of the jail?

3  A.    Generally, yes, ma'am.

4  Q.    And which part is that?

5  A.    Usually in the back in the sally port.

6  Q.    The sally port?

7  A.    Yes, ma'am.

8  Q.    And where is that in relation to booking?

9  A.    Maybe a hundred feet, if that, through about three doors

10 towards the back of the jail.

11 Q.    And what is in the sally port area?

12 A.    That's where all -- all of the male dorms are -- that

13 houses the males that are in general population.

14 Q.    Now, did you receive Taser training when you started at

15 the Cheatham County jail?

16 A.    Yes, ma'am.

17 Q.    And when were you hired there?

18 A.    September of 22nd of 2016.

19 Q.    And do you remember approximately when you received the

20 Taser training?

21 A.    It was the week of September 22nd.

22 Q.    So basically right after you started?

23 A.    Yes, ma'am.

24 Q.    And who Taser trained you?

25 A.    Sgt. Gary Ola.

```
 1   Q.   And do you know how long Sgt. Ola had been conducting
 2   those trainings there?
 3   A.   Not right off the top of my head, no, ma'am.
 4   Q.   Do you know if any of your other colleagues had been
 5   trained by Sgt. Ola?
 6   A.   Yes, ma'am.
 7   Q.   And what was Sgt. Ola's formal title?
 8   A.   He was a sergeant on patrol.
 9   Q.   So did he work in the jail?
10   A.   I'm not sure.  Not -- not while I was working there, no,
11   ma'am.
12   Q.   And your fellow colleagues at the jail, were any of them
13   Taser trained in your class alone or --
14            THE COURT:  What is that and who is doing that?
15   Let's stop that.
16   BY MS. MYERS:
17   Q.   Were any of your colleagues Taser trained along with you
18   in your class?
19   A.   Yes, ma'am.
20   Q.   Do you remember who those colleagues were?
21   A.   I know there were seven of us total in the class.  I
22   don't remember everybody right off the top of my head.
23   Q.   Anybody else who started about the at the same time as
24   you?
25   A.   Yes, ma'am.  All seven of us that were in the class
```

```
 1  started at the same time.
 2  Q.   And so all seven who started on the same date?
 3  A.   Yes, ma'am.
 4  Q.   You all were required to get Taser training?
 5  A.   Yes, ma'am.
 6  Q.   Can you describe that training for us?
 7            MR. STRIANSE:  I'm going to object to the
 8  relevance.
 9            THE COURT:  Go ahead.
10            MR. STRIANSE:  He was trained in September of
11  2016.  Mr. Bryant was trained in a different class, October
12  of '15.
13            MS. MYERS:  Yes, but he was Taser trained and
14  these events occurred in 2016.
15            THE COURT:  Okay.  Why don't you approach.
16            (Bench conference outside the hearing of the
17            jury.)
18            THE COURT:  So Bryant was trained before this --
19            MR. STRIANSE:  In a different class.
20            MS. MYERS:  That's correct.  He was --
21            THE COURT:  October of '15, and he was trained
22  in --
23            MR. STRIANSE:  September of '16.
24            MS. MYERS:  That's correct.  And Bratton received
25  training from Sgt. Ola in 2016.  We're going to go through
```

1    just briefly what the training looked like for him.

2            THE COURT:  But how does that help the jury

3    understand what Mr. Bryant went through in 2015?

4            MS. MYERS:  Because it helps contextualize what

5    Bratton did.  Because Bratton tased Jordan Norris in this

6    case.  And it contextualizes --

7            THE COURT:  The training doesn't.  It just -- he

8    can testify about his training, why he -- he can testify

9    about why he tased, why he thought the tasing was

10   appropriate, was that consistent with his understanding of

11   the policy in the jail.

12           But I don't know why we need -- I don't how it

13   helps the jury understand the training, to go into his

14   training a year later.

15           MR. SONGER:  Your Honor, just to point -- it helps

16   explain what the training and policy was at the time at the

17   jail, at the before --

18           THE COURT:  At the time --

19           MR. SONGER:  -- the incident happened.  This is

20   still a couple months before the incident happened.  So it

21   shows what the policy was then.

22           MS. MYERS:  Exactly.  And it shows what he was

23   taught in terms of training and what he put in his reports.

24           MR. STRIANSE:  It's not what Bryant was taught.

25   It's going to be confusing to the jury.  There is a big issue

about the training and what was said to candidates when they
were being trained, and there was a big change in the policy
after the lawsuit.  So. . .

MS. MYERS:  But we're not after the lawsuit; we're
before the lawsuit.

THE COURT:  And before --

MR. STRIANSE:  Before --

THE COURT:  Before Bryant's.

MS. MYERS:  Before the incident.

THE COURT:  And after Bryant was trained.

MS. MYERS:  So Marriott and Bryant were trained in
the same class, which was covered in Marriott's testimony.

THE COURT:  Okay.

MS. MYERS:  And that was covered.  So his
perspective on what was appropriate.

Now, we have a new person who has been Taser
trained by the same person, receiving the same training.  I'm
not going to get into the details of the training.

THE COURT:  Yeah.  I'm going to exclude this.  You
can go through Mr. Ola's training philosophy and history when
he testifies, but his -- this is a waste of time.

MS. MYERS:  I was just going through if he is
Taser --

THE COURT:  He's already said he was.

MS. MYERS:  Right.  And what he learned in that

1   training in terms of what is appropriate.

2           THE COURT:  You asked him --

3           MR. STRIANSE:  And that's our objection.

4           THE COURT:  You asked him to describe the

5   training.

6           MS. MYERS:  Right.  What it entailed.  You know,

7   were there slides?  How long was it?

8           THE COURT:  That's his objection.  Why do we need

9   to go into that if it's not the training that Mr. Bryant

10  received?

11          MS. MYERS:  Because it's the training that he

12  received before he --

13          THE COURT:  How is that relevant here?

14          MS. MYERS:  Why he was involved in this incident.

15          THE COURT:  Why is that relevant?

16          MS. MYERS:  His understanding based on his

17  training and experience.

18          THE COURT:  Then you can ask him, "Did you tase

19  Mr. Norris?  Why did you do that?"  "I did that because of

20  blank."  "Why -- is that consistent with the way that you

21  thought tasing should occur?"  "Yes."  "Why did you think it

22  was consistent?"  "Because that was the way -- I thought

23  that's what the policy was and that's the way I was trained."

24          We don't need to go into his training.  Let's move

25  on.

```
 1              MS. MYERS:  Okay.
 2              (Jury present.)
 3   BY MS. MYERS:
 4   Q.   So we left off and you were Taser trained around the
 5   time that you began --
 6   A.   Yes, ma'am.
 7   Q.   -- at the jail?
 8              And during that training, did you learn how much
 9   an officer can use a Taser?
10   A.   Yes, ma'am.
11   Q.   And when can an officer -- how often can a person --
12              MR. STRIANSE:  Judge, I think we handled this at
13   the bench.
14              THE COURT:  Sustained.
15              Move on.
16   BY MS. MYERS:
17   Q.   Did you learn that there are two ways to shoot a Taser?
18   A.   Yes, ma'am.
19              MR. STRIANSE:  Objection --
20              MS. MYERS:  I'm trying to lay a foundation for
21   what happened later, Your Honor.
22              THE COURT:  Why don't we just go to what happened
23   later.  Let's go there.
24   BY MS. MYERS:
25   Q.   So, Mr. Bratton, I'm going to go to November 5th of
```

1    2016, back where I started.

2              What shift did you work that day?

3    A.    I was on second shift, which is from 2:00 p.m. to

4    10:00 p.m.

5    Q.    And who was your supervisor that night?

6    A.    Mark Bryant.

7              THE COURT:  All right.  You need to speak up.

8              THE WITNESS:  Yes, sir.

9              It was Mark Bryant, was one of my supervisors.

10   BY MS. MYERS:

11   Q.    And what was Mark Bryant's position at that time?

12   A.    He was a corporal.

13   Q.    Did you have any other supervisor there that night?

14   A.    My FTO.  I'm not sure if my sergeant was there that

15   night.

16   Q.    You don't remember?

17   A.    No, ma'am.

18   Q.    Do you remember meeting an inmate named Jordan Norris

19   that night?

20   A.    Yes, ma'am, I do.

21   Q.    And how did you first meet him?

22   A.    I first came into contact with him when I was on my way

23   up to booking.  I saw that there were officers struggling to

24   restrain Inmate Norris.

25   Q.    And who were those officers?

1    A.    At that point it was Deputy Key and Cpl. Bryant.

2    Q.    And so you were on your way up to booking?

3    A.    Yes, ma'am.

4    Q.    Okay.  From where?

5    A.    From the -- from the sally port.

6    Q.    Do you remember why?

7    A.    No, ma'am, I do not.

8    Q.    Do you have to walk by those cells in booking to get to

9    where you were going?

10   A.    Once you enter booking from where I was coming from, the

11   cells are right in front of you.

12   Q.    So did somebody call you for assistance?

13   A.    Not that I can remember, no, ma'am.

14   Q.    So you just happened to be walking by?

15   A.    Yes, ma'am.

16   Q.    And at the time could you tell what happened that

17   started the struggle between those officers and Jordan?

18   A.    No, ma'am.

19   Q.    And was Jordan in handcuffs when you arrived?

20   A.    No, ma'am.  Not fully.

21   Q.    So what did you do when you saw this struggle happening?

22   A.    Once I entered the booking office, I took the Taser that

23   I was carrying out of the holster, took the cartridge off of

24   the Taser, and walked towards the struggle, and that's when I

25   administered the first tase.

Q.   Were you concerned about anyone's safety at the time?

A.   Yes, ma'am.

Q.   And why was that?

A.   Due to the fact that he was actively resisting being put in handcuffs.  He had one hand in the handcuffs, and that was it.  And I've seen where handcuffs can be used to do great damage to somebody.

Q.   Were his feet restrained in any way?

A.   No, ma'am.

Q.   And was any other part of him restrained in any way?

A.   No, ma'am.

Q.   And you said that you tased him.

How did you tase him?

A.   I administered a drive stun to his lower back.

Q.   And did that -- was that effective?

A.   No, ma'am.

Q.   What happened when you drive stun tased him?

A.   He locked up for about a second and then he continued to actively resist.

Q.   Do you know how long you had the drive stun tase on Jordan Norris?

A.   Approximately three to four seconds for the first one, I believe.  It wasn't the full five seconds.

Q.   Okay.  Now, the full five seconds.  How do you achieve a full five-second tase?

A.    You pull and then release the trigger of the Taser, and
five seconds is a cycle.

Q.    Okay.  So does it stop, then, after five seconds?

A.    When you -- if you release the trigger, yes, ma'am.

Q.    How would you get it to go longer than five seconds?

A.    You would hold the trigger down.

Q.    Okay.  And did you hold the trigger down?

A.    No, ma'am.

Q.    So you said three to four seconds?

A.    Yes, ma'am.

Q.    How did you know that it was three to four seconds?

A.    Because that's when I pulled the Taser off of him.  I
did not hold it on him for the full five seconds.

Q.    Does it continue to finish a cycle even if you pull it
off?

A.    Yes, ma'am.

Q.    And so then what happened after that first tase?

A.    He continued to actively resist.  It was at that point
that I attempted to administer another cycle.  The cycle I
guess didn't make good contact, so a deputy tried to re- --
re- -- move with the Taser to a different spot in order to
get a better connection.

Q.    How does one do that?

A.    He just grabbed it and tried to move it while it was in
a cycle.

1  Q.    Is that dangerous?

2  A.    It can be, yes, ma'am.

3  Q.    Did anyone get hurt in that process?

4  A.    Not that I know of, no, ma'am.

5  Q.    Did Jordan Norris get tased in that process?

6  A.    During when somebody grabbed the Taser?

7  Q.    When it was removed, when the prongs were removed.

8  A.    No.  He was not being tased when the Taser was removed

9  from him.

10 Q.    What about anybody else who was close by?

11 A.    Yes.  Due to the fact that we were all touching, when

12 Deputy Key grabbed the Taser, it administered to him and to

13 all of the deputies that were touching him.

14 Q.    And so what happened after that point?

15 A.    At that point they were able to get the free hand in the

16 handcuffs, and they were -- they started to escort him to the

17 chair, the restraint chair.

18 Q.    So was the chair already out at that point?

19 A.    Yes, ma'am.

20 Q.    So when you got there and you're walking by, did you

21 notice that the chair was out?

22 A.    I do believe so, yes, ma'am.

23 Q.    Did you know what the objective was when you were trying

24 to help get him out of the cell?

25 A.    At that -- at my first point of contact, no, ma'am, I

1  did not.

2  Q.   Did you eventually find out what it was?

3  A.   Yes, ma'am.

4  Q.   And what was that?

5  A.   According to what I had heard, Inmate Norris was acting

6  aggressively towards the other inmates in the cell that he

7  was --

8  Q.   What I'm asking you about, when you got there and

9  realized what you were supposed to be doing with him, how

10  you're getting him out of the cell, where were you taking

11  him?

12  A.   Oh.  Once I saw that he had one of his hands in a

13  handcuff, that's when I, I guess, realized that they were

14  trying to restrain him.

15  Q.   In the chair?

16  A.   Get him restrained to escort him to the chair.

17  Q.   Okay.  And then were they able to get him to the chair?

18  A.   Yes, ma'am.

19  Q.   Okay.  And then what happened when he got to the chair?

20  A.   Once he got into the chair, he attempted to stand up,

21  still actively resisting.  And that's when I applied the

22  third and final cycle of the Taser in order to get him into

23  the chair.

24  Q.   Okay.  You said the third and final cycle.

25         So you tased him for three times?

```
 1   A.    Yes, ma'am.
 2   Q.    Okay.  Now, how about that third tase?  Let's talk about
 3   that a little bit.
 4              So he's in the chair at that point?
 5   A.    No, ma'am.  Not fully.
 6   Q.    Okay.
 7   A.    The -- none of the restraints that were a part of the
 8   chair had been applied to Mr. Norris.  So he was not strapped
 9   in the chair and he was still actively resisting when I tased
10   him for the third and final time.
11   Q.    Was any part of him strapped into the chair at that
12   time?
13   A.    No, ma'am.
14   Q.    His feet?
15   A.    No, ma'am.
16   Q.    His arms?
17   A.    No, ma'am.
18   Q.    His shoulders?
19   A.    No, ma'am.
20   Q.    Okay.  But he did have handcuffs?
21   A.    Yes, ma'am.
22   Q.    And what was he doing with his body at the time?
23   A.    From what I can remember, he was still trying to get
24   away from the deputies, kicking, flailing.  That's why I
25   tased him for the third time, to try to get him to where we
```

1    could restrain him and prevent bodily harm to anybody else.

2    Q.    Do you know how long that third and final tase was?

3    A.    I would say approximately two to three seconds, just

4    until we were able to get him firmly put in the chair in

5    order to restrain him.

6    Q.    And how do you know that it wasn't the full five-second

7    cycle?

8    A.    Because I pulled it off of him.

9    Q.    And at that time, after that third and final tase, were

10   the officers able to secure him in the chair?

11   A.    Yes, ma'am.

12              THE COURT:  I think it's the other microphone on

13   the desk.  Go ahead.

14   BY MS. MYERS:

15   Q.    And so was he then completely secured into the restraint

16   chair?

17   A.    After -- yes, ma'am.

18   Q.    Straps across his shoulders?

19   A.    Yes, ma'am.

20   Q.    Straps on his arms?

21   A.    Yes, ma'am.

22   Q.    Straps across his lap?

23   A.    Yes, ma'am.

24   Q.    And straps across his feet?

25   A.    Yes, ma'am.

1   Q.   All of those straps --

2   A.   Yes, ma'am.

3   Q.   -- were down?

4   A.   Yes, ma'am.

5   Q.   And during that period, when you were helping transport

6   Jordan from the cell to the chair, did anyone else use a

7   Taser during that time?

8   A.   No, ma'am.

9   Q.   I would like to now show you -- could you please flip to

10  Exhibit 6 in the binder.  All right.

11          Do you recognize that?

12  A.   Yes, ma'am.

13  Q.   And what is it?

14  A.   It is a DVD that contains a video of the events that led

15  up to the incident that night.

16  Q.   How do you know that?

17  A.   I was shown the video previously.

18  Q.   Are your initials in fact on that DVD?

19  A.   Yes, ma'am.

20  Q.   And do you remember it accurately depicting the events

21  that we just discussed that night?

22  A.   Yes, ma'am.

23          MS. MYERS:  At this time I would like to ask that

24  Exhibit 6 be admitted into evidence.

25          MR. STRIANSE:  No objection.

```
1              THE COURT:  Admitted.
2              (Whereupon Plaintiff Exhibit 6 was marked for
3              identification and received in evidence.)
4              MS. MYERS:  May I publish it to the jury, Your
5    Honor?
6              THE COURT:  Yes.
7              MS. MYERS:  Thank you.
8              (Video played.)
9              MS. MYERS:  If we could pause for one second,
10   please.
11   Q.   So, Officer Bratton, do you see yourself in this video?
12   A.   Yes, ma'am.
13   Q.   Okay.  And where are you?
14   A.   In the group that is over there by the cell door.  I am
15   the last male officer that you can see.
16   Q.   Okay.  And do you see the other officers who are there?
17   A.   Yes, ma'am.
18   Q.   Okay.  And where are they located at the time?
19   A.   It looks like Jeff is on the outside, and I believe Josh
20   is right in front of me, and in front of Jeff is Cpl. Bryant.
21   Q.   Thank you.  And how about right in the back, the female?
22   A.   That is officer -- Caitlin.
23   Q.   And what is her last name?
24   A.   Marriott.
25   Q.   Marriott?
```

1  A.    Yes, ma'am.

2  Q.    Okay.  Thank you.

3             You can keep going.  Thank you.

4             (Video continued.)

5  BY MS. MYERS:

6  Q.    All right.  So does that once again accurately depict

7  the events that we just discussed at that time?

8  A.    Yes, ma'am.

9  Q.    And even though Jordan Norris was not restrained,

10 when -- as you mentioned, when you started to help the

11 officer with him, were you able to get him to the chair with

12 those short Taser bursts?

13 A.    Yes, ma'am.

14 Q.    And were the other officers able to fully restrain him

15 following those short Taser bursts?

16 A.    Yes, ma'am.

17 Q.    Now, the cameras here, this doesn't have any audio.

18             Do you know why it doesn't have any audio?

19 A.    No, ma'am, I do not.

20 Q.    Do you know whether the jail cameras have audio?

21 A.    There are, I believe, two in the jail that have audio.

22 Q.    So you don't know whether this was one of the ones that

23 did or did not have audio?

24 A.    I do not, no, ma'am.

25 Q.    Now, when you use a Taser, does it have audio?

```
 1    A.    Yes, ma'am.
 2    Q.    And so are you aware that when you use a Taser, it does
 3    have sound?
 4    A.    Yes, ma'am.
 5    Q.    Now, had you ever used a Taser in the field before this
 6    night?
 7    A.    I do not believe so, no, ma'am.  I believe that was the
 8    first time.
 9    Q.    Have you ever used a Taser before, period?
10    A.    No, ma'am.
11    Q.    What about in training?
12    A.    We didn't actually use them in training, but we were
13    tased during that class.
14    Q.    You were personally tased?
15    A.    Yes, ma'am.
16    Q.    What did that feel like?
17    A.    It -- it hurt.
18    Q.    Do you remember how long you were tased?
19    A.    Not right off the top of my head, no, ma'am.  I know it
20    was -- it was less than the full five-second cycle.
21    Q.    How do you know that?
22    A.    Because I used my code word, which was a key for them to
23    pull it off.
24    Q.    Like a safe word?
25    A.    Yes, ma'am.
```

```
 1   Q.    Okay.  And so you said your safe word and they stopped?
 2   A.    Yes, ma'am.
 3   Q.    Okay.  Why did you use your safe word?
 4   A.    Because it -- it hurt.
 5   Q.    Can you compare the feeling of being tased to some other
 6   sort of pain you've experienced?
 7   A.    No, ma'am.  Not right off the top of my head.
 8   Q.    How about on a scale -- pain scale of 1 to 10?
 9   A.    I would say it was probably a 7 or 8.
10   Q.    Meaning closer to 10 is the most painful?
11   A.    Yes, ma'am.
12   Q.    And what did you do at this period once Jordan Norris
13   was fully restrained in that chair?
14   A.    I believe after that is when I went outside for a break,
15   and once my break was completed, I returned back to my post.
16   Q.    How long was your break?
17   A.    We are allowed 15 minutes.  I'm not sure if I took the
18   full 15 minutes or not.
19   Q.    Did you go outside the jail at that time?
20   A.    Yes, ma'am.
21   Q.    Did you hear anything going on inside the jail when you
22   left?
23   A.    No, ma'am.
24   Q.    Any of the other officers come out?
25   A.    With me?
```

1  Q.    Yes.

2  A.    No, ma'am.

3  Q.    So when you came back in, did you see Jordan Norris

4  again?

5  A.    Yes, ma'am.

6  Q.    And where was he?

7  A.    He was still in the restraint chair.

8  Q.    Was he secured in the restraint chair?

9  A.    I believe when I came back in, he had gotten one of his

10  arms free from the arm restraints.

11  Q.    Do you remember which arm that was?

12  A.    I do not.  No, ma'am.

13  Q.    What did you do when you saw that arm free?

14  A.    I stood by until officers were able to fully restrain

15  Inmate Norris.  I did pull the Taser out of the holster.  I

16  did not turn it on.  And I did not deploy the Taser.

17  Q.    So the officers at that time, with the loose arm, then

18  they were still able to get it back in?

19  A.    Yes, ma'am.

20  Q.    Do you remember if the arm was completely free or still

21  attached in some way?

22  A.    I -- I don't -- I do not recall if it was completely

23  free or not.

24  Q.    Do you remember which officers you called for help?

25  A.    I believe they were already attempting to get him back

1  in the restraint chair, and I don't remember right off the
2  top of my head who it was that was restraining him.
3  Q.    Do you know if it was Josh Marriott?
4  A.    I don't remember, to be completely honest.  I don't
5  remember who was it that was there with them.
6  Q.    But regardless, you did not have to use a Taser to get
7  the arm secured?
8  A.    Correct.
9  Q.    Did anyone else use a Taser at that time when his hand
10 was loose?
11 A.    Not to my knowledge, no, ma'am.
12 Q.    And then what did you do after that?
13 A.    That's when I returned to my post.
14 Q.    Was that in the sally port?
15 A.    Yes, ma'am.
16 Q.    And you said that this was after your 15-minute break,
17 right?  You came back in?
18 A.    Yes, ma'am.
19 Q.    Did you come back to that area and see Jordan Norris
20 again?
21 A.    When I left to go home, yes, ma'am.
22 Q.    And what time was that?
23 A.    Around 10:00.
24 Q.    And so I think you mentioned before approximately what
25 time all of this happened.

1                Do you remember?
2    A.    I want to say it was approximately around 8:00.
3    Q.    So two hours later you leave then.
4    A.    Yes, ma'am.
5    Q.    Did any officers call for your help during that two-hour
6    period?
7    A.    No, ma'am.
8    Q.    Were you available to help if any officer needed you?
9    A.    Yes, ma'am.
10   Q.    Were you aware at that time of any other tasings that
11   night involving Jordan Norris during your shift?
12   A.    I was not, no, ma'am.
13   Q.    And after you helped the officers secure Jordan Norris
14   in the chair, when you left at 10:00 p.m., was Jordan Norris
15   still secure in the chair?
16   A.    Yes, ma'am.
17   Q.    Now, is using a Taser considered a use of force?
18   A.    Yes, ma'am.
19   Q.    Are you required to write any reports following a use of
20   force?
21   A.    Yes, ma'am.
22   Q.    And what reports are you required to author?
23   A.    Usually an incident report and a use of force report.
24   Q.    So when do you -- when do you do an incident report?
25   A.    You -- as soon as possible, but you try to do it right

1  after the incident occurred.

2  Q.    Okay.  And does that mean -- in order to write a report,

3  do you have to witness an incident?

4  A.    Yes, ma'am.

5  Q.    Okay.  Or do you have to be hands on and involved in the

6  incident?

7  A.    You can write an incident report for either one.  You

8  can either do it as a witness or due to the fact that you

9  were hands on.

10  Q.    Are you required to do an incident report when you use a

11  Taser?

12  A.    Yes, ma'am.

13  Q.    How about a use of force report?

14  A.    Yes, ma'am.

15  Q.    Okay.  Now, what do you put in a use of force report

16  that's different from an incident report?

17  A.    Use of force report is more geared towards the detail of

18  the witnesses, the actual use of force, the person that uses

19  the use of force, and the person that the use of force is

20  used upon.

21          You can also put a small narrative on the bottom

22  of it leading -- describing the events leading up to the use

23  of force.

24  Q.    Now, did you write an incident report about your tasings

25  of Jordan Norris that night?

1   A.   I do believe so.  Yes, ma'am.

2   Q.   Okay.  And could you please flip to Exhibit 16.

3        Do you recognize that document?

4   A.   Yes, ma'am, I do.

5   Q.   What is that document?

6   A.   That is the incident report that I wrote that night

7   about the incident.

8   Q.   Do you recognize your signature?

9   A.   Yes, ma'am, I do.

10       MS. MYERS:  Your Honor, at this time I would like

11  to ask that Exhibit 16 be admitted into evidence.

12       MR. STRIANSE:  No objection.

13       THE COURT:  Admitted.

14       (Whereupon Plaintiff Exhibit 16 was marked for

15       identification and received in evidence.)

16       MS. MYERS:  May I publish it to the jury, Your

17  Honor?

18       THE COURT:  Yes.

19       MS. MYERS:  All right.

20  Q.   So is this report that you see in the binder,

21  Exhibit 16?

22       Can we enlarge the top part, please?  Thank you.

23  A.   Yes, ma'am.

24  Q.   Do you see the date on it?

25  A.   Yes, ma'am.

1  Q.   What is the date on that document?

2  A.   11/5 of 2016.

3  Q.   Okay.  And the time?

4  A.   It says 1855.

5  Q.   Okay.  And what time is that, not in military?

6  A.   6:55.

7  Q.   Okay.  And how about the reporting officer?

8  A.   Yes, ma'am.  That's myself.

9  Q.   That's you?

10 A.   Yes, ma'am.

11 Q.   And then the nature of the incident?

12 A.   Yes, ma'am.

13 Q.   Are you supposed to write basically what happened in a

14 couple of words in that box?

15 A.   Yes, ma'am.

16 Q.   Okay.  And then you have the inmates involved and the

17 officers involved.

18         To the best of your recollection, is that

19 accurate?

20 A.   Yes, ma'am.

21 Q.   And now, how about the narrative?  Why don't we -- why

22 don't we walk through this a little bit.

23         Can you read it all right?

24 A.   Yes, ma'am.

25 Q.   I think we might be able to just blow up the narrative

1  so you can read that a little bit better.  Thank you.

2           All right.  Okay.

3           So after you -- after you saw what was happening,

4  can you go to "Once I walked through"?

5  A.   Yes, ma'am.  Did you want me to read it?

6  Q.   If you could, please.

7  A.   (As read):

8                Once I walked through the door, I took the

9                issued Taser out of the holster and took the

10               deployment cartridges off and turned it on.

11 Q.   Okay.

12 A.   (As read):

13               I then issued Inmate Norris a command to stop

14               fighting or he would be tased.

15               It says Inmate Key, but it was supposed to say

16 Deputy Key (as read):

17               Also stated that he would be tased if he did

18               not comply.  I then placed the Taser on the mid of

19               Inmate Norris's back and drive stunned him.

20               Inmate Norris continued to resist, and I issued

21               another verbal order to stop resisting.  When he

22               did not, I placed the Taser on his upper shoulder

23               blade -- the upper shoulder blade of Inmate

24               Norris's left side and deployed again.

25               Once he was placed in cuffs and escorted to the

```
 1                    restraint chair -- after which he was placed in
 2                    handcuffs and escorted to the restraint chair.
 3                    Once at the restraint chair, he arched back and
 4                    refused to comply with verbal demands to sit, at
 5                    which time I drive stunned him in his stomach.  He
 6                    was then able to be placed in the restraint chair.
 7   Q.    So how many times do you mention in that report that you
 8   tased Jordan Norris?
 9   A.    Three.
10   Q.    And to the best of your recollection, was that accurate?
11   A.    Yes, ma'am.
12   Q.    And during those -- do you have a justification for each
13   time?
14   A.    Yes, ma'am.
15   Q.    Is that consistent with what you were taught about how
16   to write incident reports?
17   A.    Yes, ma'am.
18   Q.    And jail policy to write incident reports?
19   A.    Yes, ma'am.
20   Q.    It is there any mention in your report of Mark Bryant's
21   tasing Jordan Norris?
22   A.    No, ma'am.
23   Q.    And why not?
24   A.    Because I did not witness it.  And he did not do it
25   when -- while I was there.
```

Q.   Now, did you write a use of force report about this incident?

A.   No, ma'am.  I do not believe I did.

Q.   And when you use a Taser, I believe you previously mentioned you're required to do a use of force report?

A.   That is correct.

Q.   And is that policy?

A.   Yes, ma'am.

Q.   Why didn't you write a use of force report?

A.   I was told that it would be taken care of.

Q.   Who told you that it would be taken care of?

A.   I believe it was Cpl. Bryant that told me that.

Q.   And what is his position in relation to you?

A.   He was my direct supervisor.

Q.   At that time?

A.   Yes, ma'am.

Q.   So when -- when the defendant told you not to write a report, do you remember what time that was?

A.   No, ma'am, I do not.  Not right off the top of my head.

Q.   Do you remember if it was towards the beginning or end of your shift?

A.   I know it was towards the end of it.  It was closer to the end of it.

Q.   And again, the end of your shift was?

A.   10:00 p.m.

Q.   And were you aware at that time that Jordan Norris had
been tased after your interaction with him?

A.   No, ma'am.

Q.   And what did you think about the defendant asking you
not to do a use of force report?

A.   I didn't think anything of it.

Q.   Why is that?

A.   Because he was my -- my supervisor.

Q.   Do you know if Mark Bryant ever wrote a use of force
report regarding the times that you tased him?

A.   I do not.  No, ma'am.

Q.   Did you see any report that Mark Bryant wrote regarding
your tases that night?

A.   Not that I recall.

Q.   Did you read anything that the defendant had written
about you that night?

A.   Not that I can recall, no, ma'am.

Q.   You're not aware of any reports?

A.   Not right off the top of my head, no, ma'am.

Q.   And if the defendant had not told you not to write a
report, would you have completed a use of force report?

A.   Yes, ma'am.

            MS. MYERS:  One moment, please.

            I have no further questions at this time.

            THE COURT:  All right.  Ladies and gentlemen,

```
1   let's take our morning break and come back about 10:25.
2              (Recess.)
3              (Jury not present.)
4              THE COURT:  Be seated.  Bring in the jury.
5              (Jury present.)
6              THE COURT:  All right.  Be seated.
7              MS. MYERS:  And, Your Honor may we approach
8   briefly?
9              THE COURT:  Sure.
10             (Bench conference outside the hearing of the
11             jury.)
12             MS. MYERS:  So in the last cross Mr. Strianse was
13  having our paralegal pull up exhibits for him.  That is
14  something that we actually do have an office policy about.
15  We're not supposed to let --
16             THE COURT:  Well, you're going to do it in this
17  Court.  Let's proceed.
18             MS. MYERS:  Okay.
19             THE COURT:  That's very unprofessional.  Very
20  unprofessional.
21             MS. MYERS:  Okay.  Thank you, Your Honor.
22             (Jury present.)
23             MR. STRIANSE:  Your Honor, may I proceed?
24             THE COURT:  Proceed.
25
```

```
 1                    CROSS-EXAMINATION
 2   BY MR. STRIANSE:
 3   Q.    Good morning, Mr. Bratton.
 4   A.    Good morning, sir.
 5   Q.    Back in November of 2016, were there three Tasers that
 6   were kept in the jail?
 7   A.    Yes, ma'am.  To my knowledge, yes, sir.
 8   Q.    Now, your recollection of the events is that you think
 9   that in the incident with Mr. Norris outside of Cell 4 that
10   you may have tased three times; is that right?
11   A.    Yes, sir.
12   Q.    Okay.  Did the TBI get your Taser and do any sort of an
13   analysis of it during the course of the investigation?
14   A.    I'm not sure if they did or not, sir.
15   Q.    Your Taser would give a readout of how many times that
16   you actually used it; is that right?
17   A.    I do believe so, yes, sir.
18   Q.    So they would be able to independently verify the number
19   of times that the tase was used?
20   A.    I believe.
21   Q.    And the duration of the tase; is that right?
22   A.    I do believe so, yes, sir.
23   Q.    Okay.  Now, we saw you trying to help the officers that
24   were struggling with Mr. Norris after they had extracted him
25   from Cell 4; is that right?
```

```
1   A.    Yes, sir.
2   Q.    And your purpose in tasing him was to try to help them
3   get control of Mr. Norris; is that right?
4   A.    Yes, sir.
5   Q.    Because they were trying to get his arms cuffed behind
6   his back?
7   A.    Correct.
8   Q.    And you all were successful in -- I guess in that door
9   area of getting the cuffs behind his back; is that right?
10  A.    Yes, sir.
11  Q.    But he was then brought to the restraint chair, correct?
12  A.    Yes, sir.
13  Q.    He was still fighting?
14  A.    Yes, sir.
15  Q.    And then you had to tase him one additional time to get
16  him to sit down in the chair; is that right?
17  A.    Yes, sir.
18  Q.    So his hands were cuffed behind his back, but to gain
19  control and get him in the chair, you had to tase him that
20  one last time; is that right?
21  A.    Yes, sir.
22          MR. STRIANSE:  If -- if it's possible, I would
23  like to show him his exhibit, I think it's 16.
24          Thank you.
25  Q.    This is the incident report that you prepared; is that
```

1 right?

2 A.   Yes, sir.

3 Q.   And look at the bottom right box.

4            That's 2205; is that right?

5 A.   Yes, sir.

6 Q.   And you were a second shift employee; is that correct?

7 A.   Yes, sir.

8 Q.   So 2205 is about five minutes after your quitting time;

9 is that right?

10 A.   Yes, sir.

11 Q.   And Mr. Bryant -- you told the jury Mr. Bryant said that

12 he would take care of it; is that right?

13 A.   The use of force, not the incident report.

14 Q.   Okay.  If you had stayed after at work and prepared a

15 use of force report, that's a pretty detailed account of what

16 happened in terms of your part; is that right?

17 A.   Yes, sir, for an incident report, yes, sir.

18 Q.   So I think typically you might have taken that box in

19 the narrative section and literally cut and pasted it into

20 the use of force report; is that right?

21 A.   If I had done a use of force, yes, sir.

22 Q.   Okay.  Because that really contained all of the details

23 of what you had done that night?

24 A.   Yes, sir.

25            MR. STRIANSE:  Those are my questions.

1    THE COURT:  All right.  Redirect.

2

3                   REDIRECT EXAMINATION

4  BY MS. MYERS:

5  Q.   So, just to clarify, so when you were removing Jordan

6  Norris from the cell and as you described those three brief

7  tases in your incident report, during those three tases, was

8  Mr. Jordan Norris posing a threat at those times?

9  A.   Yes, ma'am.

10          MS. MYERS:  Thank you.

11          THE COURT:  All right.  You can step down.

12          THE WITNESS:  Thank you, sir.

13               (Witness excused.)

14          THE COURT:  Okay.  Call your next witness.

15          MS. MYERS:  The United States calls Caitlin

16  Johnson Marriott.

17          THE COURT:  All right.  If you'll stop there,

18  we'll swear you in.

19          COURT DEPUTY:  Please raise your right hand.

20                   CAITLIN MARRIOTT,

21  called as a witness by the Plaintiff, was duly sworn and

22  testified as follows:

23

24          COURT DEPUTY:  Please be seated.

25          Yeah.  Please be sure to speak directly into the

1  mike and state your full name.

2          THE WITNESS:  Caitlin Marriott.

3          THE COURT:  And can you spell your first and last

4  name.

5          THE WITNESS:  C-a-i-t-l-i-n, M-a-r-r-i-o-t-t.

6          COURT DEPUTY:  Thank you.

7

8                    DIRECT EXAMINATION

9  BY MS. MYERS:

10  Q.    Good morning, Ms. Marriott.

11  A.    Good morning.

12  Q.    Now, I have you with your last name as Marriott.

13          Are you married?

14  A.    Yes.

15  Q.    Are you married to a fellow employee at the Cheatham

16  County jail?

17  A.    Yes.

18  Q.    And to whom are you married?

19  A.    Josh Marriott.

20  Q.    And what is your occupation?

21  A.    I am a correctional officer.

22  Q.    And before that, what did you do?

23  A.    I worked at Miller Rich, helped special needs students.

24  And then, before that, I worked at Pleasantview Eye Care.

25  And then I was working at Cheatham County Sheriff's

1    Department in 2016.
2    Q.    All right.  So, just to get the timeline straight, you
3    were working at the Cheatham County sheriff's office on
4    November 5th of 2016?
5    A.    Correct.
6    Q.    And then you took a break?
7    A.    Correct.
8    Q.    And then now you're back?
9    A.    Correct.
10   Q.    And when did you start at the Cheatham County sheriff's
11   office around the time of 2016?
12   A.    September 22nd, 2016.
13   Q.    And then when did you restart your employment?
14   A.    November 6th, 2019.  No.  2018.  Sorry.
15   Q.    So just a few months ago?
16   A.    Yes.
17   Q.    Now, on November 5th of 2016, what was your position?
18   A.    A correctional officer.
19   Q.    And what did your job entail?
20   A.    Booking in inmates, watching the cameras, and making
21   sure all the inmates were doing what they were supposed to be
22   doing.
23   Q.    And did you receive any Taser training around the time
24   that you started?
25   A.    Yes.  I think it was in October.

```
1   Q.    And who did that Taser training for you?
2   A.    Gary Ola.
3   Q.    And about that time, how long had you worked there?
4   A.    A month or so.
5   Q.    When did you first encounter Jordan Norris?
6   A.    The day that he got booked in.  I'm not really sure of
7   the date that he got booked in, though.  I think it was a
8   Friday.
9   Q.    Was it -- so it was before November 5th?
10  A.    Yes.  Yes, ma'am.
11  Q.    So on a different day than November 5th --
12  A.    Yes.
13  Q.    -- you saw him?
14         And from that first time you saw him, do you
15  remember anything about that first meeting with him?
16  A.    No.  He -- I mean, he was just sitting in a cell.
17  Q.    And what shift did you work on November 5th --
18  A.    Second.
19  Q.    -- of 2016?
20  A.    So that --
21         THE COURT:  All right.  Now, let her finish the
22  question.  It's easier on the court reporter.  So you all
23  don't talk over each other.
24         Go ahead.  Say it -- ask it again.
25  BY MS. MYERS:
```

1  Q.   So what shift did you work on November 5th of 2016?
2  A.   Second shift.  That's 2:00 to 10:00.
3  Q.   And what were you doing that evening as part of your
4  job?
5  A.   I was working in booking.
6  Q.   And when you worked in booking, what did your duties
7  entail?
8  A.   Checking on the inmates that are in the cells and then
9  booking inmates in as they came in the back door.
10 Q.   And did you interact with Jordan Norris that night?
11 A.   I did.
12 Q.   And where was Jordan at that time?
13 A.   He was in Cell 4.
14 Q.   And where was Cell 4 in relation to where you were?
15 A.   It's in the same office.  I mean, it's right out the
16 door of the booking room.
17 Q.   And what did the door of Cell 4 look like?
18 A.   It's just a -- just a cell door.  It does not have bars
19 on it.  It's a hard door.  I don't know how to explain it.
20 Q.   So a solid door?
21 A.   A solid door, yes.
22 Q.   Okay.  Could you see into that --
23 A.   Yes.  It has a window.
24 Q.   Okay.  Where is the window placed?
25 A.   Right beside the handle of the door.

Q.    Okay.  Could you get a full view of what was going on in
that cell?

A.    Depends on what you were trying to look at.

Q.    At that time could you see what was happening in the
cell?

A.    I don't remember because I was -- I don't know that I
was in -- I might have been inside, looking through --
looking at the cameras.

Q.    So there are cameras where you were?

A.    Yes.

Q.    Okay.  So what did you see on the cameras?

A.    Jordan Norris banging his head against the cell door and
trying to get out.

Q.    So what did you do when you saw that?

A.    I asked Mark Bryant, Jeff Key, and Josh Marriott to go
assist him and try to calm him down.

Q.    And what did they do to try to calm him down?

A.    They tried to talk to him at first.  He wouldn't calm
down.  So they went in to try to get him out of the cell.

Q.    Did you see anything that was happening from your
vantage point?

A.    No, I didn't see anything.

Q.    Could you see anything in the cell at that time?

A.    No.

Q.    So after, you said Officers Marriott, Key, and the

1  defendant arrived; is that right?

2  A.    Uh-huh.  And then Deputy Bryant -- or not Bryant --

3  Bratton came in, as well.

4  Q.    Okay.  And do you remember how Bratton came into the

5  scene?

6  A.    I think that I called for him to come up for assistance

7  as well.

8  Q.    Now, I'm going to back up a bit and talk about your

9  relationship --

10  A.    Okay.

11  Q.    -- with the different people who were involved that

12  night.

13  A.    Okay.

14  Q.    So you've already mentioned that you were married to

15  Officer Marriott?

16  A.    Uh-huh.

17  Q.    And when was that?

18  A.    We got married May 12th, 2018.

19  Q.    So back in 2016, you guys were not married at that time?

20  A.    Correct.

21  Q.    And what was your relationship with Officer Marriott at

22  that time?

23  A.    Friends.

24  Q.    And how about with Officer Key?

25  A.    Friends as well.

```
1    Q.    And how about with the defendant, Mark Bryant?
2    A.    Friends.
3    Q.    And how would you characterize that friendship?
4    A.    I mean, we would go out, hang out after work.  We would
5    go to lunch before work.  I don't know.
6    Q.    So would you socialize outside of work?
7    A.    Yes.
8    Q.    And how about in terms of living arrangements?  Did any
9    of you all have a roommate?
10   A.    My husband did, Josh Marriott, with Mark Bryant.  I
11   don't remember the timeline of that, though.
12   Q.    But they did live together?
13   A.    Yes.
14   Q.    And how about your professional relationship with Mark
15   Bryant?  What would his professional relationship have been
16   to you and your position?
17   A.    He was my corporal, so he was the boss.
18   Q.    And was he the boss on that night of November 5th?
19   A.    He was.
20   Q.    And are you all still friends?
21   A.    Yes.
22   Q.    You're still friends with Mark Bryant?
23   A.    Uh-huh.
24              THE COURT:  You need to verbalize your answer.
25              THE WITNESS:  Yes.
```

BY MS. MYERS:

Q.   And now I'm going to go back to getting Jordan Norris out of the cell.

So what did Officers Marriott, Key, and Bryant do right when you got them to help?

A.   They opened the cell door and tried to just get him out of the cell.  And he was combative the whole time.

Q.   And did you remember when Bratton arrived on the scene?

A.   I remember -- as soon as they opened the cell door, he was there.  I really don't know how he got there.  But he was there, and I remember him pulling the Taser and tasering him because I heard the sound.

Q.   Okay.  So Bratton, you remember him pulling the Taser?

A.   Uh-huh, I do.

Q.   Did anybody else have a Taser at that time?

A.   Not pulled on him that I remember.

Q.   So you heard the sound?

A.   Yes.

Q.   Okay.  Is that a distinctive sound for you?

A.   It is.

Q.   What is that sound like?

A.   Ticking.

Q.   And do you know approximately how long that tase was that Bratton used?

A.   I don't remember.

1   Q.    So, after that tase, what did the officers do with

2   Jordan Norris?

3   A.    They asked for the restraint chair.  So I went to go and

4   grab it out of the vehicle sally port where we kept it.  And

5   I moved it into -- for them to be able to place Jordan in it.

6   Q.    And what was the restraint chair for?

7   A.    So Jordan would not hurt himself or anyone else.

8   Q.    And who was trying to get Jordan Norris into the chair

9   at that time?

10  A.    Mark Bryant, Josh Marriott, Daniel Bratton, and Jeff

11  Key.

12  Q.    And where were you standing while this was happening?

13  A.    Probably ten feet away.

14  Q.    And were they still having issues, even after that tase?

15  A.    Yes.

16  Q.    Okay.  So what happened then?

17  A.    They still put him in the chair and were putting the

18  straps on him at that time.

19  Q.    Okay.  Did he at any point get tased again during that

20  process?

21  A.    I don't remember at that process of him getting into the

22  chair.

23  Q.    Do you remember Mark Bryant using the Taser at that

24  point?

25  A.    I don't know if he used it while he was getting him

1  in -- I just remember when he got his arm later on out, that
2  he used the Taser.
3  Q.   Okay.  So that was later on?
4  A.   Right.
5  Q.   We're talking about the 6:55 incident.
6  A.   Okay.
7  Q.   So getting him out of the cell.
8       But you remember some period of time passing --
9  A.   Uh-huh.
10 Q.   -- between the time that Jordan Norris got in the chair
11 and then what happened later with the defendant and the
12 Taser?
13 A.   Correct.
14 Q.   Did you write an incident report --
15 A.   I did not.  That night, I did not.
16 Q.   -- about the 6:55 --
17 A.   No.
18 Q.   -- incident?  You did not that night?
19 A.   Not that night, no.  I did it in July.
20 Q.   You did in July?
21 A.   Correct.
22 Q.   Okay.  And this was November 5th?
23 A.   Correct.
24 Q.   Why didn't write an incident report?
25 A.   Because I was told I wouldn't need to because I did not

1  go hands on with him.

2  Q.    Okay.  Who told you that?

3  A.    Mark Bryant and Josh Marriott.

4  Q.    Now, was Jordan Norris in the restraint chair for a

5  while after he was secured into the chair?

6  A.    Yes.

7  Q.    And did he get worked up again later?

8  A.    He did.

9  Q.    Was he yelling things later?

10 A.    Yes, he was.

11 Q.    And around what time was that?  Do you remember?

12 A.    I want to say around 9:00.

13 Q.    So a fair amount of time later?

14 A.    (Witness moves head up and down.)

15 Q.    And what happened at that point?

16 A.    Jeff Key, Josh Marriott, and Mark Bryant moved towards

17 him, and I was standing there.  Mark asked for the Taser that

18 I had on my hip and started tasing his leg.

19 Q.    Did you notice anything about Jordan Norris at the time

20 in terms of his restraints?

21 A.    His arm was out.

22 Q.    Do you remember if it was completely out?

23 A.    I don't.  I don't think it was at all.  I don't think it

24 was -- like, he couldn't flair and hit anyone, no.

25 Q.    Okay.  So he couldn't hit anyone with that arm?

1  A.    Correct.

2  Q.    What about his legs?  Were his legs still restrained?

3  A.    Yes.

4  Q.    Was his lap belt still on?

5  A.    Yes.

6  Q.    Did he still have the shoulder straps on?

7  A.    He did.

8  Q.    And you said that Mark Bryant asked for you to get the

9  Taser?

10 A.    Correct.

11 Q.    And so where did you get it from?

12 A.    I had it on -- holstered on my hip.

13 Q.    And did you just hand it to him, or how did you get it

14 to him?

15 A.    I took the cartridge out and handed it to him.

16 Q.    And what happened after you handed it to him?

17 A.    He started tasing his leg.

18 Q.    So the defendant started tasing his leg?

19 A.    Correct.

20 Q.    Now, do you remember what kind of tase it was, from your

21 training?  Was it using the prongs or --

22 A.    No.  It was drive stun.

23 Q.    Okay.  And how do you do that?

24 A.    You just pull the trigger and it will activate.

25 Q.    Okay.  And do you remember how many times the defendant

1  tased Jordan Norris?

2  A.  I do not.

3  Q.  Do you remember the defendant saying anything to Jordan

4  Norris while he tased him?

5  A.  I do.

6  Q.  What do you remember him saying?

7  A.  That he would tase him until the batteries run out.

8  Q.  Do you remember him saying anything else?

9  A.  I don't.

10 Q.  Based on your training that you had received, was that

11 an appropriate comment?

12 A.  No.

13 Q.  So you mentioned that you had had Taser training about a

14 month before this event?

15 A.  Correct.

16 Q.  Is that the reason you were permitted to carry a Taser?

17 A.  Yes.

18 Q.  Are you permitted to carry a Taser if you're not Taser

19 certified?

20 A.  No.

21 Q.  So you said that this was -- you remember it being

22 around 9:00?

23 A.  Correct.

24 Q.  So sometime after that 6:55 initial movement of Jordan

25 Norris to the chair?

1  A.   Uh-huh.  Yes.

2  Q.   And did you write a report regarding that later incident

3  with the defendant tasing Jordan Norris?

4  A.   I did not.

5  Q.   Was it policy to write a use of force report?

6  A.   Yes.  If you go hands on, is what I was taught.

7  Q.   And did you go hands on?

8  A.   I did not.

9  Q.   What about an incident report?  Did you write an

10 incident report?

11 A.   I did not.

12 Q.   And why didn't you write an incident report?

13 A.   Because I was told not -- I didn't need to because I did

14 not go hands on with Jordan Norris.

15 Q.   An incident report?

16 A.   Correct.

17 Q.   But the use of force is when you go hands on, right?

18 A.   Correct.

19 Q.   So what's the difference between an incident report and

20 a use of force report?

21 A.   I'm not really sure.  I mean, incident, it was

22 probably -- I should have done one, but I just -- I don't

23 know what the difference is.

24 Q.   And who told you not to write an incident report?

25 A.   Josh Marriott and Mark Bryant.

1   Q.   Were there any other issues related to Jordan Norris for

2   the rest of your shift?

3   A.   Not that I remember.

4   Q.   And you left -- you said 10:00 p.m.; is that correct?

5   A.   Correct.

6   Q.   Did you leave right at 10:00 p.m.?

7   A.   I probably did that night.

8   Q.   And I want to go back to when you handed the Taser to

9   Mark Bryant.

10        Could we please pull up Exhibit 10, timestamp

11   2:37.

12        (Video playing.)

13        MS. MYERS:  If we could stop for a second.

14   Q.   Do you recognize this?

15   A.   (Witness moves head up and down.)

16   Q.   Okay.  And what is this depicting?  And you can take

17   your time.

18   A.   What was the question?  Sorry.

19   Q.   That's fine.  Let's -- let's go around, and can you name

20   the people in this picture?

21   A.   Jordan Norris is in the chair.  Joshua Marriott is

22   holding his chin.  Mark is in front of him.  And Jeff Key's

23   on the side of him.

24   Q.   Okay.  Now, where were you at this point in time?

25   A.   Standing off to the side.

1  Q.    Okay.  Which side, like, as we're looking at it?  As

2  we're looking at --

3  A.    To the right.

4  Q.    To the right.  Okay.

5        And you're just not on camera at this point?

6  A.    Correct.

7  Q.    And can you describe the straps?  You mentioned

8  before -- are Jordan Norris's feet secure at this point?

9  A.    Yes.

10 Q.    And does he still have the shoulder straps on?

11 A.    He does.  But they're down on his arms more than what

12 they should be.

13 Q.    And they're still secure around his arms though?

14 A.    Yes.

15 Q.    And how about his lap?  Can you see the lap restraint?

16 A.    I can't see it because of his black shirt.

17 Q.    Do you remember seeing at that point whether or not --

18 A.    It was secure.

19 Q.    -- it was secure?

20 A.    (Witness moves head up and down.)

21 Q.    And how about the hands that are on one of Jordan

22 Norris's arms?  Who has hands on Jordan Norris's arms?

23 A.    Mark Bryant and Jeff Key.

24 Q.    And at that point, based on your training, is Jordan

25 Norris posing a threat to these officers?

```
1   A.    As of right now, no.
2              MS. MYERS:  Could we please play the video from
3   this point.
4              (Video played.)
5   BY MS. MYERS:
6   Q.    Okay.  And is that you?
7   A.    Yes.
8              (Video played.)
9   BY MS. MYERS:
10  Q.    So did you see Officer Key's hand on Jordan Norris
11  through that video?
12  A.    I did.
13  Q.    And where was Officer Key's hand?
14  A.    On Jordan's hand, trying to put it back in the
15  restraints.
16  Q.    And was any other part of Jordan Norris out of
17  restraints at that point --
18  A.    No.
19  Q.    -- throughout this period?
20  A.    No.
21  Q.    And from your vantage point that night, did you see
22  anything that would pose an immediate threat during that
23  period?
24  A.    No.
25             MS. MYERS:  You can take that off.  Thank you.
```

1  Q.   So how did witnessing this incident make you feel?

2  A.   I don't -- I'm sad.  I mean, I don't know.

3  Q.   How about back on that night after you witnessed that

4  incident?  What did you think?

5  A.   I've never seen anything like that before.

6  Q.   And based on your Taser training, was Mark Bryant's

7  tasing of Norris consistent with what you were taught?

8  A.   Not that I remember, no.

9  Q.   And why not?

10  A.   Because he was restrained for the one -- I mean, that

11  one part.

12  Q.   How about the length of the tases that you saw that

13  night?

14  A.   I don't remember anything about that.

15  Q.   Did it feel like it was a long time to you?

16  A.   It did.

17  Q.   Longer than you were taught?

18  A.   Yes.

19  Q.   Did you ask Mark Bryant to stop tasing Jordan Norris

20  that night?

21  A.   I did not.

22  Q.   Did you feel like you could ask him?

23  A.   No.

24  Q.   Why did you feel like you couldn't ask him to stop?

25  A.   Because he was the boss at the time.

1  Q.   Did the defendant talk to you about that incident that

2  night later?

3  A.   Not that I remember, no.

4  Q.   What about after that?  Did Mark Bryant make any

5  statements to you about that night?

6  A.   Not that I remember.

7  Q.   And after November 5th, did you interact with Jordan

8  Norris again?

9  A.   I did.

10  Q.   When was that?

11  A.   Wednesday, that I came back to work.

12  Q.   Do you remember how many days later that was?

13  A.   That was three.

14  Q.   And did Jordan Norris have any injuries from the tasing?

15  A.   He did.  On his leg.

16  Q.   And did he show them to you?

17  A.   He did.

18  Q.   And what did they look like to you?

19  A.   Grounded hamburger meat.

20  Q.   Where was the ground hamburger meat on his body?

21  A.   It was on his leg, above his knee.

22  Q.   Was Jordan Norris in pain as a result of those wounds?

23  A.   I'm not sure.  I asked him if he had seen the nurse

24  though, and he said yes.

25  Q.   Did it appear that he had had any medical assistance?

```
 1   A.    No.
 2   Q.    Was there a bandage on it?
 3   A.    No.
 4   Q.    Did you see Jordan Norris again after that interaction?
 5   A.    It wasn't until months later.
 6   Q.    Now, you still work in the Cheatham County jail?
 7   A.    I do.
 8   Q.    Are you still around Tasers as part of your job?
 9   A.    I am.
10   Q.    How does that affect you at work?
11   A.    They all know not to do that spark test in front of me.
12   Q.    And why is that?
13   A.    Because every time I hear the sound, I go back to the
14   chair with Jordan in it.
15   Q.    And did you carry a Taser after that night?
16   A.    Not until several -- probably several weeks later.
17   Q.    And why was that?
18   A.    Because I didn't want to have to tase anyone.
19             MS. MYERS:  One moment.
20             I have no further questions.
21             THE COURT:  All right.
22             Cross.
23
24
25
```

1                    CROSS-EXAMINATION

2    BY MR. STRIANSE:

3    Q.   Good morning, Mrs. Marriott.

4    A.   Good morning.

5    Q.   I just have a few questions.  And I know this is

6    upsetting to have to go back through this.

7              Do you remember back in August of 2017 being

8    interviewed by the TBI in connection with this?

9    A.   I do.

10   Q.   And I think you gave them a -- what they called a

11   typewritten statement; is that right?

12   A.   Correct.

13   Q.   Where, in your own words, you told what really happened

14   that night on November 5, 2016; is that a fair statement?

15   A.   Yes.

16   Q.   I think you told the agent, Mr. Atkins, that there was

17   really no way to control Mr. Norris that night; is that

18   right?

19   A.   Yes.  That's right.

20   Q.   I think you told the agent that he was fighting and

21   flailing and struggling with the officers; is that right?

22   A.   Correct.

23   Q.   Cursing and spitting?

24   A.   Correct.

25   Q.   I think you also told them that he was trying to fight

1  with other inmates in Cell 4; is that right?
2  A.   That's correct.
3  Q.   You said a few minutes ago that when he was -- when
4  Mr. Norris was in the chair that he was not a threat to
5  anybody else.  And then you were shown that still photograph
6  and the video that we saw that followed.
7          You saw your husband standing behind him, did you
8  not?
9  A.   I did.
10 Q.   And he was applying pressure under Mr. Norris's chin; is
11 that right?
12 A.   Correct.
13 Q.   Because he was trying -- Mr. Norris was trying to head
14 butt the officers; is that right?
15 A.   Correct.
16 Q.   And I assume you would consider that a threat to the
17 officers?
18 A.   Yes.
19 Q.   Also, his right hand was free; is that correct?
20 A.   Not completely.
21 Q.   But you saw Jeff Key trying to hold on to his hand; is
22 that right?
23 A.   Correct.
24 Q.   And they did not have him under complete control at that
25 point in time, did they?

A.   His hand was still in the restraint though.  It just
wasn't tied tightly.

Q.   You talked about your training.

        Do you remember telling the TBI that you had never
gone over this type of a scenario in your training?

A.   I don't recall.

Q.   How about telling the TBI that you were not trained
about the Taser and how to use it in conjunction with the
restraint chair?

A.   I don't remember.

Q.   You talked about your interaction with Mr. Norris after
this event where you say that you saw this injury to his
knee.

A.   Yes.

Q.   Is that right?

A.   Yes.

Q.   Now, when he came to the jail on -- on or about
November 3rd or so, you didn't see if he had any injuries
that he brought with him to the jail, do you?

A.   Right.  I didn't see anything.

Q.   So you don't know what caused this injury to his knee?

A.   Correct.

Q.   Okay.  You talked about this report that you did -- I
think you said that you did it in July; is that right?

A.   That's correct.

Q.   About nine months after the event --

A.   Correct.

Q.   -- is that correct?

     And what caused you to have to do the report nine
months after the event?

A.   The administration came and told me I needed to do a
report on what I remember.

Q.   Okay.  And you did your report about July 30th, 2017; is
that right?

A.   Yes.

Q.   And this was after that civil lawsuit was filed; is that
correct?

A.   That's correct.

          MR. STRIANSE:  Your Honor, may she be shown what's
been marked for identification as Defendant's 1?

          THE COURT:  Any objection?

          MS. MYERS:  No objection.

          THE COURT:  All right.

BY MR. STRIANSE:

Q.   Is that the report that you prepared on or about
July 30, 2017?

A.   Yes.

          MR. STRIANSE:  Your Honor, we would offer
Defendant's 1 as evidence.

          THE COURT:  Any objection?

1           MS. MYERS:  Oh, no objection, Your Honor.

2           THE COURT:  All right.

3           (Whereupon Defense Exhibit 1 was marked for

4           identification and received in evidence.)

5    BY MR. STRIANSE:

6    Q.   Since it's only really one sentence, why don't you read

7    it into the record.

8    A.   (As read):

9               While on booking I heard Inmate Norris banging

10              his head on the cell door.  Deputy Key, Deputy

11              Marriott, and Deputy Bryant, Deputy Bratton went

12              over to talk to him to try to calm Inmate Norris

13              down.  Inmate Norris wasn't calming down so they

14              put him in the restraint chair.  Deputy Bratton

15              tased Inmate Norris.

16   Q.   Now, you testified this was done in July of 2017,

17   correct?

18   A.   Correct.

19   Q.   And Mr. Bryant was no longer working at the jail at that

20   point in time; is that correct?

21   A.   Not that I -- I mean, I don't remember when he got put

22   on administrative leave.

23   Q.   Okay.  But you certainly don't report anything in -- in

24   this report about the comments being inappropriate that

25   Mr. Bryant made that evening, on November 5th, 2016; is that

1  right?

2  A.   That's correct.

3  Q.   You don't put anything in this report where you say that

4  the activities of that night were -- by anybody were

5  inconsistent with the training that you had received; is that

6  right?

7  A.   That's correct.

8  Q.   He was no longer your corporal or your boss at that

9  period in time; is that right?

10 A.   That's correct.

11             MR. STRIANSE:  Your Honor, may I have one moment?

12             THE COURT:  Sure.

13             MR. STRIANSE:  Those are my questions.

14             THE COURT:  All right.  Redirect.

15

16                    REDIRECT EXAMINATION

17 BY MS. MYERS:

18 Q.   So, Officer Marriott, when we showed the video,

19 Exhibit 10, and you talked about where people were and

20 whether or not there was any threat, was that -- if there had

21 been a threat at all, was that controlled in the scene that

22 we saw?

23 A.   Yes.

24 Q.   You mentioned that Josh Marriott, your husband, was

25 behind Jordan Norris at that time.

1    A.    That's correct.

2    Q.    So there was -- was there any way that Jordan Norris

3    could head butt at that time?

4    A.    No.  Because Josh had his head at that point.

5    Q.    And in terms of his arm, who was holding his arm?

6    A.    Jeff Key.

7    Q.    Was any threat that Jordan Norris could have posed

8    controlled at that point?

9    A.    It was controlled.

10   Q.    And you mentioned the injury earlier, the hamburger meat

11   injury that you saw --

12   A.    Uh-huh.

13   Q.    -- that you saw on Jordan Norris's leg.

14         Did that injury appear to be on the spot where you

15   saw him tased by Mark Bryant?

16   A.    Correct.

17   Q.    Now, the Defense Exhibit 1, which is the incident report

18   that was just referenced that you wrote nine months after the

19   incident, you read that last sentence.

20         Could you read that last sentence again?

21   A.    (As read):

22              Inmate Norris wasn't calming down so they put

23              him into the restraint chair.  Deputy Bratton

24              tased inmate Norris.

25   Q.    Was this the earlier incident?

A.    It was.

Q.    Okay.  So this was not an incident report, then, in
relation to that later period when you witnessed Mark Bryant
doing the tasing?

A.    Correct.

Q.    And again, why didn't you submit a report about that
8:00 p.m. -- that later incident?

A.    Because I was told that I didn't need to -- because Mark
and Josh told me I didn't need to because I didn't go hands
on.

            MS. MYERS:  Thank you.

            THE COURT:  All right.  You can step down.

                  (Witness excused.)

            THE COURT:  Ladies and gentlemen, we need to take
just a very quick break, about five minutes.

            (Brief recess.)

            (Jury not present.)

            THE COURT:  All right.  Be seated.  Bring in the
jury.

            (Jury present.)

            THE COURT:  All right.  Be seated.

            Okay.  Call your next witness.

            MR. SONGER:  The United States calls Michael
Montgomery.

            THE COURT:  All right.  If you'll stop there,

1  we'll swear you in.

2          COURT DEPUTY:  Please raise your right hand.

3

4              STEVEN MICHAEL MONTGOMERY,

5  called as a witness by the Government, was duly sworn and

6  testified as follows:

7

8          COURT DEPUTY:  Can you please state your full

9  name.

10         THE WITNESS:  Stephen Michael Montgomery.

11         THE COURT:  And spell your last name, please.

12         THE WITNESS:  My last name?

13         COURT DEPUTY:  Yes.

14         THE WITNESS:  M-o-n-t-g-o-m-e-r-y.

15         COURT DEPUTY:  Thank you.

16         THE COURT:  All right.

17

18                  DIRECT EXAMINATION

19 BY MR. SONGER:

20 Q.   Good morning.

21 A.   Good morning.

22 Q.   Could you please tell us how you're currently employed?

23 A.   I work for Cheatham County 911.

24 Q.   And have you ever worked in the Cheatham County jail?

25 A.   I have.

```
1   Q.   When did you work there?
2   A.   From 2007 until a little over a year ago.
3   Q.   And what was your position when you worked in the
4   Cheatham County jail?
5   A.   I started out as a correctional jailer, and then, when I
6   left, I was a corporal.
7   Q.   When did you get promoted to corporal?
8   A.   I couldn't tell you an exact date.
9   Q.   Ballpark?
10  A.   A few years before I left.
11  Q.   Okay.  And when did you leave?
12  A.   October of 2017.
13  Q.   This past October?
14  A.   No.  2017.
15  Q.   Oh, so a little over a year ago?
16  A.   Right.
17  Q.   Gotcha.
18            And you'd been a corporal for a few years at the
19  time you left?
20  A.   Yes, sir.
21  Q.   So, as a corporal, what are you are basic
22  responsibilities?
23  A.   I was a assistant shift supervisor.
24  Q.   And what does that mean?
25  A.   When the sergeant wasn't there, I basically ran shift,
```

```
 1   helped oversee other deputies.  Just make sure that it was
 2   run. . .
 3   Q.   How many deputies would you supervise on a shift?
 4   A.   It varied.  Anywhere from four to six.  Sometimes seven.
 5   Q.   And did you work a particular shift?
 6   A.   I've worked all three shifts during my time there.
 7   Q.   When you worked in the jail, did you carry a Taser?
 8   A.   From time to time.
 9   Q.   Were you Taser certified?
10   A.   Yes, sir.
11   Q.   Were officers required to take training and get
12   certified before they carried a Taser?
13   A.   Yes, sir.
14   Q.   And so I assume you completed that training?
15   A.   Yes, sir.
16   Q.   Who taught it?
17   A.   Gary Ola.
18   Q.   Now, have you, yourself, been tased?
19   A.   I've been drive stunned.
20   Q.   Why were you drive stunned?  When did that happen?
21   A.   I did it as a volunteer exposure.
22   Q.   Was that as part of your training?
23   A.   Yes.
24   Q.   So you actually volunteered for it?
25   A.   Yes.
```

1  Q.   Okay.  And where on your body were you drive stunned?

2  A.   I've been drive stunned in my right arm.  I've been

3  drive stunned in my leg.  And I've been drive stunned in the

4  back.  And then I've accidentally caught myself in the pinky

5  one time.

6  Q.   Okay.  In those different drive stuns, what was the

7  longest period of time that you had ever been exposed to the

8  Taser?

9  A.   I couldn't give an exact time.  I would say anywhere

10 from, you know -- as little as, like, half a second up to

11 about three seconds.

12 Q.   Okay.

13 A.   Maybe five.

14 Q.   You've never been exposed to Taser for more than five

15 seconds?

16 A.   No.

17 Q.   So what does it feel like when you get drive stunned?

18 A.   Just a real intense pain.

19 Q.   And on a scale of 1 to 10, where would you rate the

20 pain?

21 A.   8 or a 9.

22 Q.   And that's after just three to five seconds?

23 A.   Yes.

24 Q.   Now, based on your experience in the jail and your

25 training, what was your understanding of when officers were

1  permitted to use a Taser on someone in the jail?

2  A.   A Taser could be used to control or capture a subject

3  and also as a pain compliance tool whenever they are refusing

4  orders or resisting.

5  Q.   Okay.  If someone just simply is noncompliant and

6  refuses an order, was it permissible to use a Taser on them?

7  A.   Not to my understanding.

8  Q.   So did they have to be actually actively resisting?

9  A.   Yes.

10  Q.   Posing a threat to officers?

11  A.   Not necessarily posing a threat.  I mean, it could be

12  the fact that you've gave them a lawful order; they refused

13  to do so.  Then, whenever you attempt to force them to do

14  that, they start struggling, and at which point a Taser could

15  be used.

16  Q.   Struggling, actively fighting back?

17  A.   Correct.

18  Q.   All right.  And what was your understanding of the --

19  when officers -- excuse me -- how long officers were

20  permitted to tase someone?

21  A.   I think it was up to five seconds and then up to three

22  times.

23  Q.   So even if there was some justification for using the

24  Taser, officers couldn't do it more than three times at five

25  seconds each?

A.    Unless there were extenuating circumstances.

Q.    And what kind of extenuating circumstances could justify going beyond that?

A.    In my opinion, immediate threat to loss of life or severe injury.

Q.    Some really serious threat?

A.    Correct.

Q.    And do you know how a Taser works, I assume?

A.    I do.

Q.    So how long is a standard Taser cycle, just one cycle?

A.    Depending on the model, it's five to seven seconds.

Q.    Okay.  And what model were you using back in the jail in 2016?

A.    The X26P.

Q.    How long was the cycle on the X26P?

A.    Five seconds.

Q.    Is that one pull of the trigger?

A.    Correct.

Q.    So if an officer pulls the trigger once and then lets it go, what happens to the Taser?

A.    It runs its five-second cycle and it stops.

Q.    Is there a way to keep the Taser going beyond those five seconds?

A.    There is.

Q.    How is that?

1    A.    By continuously holding the trigger.

2    Q.    Do you have to keep your finger on the trigger to keep

3    it going?

4    A.    Correct, after the five seconds.

5    Q.    Is there more than one mode in which you can use a

6    Taser?

7    A.    I'm assuming you're talking about either a drive stun or

8    with the probes?

9    Q.    Right.   So what is drive stun mode?

10   A.    Drive stun mode is basically where the Taser is making

11   contact with the body and the two electrodes are touching the

12   body at one point, and it just passes electricity through

13   those two points.

14   Q.    Is that a pain compliance technique?

15   A.    It is.

16   Q.    What does it mean for something to be, like, a pain

17   compliance weapon?

18   A.    Pain compliance, basically you inflict pain on the

19   subject, and then, whenever you stop inflicting that pain, it

20   gives them an opportunity to comply with your directives.

21   And then, if not, you could go for a second application.

22   Q.    So, if you're using a pain compliance weapon, how do you

23   know if it's effective?

24   A.    There's a big debate about whether pain compliance --

25   you know, the effectiveness of it.   Basically, you are

1    inflicting pain upon a subject then stopping that pain,

2    giving them an opportunity to comply.  And the supposed

3    thought process is that they don't want it to happen again,

4    so they stop and start complying with your orders.

5    Q.    So is there any way to know whether it's -- the tool --

6    the pain compliance tool is effective if you don't stop and

7    see how the person reacts?

8    A.    No.

9    Q.    So were you taught to use the pain compliance Taser in

10   that way?

11   A.    I don't know that it was taught in the class.  I watch a

12   lot of, you know, documentaries and did a lot of research on

13   my own, but that's how I learned to use it.

14   Q.    Sure.  Well, don't tell me about stuff you learned

15   outside of the jail.

16              But what was your understanding of how it was

17   supposed to be used in the jail as a pain compliance tool?

18   A.    I don't know 100 percent how they explained it in the

19   training, but we were instructed to use the Taser, then give

20   them a chance to stop resisting, and then, if they don't,

21   then you can use it again.

22   Q.    Then can you use it again after you see whether they've

23   stopped?

24   A.    Correct.

25   Q.    Up to a max of three times for five seconds each?

```
1  A.    Correct.
2  Q.    All right.  Now, in the ten years that you worked at the
3  jail, how many times did you personally have to use a Taser?
4  A.    If I remember correctly, I think three.
5  Q.    Were each of those in this drive stun mode?
6  A.    Yeah, they were.
7  Q.    Do you remember those three incidents?
8  A.    I do.
9  Q.    Could you quickly tell us about them?
10 A.    One, we were moving a subject from booking to general
11 population.  He was refusing to do so.  I went in, attempted
12 to handcuff him.  Whenever he did, he started to struggle.  I
13 applied a drive stun to his back.  And then, as he fight- --
14 he was fighting with me, it went to the back of his leg.  I
15 tased him for one cycle and then he complied.  We cuffed him
16 up and moved him.
17 Q.    Okay.  Let me just follow up real quickly about that.
18        Was the person restrained at the time you tased
19 him?
20 A.    No.
21 Q.    He was actively fighting you?
22 A.    Yes.
23 Q.    And how much total time was the Taser on this person?
24 A.    Less than five seconds, because as he started -- I only
25 used one cycle.  And as he started to struggle, I had to
```

1    relocate to move it to the back of his leg.

2    Q.    Okay.  And I think you were starting to talk about the

3    second time.

4    A.    The second time that I used one was I was coming from

5    the general population area into booking.  I saw that my

6    officer had the door to Cell 3 open.  At that time we still

7    had bars on the doors instead of the full plates.

8              The inmate was throwing knee strikes at my

9    officer.  So I ran up, pulled my Taser, and drive stunned --

10   stuck my hand through the bar to drive stun her to get her

11   off my officer.

12             And as soon as I hit her with the drive stun, she

13   jumped back.  I grabbed my officer by the collar, pulled him

14   back and then just slammed the door.  So I was able to get my

15   officer out of the situation and keep her contained.

16   Q.    So you were able to accomplish your objective after how

17   long?  How long was the drive stun?

18   A.    As soon as it hit her, she jumped backwards.  And I

19   couldn't get my arms any further through the bars because

20   they're only, like, that wide (indicating).

21   Q.    Are we talking one second?

22   A.    Probably.

23   Q.    And that person had been actively hitting the officer

24   with knee strikes?

25   A.    Knee strikes, yes.

1  Q.    Okay.  What about the third time?

2  A.    While we were attempting to get Jordan Norris in a

3  vehicle to go to the hospital for mental evaluation, we had

4  gotten one leg in the vehicle.  He had braced the other leg

5  against the ground and was using it to push up toward the top

6  of the vehicle with his shoulders.  We couldn't get him in

7  there.

8          The Taser instructor instructed me to apply a

9  drive stun to his calf, which would cause -- the pain would

10 cause his knee to jerk upward and away from it.  And at that

11 point we were able to get him in the vehicle.

12 Q.    Okay.  And how long did you apply the drive stun?

13 A.    A second or less.  And it -- when his knee jerked up,

14 then I just pulled the Taser away from him.

15 Q.    And then you were able to get him into the vehicle?

16 A.    Yes.

17 Q.    I'm sorry.  What was the name of that inmate?  What was

18 the name of the inmate?

19 A.    Jordan Norris.

20 Q.    Was that on November 5th, 2016?

21 A.    Yes.

22 Q.    Okay.  Thinking about your role and duties as a

23 supervisor, as a corporal in the jail, when you first arrive

24 for a shift, do you typically get a briefing from the

25 officers who are already there to learn if there's anything

1  you need to know before you go on duty?

2  A.    Yes.

3  Q.    Who usually gives you that briefing?

4  A.    Most of the time it's the supervisor from the shift

5  before.

6  Q.    Okay.  And what types of information do they tell you

7  about in a briefing?

8  A.    Anything that's pending that needs to be, you know,

9  taken care of, like the booking process, any kind of watches

10 that they're on, such as, you know, either suicide, medical

11 watches.  Anything basically pertinent to the day that the

12 next shift may need to know about.

13 Q.    What about serious incidents that happened on the prior

14 shift?

15 A.    Most of the time, yes.

16 Q.    What if an inmate who you were going to have to deal

17 with had been injured in a prior shift?  Is that something

18 they tell you about?

19 A.    Yes.

20 Q.    Was it important for you to have that information?

21 A.    Yes.

22 Q.    All right.  Was Mark Bryant a supervisor of the jail

23 during the time that you worked there?

24 A.    He was on the second shift, yes.

25 Q.    So were there any times that he was on second shift as a

1  supervisor and you would come in the next shift and he would
2  give you a briefing?
3  A.    Yes.
4  Q.    All right.  Now, were you working at the jail on
5  November 5th, 2016?
6  A.    I was.
7  Q.    What shift were you that night?
8  A.    Third.
9  Q.    So what time did you come in?
10  A.    10:00 p.m.
11  Q.    So is that 10:00 p.m. to 6:00 a.m. shift?
12  A.    Yes, sir.
13  Q.    Now, was Officer Bryant working that night?
14  A.    He was.
15  Q.    Was he the supervisor on the second shift?
16  A.    He was.
17  Q.    When you arrived, did Defendant Bryant give you any kind
18  of a briefing that night?
19  A.    When I arrived, they were dealing with an ongoing
20  incident at the time.  So at that time I did not get a
21  briefing.
22  Q.    At some point that evening did he give you a briefing?
23  A.    Later on in the shift, yes.  After that situation was
24  dealt with.
25  Q.    Okay.  Do you remember what he told you?

A.   Just basically told me that -- of course, that the
inmate had been taken out to the hospital for a medical eval,
that he had been on suicide watch earlier, and that they had
dealt with him earlier that day.

Q.   You said, "They had dealt with him earlier that day"?

A.   Yes.

Q.   Did he tell you that the inmate -- was that Jordan
Norris, the inmate?

A.   It is.

Q.   Did he tell you that Jordan had been tased earlier that
day?

A.   No.

Q.   So didn't tell you that he had been tased for long
amounts of time, I guess?

A.   No.

Q.   Did he tell you that Jordan had been injured?

A.   No.

Q.   Okay.  So when you arrived that night, what was -- what
was happening?

A.   When I arrived that night, they had Jordan Norris
partially restrained in the restraint chair, and they were
attempting to get him fully restrained.

Q.   Okay.  And this was around 10:00 p.m.?

A.   Correct.

Q.   Now, why were they trying to get him fully restrained?

1  Do you know?

2  A.   Because he was needing to be transported to the Ashland

3  City ER for a mental evaluation.

4            MR. SONGER:  Could we have the court security

5  officer hand the witness the exhibit binder that's behind

6  him.  Thank you.

7  Q.   Mr. Montgomery, could you please turn to Tab 14.

8            Do you see the first picture there that's stamped

9  Exhibit 14A?

10  A.   Oh, you said 14?

11  Q.   14.  Yes.

12  A.   I'm sorry.  I thought you said 4.

13  Q.   No problem.

14  A.   I do.

15  Q.   Okay.  Do you recognize the scene that's depicted in

16  that picture?

17  A.   I do.

18  Q.   What does it show?

19  A.   Inmate Norris partially restrained in the restraint

20  chair and partially handcuffed to the rail in front of the

21  booking counter.

22  Q.   Okay.  Is that a fair and accurate depiction of the

23  scene shortly after you arrived at the jail that night?

24  A.   It is.

25            MR. SONGER:  Your Honor, the Government moves

Exhibit 14A into evidence.

MR. STRIANSE:  No objection.

THE COURT:  Admitted.

(Whereupon Plaintiff Exhibit 14A was marked for identification and received in evidence.)

MR. SONGER:  May we publish it?

THE COURT:  Yes.

MR. SONGER:  Thank you.

Q.    Okay.  So could the individual in the picture -- is that Jordan?

A.    It is.

Q.    And what's happening right now with his hands?

A.    They are attempting to basically remove him from the restraint chair, soft restraints, and handcuff him to the bar.

Q.    And why are they trying to handcuff him to the bar?

A.    They're trying to handcuff him to the bar so they could handcuff him just with handcuffs.

But at that night, it would take all -- everything we could just to control one arm at a time.  So that's why they did them each individually, and then they were going to cuff him in front and remove the other handcuffs from the bar.

Q.    So it was a way to ultimately get him handcuffed in front of his body?

1  A.    Correct.

2  Q.    And why was that necessary?

3  A.    Our original thought process that night was to remove

4  him from the restraint chair and then walk him out to a

5  patrol car that was waiting to take him to the ER for his

6  mental eval.

7  Q.    Okay.  We can take that down.  Thanks.

8          All right.  Were there -- at some point were there

9  any restraints placed on his feet?

10 A.    There was.

11 Q.    What was placed on his feet?

12 A.    Shackles.

13 Q.    And can you describe those for us.

14 A.    They're kind of like handcuffs for your feet, only they

15 have a longer chain attached to them that allows an inmate to

16 be able to walk but not take big enough steps to run.

17 Q.    Okay.  And did Jordan struggle with officers at first

18 when they tried to get those cuffs and shackles on him?

19 A.    Yes.

20 Q.    And do you know if he was tased during that process when

21 he was struggling?

22 A.    I think he was, yes.

23 Q.    Do you know how many times?

24 A.    While I was there, I think two.

25 Q.    Okay.  And which officer tased him?

```
 1   A.    Officer Bryant.
 2   Q.    Can you turn now to the next tab, please, Tab 15.
 3              And can you tell us what's there?
 4   A.    There's a CD with the Taser from -- the Taser video, as
 5   well as other video from that date.
 6   Q.    The video from this incident at 10:30 p.m.?
 7   A.    Yes.
 8   Q.    Okay.  And how do you know that's what it is?
 9   A.    I was showed this, and these are my initials on there
10   saying this is what it is.
11   Q.    And is that a fair and accurate depiction of this scene
12   as officers tried to get Jordan secured and into handcuffs?
13   A.    It is.
14              MR. SONGER:  We move to admit Exhibit 15.
15              MR. STRIANSE:  No objection.
16              THE COURT:  Admitted.
17              (Whereupon Plaintiff Exhibit 15 was marked for
18              identification and received in evidence.)
19              MR. SONGER:  May we publish it, please?
20              THE COURT:  Yes.
21              (Video played.)
22   BY MR. SONGER:
23   Q.    Now, is the video clip we just watched, is that
24   basically what you were just describing?
25   A.    Yes.
```

1    Q.    Trying to get Jordan handcuffed while he was struggling

2    against officers?

3    A.    Yes.

4    Q.    Okay.  Can we play the next segment of the video,

5    please.

6              (Video played.)

7    BY MR. SONGER:

8    Q.    All right.  Now, in this shot here, can you identify the

9    players for us?  Who is the person sitting in the black

10   chair?

11   A.    The person sitting in the black chair?

12   Q.    Uh-huh.

13   A.    That's Jordan Norris.

14   Q.    And do you see yourself in this picture?

15   A.    I do.

16   Q.    Where are you?

17   A.    All the way on the far left.

18   Q.    And as we've moving left to right, who is the officer

19   that's reaching down next to Jordan?

20   A.    Mark Bryant.

21   Q.    And who is the officer that's kneeling in front of him?

22   A.    Rebecca Burney.

23   Q.    And what about the officer standing behind him?

24   A.    Deputy Dwayne Jones.

25   Q.    And the officer standing right next to Deputy Jones?

1  A.    Sgt. Gary Ola.

2  Q.    Okay.  Now, in that clip that we just watched, a minute

3  and 20 seconds or so, is Jordan still fighting with the

4  officers?

5  A.    He was struggling, yes.

6  Q.    In the last minute and 20 seconds?

7  A.    Not the last minute and 20 seconds no, sir.

8  Q.    Had he calmed down some?

9  A.    Yes.

10 Q.    All right.  And the female officer I think you

11 identified as Rebecca Burney in front of him, right?

12 A.    Yes, sir.

13 Q.    Do you know what she's talking to him about?

14 A.    She's basically just trying to explain to him that we're

15 trying to get him to the hospital to get him some help and

16 just trying to keep him calm.

17 Q.    And she's just kneeling down right in front of his legs

18 telling him that; is that right?

19 A.    Right.

20 Q.    Now, at this point is Jordan handcuffed?

21 A.    He is.

22 Q.    Is there anything around his waist?

23 A.    They had applied a belly chain.

24 Q.    Okay.  And tell us -- describe a belly chain for us.

25 What does it do?

1   A.   It's basically just a chain that you put around the

2   inmate's stomach that limits their movement to be able to

3   pull their hands only a certain distance away from them.

4   Q.   Does it connect to the handcuffs?

5   A.   The handcuffs run through the belly chain.

6   Q.   Does that restrict how much he can move his arms?

7   A.   Correct.

8   Q.   When you're cuffed and put into a belly chain, how much

9   can you move your arms?

10  A.   Depends on who applied it.  I mean, it could be as

11  little as, you know, three or four inches or up to six.

12  Depending on if it's applied correctly or not.

13  Q.   No more than three to six inches, correct?

14  A.   Right.

15  Q.   And are Jordan's feet in shackles?

16  A.   They are.

17  Q.   Are there any other restraints around his feet?

18  A.   There was -- it wasn't around his feet.  It -- there's a

19  band that's kind of like a -- a car seatbelt that -- going

20  around halfway in between his knees -- -- or in between his

21  ankle and his knees.

22  Q.   A belt across his legs?

23  A.   Yes.

24  Q.   And that's in addition to the leg shackles?

25  A.   Yes.

1  Q.   All right.  If you would, please, turn back one tab to

2  Tab 14.  And then look at the picture that's marked Exhibit

3  14C.  Let me know when you find that.

4  A.   I've got it.

5  Q.   All right.  Do you recognize that picture?

6  A.   I do.

7  Q.   Does that appear to be an accurate depiction of the

8  restraints that the lower part of Jordan's body were in?

9  A.   Yes.

10          MR. SONGER:  Your Honor, we move to admit

11 Exhibit 14C.

12          MR. STRIANSE:  No objection.

13          THE COURT:  Admitted.

14          (Whereupon Plaintiff Exhibit 14C was marked for

15          identification and received in evidence.)

16          MR. SONGER:  May we publish it to the jury?

17          THE WITNESS:  Yes.

18 BY MR. SONGER:

19 Q.   Are these the restraints you were just describing?

20 A.   They are.

21 Q.   It's got the metal shackles at the bottom by his feet

22 and then a belt around his legs?

23 A.   Yes.

24 Q.   And another belt and a chain over his waist?

25 A.   Yes.

1  Q.    And his hands are in handcuffs?

2  A.    Yes.

3  Q.    Now, at this point in time, do you have any reason to

4  think that Jordan could be armed in any way?

5  A.    No.

6  Q.    How many officers were standing around him?

7  A.    Seven.

8  Q.    So at this point is he ready to be moved outside to the

9  transport to be taken to the hospital?

10 A.    He is.

11 Q.    Now, at this point do you see any threat that he

12 presents that would justify tasing him?

13 A.    I do not.

14 Q.    Play the next part of Exhibit 15, please.

15        (Video played.)

16 BY MR. SONGER:

17 Q.    What just happened in that video?

18 A.    They were trying -- one of his legs was not in the area

19 where it is in the picture.  They were trying to move it to

20 that area.  And I don't know if he just started resisting or

21 what, but anyway, Officer Bryant applied a Taser to him.

22 Q.    Okay.  Officer Bryant just tased him?

23 A.    Yes.

24 Q.    Did you see any reason for Officer Bryant to tase him?

25 A.    I couldn't see anything at the time, no.

1    Q.    And do you know how long that tase lasted?

2    A.    After reviewing the video, I think it was something like

3    11 seconds.

4    Q.    It was in drive stun mode, right?

5    A.    Yes.

6    Q.    That's more than two of those cycles that officers were

7    taught to use?

8    A.    It is.

9    Q.    Now, based on what you saw, did that 11-second tase

10   while Jordan was cuffed and in shackles violate policy?

11   A.    From my perception, yes.

12   Q.    Okay.  And where were you standing when Defendant Bryant

13   started tasing Jordan when he was cuffed?

14   A.    At the edge of the counter.

15   Q.    And once -- were you expecting him to start tasing at

16   that moment?

17   A.    I was not.

18   Q.    And so then, once he started tasing, what were you

19   focused on?  What did you respond to?

20   A.    Just rushing to try to help.  I noticed that Rebecca

21   Burney was having trouble with his other leg, keeping it

22   under control.  So I went to help assist her.

23   Q.    All right.  So at the time, did you realize sort of the

24   full extent of what had happened?

25   A.    I did not.

1   Q.   Now, if you had fully realized that Defendant Bryant had

2   tased a handcuffed and compliant person for 11 seconds, would

3   you have tried to do something?

4   A.   I would.

5   Q.   Okay.  And why is that?

6   A.   Because that's just not the way the pain compliance

7   works.  You've got to give him the chance to feel the relief

8   and stop the struggling, because if you're continuing to

9   apply that pain, the only thing they're worried about is

10   trying to get away from it.

11   Q.   It wasn't the way that officers had been taught to do

12   it?

13   A.   No.

14   Q.   Okay.  Now, earlier you talked about a time when you,

15   yourself, had to tase Jordan -- I think you said for, like,

16   one second on his leg do you remember that?

17   A.   I do.

18   Q.   When did that happen in relation to this?

19   A.   After we had taken him outside.  And it was whenever we

20   were trying to get him into the cruiser.

21   Q.   So at that point had the officers taken Jordan back out

22   of the restraints and the chair and trying to get him into

23   the car?

24   A.   Yes.

25   Q.   And you were able to do that by tasing him for one

1  second?

2  A.   Yes.

3  Q.   How did you get the Taser that you used to tase him for

4  that one second?

5  A.   Mark was trying to get him in the car.  To free up a

6  hand, I said, "Mark, hand me your Taser."  He handed the

7  Taser to me.  They continued to try to get him in the car.

8  And then that's. . .

9  Q.   So when you tased him, did you use the same Taser that

10  Defendant Bryant had used?

11  A.   I did.

12  Q.   All right.  Now, when officers use a Taser, is there any

13  documentation that they're required to complete?

14  A.   A use of force report and an incident report.

15  Q.   And what type of information are officers supposed to

16  put in those reports?

17  A.   It varies from officer to officer.  I personally always

18  put in, you know, all the information about the incident; the

19  amount of times that I had used the Taser, if I had used one;

20  the serial number of the Taser; and of course, the date and

21  time so that way they can pull the video and things like that

22  and put it with this incident.

23       Of course, if there's any kind of injuries, you

24  know, that occurred during that, and what led up to the

25  incident.

1    Q.   All the information that a supervisor would need to make

2    sure they could understand what happened?

3    A.   Correct.

4    Q.   And understand if it was a justified use of force?

5    A.   Correct.

6    Q.   And you supervised other officers on your shift.

7         So is that your expectation for how those officers

8    would write those reports, too?

9    A.   Yes.

10   Q.   Would you turn in that binder, please, to Tab 22.  Okay.

11        Do you recognize what that is?

12   A.   I do.

13   Q.   And what is it?

14   A.   It's my use of force report from that night.

15   Q.   Does it appear to be an accurate version of the use of

16   force report you did that night?

17   A.   Yes.

18        MR. SONGER:  The Government moves to admit

19   Exhibit 22.

20        MR. STRIANSE:  No objection.

21        THE COURT:  Admitted.

22        (Whereupon Plaintiff Exhibit 22 was marked for

23        identification and received in evidence.)

24        MR. SONGER:  May I publish it for the jury?

25        THE COURT:  Yes.

BY MR. SONGER:

Q.    Okay.  So this is the report that you filled out for
that tasing that you did that night around 10:30?

A.    It is.

Q.    And did you include the Taser serial number in this
report?

          Can you zoom in?

A.    I did.

Q.    And can you just read off the serial number for us?

A.    X12002342.

Q.    Is there a unique serial number on each Taser?

A.    There is.

Q.    So that serial number also corresponds to the Taser that
Mark Bryant had just used?

A.    It is.

Q.    All right.  Did you also include how long you tased
Jordan for?

A.    I did.

Q.    Can we blow up the narrative a little bit so we can see
it.

          So you included that you did it for one second?

A.    I did.

Q.    Did you include what part of the body you used the Taser
on?

A.    I did.

1  Q.   Did you include how many times you tased?

2  A.   No.  Just the amount of time.

3  Q.   Well, how many times did you tase him that night?

4  A.   One.

5  Q.   And does your report explain that you tased him?

6  A.   Yes.

7  Q.   And does the report include a justification for what

8  tase -- why you had to do it?

9  A.   It does.

10 Q.   Would you turn now to Tab Number 20.  And --

11 A.   I have it.

12 Q.   What is that document?

13 A.   I'm sorry?

14 Q.   What is that document that you're looking at in Tab 20?

15 A.   It's an incident report from Officer Mark Bryant.

16 Q.   And what's the date on the report?

17 A.   11/5/16.

18 Q.   Okay.  Is Officer Bryant's signature on the report?

19 A.   I don't know his signature, but it appears to be.

20          MR. SONGER:  We move to admit Exhibit 20.

21          MR. STRIANSE:  No objection.

22          THE COURT:  Admitted.

23          (Whereupon Plaintiff Exhibit 20 was marked for

24          identification and received in evidence.)

25          MR. SONGER:  May we publish it for the jury?

```
 1              THE COURT:  Yes.
 2   BY MR. SONGER:
 3   Q.   And the date on this report is November 5th, 2016; is
 4   that right?
 5   A.   It is.
 6   Q.   And the time is 2220 or 10:20 p.m.?
 7   A.   It is.
 8   Q.   Is that the time that -- of the video that we watched
 9   earlier, where there were a number of -- I think you said
10   seven officers around and Defendant Bryant used his Taser?
11   A.   Approximately.
12   Q.   Approximately that time?
13   A.   Yes.
14   Q.   All right.  Now, does this report from Officer Bryant
15   say how many times Defendant Bryant tased Jordan during that
16   sequence?
17   A.   Just multiple.
18   Q.   Did it say how long any of those tases lasted?
19   A.   It does not.
20   Q.   Does it indicate that Jordan was in handcuffs at the
21   time he was tased?
22   A.   It does not.
23   Q.   Does it indicate that he was in leg shackles?
24   A.   It does not.
25   Q.   Does it say how many officers were around?
```

```
1   A.    It does not.
2   Q.    How many officers are listed on the report?
3   A.    Two.
4   Q.    And how many officers were there?
5   A.    Seven.
6   Q.    And what's the justification given in the report for why
7   Defendant Bryant used his Taser?
8   A.    Because Inmate Norris was not complying with commands.
9   Q.    Now, at the time of that last 11-second tase while
10  Jordan was handcuffed and waiting to go to the hospital, is
11  that an accurate description?
12  A.    No.
13  Q.    You said earlier -- and we can take that down.  Thank
14  you.
15          You worked at the Cheatham County jail for ten
16  years, right?
17  A.    Yes.
18  Q.    A full decade?
19  A.    Yes, sir.
20  Q.    In your ten years there, did you ever see another
21  officer tase anyone for as long as that 11-second tase that
22  we just watched?
23  A.    No.
24  Q.    And that includes people who are not handcuffed?
25  A.    Correct.
```

1  Q.    Who are not shackled?

2  A.    Correct.

3  Q.    Who are fighting, actively fighting with officers?

4  A.    Correct.

5  Q.    In ten years, you never saw anyone -- any of those

6  people tased for 11 seconds?

7  A.    No, sir.

8            MR. SONGER:  That's all I have for now.

9            THE COURT:  All right.  Cross.

10

11                    CROSS-EXAMINATION

12  BY MR. STRIANSE:

13  Q.    Good morning, Mr. Montgomery.

14  A.    Good morning, sir.

15  Q.    You were working third shift on November the 5th, 2016;

16  is that right?

17  A.    Yes, sir.

18  Q.    So you came in around 10:00 or so?

19  A.    Yes, sir.

20  Q.    And had a decision been made by the second shift to wait

21  for additional people to come in to try to deal with Jordan

22  Norris and this plan of transporting him to the emergency

23  room?

24  A.    I don't know.

25  Q.    Okay.  That -- that -- the plan was to get him out of

1  the restraint chair and then to walk him out of the jail and

2  put him in a car and send him to the hospital in Ashland

3  City; is that right?

4  A.   Correct.

5  Q.   And that plan would have included putting a bully -- a

6  belly chain on him; is that right?

7  A.   Yes, sir.

8  Q.   And having him cuffed --

9  A.   Yes, sir.

10  Q.   -- Is that correct?

11       And having shackles on his legs; is that right?

12  A.   Yes, sir.

13  Q.   But because of his resistance, that did not work; is

14  that correct?

15  A.   Correct.

16  Q.   And he had to be placed back into the restraint chair;

17  is that right?

18  A.   Correct.

19  Q.   And that scene that we saw just a few minutes ago with

20  the six or seven officers where you identified yourself is

21  when you're trying to get him back into that restraint chair;

22  is that correct?

23  A.   Correct.

24  Q.   You had said something earlier in your direct

25  examination that "It took everything that we could do to

```
 1  control one arm at a time."
 2              Do you remember --
 3  A.   I do.
 4  Q.   -- saying that?
 5  A.   (Witness moves head up and down.)
 6  Q.   Now, you worked in the jail for probably around 11 1/2
 7  years; is that right?
 8  A.   No, sir.  Just over ten.
 9  Q.   Just over ten.  And over that ten-year period, I assume
10  you would have seen inmates that were intoxicated in some
11  way?
12  A.   Yes, sir.
13  Q.   And did you form the judgment that Mr. Norris was on
14  something that evening?
15  A.   He appeared under the influence of something.
16  Q.   Okay.  And did he appear to have more than normal
17  strength for somebody his size?
18  A.   Yes.
19  Q.   Okay.  Now, when the tasing occurred by Mr. Bryant when
20  Mr. Norris was in the chair, among the people that were
21  circling the chair was Gary Ola; is that right?
22  A.   Yes.
23  Q.   And he was the so-called Taser instructor; is that
24  correct?
25  A.   Yes, sir.
```

1  Q.    So he was present there on the scene when Mark Bryant
2  tased Mr. Norris; is that correct?
3  A.    Yes, sir.
4  Q.    Do you remember Mr. Ola stopping the action in any way
5  that evening and saying that the tase that Mark Bryant had
6  used on Mr. Norris's leg was in any way inappropriate?
7  A.    No, sir.
8  Q.    Now, you talked about your experience in the jail where
9  you had tased two other individuals prior to this; is that
10 right?
11 A.    I don't know if it was prior to this, but over my total
12 time there at the facility, those three were the only times I
13 had used it.
14 Q.    Okay.  And I think among the three is the Mr. Norris
15 incident; is that correct?
16 A.    It is.
17 Q.    Were the other two instances, were those individuals as
18 profoundly impaired as Mr. Norris was?
19 A.    They were not.
20 Q.    As wild as Mr. Norris was?
21 A.    They were not.
22 Q.    In your experience of working at the jail, did you think
23 it was remarkable that it took that many men to get him under
24 control?
25 A.    I did.

1 Q.   You were asked about the reports that you did and the
2 report that Mr. Bryant did.
3           Do you remember those questions?
4 A.   I do.
5 Q.   I think everybody that works as a correctional officer
6 in the jail knows that every moment is being recorded by
7 video; is that right?
8 A.   It is.
9 Q.   So if there was any deficiency in the written report,
10 the video would not lie; is that a fair characterization?
11 A.   It is.
12           MR. STRIANSE:  Your Honor, may I have one moment?
13           THE COURT:  Yes.
14 BY MR. STRIANSE:
15 Q.   Just one other question.
16           Do you remember being interviewed by the TBI on or
17 about August 9th, 2017?
18 A.   I do.
19 Q.   Do you remember telling Shawn Atkins the difficulty that
20 the officers were having with communicating with Mr. Norris?
21 A.   I do.
22 Q.   I think you told them that it was as if he was not even
23 hearing what you were saying?
24 A.   It was.
25           MR. STRIANSE:  Those are my questions.

THE COURT:  All right.  Redirect.


                    REDIRECT EXAMINATION

BY MR. SONGER:

Q.    Mr. Montgomery, there's always video going at the jail, right?

A.    Yes, sir.

Q.    Are officers still required to submit reports?

A.    Yes, sir.

Q.    Is the video a substitute for a report?

A.    It is not.

Q.    Why is it important to file a report if there's video?

A.    Even though there is video, no one's going to go back and check the video unless there is a report or there's a complaint that something has happened.  It's basically a way to alert the administration of incidents that happen so they can investigate.

Q.    And I think you testified that you always put the serial number on your reports when you use a Taser; is that right?

A.    I do.

Q.    And one of the reasons for that was so that supervisors could identify the video and review it?

A.    Yes, sir.

Q.    And you put the serial number in the report that you filed this night?

```
1    A.    Yes, sir.
2    Q.    The report that we looked at that Defendant Bryant filed
3    that night, did he include a serial number?
4    A.    He did not.
5    Q.    Defense counsel also asked you, you know, whether it was
6    difficult to get Jordan under control that night, right?
7    A.    Right.
8    Q.    And I think you said it was, right?
9    A.    Yes, sir.
10   Q.    And by the time of that last 11-second tase, was Jordan
11   under control?
12   A.    He was.
13              MR. SONGER:  Nothing further.  Thank you.
14              THE COURT:  All right.  Ladies and gentlemen,
15   we're going to take our lunch break, and let's plan to be
16   back say about 1:15.  Thanks.
17              (Whereupon a lunch break was observed.)
18              (Jury not present.)
19              THE COURT:  All right.  Be seated.
20              Are we ready to bring in the jury?  Are we ready
21   to bring in the jury?
22              MR. STRIANSE:  Yes, sir.
23              MS. MYERS:  Yes.
24              THE COURT:  All right.
25              (Jury present.)
```

```
 1              THE COURT:  Be seated.
 2              All right.  Call your next witness.
 3              MS. MYERS:  The United States calls Gary Ola.
 4              THE COURT:  All right.  If you'll stop there,
 5    we'll swear you in.
 6              COURT DEPUTY:  Please raise your right hand.
 7
 8                          GARY OLA,
 9    called as a witness by the Plaintiff, was duly sworn and
10    testified as follows:
11
12              COURT DEPUTY:  Please be seated.  Please speak
13    clearly.  State your full name and spell your last name.
14              THE WITNESS:  Gary Ola.  My last name is O-l-a.
15              THE COURT:  All right.
16
17                       DIRECT EXAMINATION
18    BY MR. SONGER:
19    Q.   Good afternoon, Mr. Ola.
20    A.   Hi.
21    Q.   How are you currently employed, sir?
22    A.   The Cheatham County Highway Department.
23    Q.   What do you do at the highway department?
24    A.   I'm a backhoe crew.
25    Q.   Have you ever worked at the Cheatham County sheriff's
```

1  office?

2  A.   Yes, sir.

3  Q.   When did you work there?

4  A.   I started in September of 1999.

5  Q.   And how long did you work in the Cheatham County

6  sheriff's office?

7  A.   Until June of 2018.

8  Q.   So you were there for almost 20 years?

9  A.   Yes, sir.

10 Q.   Do you have any other law enforcement experience?

11 A.   Yes, sir.  I originally started as a deputy in Hickman

12 County in Centerville, 1995, for approximately four years.

13 Q.   And what was your position when you worked the sheriff's

14 office in Cheatham County?

15 A.   I become a corporal shortly after 20 -- a sergeant

16 shortly after 2015.

17 Q.   Okay.

18 A.   Prior to that, I was a corporal.  Prior to that, I was

19 just a road deputy.

20 Q.   You came in as a road deputy and got promoted to

21 corporal and then promoted to sergeant in 2015?

22 A.   Yes, sir.

23 Q.   And were you still a sergeant when you left in 2018?

24 A.   I was.

25 Q.   Now, as a sergeant, what are your responsibilities?

A.    I had six men under me, basically street patrol or. . .
Shift.  Shift --
Q.    I'm sorry.  You supervised everybody who was on your
shift?
A.    Yes, sir.
Q.    And do you also have any roles as a trainer at the
sheriff's office?
A.    I did.  I was the Taser trainer for the County.
Q.    Okay.  So who do you train in that role?
A.    Everybody that uses a Taser, including our jailers, our
correction officers, and our street patrol deputies.
Q.    Does that include everybody who works at the Cheatham
County sheriff's office?
A.    Everyone that's going to handle a Taser, yes.  Other
than administration.  Some CID guys did not take the courses.
Q.    Officers who work on patrol and officers who work in the
jail?
A.    Yes.
Q.    All right.  How did you become a Taser instructor?
A.    I started looking into it in 2004.  We was able to get
our -- our previous sheriff to sign on in 2006.  I went to a
two-day course up in Gatlinburg, Tennessee, to become an
instructor.
Q.    What did you learn in that course up in Gatlinburg?
A.    The do's, the don'ts, basically the Taser -- everything

1  about the Taser and how to come back and teach it to where an
2  individual could use it.
3  Q.   Is there any ongoing certifications you have to complete
4  to sort of stay eligible to be a Taser trainer?
5  A.   Every two years.
6  Q.   Was there anybody else at the Cheatham County sheriff's
7  office during the time that you were the trainer that also
8  trained officers on Tasers?
9  A.   No.  Not -- no.  We had some that would help, you know,
10  on our days of training with spotting and stuff like that,
11  but I was -- I was the instructor that signed off.
12  Q.   Can you describe sort of what your training looks like?
13  What does it consist of?
14  A.   It consists of a disc of PowerPoints presentation, and
15  then hands on.  And then we do a voluntary exposures of about
16  middle -- about -- almost to the end of the class, and then a
17  20-question test.
18  Q.   Okay.  How long is the class?
19  A.   It just depends.  It's generally between four to eight
20  hours, in that ball park.  But, you know, if we don't do
21  dinner and -- it's according to how big the class is and that
22  sort.
23  Q.   Okay.  And you go through a PowerPoint presentation with
24  slides that have information about Tasers?
25  A.   That's the first thing we do, yes, sir.

Q.    Okay.  And after that you said there's a section where
you take volunteers to see if people want to get exposed?
A.    After that I go with -- I do the hands on of touching
the Taser, showing each you know -- you know, showing parts
of the Taser, the changing of the cartridges, changing of the
batteries, that kind of stuff.
            And then later, after that, we do go into the
voluntary exposures.
Q.    Okay.  Do you ever have any trouble getting volunteers?
A.    No.
Q.    All right.
A.    I do for drive stuns.
Q.    You do for drive stuns?
A.    Yes, sir.
Q.    Why is that?
A.    Nobody wants to -- the burn.  And you're instructed, if
you hold a Taser to someone over five seconds, it's going to
leave a burn.
Q.    Do you tell officers that during training?
A.    Yes.
Q.    Are officers who take your certification class, are they
told that they're responsible for knowing the material that
you teach?
A.    Yes, sir.
Q.    Are they told that they're obligated to follow the

1  principles that you teach when they're the working for the

2  sheriff's office?

3  A.    Yes, sir.

4  Q.    Have you ever certified an officer that you weren't

5  confident understood the material?

6  A.    No, not that -- no.

7  Q.    At the end of the course, do you document which -- which

8  officers have completed it?

9  A.    They get a certificate that has to go in their personnel

10  file, yes.  And there's a log-in at every class.

11  Q.    Okay.

12  A.    There's a roster sheet.

13  Q.    Would you pick up that white binder that's in front of

14  you, please, and look at Exhibit Number 5, the fifth tab.

15  A.    Okay.

16  Q.    Okay.  Do you recognize what that document is?

17  A.    Yes, sir.

18  Q.    What is it?

19  A.    That is a certificate made out to Mark Bryant, October

20  the 23rd, 2015, after a Taser course.

21  Q.    Mark Bryant's Taser training certificate?

22  A.    Yes.

23  Q.    Does that appear to be an accurate version of his

24  certificate?

25  A.    What's that, sir?

```
 1   Q.   Does that appear to be a true and accurate version of
 2   his --
 3   A.   Yes.
 4           MR. SONGER:  The Government would move to admit
 5   Exhibit 5.
 6           MR. STRIANSE:  No objection.
 7           THE COURT:  Admitted.
 8           (Whereupon Plaintiff Exhibit 5 was marked for
 9           identification and received in evidence.)
10           MR. SONGER:  May I publish it to the jury?
11           THE COURT:  Yes.
12   BY MR. SONGER:
13   Q.   All right.  So is that your signature on the
14   certificate?
15   A.   Yes, sir.
16   Q.   And what's the date?
17   A.   October -- October 23rd, 2015.
18   Q.   What does that date indicate?
19   A.   The day of the class.
20   Q.   The day of the class?  Okay.
21           Ms. Hughes, can we show Exhibit 4 and Exhibit 5
22   side by side.  Okay.
23           On the right side, that's Mark Bryant's
24   certificate that we just looked at, right?
25   A.   Yes.
```

1  Q.    Okay.  And what's the document on the left side?

2  A.    That's a certificate also of another individual that

3  worked in the corrections, Josh Marriott.

4  Q.    And what's the date on Officer Marriott's certificate?

5  A.    The same, October 23rd, 2015.

6  Q.    So does that mean that Officer Marriott and Officer

7  Bryant were in the same training class?

8  A.    They were.

9  Q.    You taught both of them?

10  A.    Yes, sir.

11  Q.    Now, are officers who are in the same class, are they

12  together the whole time, or do they split up into different

13  groups?

14  A.    No, sir, we're all in -- one -- one section.

15  Q.    Everybody in the same class learns the same stuff?

16  A.    Yes, sir.

17  Q.    Do you remember anyone else who was in that class on

18  October 23rd, 2015?

19  A.    I know I had one of the deputies, Monica Matkins.  I

20  know that was the first class that -- the Taser course that

21  our sheriff -- previous sheriff now -- or current sheriff

22  now, Mike Breedlove, was in.

23  Q.    So the sheriff was actually in that class too?

24  A.    Yes, he was.

25  Q.    Did that make it memorable for you?

```
 1   A.   What's --
 2   Q.   Did that make it memorable for you, to have the sheriff
 3   sitting there?
 4   A.   Yeah.  That was the first class he ever attended.
 5   Q.   Do you remember the sheriff saying anything to the other
 6   officers who were in the class about Tasers?
 7   A.   He spoke just briefly on use them right and, you know --
 8   and that kind of stuff, of that nature.  And I know at one
 9   time we had had a conversation about an investigation he did
10   as a TBI agent.
11        THE COURT:  I'm going to get you to slow down for
12   my court reporter.  Slow down.
13        THE WITNESS:  He had discussed a --
14        MR. STRIANSE:  Your Honor, I'm going object to
15   whatever he discussed about his prior investigation.  Talking
16   about the sheriff.
17        THE COURT:  All right.  Do you want to rephrase?
18        MR. SONGER:  Sure.
19   Q.   Sgt. Ola, just asking -- did the sheriff, during that
20   training class that Defendant Bryant attended, did he convey
21   any information about Tasers?
22   A.   To not -- not to use them improperly.
23   Q.   Okay.
24   A.   Without putting words in his mouth, yes, sir.
25   Q.   Okay.  Now, in your training, do you go over the
```

1  Cheatham County sheriff's office use of force policy?

2  A.   Yes, sir.

3  Q.   Would you please turn to the first tab in that binder,

4  Exhibit Number 1.

5           Sgt. Ola, do you recognize that?

6  A.   Yes, sir.

7  Q.   Can you tell us what it is?

8  A.   It's the policy and procedure that was implemented on

9  March the 12th, 2015, when the new sheriff, Mike Breedlove,

10  came in.

11  Q.   All right.  Okay.

12          So was that the policy that was in place at the

13  time that you gave this training to Officer Bryant and

14  Officer Marriott?

15  A.   I think it was still the same, yes.  It has since been

16  redone a little bit, yes.

17  Q.   But at the time of the training in 2015, that's the

18  policy that was in place?

19  A.   Yes.  As far as I recall, yes.

20  Q.   Okay.  Does that appear to be an accurate version of the

21  policy, too?

22  A.   Yes, sir.

23          MR. SONGER:  The Government moves to admit

24  Exhibit 1.

25          MR. STRIANSE:  No objection.

1          THE COURT:  Admitted.

2          (Whereupon Plaintiff Exhibit 1 was marked for

3          identification and received in evidence.)

4          MR. SONGER:  May we publish it?

5          THE COURT:  Yes.

6          MR. SONGER:  Thank you.

7    Q.   And, Ms. Hughes, if we could go, please, to Policy

8    Number 4.5.  And can we blow that up?  Okay.

9          Mr. Ola, do you recognize the portion of the

10   policy that we've blown up on the screen?

11   A.   Yes, sir.

12   Q.   And could you read the second sentence for us, the one

13   that starts with the word "only"?

14   A.   (As read):

15          Only the minimum number of bursts and the

16          minimum duration reasonable, necessary to achieve

17          the desired effect of the temporary immobilization

18          of the --

19          THE COURT:  A little slower, please.

20          THE WITNESS:  Oh, excuse me, sir.

21          THE COURT:  Can only go so fast.

22          THE WITNESS:  Shall I start over, sir?

23          THE COURT:  Yeah.

24          THE WITNESS:  (As read):

25          The only -- only the minimum number of bursts

```
1                    and the minimum duration reasonable, necessary to
2                    achieve the desired effect of temporary
3                    immobilization of the individual shall be
4                    administered.
5    BY MR. SONGER:
6    Q.   So can you tell us in your own words, what does that
7    mean, only the minimum number of bursts and the minimum
8    duration reasonably necessary shall be used when you're using
9    a Taser?  What does that mean?
10   A.   Basically, no more than three at five seconds.  That is
11   the most that you can do.
12   Q.   Okay.  And do you tell officers that during your
13   training?
14   A.   Yes, sir, several times.
15   Q.   And did you tell officers that during the training that
16   you gave to Defendant Bryant?
17   A.   Yes, sir.  Every -- every class.
18   Q.   Okay.  And then the first sentence there says (as read):
19                    When deploying electronic immobilizing devices
20                    (Taser), it shall be deployed consistent with
21                    department-approved training.
22                    Did I read that correctly?
23   A.   Yes.
24   Q.   And is that also part of the policy?
25   A.   Yes.
```

1  Q.   Okay.  Then I would like to talk to you about some of
2  the training that you give to officers.
3          So you alluded to this just a moment ago.  But is
4  there a part of the training where you explain to officers
5  physically how to operate a Taser?
6  A.   Yes.
7  Q.   Do you tell them that there are two different modes that
8  a Taser can be used in?
9  A.   Yes, sir.
10 Q.   What are those two modes?
11 A.   One of them is deploying of the probes; the second one
12 is the drive stun.
13 Q.   Okay.  And do you tell them how long a single Taser
14 cycle lasts?
15 A.   Yes.
16 Q.   And how long is that?
17 A.   Five seconds.
18 Q.   Is that one pull of the trigger?
19 A.   One pull of the trigger is five seconds.
20 Q.   Okay.  Is it possible to keep the Taser going beyond
21 five seconds?
22 A.   If you hold the trigger down, it will continue.
23 Q.   Do you tell them that in class as well?
24 A.   Yes, sir, and show them.
25          MR. SONGER:  Your Honor, with the Court's

permission, I would like to pass the defendant what's been marked as Government's Demonstrative Number 1 through the court security officer.

THE COURT: Well, let's see now. We've got an Exhibit 1. What is this exhibit?

MR. SONGER: It's just a demonstrative. We won't be introducing it into evidence.

THE COURT: Okay. Sure.

BY MR. SONGER:

Q. Sgt. Ola, do you recognize what we just handed to you?

A. Yes. It's an X26P.

Q. X26P Taser?

A. Taser.

Q. What type of Taser was being used at the jail back in 2016?

A. They've only had X26Ps, these particular guns here with the camera on the bottom.

Q. Okay. Basically the same as the one you're holding?

A. It's identical.

Q. Okay. Now, can you carefully take that out of the bag.

And to be clear, that Taser has been disarmed. There's no battery in it. It's not possible for it to be fired in any way.

A. (Witness complies.) Yes, sir. It has no cartridge and no battery, no power.

1    Q.    Correct.  So can you hold it up so the jury can see it.

2          And can you explain how in your class you

3    demonstrate to officers that they should fire a Taser when

4    they're using the drive stun mode?

5    A.    What I generally do is we -- I show them that you pull

6    the trigger.  It will count back here down five seconds.  And

7    take your -- your finger off of the trigger as you would your

8    Glock in a situation or an event, where you're likely not to

9    keep it held.

10          Pull it, let it go, and put your finger right out

11   here.

12          I tell them, if you continue to pull the trigger

13   that the battery -- I mean, it will continue to run and

14   nonstop in a heated situation.

15   Q.    Okay.

16   A.    So if you'll just pull it one time and let it go -- you

17   can actually cut it off less than five seconds if you need

18   to, if the subject complies.  But generally, it's one pull,

19   five seconds, remove your finger, address the -- readdress

20   the situation, and then -- and do what needs to be done.

21   Q.    Okay.  So you instruct them to pull the trigger and then

22   move their finger --

23          THE COURT:  Hold on.

24   BY MR. SONGER:

25   Q.    Let me ask the question first.  I apologize.

1    I just want to make sure I understood you
2 correctly.
3    Is it right that you instruct them to pull the
4 trigger once and then move the finger off the trigger and put
5 it along the side of the Taser?
6 A.    Right.
7 Q.    And why is that?
8 A.    That way you might not keep it held or pull it again if
9 not needed.
10 Q.    Okay.  Make sure it cuts off after five seconds?
11 A.    Yes.  And it will shut -- it won't shut down, but it
12 will stop firing after five seconds.
13 Q.    And you do that demonstration that you just did for us
14 in the class?
15 A.    Yes, sir.
16 Q.    All right.  Now, is there a screen on that Taser that
17 shows how long the Taser has been cycling for?
18 A.    Yes, sir.  It's a screen right here.  It's called the
19 CID.
20 Q.    Okay.  And can you show us -- if the Taser is actually
21 being used on someone, where is that screen in relation to --
22 can the officer see it?
23 A.    Right on the back.
24 Q.    Is it facing the officer?
25 A.    Yes.  Right -- right (indicating).

1    Q.    And what does the screen display?

2    A.    It counts down the seconds that it's being fired.

3    Q.    Okay.  And so does it count 1 through 5?

4    A.    This one particular one I think goes from 5 to 1.  Some

5    of the old ones went from 1 to 5, but this one counts

6    backwards, if I recall.

7    Q.    The ones that were in use in 2016, do you know what they

8    did?

9    A.    These were them.

10   Q.    Okay.  So they count down from 5 to 1.

11   A.    Yes, sir.

12   Q.    And what happens if you keep the Taser pulled?

13   A.    If you continue to pull the trigger?

14   Q.    Uh-huh.

15   A.    It will just keep firing.

16   Q.    But does it -- what does it show on the screen?

17   A.    It will just keep counting -- it will keep counting.

18   Q.    Would it go up or would it start over at 5?

19   A.    I think it starts over.

20   Q.    So it would -- it would keep -- you would see the

21   numbers keep starting over?

22   A.    Yes.  Yes.

23   Q.    Keep going back up to 5?

24   A.    (Witness moves head up and down.)

25   Q.    Okay.

1          All right.  Thank you.  I think those are the only
2  questions about that demonstrative.  So if you want to put
3  that to the side.
4          Thank you.
5          Okay.  So in your training, after explaining to
6  officers how to use a Taser, do you also give them training
7  on when it's appropriate to use a Taser?
8  A.    Yes, sir.
9  Q.    And what do you tell officers in the training about when
10 it's appropriate to use a Taser?
11 A.    Only time you can use a Taser on anyone is when they're
12 actively resisting, no passive resisting and just verbal
13 noncomplying.
14 Q.    Okay.  Can they use a Taser to counter a threat?
15 A.    What's that?
16 Q.    Can they use a Taser to stop a threat?
17 A.    Yes, sir.  It's the severity of the threat to the
18 officer and the severity of the crime that you have to look
19 at -- or the offense.
20 Q.    Okay.  Based on your training, is it ever appropriate to
21 use a Taser just because someone in the jail is being
22 belligerent?
23 A.    No, sir.
24 Q.    Giving verbal insults to the officers?
25 A.    No, sir.

1  Q.    Okay.  Spitting at the officers?

2  A.    No, sir.

3  Q.    Even spitting does not justify it?

4  A.    No, sir.

5  Q.    What about just being noncompliant, refusing to comply

6  with commands?

7  A.    No, sir.

8  Q.    Is it ever appropriate in any circumstances to use a

9  Taser for punishment?

10  A.    No, sir.

11  Q.    Do you say that in the training?

12  A.    Yes, sir.

13  Q.    All right.  Does the number of officers who are present

14  in a situation impact whether it's appropriate to use a

15  Taser?

16  A.    Yes, sir.

17  Q.    How so?

18  A.    In some court cases they have found that, you know, the

19  Taser was used improperly -- inappropriately when there was

20  enough people there to control the situation.  And the threat

21  wasn't to that level of using a Taser.

22  Q.    Do you remember what you tell officers about that in the

23  training?

24  A.    Basically, that it -- you've got to be able to justify

25  why you used it if you've got enough accurate help.  I tell

1  my road deputies a lot of times, you know, we're out there by
2  ourselves.  Our ETA of responding officers is sometimes 25
3  minutes.
4          Where in the jail, you're in a confined area and
5  you have four or five people at times, maybe four at the most
6  maybe.  So it would be totally -- sometimes used more in the
7  field than it would be in closed doors.
8  Q.    Okay.  So is it right -- you tell officers they need
9  particular justification if there are more officers around?
10 A.    Every trigger pull must be justified.
11 Q.    Okay.  And I think you mentioned this earlier, but I
12 just want to be crystal clear.
13         Do you train officers in your training about how
14 long they are allowed to use a Taser for?
15 A.    Yes, sir.
16 Q.    And what is that?
17 A.    No more than three times at five seconds.
18 Q.    Three times five seconds each in one incident?
19 A.    That's it.
20 Q.    All right.  If you would, please, turn to Tab 2 in that
21 binder.
22         Do you recognize that document?
23 A.    Yes, sir.
24 Q.    What is it?
25 A.    This is the PowerPoint presentation.

```
1   Q.   The one you use in your training?
2   A.   Yes, sir.
3   Q.   And what's the date on that document?
4   A.   January 2016.
5   Q.   Okay.  Now, you trained Defendant Bryant and Officer
6   Marriott in October of 2015, right?
7   A.   Uh-huh.
8   Q.   Do you know if the slides that are in that PowerPoint,
9   how do they compare to the ones that you used in 2015?
10  A.   Yes.  At the -- in 2015, it would have been Version 19,
11  which was absolutely no different, other than they updated a
12  few things on a Taser that might have been submerged in water
13  and a couple little things.  But basically it's the same.
14  Q.   Any of the slides other than the piece about Tasers
15  being submerged in water, are any of the other ones
16  different?
17  A.   No, sir.
18  Q.   Otherwise, it's the same as the training you gave to
19  Defendant Bryant?
20  A.   Yes, sir.
21  Q.   Okay.
22  A.   It covers the same materials, the same guns.
23  Q.   And looking through that PowerPoint, does that appear to
24  be an accurate version of the slides that you used in
25  Defendant Bryant's training?
```

A.   Yes, sir.

          MR. SONGER:  The Government moves to admit
Exhibit 2.

          MR. STRIANSE:  Your Honor, may we approach one
moment?

          THE COURT:  Sure.

          (Bench conference outside the hearing of the
          jury.)

          MR. STRIANSE:  Your Honor, this is the exhibit
that is dated after Mr. Bryant received the training.

          THE COURT:  Exhibit 2.

          MR. SONGER:  Yes, Your Honor.  It's provided on a
CD.

          THE COURT:  Oh.

          MR. SONGER:  It's a. . .

          THE COURT:  Okay.  Go ahead.

          MR. STRIANSE:  It's dated after the time that
Mr. Bryant received his training.

          THE COURT:  Do you have an extra copy?

          MR. SONGER:  We could show you the witness copy
right now.

          THE COURT:  Okay.

          MR. SONGER:  We just went through how -- he just
went through and acknowledged that it's a few months after
the training.

1          THE COURT:  All right.  Well --

2          MR. SONGER:  Sure.

3          THE COURT:  I just want the document.

4          MR. SONGER:  Just take it out.  Okay.  You can go

5   ahead.

6          MR. STRIANSE:  My client received his training on

7   October 23rd, 2015.  This version is a later version.  I

8   think this is Taser Version 20.  My client was trained on

9   another version.

10         MR. SONGER:  Your Honor, we just went through and

11  acknowledged that this is the version from a few months

12  later, and the witness testified that the only slides that

13  are different are ones about submerging the Taser in water,

14  and I don't plan to ask about those.

15         THE COURT:  I think, given his testimony --

16         MR. STRIANSE:  Okay.  That's fine.

17         THE COURT:  -- I'll admit it.

18         Are you going to go through this?

19         MR. SONGER:  Only a handful of slides, Your Honor.

20  It won't be very tedious.

21         THE COURT:  All right.

22         MS. MYERS:  Could the witness look at Trial

23  Director while the judge has this copy?

24         MR. SONGER:  Certainly.

25         THE COURT:  I actually just want the pages you're

```
 1  going to talk about.
 2            MR. SONGER:  It's --
 3            THE COURT:  What pages are you going to talk
 4  about?
 5            MR. SONGER:  I don't believe the pages are
 6  numbered, which will be the challenge, but they'll up on the
 7  Trial Director, on the screen.
 8            THE COURT:  If it's a problem, let's just figure
 9  it out and keep going.
10            (Jury present.)
11            THE COURT:  All right.  Exhibit 2 is admitted.
12            (Whereupon Plaintiff Exhibit 2 was marked for
13            identification and received in evidence.)
14
15  BY MR. SONGER:
16  Q.   All right.  Thank you.
17            Okay.  Mr. Ola, I would like to first show you
18  what's page 227.  It's pretty far back in that PowerPoint.
19  And I believe we can put it up on the screen.
20            Do you recognize this slide, sir?
21  A.   Yes, sir.
22  Q.   And it says that (as read):
23            Several law enforcement groups (IACP, PERF,
24            COPS, and DOJ) have established 15 seconds of CEW
25            exposure, multiple applications, standards or
```

1          continuous, as a significant safety point.
2          Is that right?
3   A.   Yes.
4   Q.   And what is CEW exposure?  What does that mean?
5   A.   That's basically the name of the gun.  It's --
6   Q.   That's a Taser?
7   A.   Yes.
8   Q.   Okay.
9   A.   Without just spelling out Taser.
10  Q.   Sure.  And did you discuss this slide in the defendant's
11  training?
12  A.   Yes, sir.
13  Q.   All right.  Can we look now at Slide 222, please,
14  Ms. Hughes.  Okay.
15          And do you go over this slide in the training as
16  well?
17  A.   Yes, sir.
18  Q.   Can you tell us what's the purpose of going over this
19  slide?  What information is it talking about?
20  A.   Basically, to stay away from the chest.  Dart-to-heart
21  means deployment of the Tasers, the probes.
22          And I demonstrate -- I mean, I talk to the
23  individuals in class about not shooting directly into the
24  chest.  It would be --
25          MR. STRIANSE:  Judge, I don't know the relevance

```
 1   of this.  Both of these slides, 221 and 222, deal with
 2   probes.
 3               MR. SONGER:  I can lay a foundation.
 4               THE COURT:  All right.  Sustained.
 5               You can lay a foundation.
 6   BY MR. SONGER:
 7   Q.   Mr. Ola, the same standards -- when officers use Tasers,
 8   do you train them that the same standards apply for both
 9   drive stun and probes?
10   A.   Yes.
11               THE COURT:  Go ahead.
12               MR. SONGER:  Thank you.
13   Q.   And this slide that you show, it says that the duration
14   of the delivered electrical charge is an important factor for
15   considering those health risks?
16   A.   Yes.
17   Q.   That's something you emphasized to officers?
18   A.   Yes.
19   Q.   Okay.  Can we go to the next slide, please.
20               And this slide says, "To reduce cardiac risks," it
21   says, if you look at the last bullet, "avoid prolonged and
22   repeated exposures"?
23   A.   Yes, sir.
24   Q.   That something you go over in training?
25   A.   Yes, sir.
```

1  Q.    And what would you consider to be a prolonged or

2  repeated exposure?

3  A.    Anything over the minimum of the three to 15 seconds.

4  Q.    Okay.

5  A.    I mean three to five seconds.

6  Q.    Next slide.  Okay.

7        And this slide says "CEWs" -- which you said means

8  Taser; is that right?

9  A.    Yes, sir.

10 Q.    (As read):

11        -- may produce effects that could increase the

12        risk of sudden death, including changes in blood

13        chemistry, blood pressure, respiration, heart rate

14        and rhythm.

15        And then at the bottom, it says (as read):

16        The longer the Taser exposure, the greater

17        potential effects.

18        Is that right?

19 A.    Yes, sir.

20 Q.    And for that reason, you instruct officers to minimize

21 the number and duration of the Taser exposures?

22 A.    Yes, sir.

23 Q.    So is the importance of minimizing the number and length

24 of Taser exposure something that you discuss several times

25 during the training?

A.   Yes, sir.
Q.   217.
            What about this slide?  Is this also shown during
the training?
A.   Yes, sir.
Q.   And this another example of instructing officers to
avoid multiple, repeated, prolonged, extended exposures?
A.   Yes, sir.
Q.   Go to 215.  Okay.
            Is this slide shown in your training?
A.   Yes, sir.
Q.   And at the bottom it says (as read):
            Do not use a Taser for verbal defiance or
            belligerence or punishment.
            Do you see that?
A.   Yes, sir.
Q.   So, in addition to telling officers that, you also show
them that on the screen?
A.   Yes, sir.  That's part of the Power presentation --
PowerPoints.
Q.   Okay.  Do you instruct officers in training about what
they should do if they're using a Taser and it's not
effective?
A.   Look to another alternative.
Q.   To use an alternative; is that right?

A.   More help, whatever -- every scenario is different.
Maybe what the case may be.  You need more help?  I mean, you
know, what's going on at the moment.

          But if the Taser isn't working -- and it's never
100 percent effective -- then you got to look for another
alternative.

Q.   Not to just continue tasing for a longer period of time?

A.   No, sir.

Q.   Do you tell officers in training whether they are
allowed to tase a person who has already been placed in
handcuffs?

A.   Yes, sir.

Q.   What do you say?

A.   No, we do not.  We do not tase anyone that's already in
handcuffs.

Q.   Did you say that in Defendant Bryant's training?

A.   Yes, sir.  Every training.

Q.   Did you say that in --

A.   Be just like out on the street.  I tell the road
deputies, you do not assault an individual after handcuffs.
I mean, they're -- it's -- it's -- you -- there's no tasing.
There's no -- anything after that effect.

Q.   And again, is that rule true for drive stun mode and
prongs?

A.   Anything.

```
1    Q.    Okay.  Could you flip now to Tab Number 3 in that
2    binder.
3              Do you recognize that document?
4    A.    Yes, sir.
5    Q.    Could you tell us what it is?
6    A.    It's some legal stuff that came back out of one of my
7    instructor's in-service -- I mean, research.
8    Q.    Is it -- does it talk about legal standards connected to
9    using a Taser?
10   A.    Yes, sir.
11   Q.    Do you provide that packet of information to officers in
12   your training?
13   A.    Yes, sir.
14   Q.    And do you go over it as well?
15   A.    Yes, sir.
16   Q.    Did you do that in Defendant Bryant's training?
17   A.    Yes, sir.
18   Q.    Okay.  Does that appear to be an accurate version of the
19   legal Taser materials that you provided in Defendant Bryant's
20   training?
21   A.    It is.
22             MR. SONGER:  The Government would move to admit
23   Exhibit 3.
24             MR. STRIANSE:  No objection.
25             THE COURT:  All right.  Admitted.
```

```
 1                  (Whereupon Plaintiff Exhibit 3 was marked for
 2                  identification and received in evidence.)
 3                  MR. SONGER:  May we publish it, Your Honor?
 4                  THE COURT:  Yes.
 5       BY MR. SONGER:
 6       Q.   Okay.  And, Ms. Hughes, if we could show the seventh --
 7       page number 7, the Graham factors.
 8                  Mr. Ola, is the page that we've highlighted here
 9       on the board, is this one that you go over during the course?
10       A.   Yes, sir.
11       Q.   And are there any of these factors that are listed --
12       excuse me -- that are listed that you particularly emphasize
13       during the training?
14       A.   The second one.
15       Q.   That's actively resisting?
16       A.   Actively resisting.
17       Q.   Why is that one so important?
18       A.   Because that's the number one thing that you can use a
19       Taser for.  Anything else is out of play.
20       Q.   All right.  Can we now show page 15, please.
21                  All right.  Do you recognize this slide, sir?
22       A.   Yes, sir.
23       Q.   And, Ms. Hughes, can we blow up the box that's on the
24       top?
25                  Okay.  So this slide talks about considerations to
```

1  avoid Taser excessive force liability; is that right?

2  A.    Right.

3  Q.    And if you would go three bullets down, sort of the

4  subbullet.  Can you read what that says, the sentence that

5  starts with the word "not"?

6  A.    Oh.  (As read):

7              Not for restraint or punishment -- use five

8              seconds discharge window to restrain.

9  Q.    So, in this context, you're telling officers that not

10  only does policy say they should only use those five-second

11  bursts, but if they use more than five-second bursts, they

12  could face legal liability, right?

13  A.    Yes, sir.

14  Q.    And did you go over that in Defendant Bryant's training?

15  A.    Yes, sir.  Yes, sir.

16  Q.    Okay.  Can we now go to the next piece.

17              Okay.  Mr. Ola, do you recognize what this is?

18  A.    Yes, sir.

19  Q.    Is this part of that legal packet and other information

20  that you hand out during the training?

21  A.    I believe -- yes, sir.

22  Q.    And if we could zoom in on the box about two-thirds of

23  the way down the page.

24              THE COURT:  You need to identify for the record

25  what we're looking at.  Otherwise, the record's not going to

1  show.

2          MR. SONGER:  Sure.  This is the first page of a

3  packet of information that's labeled -- it's -- the Taser

4  logo and "Important Safety and Health Information."  It looks

5  like it contains several pages of manufacturer's information

6  provided by Taser.

7  Q.   Is that right, sir?

8  A.   Yes, sir.

9          THE COURT:  Let the record reflect it's page 1 of

10  8, so if another court's looking at this record, they're not

11  going to have a clue what we're looking at.

12          MR. SONGER:  Thank you.  Okay.

13  Q.   And on page 1 of 8, the box about two-thirds of the way

14  down, the second sentence in that box, do you see that?

15  A.   Yes, sir.

16  Q.   And it says (as read):

17              In some individuals, the risk of death or

18              serious injury may increase with cumulative Taser

19              exposure?

20  A.   Yes, sir.

21  Q.   And the next sentence is (as read):

22              Repeated, prolonged, or continuous Taser

23              applications may contribute to cumulative

24              exhaustion, stress, cardiac, physiological,

25              metabolic, respiratory and other medical risks; is

```
 1              that right?
 2   A.   Yes.
 3   Q.   And you provided this to Defendant Bryant and the other
 4   officers in this training?
 5   A.   Everyone should have got one, yes.
 6   Q.   Okay.  Can we now look at page 2 of 8, please.
 7              And, Ms. Hughes, can we zoom in on Bullet
 8   Number 1.
 9              Mr. Ola, what is the title of this paragraph?
10              THE COURT:  Pull that mike closer to you.
11              THE WITNESS:  (As read):
12                  Minimize the number of durations of the Taser
13                  exposures.
14   BY MR. SONGER:
15   Q.   And then it says (as read):
16                  Most human Taser lab testing has not exceeded
17                  15 seconds of Taser application, and none has
18                  exceeded 45 seconds.
19                  Do you see that?
20   A.   Yes, sir.
21   Q.   So does that indicate that there's never even been human
22   testing on tasing someone for longer than 45 seconds?
23   A.   I would assume.  You know, that's some of the stuff that
24   come out of Taser's medical and research department.
25   Q.   And you pass this along to the officers who get Tasers
```

1   in the jail?

2   A.   Yes, sir.  Yes, along with copies of the legal packet

3   and the policy and procedures.

4   Q.   All right.  Thank you.

5           Mr. Ola, in your training, do you specifically

6   discuss the types of injuries that can result from using a

7   Taser in drive stun mode?

8   A.   Yes, sir.

9   Q.   And what do you tell officers about that?

10  A.   We basically talk about that in our voluntary exposures.

11  And it is that if you touch someone with a Taser, even

12  through clothing, that it will leave a nasty burn.

13  Q.   Is that why it's tough to get volunteers?

14  A.   Very few, but some officers have taken it.

15  Q.   Do you tell them how long they'll be exposed if they

16  volunteer?

17  A.   Until they give a code word, and then we will stop the

18  gun.

19  Q.   About what's the longest they can be exposed?

20  A.   Five seconds.

21  Q.   Does some officers make it the full five seconds?

22  A.   Absolutely.

23  Q.   Do some yell out the code word first because it hurts

24  too much?

25  A.   A few, yes.

Q.    And have you seen the burns that -- the injuries that
can happen as a result of a five-second tase?

A.    Yes, I have.

Q.    What do they look like?

A.    They start real -- as a redness, and then at some point
they can turn into a blister.

Q.    So do they look worse immediately after the tasing or
some period of time later?

A.    Period of time.

Q.    About how long does it take for the burns to really show
up the worst?

A.    On what I have seen from officers, two to three days.
Right after it's done -- we do look at the site, but it's
usually just red.

Q.    Do you show officers pictures of burns from drive stuns
during the training?

A.    There was some that was in the PowerPoints.  I'm not
sure if they're still in this -- in the particular Number 20
or not.

Q.    Okay.  Do you remember whether you showed those pictures
in the training in October of 2015?

A.    I don't.

Q.    Okay.

A.    I don't.

Q.    But did you talk about the injuries?

1    A.    Yes.  We talk about that strenuous [phonetic] before I
2    apply a Taser to some officer's feet, legs, thighs, wherever.
3    At any time he can say no.  And, you know, it's not -- it's
4    not a pass or fail thing.  You do not have to be exposed to
5    be certified with a Taser.
6    Q.    Okay.
7    A.    It's strictly volunteer.
8    Q.    And in your training do you also tell officers about
9    whether there's any documentation that's required if they
10   tase someone?
11   A.    Yes.
12   Q.    What do you tell them is required?
13   A.    There is a use of force that has to be filled out, and
14   you must justify in that and in your narrative for each
15   trigger pull.  You must also discuss in there the individual,
16   what he was doing at the time, what he was doing that you
17   continued to use the Taser, all in the narrative.
18   Q.    Okay.  Did you tell them they're required to put in a
19   separate justification for each five-second trigger pull?
20   A.    Yes.
21   Q.    Did you say that in Defendant Bryant's training?
22   A.    Yes, sir.
23   Q.    Are you familiar with an incident that happened on
24   November 5th, 2016, involving an inmate named Jordan Norris?
25   A.    Yes, sir.

1   Q.   Were you working that night?

2   A.   Yes, sir.

3   Q.   Were you working in the jail?

4   A.   No, sir.  I've never worked in the jail.

5   Q.   Okay.  So you were out on the road?

6   A.   Yes, sir.

7   Q.   And at some point did you get called into the jail?

8   A.   I did.

9   Q.   And why were you called in?

10  A.   I received a radio transmission from dispatch that the

11  jail needed assistance moving an inmate to the hospital or

12  somewhere for evaluation.

13  Q.   Do you remember about what time you arrived at the jail

14  that night?

15  A.   I know it was after dark.  It was sort of late.  But I

16  don't know the exact time.

17  Q.   And when you arrived, were you briefed by any of the

18  officers who were there about what was happening?

19  A.   Not right at first, but shortly after, I believe at the

20  time Michael Montgomery had told me that they were trying to

21  get the individual evaluated and some things that had

22  happened.

23  Q.   Okay.  So while you were there that night, did you know

24  that Jordan Norris had been tased earlier that night?

25  A.   No, sir.

1  Q.    Did -- at some point in the future, did you learn that
2  he had been tased earlier that night?
3  A.    Yes, sir.
4  Q.    How did you find out about that?
5  A.    I believe the first time I knew about it was when it
6  showed up on TV.
7  Q.    At some point were you asked to pull Taser logs from
8  this date, from November 5th, 2016?
9  A.    I was.
10 Q.    And what is a Taser log?  Can you describe that for us?
11 A.    Basically, I stick a cable to the Taser and pull off the
12 data off of it, and it shows the duration of the tasing, the
13 time, the date, the particular gun by serial number, and
14 different things like that.
15 Q.    Okay.  Is that information recorded automatically?
16 A.    Yes, sir.
17 Q.    Any time the Taser's used, that information is captured?
18 A.    It starts the minute the Taser is armed, in the armed
19 position.
20 Q.    All right.  Would you please turn to Tab Number 23.
21 A.    Okay.
22 Q.    Do you recognize that document?
23 A.    Yes, sir.
24 Q.    What is it?
25 A.    It's the site we use through Taser.  It's called

1  evidence.synchs.  It's the data logs that were pulled off of

2  a gun, off a Taser.

3  Q.    Are those the Taser logs that you pulled about

4  November 5th, 2016, and the surrounding time?

5  A.    Yes, sir.

6  Q.    Does that appear to be a correct copy of those logs?

7  A.    Yes, sir.

8        MR. SONGER:  The Government moves to admit

9  Exhibit 23.

10       MR. STRIANSE:  No objection.

11       THE COURT:  All right.  Admitted.

12       (Whereupon Plaintiff Exhibit 23 was marked for

13       identification and received in evidence.)

14       MR. SONGER:  May we publish it?

15       THE COURT:  Yes.

16 BY MR. SONGER:

17 Q.    Okay.  And, Ms. Hughes, can we just zoom in on the

18 serial number at the top of this form.  Okay.

19       Mr. Ola, do you see at the top of this form the

20 serial number that's listed there?

21 A.    Yes, sir.

22 Q.    And does that number correspond to a specific Taser?

23 A.    It would, yes.

24 Q.    And is that the Taser that you were asked to pull -- the

25 log that you were asked to pull that night?

1  A.    I believe it -- believe it was, yes.

2  Q.    Okay.  And that's Serial Number X12002342; is that

3  right?

4  A.    Yes.

5  Q.    Okay.  Can we look please at page 33 of this exhibit.

6  And if we go about halfway down the page, can you see one of

7  the lines -- the first line that's darkened a little bit.  If

8  we can zoom in.  All right.

9          So what's the date on these entries that we're

10 looking at here, sir?

11 A.    November the 5th, 2016.

12 Q.    Okay.  And on the left-hand column, that's military

13 time, right?

14 A.    Yes, sir.

15 Q.    So this is 1959 or about 7:59 p.m.?

16 A.    Right.

17 Q.    About 8:00.  And can you walk us through what these

18 different columns mean.

19          What's the column next to the -- next to the time?

20 What is that indicating?

21 A.    Which one now?

22 Q.    The one just next to the one that shows the time.

23 A.    That is actually -- it shows whether or not -- what --

24 where the gun is, is it armed, is it -- the trigger being

25 pulled, is it in safe mode.

```
1   Q.   So if it says it's armed, what does that mean?
2   A.   It means that it's ready to fire.
3   Q.   It's not actually being fired but it's ready?
4   A.   Yes, sir.
5   Q.   Would the -- the cameras that are on the Taser be
6   activated if it's armed?
7   A.   Yes.
8   Q.   And then if it says "Trigger" in that column, what does
9   that mean?
10  A.   That means it's been pulled.
11  Q.   All right.  And in the column next to that where you see
12  the numbers?
13  A.   It shows the duration of how long the trigger was
14  activated.
15  Q.   How long the trigger was actually pulled?
16  A.   Five seconds, I believe, in that one.
17  Q.   So then, reading down, we've got 7:59, five seconds;
18  7:59:29 seconds, another five seconds?
19  A.   Yes.
20  Q.   Another one at 7:59 for 25 seconds?
21  A.   Yes, sir.
22  Q.   And then one at 8:00 for 15 seconds.
23  A.   Yes, sir.
24  Q.   Is that right?
25  A.   Yes.
```

1  Q.    Okay.  So that's -- is it correct that that's a total of
2  50 seconds of tasing between 7:59 and 8:00?
3  A.    Yes.
4  Q.    Now, did you know how long those tases were before you
5  saw the logs?
6  A.    Did I what, sir?
7  Q.    Did you know there had been tases used that were this
8  long before you saw those logs that night?
9  A.    No.
10  Q.    So what was your reaction when you saw there had been 50
11  seconds of tasing in a minute?
12  A.    Shocked.
13  Q.    You ever heard about anything like that any other time
14  in your law enforcement career --
15  A.    No, sir.
16  Q.    -- in 25 years?
17  A.    (Witness moves head from side to side.)  Not -- not in
18  our county.  No.
19  Q.    In any county, have you ever heard of anybody being
20  tased 25, 50 seconds?
21  A.    There's been a case somewhere off from here where a
22  S.W.A.T. team used it quite a while to get in to get somebody
23  that was attempting to cut an individual's throat or
24  something to that extent, but that was a S.W.A.T. team.
25  Q.    Nothing you've ever seen at any agency you've ever

1  worked for?

2  A.   No, sir.

3  Q.   Okay.  Take that down.

4          All right.  So turning back to when you arrived at

5  the jail that night, November 5th, 2016.

6          You go there after 8:00; is that right?

7  A.   Yes, sir.

8  Q.   So what was happening when you first showed up?

9  A.   When I first showed up and they let me in, I remember an

10  individual, Jordan Norris, that was in the chair.  And right

11  in front of our booking window.  And there was several

12  officers around him attempting to get him in the chair, I

13  think.  I mean, trying to get the straps done.

14  Q.   Okay.  Can we show Exhibit 14A, please.

15          Do you recognize the scene in this picture, sir?

16  A.   Yes, sir.

17  Q.   And who is the person in the picture?

18  A.   That's Jordan Norris.

19  Q.   Is that what it looked like around the time that you got

20  there?

21  A.   Yes, sir.

22  Q.   He's got one arm cuffed to the bar; is that right?

23  A.   Generally policy, if one arm -- when we bring one in, or

24  something, is cuffed, until they can get him completely

25  booked out.

```
1   Q.   Okay.  And what are officers attempting to do right now?
2   A.   At that point I believe they were wrestling with -- with
3   his right -- his right arm and the straps.
4   Q.   Okay.  And what was the ultimate goal?
5   A.   To get him in the restraint chair to restrain him.
6   Q.   Get him restrained.
7            Do you know why they wanted to get him restrained?
8   A.   They were -- I was told to take him to the Tristar for
9   an evaluation for -- to transport him out to be -- to a
10  hospital.
11  Q.   Okay.  So is it right that the officers were attempting
12  to get Jordan restrained so they could then move him to the
13  hospital?
14  A.   Yes, sir.
15  Q.   Now, during that process, did Jordan fight with the
16  officers at first?
17  A.   He postured a few times, and his right arm -- he slung
18  it and flailed a little bit.  I don't know that it --
19  physically fighting, no.  Not at that point.
20  Q.   Okay.
21  A.   Actually, I think the belly -- the belly strap is
22  already on.  Which is above his waistline -- below his
23  waistline.
24  Q.   Okay.  Do you know if he was -- if Jordan was tased
25  during the process of trying to get him restrained so he
```

1  could be moved to the hospital?

2  A.    Yes.

3  Q.    And which officer tased him?

4  A.    Mark Bryant.

5  Q.    All right.  Now, at some point did officers get Jordan

6  secured in that chair?

7  A.    Yes.

8  Q.    Can we publish a clip from Exhibit 15, please.

9           (Video played.)

10 BY MR. SONGER:

11 Q.    Now, in that last minute-and-20-second clip that we just

12 watched, was Jordan still fighting with officers?

13 A.    At that time I do not believe so, no.  He was -- he was

14 rattling off some crazy stuff about "kill me," something

15 "devil."  I don't remember all the mumble that he was saying.

16 Q.    Was he actively resisting anything at this point?

17 A.    No, sir.

18 Q.    Now, do you see yourself in this image?

19 A.    I do.

20 Q.    Where are you?

21 A.    I'm to the right of his -- well, to his left shoulder.

22 Q.    Are you the individual sort of looking down on him,

23 right next to him?

24 A.    Yeah.  The female officer, Burney is the female there,

25 and then me right there.

```
1   Q.   You're the person who is circled in the picture?
2   A.   Yes, sir.
3   Q.   And the female officer who is bending down right in
4   front of him, you said that's Officer Burney?
5   A.   Yes.  Rebecca.
6   Q.   And what's she doing?  What is she talking to Jordan
7   about?
8   A.   I think she was still trying to get one of the straps or
9   something so we could roll him out.
10  Q.   Okay.  And how many officers are around at this point?
11  A.   Seven, six.  There's seven of us.
12  Q.   Seven of you?
13  A.   Yes.
14  Q.   And at this point is Jordan placed in handcuffs?
15  A.   He also is, yes.
16  Q.   And you mentioned a belly chain a moment ago.  Is he
17  wearing a belly chain?
18  A.   They did put a belly chain on him.
19  Q.   And does the belly chain connect to the handcuffs?
20  A.   Yes, sir.
21  Q.   What does that do?
22  A.   It keeps him minimized where he can't move other than
23  his belly, around his waistline.
24  Q.   Can't move his hands and arms?
25  A.   Huh-uh.
```

1  Q.    Does he have any restraints on his feet?

2  A.    He has shackles on.

3  Q.    And those are like handcuffs for your feet?

4  A.    Oversize handcuffs, yes, with a chain to keep you from

5  running.

6  Q.    Does he also have a belt around his legs?

7  A.    He has the chair straps.

8  Q.    And this is inside a secure area of the jail, right?

9  A.    It's in the booking, the main entrance of the booking,

10  to where you come in booking.

11  Q.    Can we show the witness Exhibit 14C, please.

12        Do you recognize this image?

13  A.    Yes, sir.

14  Q.    Is that an accurate depiction of the restraints Jordan's

15  hands and feet were in?

16  A.    Yes.

17  Q.    Okay.  Now, at this point is he ready -- is Jordan ready

18  to be moved outside and taken to the hospital?

19  A.    Yes, sir.

20  Q.    And you're standing right next to him.

21        Do you see any threat that justifies tasing him at

22  this point?

23  A.    No.

24  Q.    Is he actively resisting?

25  A.    No, sir.  He's still mumbling some of that crazy stuff,

1  but it's just verbal.

2  Q.   Can you tase somebody for --

3  A.   Absolutely not.  No.

4         THE COURT:  You're going to start all over.  You

5  all talked over each other.

6         MR. SONGER:  I apologize.  I'm talking over you.

7         THE COURT:  Why don't you ask the question.

8  BY MR. SONGER:

9  Q.   Are officers permitted to tase someone just because

10  they're mumbling something crazy at the officers?

11  A.   No.

12  Q.   Can we now please play the next clip from Exhibit 15.

13         (Video playing.)

14  BY MR. SONGER:

15  Q.   What just happened in the clip we watched?

16  A.   He was doing something with one of his feet where the

17  female was down there, and he did a posture and he was tased.

18  Q.   Who tased him?

19  A.   Mark Bryant.

20  Q.   Did you see any justification for Mark Bryant tasing

21  him?

22  A.   No, I did not.

23  Q.   How long did that tase last?

24  A.   I think the log said 11 seconds.  That whole event went

25  by that quick.

1 Q.   And was that tase consistent with the training that you

2 gave to Defendant Bryant?

3 A.   No, sir.

4 Q.   I'm sorry?

5 A.   No, sir.

6 Q.   And why not?

7 A.   Because he's completely -- other than that one strap she

8 was trying to get on, he's completely chained, strapped,

9 shackled.  There's no --

10 Q.   Handcuffed?

11 A.   Handcuffed.  No way of him getting out of that chair.

12 Q.   And there's seven officers around?

13 A.   And there's still seven -- right.  There's a little

14 female, Ms. King's standing over in the corner.

15 Q.   Okay.  Now, if you would please look back at Exhibit

16 Number 23 in your binder.  That's the Taser log that we

17 looked at earlier.  And if you would look at page 33 of that

18 exhibit, please.

19           And if you look down now to sequence number, the

20 number on the left side, 967.

21 A.   Yes, sir.

22 Q.   The time on this event is 2225 or 10:25 p.m.; is that

23 right?

24 A.   Yes.

25 Q.   Okay.  And what's the length of that tase?

1  A.    I believe it says 12.

2  Q.    Twelve seconds?

3  A.    Yes, sir.

4  Q.    Okay.  And can we look now at the next few lines,

5  please.  Okay.

6            The next one, also at 10:25.  What's the time for

7  that tase?

8  A.    What's the duration?

9  Q.    Yes.  The duration.

10  A.    Five.

11  Q.    Also five seconds?

12  A.    Yes, sir.

13            THE COURT:  Okay.  You really need to talk into

14  the microphone.  You're barely whispering.

15            THE WITNESS:  Yes, sir, five seconds.

16  BY MR. SONGER:

17  Q.    Thank you.  And the line below that at 10:26:04, what's

18  the time on that one?

19  A.    Eight.

20  Q.    And below that, at 10:26:14?

21  A.    Six.

22  Q.    All right.  Do those tases appear to you to be the ones

23  that were used on Jordan when he was struggling to be

24  restrained in that chair?

25  A.    Yes, sir.

1 Q.    Okay.  Okay.  And then the next line is at 10:27:57.  So

2 almost 10:28.  Is that right?

3 A.    Yes, sir.

4 Q.    About a minute and a half later?

5 A.    Right.

6 Q.    And what's the time on that tase?

7 A.    Eleven.

8 Q.    All right.  Does that appear to be the tase that we just

9 watched when Jordan was handcuffed and shackled?

10 A.    It is.

11 Q.    And that was after he had been calm for a minute and a

12 half?

13 A.    Yes, sir.

14 Q.    Mr. Ola, where were you standing when the defendant

15 deployed that last 11-second tase?

16 A.    It would have been just to the left of Jordan

17 Norris's -- his shoulder.

18 Q.    Just a couple feet away, right?

19 A.    Yes.

20 Q.    And were you carrying a Taser that night?

21 A.    Yes, sir.

22 Q.    Now, if you thought that -- if you had seen Jordan do

23 something that justified tasing him, would you have used your

24 Taser?

25 A.    If need be, yes.

```
 1   Q.    Okay.  Did you see anything?
 2   A.    No, sir.
 3   Q.    So did you even consider using your Taser in that
 4   situation?
 5   A.    No, sir.
 6   Q.    Did you even, like, start to unholster it?
 7   A.    Never.
 8   Q.    Were you surprised when the defendant, Bryant, started
 9   tasing him there?
10   A.    Yes, sir.
11   Q.    And why were you surprised?
12   A.    Thinking why.  Shocked.  I think we all were.
13   Q.    Now, did you try to stop Defendant Bryant while he was
14   tasing Jordan in handcuffs and shackles?
15   A.    At that time I did not.
16   Q.    And why not?
17   A.    Again, just shock, and it happened so quick.  I don't
18   think any of us could have stopped him.
19   Q.    Okay.  Now, at some point after it was over, did you
20   realize that it was wrong?
21   A.    Yes, sir.
22   Q.    And did you then report Defendant Bryant for misconduct?
23   A.    I did not.
24   Q.    And why didn't you?
25   A.    I think it was a mixture of fear, embarrassed, shocked
```

1  that it happened.  That I trained this individual and just

2  had no idea what just happened.

3  Q.   Were you afraid it would make you look bad since you had

4  given him training?

5  A.   Somewhat.

6  Q.   Were you afraid you might be retaliated against if you

7  reported another officer?

8  A.   Yes, sir.  Because later, when it showed on TV, I think

9  most all of us got threats toward us and things of our

10 family.  So, yes, we was -- we was scared.

11 Q.   How do you feel about the fact that you didn't try to

12 stop it and then you didn't report it?

13 A.   Again, I'm ashamed.  I've ruined my career.  I've lost

14 everything for not doing the right thing.

15 Q.   How about -- how about Jordan?  Are you concerned about

16 him at all?

17 A.   Yes, sir.  I think -- I feel that my feelings is that

18 we've all let Jordan down, because no one in that room that

19 night reported it to a supervisor.  No one.

20 Q.   Do you feel like you failed him that night?

21 A.   Yes, sir, we did.

22 Q.   Now, at some point during the investigation of this

23 case, did you meet with officers from the FBI and the

24 Tennessee Bureau of Investigations?

25 A.   I did.

```
1    Q.    Now, in the first couple of interviews that you had with
2    those investigators, did you tell them everything that you
3    saw happen in this incident?
4    A.    No, sir.
5    Q.    In fact, did you tell them that you had walked away and
6    you didn't see anything like this happen?
7    A.    Yes, sir.
8    Q.    And why did you say those things?
9    A.    Again, fear and other -- you know, embarrassed.
10   Q.    Were you afraid you were going to get in trouble?
11   A.    Yes, sir.
12   Q.    You were ashamed that you hadn't stopped it?
13   A.    Very ashamed.
14   Q.    Were you charged with any crimes as a result of those
15   lies that you told to the FBI?
16   A.    Yes, sir, I was.
17   Q.    And what was the results of those charges?
18   A.    I pled guilty.
19   Q.    Why did you plead guilty?
20   A.    Because I was guilty.  I'm guilty.
21   Q.    Okay.  And is that a felony that you pled guilty to?
22   A.    Yes, sir.
23   Q.    Have you been sentenced yet for that charge?
24   A.    No, sir.  That will come in May.
25   Q.    And are you hoping that the Government will ask the
```

1  Court to give you a lighter sentence?

2  A.   I've not been promised anything.  I hope, but I'm not

3  promised anything.

4  Q.   All right.  So thinking back about that night now, do

5  you wish you had done anything differently?

6  A.   Absolutely.  I think many of us that was in that jail

7  that night wish we could relive that and stop it.

8  Q.   Have you ever seen a tasing that egregious any other

9  time in your law enforcement career?

10            MR. STRIANSE:  Object, Your Honor.

11            THE COURT:  Go ahead.

12            MR. STRIANSE:  I object to the characterization.

13            THE COURT:  Sustained.

14  BY MR. SONGER:

15  Q.   Have you ever seen another officer violate the training

16  that you provide more blatantly than what you saw that night?

17  A.   No.

18            MR. SONGER:  Nothing further at this time.

19            THE COURT:  All right.  Cross.

20

21                    CROSS-EXAMINATION

22  BY MR. STRIANSE:

23  Q.   Mr. Ola, you told the jury that you lost everything

24  because of the events of that night.

25            Is that what you were telling them?

1  A.    Career-wise, yes, sir.
2  Q.    Okay.  Well, you didn't lose everything because you
3  failed to stop Mark Bryant that night.
4            In your words, you lost everything because you
5  ended up lying to a TBI agent in August of 2017; is that
6  right?
7  A.    No.  I lost everything starting that night, sir, when
8  the event happened.  But you're correct.
9  Q.    Right.  You lost your career as a result of pleading
10  guilty in this Court to lying to a TBI agent in August of
11  2017; is that right?
12  A.    Yes, sir.
13  Q.    Telling that TBI agent that you didn't see what happened
14  in the booking room; is that right?
15  A.    Yes, sir.
16  Q.    And that was a decision you made on your own, to lie to
17  the agent?
18  A.    Yes, sir.
19  Q.    And then up here on the 8th floor of the federal
20  courthouse on May 1st, 2018, you lied to an FBI agent, told
21  Ms. Wright the same thing, that you didn't really see what
22  happened in that -- in that booking room; is that right?
23  A.    Yes, sir, I told her the same thing.
24  Q.    Okay.  Now, you were asked if you had seen other tasing
25  incidents of any length.

```
1              Do you remember that question?
2  A.   Yes, sir.
3  Q.   Okay.  You know Special Agent Shawn Atkins was the one
4  that you spoke to on -- in August of 2017; is that right?
5  A.   I may know of him.
6  Q.   With the TBI?
7  A.   I -- yeah.
8  Q.   And do you know that he was able to pull the Taser
9  records for Daniel Bratton and the tasing that he had done
10 that evening, on November 5, 2016?
11 A.   I was not aware of that.
12 Q.   Okay.  But you were the person that trained the people
13 at the jail in how to use a Taser; is that right?
14 A.   Yes, sir.
15 Q.   Now, would four tases within 50 seconds for the full
16 five seconds be something consistent with training?
17 A.   No, unless they're justified.  I mean, I'm not aware of
18 the incident you're talking about.
19 Q.   And justified would be if a person was fighting against
20 the officer?
21 A.   Well, yes, it would be what event's -- what's happening
22 at the time.
23 Q.   Mr. Ola, do you happen to have that looseleaf in front
24 of you?
25 A.   I do.
```

```
1    Q.    If you could turn to Tab 3 and go into several pages?
2              THE COURT:  Again, so the record's clear, we're
3    looking at Exhibit 3.
4              MR. STRIANSE:  Exhibit 3.  Paper Exhibit 3.
5    Q.    And if you can find the Taser training academy test.
6    A.    Test.  Yes.
7    Q.    Do you have that in front of you?
8    A.    I do.
9    Q.    That's a 20-question test, is it not?
10   A.    Yes, sir.
11   Q.    And that's a very important part of the training, isn't
12   it?
13   A.    Yes, sir.
14   Q.    Take a look at those 20 questions.  And don't read them
15   out loud, but just look at them to refresh your recollection
16   about them.
17   A.    Okay.
18   Q.    I think you told the jury that you're looking for each
19   candidate to get 100 percent on that 20-question test; is
20   that right?
21   A.    Yeah.  We go over the test together, as we do in the
22   instructor's course.
23   Q.    Have you had a chance to take a look at the questions?
24   A.    Yes.
25   Q.    Yeah.  There are no questions about the number of drive
```

1  stuns; is that right?  That are permissible?

2  A.    No, sir.

3  Q.    And there are no questions about the duration of any

4  drive stuns?

5  A.    Not on the test, no.

6  Q.    Keep that book in front of you.

7          And if you would take a look at Government's

8  Exhibit Number 1, Tab 1.  Tell me when you get there, and

9  then I'll direct you to a page.

10  A.    Okay.

11  Q.    Can you take a look at page 2, paragraph 4, on the force

12  continuum.

13          Do you see that?

14  A.    Yes.

15  Q.    And a Taser would be an intermediate weapon; is that

16  right?

17  A.    Yes, sir.

18  Q.    It's certainly not lethal force?

19  A.    No, sir.

20  Q.    If you would turn to page 3, you were asked some

21  questions about reporting requirements for people that use

22  the Taser.

23          Do you see that?

24  A.    What now?

25  Q.    On page 3, under the heading "Reporting" --

1  A.   Yes.

2  Q.   -- take a look at paragraph 7-1, and just read that to

3  yourself.  7-1 all the way through 7-5.  Just read it to

4  yourself and then I have a question for you.

5  A.   (Witness complies.)  Okay.

6  Q.   Under "Reporting," there's no requirement that the

7  number of Taser applications or durations be reported; is

8  that correct?

9  A.   Not -- not in there, no.

10  Q.   Nor is there a requirement that the serial number of the

11  device be recorded in any report; is that right?

12  A.   No.

13  Q.   And then, if you could turn to the Cheatham County

14  Sheriff's Office General Order, which is also in Government's

15  Exhibit 1, page 1 of that.

16  A.   Okay.

17  Q.   You're at that page, Mr. Ola?

18  A.   Yes.

19  Q.   Take a look at paragraph 6-1 and let me ask you a

20  question.

21          Do you see the language (as read):

22              The Taser may be deployed consistent with

23          established policy and procedure governing the

24          force continuum?

25          Do you see that sentence?

```
 1   A.   Yes, sir.
 2   Q.   (As read):
 3              The Taser is considered an intermediate level
 4         of force.
 5         Do you see that?
 6   A.   Yes, sir.
 7   Q.   (As read):
 8              Between soft empty hand control techniques and
 9         empty hand control techniques.
10         So it falls somewhere between the soft hand and
11   the hard hand; is that right?
12   A.   Yes.  Before lethal.
13   Q.   And then also in the Cheatham County general order, turn
14   to page 2.
15         In the upper left-hand corner, do you see
16   paragraph 6.2.2?
17   A.   I do.
18   Q.   And it talks about deploying the Taser consistent with
19   department-approved training.
20   A.   Yes, sir.
21   Q.   It says (as read):
22              Use only the minimum number of bursts and
23         minimum duration reasonably necessary to achieve
24         the desired effect of temporarily immobilizing the
25         individual?
```

1    A.    Yes, sir.

2    Q.    I stated that correctly?

3    A.    Yes, sir.

4    Q.    That contains no drive stun limits; is that right?

5    A.    No, sir.

6    Q.    And no limits on the duration?

7    A.    No, sir, not. . .

8    Q.    And then, finally, if you take a look in the right-hand

9    column, 6.8, it talks about (as read):

10                  Any use of the Taser inconsistent with the

11              policy could result in disciplinary action.

12              Is that right?

13   A.    Yes, sir.

14   Q.    If he could be shown 14C.

15              Mr. Ola, you were shown a still photograph a few

16   minutes ago in your direct examination.  Is this how Mr. --

17   and for the record, this is 14C.

18              Is this how Mr. Norris looked immediately prior to

19   the tasing incident that you testified about a minute ago?

20   A.    That's -- that's how he was when he was fully

21   restrained.

22   Q.    Okay.  Was that before or after the tasing incident that

23   we just saw a few minutes ago?

24   A.    I would have to watch it again, sir.  Because I don't

25   know at what point that is.  I know right before the tasing,

1    the young lady was trying to get something done down at his

2    feet with a strap.

3    Q.    And did Mr. Norris move his leg or legs in some way that

4    occasioned the tasing?

5    A.    At that point, no.

6    Q.    You saw no activity prior to the tasing?

7    A.    No.  I mean, I seen activity when I first got there and

8    somewhat the posturing and the right arm before it was

9    completely -- he wasn't completely in the chair and

10   restrained when I got there.

11   Q.    Okay.

12   A.    But shortly after, he was.

13   Q.    And when you saw him straining or moving, that's when he

14   was tased; is that right?

15   A.    Somewhat, yes.

16   Q.    What do you mean, "somewhat"?

17   A.    Well, at the time he was doing something with his arm.

18   Q.    You're not suggesting to the jury that Mr. Bryant bent

19   over without any provocation at all and tased Mr. Norris on

20   his leg as he was as calm as that?

21   A.    No, sir.

22   Q.    He was moving against the restraint in some way; is that

23   right?

24   A.    Yes, sir.

25   Q.    And take a look -- I realize that's a very old restraint

1 chair?

2 A.    No.   That's actually one of the new ones they bought.

3 The old one was worse than that.

4 Q.    Okay.   Well, I know you haven't been here this week,

5 but -- do you see any individual ankle restraint for that

6 chair?

7 A.    Ankle restraint?

8 Q.    Yeah.   Something that would be a restraint that would be

9 wrapped around an individual's leg at the bottom?

10 A.    I know there's straps, but I don't know if they go

11 around both legs or individually.

12 Q.    Mr. Ola, when did you stop doing the training for the

13 Cheatham County sheriff's office?

14 A.    I had not done one several, several, several months

15 before I resigned.

16 Q.    Okay.

17 A.    I don't know exact dates, sir.

18 Q.    So were you still the Taser training officer after

19 November 5, 2016?

20 A.    Yes, sir.

21 Q.    And you held that position as the Taser training

22 instructor up until what date?   Until your separation?

23 A.    Yes, sir.

24 Q.    So that would have been in May of 2018?

25 A.    I want to say June.

```
1   Q.    June of 2018?
2   A.    I think.
3   Q.    So -- I know you haven't been in the courtroom, but --
4   this week.  But I -- I think you generally know that there
5   was a lawsuit that was filed, a civil lawsuit that was filed
6   after this incident; is that right?
7   A.    Yes, sir.
8   Q.    I think you said you saw something on the news and the
9   problems that that caused; is that right?
10  A.    Yes, sir.
11  Q.    And I know you haven't heard the testimony, but if an
12  officer testified in connection with this case, someone that
13  you trained, that prior to the lawsuit, if an inmate in
14  handcuffs was combative, it was still permissible to tase
15  them --
16  A.    No, sir.
17  Q.    So their -- that officer would have been confused by
18  your training?
19  A.    I would have always -- I've always said -- and -- and we
20  have never told -- I've never instructed a student to tase
21  anybody while they were handcuffed, or road deputy.
22  Q.    And if an officer that you trained said don't tase an in
23  person a restraint chair if they're fully restrained --
24  A.    Don't tase?
25  Q.    Right.  Don't tase a person if they're fully -- if
```

1  they're fully restrained?

2  A.   If they're fully restrained, to me they're in handcuffs.

3  Most times they are.  And that would be -- no, that would not

4  be a tasable incident.

5  Q.   What about tasing a person in a restraint chair that is

6  not fully restrained?

7  A.   Sir, it would -- the -- I would have to look at -- we

8  would have to look at the situation.  Generally, if they're

9  restrained or they're in the restraint chair, if their hands

10  and everything is not a -- a threat, then you can't tase.

11        I mean, you can't tase someone that's not actively

12  resisting you or fighting you or something to that extent.  I

13  mean, just because you tell them to sit there and be quiet or

14  don't get up, if they don't do it, you can't tase them.

15  Q.   What if someone is in the restraint chair and they're

16  not fully restrained, they have an arm free and they're

17  trying to head butt an officer?

18  A.   If that officer is there by himself, that could be a

19  situation.  But if he's got enough ample help and this and

20  that, it just -- it just depends, sir.  I mean. . .  You have

21  to look at the situation.  Every scenario's different.

22        I'm telling you that in the training I would have

23  never told an individual, and have not told an individual,

24  that he can tase someone that's handcuffed or restrained.  I

25  do teach how to use the drive stuns, but not in that

1  situation.

2  Q.    Now, you have entered into a cooperation plea agreement

3  with the United States in this case; is that right?

4  A.    I've pled guilty, yes, sir.

5  Q.    You pled guilty and you entered into a plea agreement

6  with the Government; is that right?

7  A.    I pled guilty, sir.  I don't. . .

8  Q.    Well, you were represented by a lawyer?

9  A.    Yes.  Mike Flanagan.

10 Q.    Mike Flanagan represented you?

11 A.    Yes, sir.

12 Q.    And you do you remember signing off on a petition to

13 enter a plea of guilty?

14 A.    Yes, sir.

15 Q.    Do you remember signing off on a separate plea agreement

16 that the Government had prepared?

17 A.    Yes, sir.

18 Q.    And do you remember it had sections in it that requires

19 you to cooperate?

20 A.    Yes, sir.

21 Q.    And testify?

22 A.    Yes, sir.

23 Q.    And if you testify truthfully in the Government's

24 estimation, then they agree to file a motion with Judge

25 Crenshaw to reduce your sentence; is that right?

```
 1    A.    I believe that was in there, yes, sir.
 2              MR. STRIANSE:  Your Honor, if I could just have
 3    one minute.
 4              THE COURT:  Sure.
 5              (Respite.)
 6    BY MR. STRIANSE:
 7    Q.    You told us about this training that you did with the
 8    officers where you said no more than three tases, five
 9    seconds in duration; is that right?
10    A.    Generally what I say is I brought that back from several
11    years ago.  There has been federal cases, judges that have
12    found more than three second -- three five-second bursts, if
13    not justified, can be deemed excessive force.  And people --
14    and officers have been found guilty.  I say that in every
15    class.
16    Q.    But that was not codified as an official policy until
17    July 20th of 2017; is that right?
18    A.    The sheriff did that after the event, yes, sir.
19    Q.    "After the event" meaning --
20    A.    He physically --
21              THE COURT:  Hold on.  Hold on.  Hold on.
22    Question, and let him -- and then let him finish his
23    question.  Don't talk over him.
24              All right.  Reask your question.
25              MR. STRIANSE:  Forgive me, Your Honor.
```

```
 1  Q.    "After the event," you mean after the lawsuit was filed?
 2              MR. SONGER:  Your Honor, we object to introduction
 3  of any post hoc policy changes.
 4              THE COURT:  All right.  Why don't you all
 5  approach.
 6              (Bench conference outside the hearing of the
 7              jury.)
 8              THE COURT:  Go ahead.
 9              MR. SONGER:  Your Honor, for the reasons set forth
10  in the motion we filed last night, we don't think it's
11  appropriate or relevant to get into any policy changes that
12  were made after the incident.  It wouldn't bear on what
13  Defendant Bryant knew at the time of the incident nor is it
14  relevant to what this defendant told Defendant Bryant in
15  training.
16              THE COURT:  All right.
17              Mr. Strianse?
18              MR. STRIANSE:  Your Honor, it's relevant as to
19  what he didn't know.  There was no policy that Mr. Bryant was
20  aware of that limited it to three tases and five seconds in
21  duration, and it wasn't until after this happened that it was
22  codified by the sheriff in this policy.
23              And that would also be consistent with the
24  testimony of the jail administrator, JJ Hannah.
25              MR. SONGER:  The jail administrator hasn't
```

```
 1    testified, but we certainly have no objection to him asking
 2    about what he did or did not tell the defendant prior to the
 3    incident, like what the policy was.
 4            But the policy changes that the jail made after
 5    the fact would not seem to be relevant to that.
 6            MR. STRIANSE:  And it contradicts his insistence
 7    that there was a five-second, three-tase policy.
 8            THE COURT:  And he was still working there on July
 9    the 3rd of 2017?
10            MR. STRIANSE:  He was.
11            MR. SONGER:  He was.
12            THE COURT:  So he would have knowledge of the
13    policy change.
14            MR. SONGER:  He would have knowledge of the
15    change, but it wouldn't impact what Defendant Bryant was told
16    before the incident.
17            MR. STRIANSE:  That's for the jury to decide, what
18    Mr. Bryant was told.
19            THE COURT:  Yeah.  I'm going to allow it as proper
20    impeachment.
21            MR. SONGER:  Your Honor, I'll point out that he
22    did not in any way testify to anything that happened after
23    the incident, so he's not being impeached --
24            THE COURT:  Under 407, it's admissible.
25            MR. SONGER:  I don't think it contradicts anything
```

1   that he said, sir.
2           THE COURT:  Okay.  So noted.
3           MR. SONGER:  Thank you.
4           THE COURT:  Go ahead.
5           MR. STRIANSE:  Judge, can I have the Case Number?
6           THE COURT:  18-144.
7           MR. STRIANSE:  Thank you, Your Honor.
8           (Jury present.)
9   BY MR. STRIANSE:
10  Q.   Mr. Ola, let me show you what's been marked for
11  identification as Defendant's Exhibit 2 and see if you
12  recognize that.
13  A.   (Reviews document.)  Yes, sir.
14  Q.   And what is it, sir?
15  A.   It's a memo and a -- a sheet that our sheriff sent out
16  after the incident.
17  Q.   And what is it dated?
18  A.   July the 30th, 2017.
19  Q.   And you were still the Taser instructor for the County
20  as of that date; is that right?
21  A.   Yes, sir.
22          MR. STRIANSE:  Your Honor, we would offer
23  Defendant's 2 as evidence.
24          MR. SONGER:  We object for the reasons we
25  discussed.

```
1              THE COURT:  All right.  Admitted.
2              (Whereupon Defense Exhibit 2 was marked for
3              identification and received in evidence.)
4   BY MR. STRIANSE:
5   Q.    And this is the policy that was set by Sheriff Breedlove
6   in the wake of this lawsuit that was filed; is that right?
7   A.    Yes, sir.
8   Q.    And in fact, that policy was implemented probably eight
9   or nine days after the lawsuit was filed; is that correct?
10  A.    I don't know exactly what day, sir, but after, yes.
11  Q.    And if you would read the paragraph that deals with this
12  three five-second tase rule.
13  A.    It says (as read):
14              The Taser and -- the Taser and/or drive stun
15              will not be deployed for more than five seconds.
16              The Taser or drive stun will not be deployed more
17              than three times on any combative individual
18              unless unique circumstances happen and the officer
19              articulates why.
20  Q.    And there was no previous written policy that had been
21  issued by the Sheriff's Department regarding that three-
22  deployment, five-second rule; is that right?
23  A.    No.  It said minimum.
24  Q.    That wasn't my question.
25              I said, did any sheriff ever sit down at a
```

1  typewriter or a computer and type up a policy statement like
2  that one prior to July of 2017?
3  A.    Not that I'm aware of, no.
4        MR. STRIANSE:  May I have one moment?
5  Q.    You had mentioned a few minutes ago when I was asking
6  you, I asked when the last time you had actually conducted a
7  class before you left your employment there at the Cheatham
8  County sheriff's office, and you said it had been quite some
9  time; is that right?
10 A.    As far as a Taser course, yes.
11 Q.    And weren't the employees of the Sheriff's Department,
12 whether they were road officers or jail officers, supposed to
13 receive annual retraining on the Taser?
14 A.    Yes.  During our in-service.  But most of the time, our
15 correction officers, they had their own in-service.  I did
16 the road deputies.
17        At that time I think it was David Isherwood or
18 whoever it was over their department training.
19 Q.    But you knew that the correctional officers were not
20 receiving regular, annual retraining on the Taser?
21 A.    They were when I was down there, yes, sir.
22 Q.    Okay.  If -- if in Mr. Bryant's tenure he only received
23 the one training from you, would that have been consistent
24 with the annual requirement?
25 A.    Yes, sir.  There is some that didn't get it.

1  Q.   I'm not sure I understand your answer.

2  A.   It was a -- a -- a yearly thing of just a -- basically,

3  during our in-services, we talked about the Taser, anything

4  new that come up and that kind of stuff.

5       We were budget restraints on doing certain things.

6  Q.   But it wasn't a full annual retraining on the Taser?

7  A.   No, sir.

8       MR. STRIANSE:  That's all.

9       THE COURT:  All right.  Redirect.

10

11              REDIRECT EXAMINATION

12  BY MR. SONGER:

13  Q.   Mr. Ola, I have just a couple quick questions.

14       You were asked a number of questions about what

15  the policy itself said.

16  A.   Yes, sir.

17  Q.   Does the policy lay out every scenario that may come up

18  that officers might confront?

19  A.   No, sir.

20  Q.   Is that why officers are trained?

21  A.   Yes, sir.

22  Q.   Does the policy explicitly say that when using a Taser,

23  officers should follow their training?

24  A.   Yes, sir.

25  Q.   And in the training that you gave Defendant Bryant

```
 1   before this incident, did you instruct him that he should not
 2   use a drive stun for more than three five-second cycles?
 3   A.    Same as the deployment.
 4   Q.    And in addition to saying that, did you also show him
 5   that slide that showed that there could be serious health
 6   risks if you go beyond 15 seconds?
 7   A.    Yes.  Everyone has to watch the PowerPoints
 8   presentation.
 9   Q.    Okay.  And did Defendant Bryant follow your training?
10   A.    No, sir.
11   Q.    So then, after he didn't follow your training, did the
12   sheriff's office issue another new directive, again
13   emphasizing that three five-second rule?
14   A.    Yes, the sheriff did.
15   Q.    Do you know why the sheriff issued that?
16   A.    He wanted to state it was very clear on -- on the
17   guidance and had this lieutenant and whoever their training
18   officer is at the time to go over this restraint chair thing.
19   Q.    Wanted to make sure that nothing like that ever happened
20   again?
21   A.    Yes, sir.
22              MR. SONGER:  Thank you.
23              THE COURT:  All right.  You can step down.
24                   (Witness excused.)
25              THE COURT:  Okay.  Call your next witness.
```

```
 1                    MS. MYERS:  May we approach, Your Honor?
 2                    THE COURT:  Sure.
 3                    (Bench conference outside the hearing of the
 4                    jury.)
 5                    THE COURT:  Is yours off?
 6                    MS. MYERS:  It is.  I turn it off when I come up
 7      here.
 8                    THE COURT:  Okay.
 9                    MS. MYERS:  Your Honor, we, based on the last
10      testimony that we heard, only anticipate calling one more
11      witness.
12                    THE COURT:  Okay.
13                    MS. MYERS:  And that would be Special Agent
14      Wright, and then we would rest.
15                    THE COURT:  Okay.
16                    MS. MYERS:  So we just wanted to let the Court
17      know that that's where we are right now.
18                    THE COURT:  Are your witnesses here?
19                    MR. STRIANSE:  No, Your Honor.  They had a witness
20      list that I think had nine more witnesses, so I never
21      anticipated we would finish today.
22                    THE COURT:  Okay.  Can you get witnesses here?
23                    MR. STRIANSE:  I don't believe so.  No.
24                    THE COURT:  Okay.  Well, we're going to have some
25      time to try -- I've got to take a call with Judge Gibbons.  I
```

1  don't know how long it will go.  But it's going to be a
2  little bit longer than the break.  So why don't we do that
3  now, and then let me know what you -- so how long do you
4  think it's going to take with Ms. Wright?
5            MS. MYERS:  Ms. Wright will probably about 20
6  minutes.
7            MR. STRIANSE:  Judge, I can tell you now, I'm not
8  going to be able to accomplish anything.
9            THE COURT:  Okay.
10           MR. STRIANSE:  I mean, they had a witness list
11 that had --
12           THE COURT:  You're going to have to have them here
13 in the morning.
14           MR. STRIANSE:  Yeah, of course, but I'm not going
15 to be able to get anybody here now.
16           THE COURT:  Well, give it a try and we'll take it
17 up.  But at least try to reach out.
18           MS. MYERS:  Okay.  Thank you.
19           THE COURT:  All right.
20           Ladies and gentlemen, we're going to take our
21 afternoon break.  I need to attend to another matter while
22 you all are on break.  We're going to try to keep it as short
23 as possible, but it may take a little bit longer.  So I'm not
24 going to give you a time frame because I'm not sure.  But
25 know that this one's -- this may take a little bit longer

```
 1   than I can control.  All right.
 2              (Recess.)
 3              (Jury not present.)
 4              THE COURT:  All right.  Be seated.
 5              All right.  So were you at all successful?
 6              MR. STRIANSE:  No, Your Honor.  These witnesses
 7   live in Montgomery and Robertson Counties.
 8              THE COURT:  Okay.  Do you know -- I won't hold you
 9   to it -- what is your best estimate of the number of
10   witnesses you're going to have?
11              MR. STRIANSE:  Anywhere between five and seven.
12              THE COURT:  Okay.  And what's your time for that?
13              MR. STRIANSE:  I think that Mr. Bryant will be a
14   longer witness.  The other witnesses will be relatively
15   short.
16              THE COURT:  And short, 30 minutes or less?
17              MR. STRIANSE:  I think 30 minutes total for direct
18   and cross.
19              THE COURT:  Okay.  All right.  And you do need to
20   give the Government your first three at least at the end of
21   the day.
22              MR. STRIANSE:  I will.
23              THE COURT:  So tomorrow's my day that I've got to
24   be gone.  I'm trying to think how we should proceed tomorrow.
25   Well, let's do 8:30 until 10:30.  We should be able to cover
```

```
 1   some good ground there.  And I do think I can get back here
 2   by 1:30.  I'll be pretty close.  So we're going to go from
 3   8:30 until 10:30.  Then we'll resume at 1:30 and go from
 4   there.  All right.
 5              Does that work for the Government?
 6              MR. SONGER:  It does, Your Honor.
 7              THE COURT:  Does that work, Mr. Strianse?
 8              MR. STRIANSE:  Yes, sir.
 9              THE COURT:  All right.  Bring them in.
10              (Jury present.)
11              THE COURT:  All right.  Be seated.
12              All right.  Call your next witness.
13              MS. MYERS:  The United States calls Special Agent
14   Joy Wright.
15
16              JOY CHRISTINE WRIGHT, FBI SPECIAL AGENT,
17   called as a witness by the Plaintiff, was duly sworn and
18   testified as follows:
19
20              COURT DEPUTY:  Please be seated.  Please state
21   your full name and spell your last name.
22              THE WITNESS:  It's Joy Christine Wright.  It's
23   W-r-i-g-h-t.
24
25
```

DIRECT EXAMINATION

BY MS. MYERS:

Q.   Good afternoon, Special Agent Wright.

A.   Good afternoon.

Q.   Who is your current employer?

A.   The Federal Bureau of Investigation.

Q.   And how long have you been with the Federal Bureau of Investigation?

A.   Thirteen years.

Q.   And what is your position at the FBI?

A.   I'm a special agent.

Q.   And is that an agency of the federal government?

A.   Yes, it is.

Q.   And do you investigate civil rights cases?

A.   I do.

Q.   And are the charges in this case cases within the jurisdiction of the FBI?

A.   Yes, they are.

Q.   When did you first learn about this case?

A.   Would have been August of 2017.

Q.   And how did that happen?

A.   I received a call from a supervisor that had seen some media attention and a video, and they called me to see if we were aware of the incident and whether or not we had opened an investigation.

1  Q.    And did you open an investigation at that time?

2  A.    Shortly thereafter, yes.

3  Q.    How did you go about investigating the case?

4  A.    Initially I made contact with the TBI agent that was --

5  we worked jointly on the case.  And we scheduled some

6  interviews that were going to be conducted within the next

7  couple days.

8  Q.    And did you speak to the defendant as part of the

9  investigation?

10  A.    Yes, I did.

11  Q.    And when did you speak with the defendant?

12  A.    August 2nd of 2017.

13  Q.    And did the defendant remember November 25th of 2016?

14  A.    Yes, he did.

15  Q.    Where was that interview conducted?

16  A.    It was in a conference room at the district attorney's

17  office in Ashland City, Tennessee.

18  Q.    Is that in Cheatham County?

19  A.    Yes, it is.

20  Q.    And did the defendant discuss how he encountered Jordan

21  Norris on the night of November 5th, 2016?

22  A.    Yes, he did.

23  Q.    And how did he describe Jordan physically in comparison

24  to himself?

25  A.    He described Jordan as small, and he said that he was

1  two times the size.

2         MR. STRIANSE:  Your Honor, may we approach?

3         THE COURT:  Sure.

4         (Bench conference outside the hearing of the

5         jury.)

6         MR. STRIANSE:  There is an audio recording of

7  this.  I don't know why we're having to take her secondhand

8  account of what he said.  This was conducted by her and a TBI

9  agent by the name of Shawn Atkins.

10        MS. MYERS:  We're permitted to do that under the

11 rules.  It's the statement of a party opponent.

12        THE COURT:  Okay.  Go ahead and proceed.  I'm

13 going to allow you to do so.

14        MS. MYERS:  Thank you.

15        MR. STRIANSE:  Okay.

16 BY MS. MYERS:

17 Q.   I'll ask that question again:  Did the defendant compare

18 Jordan Norris's size to his own size?

19 A.   He said that he was two times the size of Mr. Norris.

20 Q.   And did the defendant remember specifically why that

21 evening that he removed Jordan from Jordan's cell?

22 A.   No, he did not.

23 Q.   Did the defendant mention any other officers helping

24 with that process?

25 A.   Yes.  He mentioned Officer Key and then Officer Bratton.

1  Q.    Any other officers who might have been there?

2  A.    Who were there at that time, yes, Officer Marriott.

3  Q.    And did the defendant tell you what the officers were

4  trying to do with Jordan in relation to the cell that

5  evening?

6  A.    Yes.  He explained they were trying to get him out of

7  the cell and they were trying get him handcuffed and put into

8  the restraint chair.

9  Q.    Did he tell you that they were eventually able to

10  handcuff Jordan?

11  A.    Yes.

12  Q.    And what did the defendant tell you about -- that he had

13  to do -- sorry -- that had to be done to get Jordan

14  handcuffed?

15  A.    He told me that Officer Bratton had to tase him briefly.

16  Q.    Did he mention the amount of time that that tase lasted?

17  A.    Yeah.  He said it was pretty quick.

18  Q.    And then what did he tell you happened after that?

19  A.    I believe he told me they got him handcuffed and then

20  they put him in the restraint chair.

21  Q.    And did he tell you anything that happened after Jordan

22  got into the restraint chair after -- directly after he was

23  removed from the cell?

24  A.    No.

25  Q.    Do you remember what time of day that was when Jordan

1   was removed from his cell?

2   A.   We didn't speak to him about the time of day, but, I

3   mean, personally, I know what time of day it was.

4   Q.   From your investigation?

5   A.   From my investigation.  So, yes.  It was, you know, 7:00

6   at night.

7   Q.   And did an amount of time pass between the time that

8   Jordan was placed into the restraint chair and then that you

9   heard from Bryant that he used force?

10  A.   Yes.

11  Q.   Do you remember how long a period of time passed?

12  A.   Yes.  Based on my investigation, it was approximately an

13  hour.  So. . .

14  Q.   And did the defendant tell you that he used force

15  against Jordan?

16  A.   Yes, he did.

17  Q.   Did he specify what type of force?

18  A.   Yes.  He told me that he tased him.

19  Q.   What did the defendant say that he did with the Taser?

20  A.   He said that he tased him and he said he did it on his

21  abdomen and on his legs.

22  Q.   Did he say how many times he tased Jordan?

23  A.   I don't think he knew how many times he did it.

24  Q.   And was this while Jordan was in the restraint chair?

25  A.   Yes.

1  Q.   And -- so you mentioned Bryant did remember where he had

2  tased Jordan?

3  A.   Yes.

4  Q.   And he told you?

5  A.   Yes.

6  Q.   And that was the leg and the abdomen?

7  A.   I believe that's how he said it.

8  Q.   Did the defendant remember how many times he tased

9  Norris when he spoke with you?

10 A.   No.

11 Q.   Did he remember specifically how long he tased Jordan

12 while he was in the restraint chair?

13 A.   I don't recall if he gave a specific time, but he knew

14 that it was more than five seconds.

15 Q.   Did the defendant say that he was given the Taser policy

16 when he started working at the Cheatham County jail?

17 A.   Yes.

18 Q.   And did he say that he had read a copy of the use of

19 force policy?

20 A.   Yes, he said he had read the policy.

21 Q.   And was the defendant Taser certified at the time that

22 he tased Jordan?

23 A.   Yes, he was.

24 Q.   Did he say who taught that class?

25 A.   Yes.  Gary Ola.

1  Q.    And what did the defendant tell you that he knew from
2  his Taser training about how the Taser trigger worked?
3  A.    He knew that if he held down the trigger that it would
4  continue to cycle the Taser.
5  Q.    And what about if you just pressed the trigger?
6  A.    It would do a five-second burst.
7  Q.    And did the defendant tell you that he knew if he was
8  permitted to tase a restrained person?
9  A.    Yes.  He said something to the effect of yeah -- of
10 course he wouldn't be, or something like that.
11            THE COURT:  I'm sorry.  I couldn't --
12            THE WITNESS:  It was something to the effect, of
13 course you wouldn't be able to do that, or there would be no
14 need to.
15 BY MS. MYERS:
16 Q.    Did the defendant remember saying anything to Jordan
17 while he tased him?
18 A.    He told him he was saying, "Stop resisting, please stop
19 resisting."
20 Q.    And is that all that the defendant remembered saying?
21 A.    Yes.
22 Q.    Did you watch the videos of the tasings in this case?
23 A.    I have.
24 Q.    And did you ask the defendant specifically about other
25 comments that you heard him say on the video?

1   A.   Yes.  We asked him about the comment where he says, "You
2   don't like this, do you?"
3              And we asked him about the comment about the
4   batteries.  And the way we asked him -- we didn't ask him the
5   specific quote, but it was something along the lines of, do
6   you remember saying, you know, you're going to do this till
7   the batteries run out?
8              And he said he didn't remember saying it, but that
9   he had seen the video and that sounded like him.
10  Q.   Did he give you any explanation for why he would have
11  made those comments?
12  A.   No.
13  Q.   Did the defendant tell you whether he knew that at the
14  time he was tasing Jordan that he was holding the trigger
15  down?
16  A.   Yes.  I think the way he put it was, you know -- "Was
17  more than five seconds, I guarantee it."
18  Q.   Did you request any reports or documentation from the
19  jail from the night of November 5th 2016?
20  A.   Yes.
21  Q.   And was that as part of your investigation?
22  A.   Yes, it was.
23  Q.   And what did the jail provide you with?
24  A.   The jail provided me with videos, Taser logs.  They
25  provided me with use of force reports, incident reports,

1    personnel files, Taser training documentation.  A lot of

2    documents.

3    Q.    Now, were all of those documents isolated to the evening

4    of November 5th of 2016?

5    A.    Not everything, no.

6    Q.    Did you look at other dates involved that they provided

7    you with?

8    A.    Yes.  So on some of the documents, for instance the

9    Taser logs, they had given us essentially a dump of the

10   entire duration of the time that the Tasers were being used

11   in the jail.  So those Taser logs encompassed from the time

12   they started using the Tasers to the day they pulled the

13   logs.  And that would have been October of 2014 through

14   approximately July of 2017.

15   Q.    And apart from the tasings, the defendant's tasings of

16   Jordan on November 5th, 2016, what was the longest tase that

17   you saw in those logs?

18   A.    There might have been one for six seconds.  There was

19   nothing as long as what we were looking at.  And I was

20   checking to see if there were any other incidents that had

21   happened.

22   Q.    And for your review, what length were the majority of

23   the tases?

24   A.    Most of them were five seconds.

25   Q.    And did you look at any personnel files from that night?

1    A.    I did.

2    Q.    And you reviewed the personnel files as well?

3    A.    Yes.

4    Q.    Did you receive incident and use of force reports for

5    November 5th of 2016?

6    A.    I did.

7    Q.    And at this time I would like to go to Exhibit 19, which

8    has already been admitted.

9              And, Special Agent Wright, you can flip to that in

10   the binder if you would like.  You can look at it up on the

11   screen.

12             Do you recognize this document?

13   A.    I do.

14   Q.    And can you explain what it is?

15   A.    So this document is a -- an incident report that's

16   filled out at the Cheatham County jail.

17   Q.    And who authored this report?

18   A.    This report was authored by Officer Bryant.

19   Q.    And what is the time of the incident that it is

20   describing?

21   A.    The time is -- the military time of 1855, but that would

22   be 6:55 p.m.

23   Q.    Thank you.  Did you read this report?

24   A.    I did.

25   Q.    And based on your total investigation, did you find the

1  investigation standards information in this report to be
2  accurate?
3  A.    I did not.
4  Q.    And why?
5  A.    There's a couple of different reasons that it's not
6  accurate.
7              MR. STRIANSE:  Your Honor, I object to this.  It's
8  going to be up to the jury to decide whether it's accurate
9  based on the testimony they've heard from the witnesses.
10             MS. MYERS:  Your Honor, she has the knowledge --
11  she's laid the foundation.  She's reviewed all of the
12  documents in the course of this investigation.  And she is
13  just merely going to describe what is in it based on her
14  entire knowledge of the case.
15             MR. STRIANSE:  She's not permitted to give an
16  opinion that he is guilty of making a false statement.
17             THE COURT:  Overruled.  She can testify about her
18  personal knowledge arising from the investigation.
19  BY MS. MYERS:
20  Q.    Could we enlarge the narrative, please.
21             So I had asked you before, is there inaccurate
22  information in this report based on what you learned in your
23  investigation?
24  A.    Yes.
25  Q.    And can you walk us through what those inaccuracies are

1    in the report.

2    A.    Yes.    Yeah.    Start- -- I'm going to go through a little

3    bit.    But -- so the 6:55 incident, when you review it on the

4    video, and you see everything that came into the

5    investigation, involved them taking him out of the cell.

6            And you see that Officer Bratton is the officer

7    that uses his Taser at 6:55.    And in this report it --

8    authored by the defendant, Officer Bryant, it says, "Deputy

9    Bratton and I tased."    Well, Officer Bryant didn't tase

10   anybody at 6:55.    So that's inaccurate.

11           The other information in here that's inaccurate is

12   he says the tasing in this narrative takes place -- it says

13   prior to him moving to soft restraints.    And that's actually

14   not what happened.

15           So if you see the video where Officer Bryant is

16   using his Taser, Inmate Norris or Jordan is in soft

17   restraints already.    So this is not accurate.

18   Q.    So that's the comment (as read):

19               After approximately 15 minutes in the chair, I

20               moved his hands to the soft restraints.

21           But you're saying that that did not happen as part

22   of this incident?

23   A.    It didn't happen -- Mr. Bryant didn't tase him before

24   moving his hands to soft restraints.    The sequence in this is

25   inaccurate.

1  Q.   And what time did the defendant tase Jordan while Jordan
2  was in the restraint chair?
3  A.   Approximately 8:00 p.m.
4  Q.   And that was for the 50-second period?
5  A.   Yes.
6  Q.   Is any of that mentioned in this incident report at
7  6:55 p.m.?
8  A.   No.
9  Q.   And again, you said about an hour passed between this
10 and the tasings that the defendant did on the victim, Jordan
11 Norris, at 8:00 p.m.; is that correct?
12 A.   Yes.
13 Q.   And did the defendant do an incident report for those
14 tasings at 8:00 p.m.?
15 A.   He did not.
16 Q.   So this is the only report that the defendant did that
17 would encompass any time period that was close to that
18 8:00 p.m.?
19 A.   Yes.
20 Q.   So what about a use of force report?  Did the defendant
21 do a use of force report for the 8:00 p.m. incident?
22 A.   No.  There were no reports for the 8:00 p.m. incident.
23 Q.   Did the defendant say anything about not writing a
24 report for the 8:00 p.m. incident?
25 A.   Yes.  When we interviewed him, he said he wrote one

1    report for his shift.  And then he said that he should have
2    written two.
3    Q.    One for the 8:00 p.m. incident, as well?
4    A.    Yes.
5    Q.    Did he have any explanation for why he didn't write a
6    report for the 8:00 p.m. incident?
7    A.    No.
8    Q.    Based on the 6:55 p.m. report that Bryant authored,
9    would you conduct a civil rights investigation based on that
10   information?
11   A.    Based on the information that's in this report, no,
12   there would not have been an investigation opened.
13   Q.    And why is that?
14   A.    Because it doesn't get into the details of what prompted
15   the excessive force investigation.
16   Q.    And at this time I would like to show Special Agent
17   Wright Exhibit 20, which has been previously admitted.
18          Do you recognize this report?
19   A.    I do.
20   Q.    Can you explain what it is?
21   A.    Yes.  It's an incident report for the Cheatham County
22   jail that was completed by Officer Bryant.
23   Q.    And what is the time on this report?
24   A.    It's 22- -- I'm sorry.  2220, which is 10:20 p.m.
25   Q.    And did you read this report as part of your

1  investigation?

2  A.    I did.

3  Q.    And based on your investigation, did you find the

4  information in this report to be accurate?

5  A.    I did not.

6  Q.    And why not?

7         And if you could hold on just one second --

8  A.    Uh-huh.

9  Q.    -- can we enlarge the narrative in this?  Thank you.

10        So why did you find it not to be accurate?

11  A.    Well, in the narrative, he is saying (as read):

12              I've drive stunned him multiple times to gain

13              compliance.

14        In the video that I reviewed, he was complying at

15  one of the times he was tased.

16  Q.    And how about any mention of the length of the tase?

17  A.    No, there's no mention of the length.  And there's no

18  mention of the number of times other than multiple.

19  Q.    And how about if we could go to the officers involved in

20  the incident report.

21        Based on your investigation, is this an accurate

22  description of the people who were involved at that 2220, the

23  10:20 p.m. incident?

24  A.    No.  There were many more officers that were present,

25  including, you know, Michael Montgomery, Gary Ola was there,

1  Dwayne Jones was there.  I mean, there were at least six

2  others, maybe five plus them.

3  Q.   Now, during this period, based on your investigation,

4  did the defendant tase Jordan multiple times around this

5  10:20 time period?

6  A.   Yes, he did.

7  Q.   Does this report have a justification for each of those

8  times?

9  A.   No, it does not.

10  Q.   Does the report mention that Jordan was restrained at

11  the time?

12  A.   No, it does not.

13  Q.   Now, was there ever a use of force report drafted for

14  this 10:20 p.m. incident --

15  A.   I don't believe so.

16  Q.   -- involving -- authored by the defendant?

17  A.   I don't recall.

18  Q.   Did he mention drafting a report -- a use of force

19  report about the 10:20 incident?

20  A.   I don't remember.

21  Q.   Did you ever meet Jordan Norris?

22  A.   I did.

23  Q.   And when was that?

24  A.   It was probably the same day that I met Mr. Bryant.  So

25  August 2nd or 3rd of 2017.

1  Q.   Did Jordan have any injuries from the tasing on
2  November 5th of 2016 still?
3  A.   He did.
4  Q.   And even though it was nine months later, were you able
5  to observe any of Jordan's injuries?
6  A.   Yes.  He showed them to me.
7  Q.   And what were those injuries?
8  A.   He had scarring on his legs that he showed me.  And I
9  believe he showed me some that were on his stomach.  And I
10 think there was something on his back.
11 Q.   And what did those scars look like?
12 A.   So they were probably about the size of a dime, round
13 scars, and they were -- kind of two of them and they were
14 probably, like, two inches apart.  And they were on his body
15 in different places.
16 Q.   Now, have you handled an X26P Taser?
17 A.   I have.
18 Q.   And is that the Taser involved in the defendant's
19 tasings of Jordan?
20 A.   It is.
21 Q.   And what is the approximate distance between those
22 prongs?
23 A.   About two inches.
24 Q.   And is that consistent with the locations that he was
25 tased on November 5th?

1  A.    Yes.

2  Q.    So, in other words, the distance between those prongs,

3  was that consistent with the injuries that you saw on Jordan?

4  A.    Yes.

5              MS. MYERS:  One moment.

6              I have no further questions.

7

8                    CROSS-EXAMINATION

9  BY MR. STRIANSE:

10 Q.    Good afternoon, Ms. Wright.

11 A.    Good afternoon.

12 Q.    Your testimony this afternoon is based on your review of

13 the entire file in this case; is that right?

14 A.    I would not say the entire file, but I would say 99

15 percent of it.

16 Q.    99 percent of it?

17 A.    Uh-huh.

18 Q.    And you worked on this case with Special Agent Shawn

19 Atkins of the Tennessee Bureau of Investigation; is that

20 right?

21 A.    I did.

22 Q.    And did you assist him in pulling the Taser logs from

23 the Cheatham County sheriff's office?

24 A.    No.  He pulled them and he provided them to me.

25 Q.    And he shared the results of that with you; is that

1  right?

2  A.    Yes, he did.

3  Q.    And are you familiar with that -- the results of the

4  Taser logs?

5  A.    Yes.

6  Q.    Okay.  And I assume he gave you a copy of his timeline

7  that he prepared?

8  A.    I have seen his timeline, yes.

9  Q.    And that's part of your file now; is that right?

10  A.    I have a copy of it.  It was not put into my case file,

11  but I have it and reviewed it.

12  Q.    But it's one of those things that you reviewed in

13  anticipation of your testimony today?

14  A.    I did not review that in anticipation of today.  I

15  reviewed it previously, but not today.

16  Q.    But I mean --

17              MS. MYERS:  I'm going to object to hearsay.

18              THE COURT:  Overruled.

19              Proceed.

20  BY MR. STRIANSE:

21  Q.    I think you're telling the jury that you've reviewed the

22  case file and you're testifying from that review?

23  A.    Yes.

24  Q.    And that would include the Taser logs, correct?

25  A.    Yes.  Not in the immediate time frame have I reviewed

1  that, but yes, I have seen it.

2  Q.    Okay.  Did you review the Taser logs for Daniel Bratton?

3  A.    I did.

4  Q.    And did it show that he had used his Taser four times

5  for five seconds each over a 50-second period beginning at

6  6:47 on November the 5th, 2016, and ending at 6:47:57

7  seconds?

8  A.    I did see that.

9  Q.    Okay.  And you heard him testify this morning?

10  A.    I did.

11  Q.    Okay.  So he couldn't recall the fourth tase, correct?

12  A.    No, he could not.

13  Q.    And that would have been four five-second tases within

14  50 seconds; is that right?

15  A.    Yes.

16  Q.    Could she be shown Government's 19 again.

17        And if you could focus in on the same sentence you

18  did before, the "After approximately 15 minutes" sentence.

19        Ms. Wright, for the record we're looking at

20  Government's Exhibit 19.  This is an incident report that was

21  prepared and filed by Mr. Bryant on November 5th, 2016.

22        And do you see that sentence that they've

23  highlighted on the screen (as read):

24            After approximately 15 minutes in the chair, I

25            moved his hands to the soft restraints?

A.    Yes.

Q.    And you indicated to the jury that in your opinion,
based on your review of all the documents in this case, that
that is a false statement?

A.    While I was reviewing the video, I watched him move his
hands from the handcuffs into the soft restraints of the
chair, and that occurred prior to him tasing him.

Q.    Now, in -- in assembling documents with Special Agent
Atkins, did you get the Cheatham County sheriff's office
restraint chair log for November 5th, 2016?

A.    I would have to review it, but I'm sure I did.

Q.    Let me show you what we'll mark for identification as
Government -- Defendant's -- Defendant's 3 for
identification.

        THE COURT:  And what is that document?

        MR. STRIANSE:  It is the restraint chair log for
November 5, 2016.

        MS. MYERS:  Your Honor, that's already admitted as
the Government's Exhibit 24.

        MR. STRIANSE:  That's even better.

        Can you put that up on the screen for me.

Q.    So you would have reviewed this document?

A.    I actually saw this document when you -- when it was on
the screen for Mr. Marriott.  So yes, I've seen this
document.

1  Q.    I'm sorry, I can't hear you.

2  A.    I've seen this document when it was on the screen for

3  Witness Marriott.

4  Q.    And on Government's Exhibit 19, you say that the

5  statement, "After approximately 15 minutes in the chair, I,"

6  being Mr. Bryant, "moved his hands to the soft restraints" is

7  not accurate; is that right?

8  A.    I would have to look at both of those, but while I was

9  reviewing the video, that was what I was --

10 Q.    Well, take a look at the restraint chair log.

11        Do you see the time check column --

12 A.    Yes.

13 Q.    -- in the left?

14 A.    Yes.

15 Q.    And go down three entries, 1917.  (As read):

16        Completed transition to soft restraints, MB,

17        And that's Mark Bryant?

18 A.    Yes.

19 Q.    And that is 1858 is when he's placed in the chair.

20        And then 19 minutes later, Mr. Bryant is making

21 that entry that the transition's been completed to soft

22 restraints?

23 A.    So 7:15. . .  Yes.

24 Q.    And you're telling the jury that at the end of the day,

25 at 2148, after dealing with Mr. Norris and all of this

```
 1   activity at the jail, some four hours, that he's off by a few
 2   minutes, and he's intending to impede and obstruct justice by
 3   putting not 15 minutes, but he should have put maybe 19
 4   minutes?
 5               MS. MYERS:  I'm going to object.  That
 6   mischaracterizes what she stated.  She stated the sequence
 7   was wrong.
 8               THE COURT:  It's "Objection to the form."
 9               Sustained.  Reask your question.
10   BY MR. STRIANSE:
11   Q.   Well, you see the restraint chair log; correct?
12   A.   Yes.
13   Q.   And it noted -- and it notes 19 minutes after being
14   placed in the chair that Mr. Bryant notes that the transition
15   was completed to soft restraints?
16   A.   Yes.  What I was saying was that -- I'm not questioning
17   the approximately 15 minutes.
18               What I'm questioning is the sequence of events
19   where Mr. Bryant is saying that he tased Jordan prior to
20   putting him into the soft restraints, and that is incorrect.
21   Q.   If we could turn to Number 20, Government's 20.  This is
22   another report that Mr. Bryant prepared on November 5, 2016,
23   at 2220, which is 10:20, which is the time and location of
24   the event in booking.
25               And you indicate that based on your opinion and
```

1    review that it's inaccurate because he only lists himself and
2    Mr. Montgomery; is that right?
3    A.    That is not the only reason it is inaccurate, but it
4    does not list the officers that were involved.
5    Q.    I'm having real trouble hearing you.  Say that again?
6    A.    I said that is not the only thing that is inaccurate,
7    but yes, it does not have all of the officers that were
8    involved.
9    Q.    Now, for the 10:20 events, the only officers that used
10   Tasers were Mark Bryant and Steve Montgomery, correct?
11   A.    Yes.  But this is a use of force -- an incident report,
12   and generally the incident report is encompassing the entire
13   incident.  This is not just a use of force report.
14   Q.    And Mr. Bryant accurately reports that he drive stun
15   tased him, being Mr. Norris, multiple times?
16   A.    Yes.  He says "multiple times."  He does not list how
17   many times or how long he did it for.
18   Q.    So the fact that he did not list each individual time
19   would have somehow impeded or obstructed this investigation?
20   A.    Well, in -- you're asking my opinion on this?
21   Q.    Well, they put you on for your opinion.
22   A.    Yes.
23   Q.    So I guess I have to.
24   A.    So while I was reviewing this, yes.  I mean, the issue
25   was that previously Mr. Bryant had put in, in his reports,

1    done prior to this incident and after this incident, the

2    timing -- the times that he had tased someone, how long he

3    had tased them for.

4              So this one, yes, it gives the impression that it

5    doesn't -- it's not accurate because he's not being exact

6    like he had previously been in his other records.

7    Q.   Well, what sort of impression are you trying to leave

8    with the jury?  Those other reports involved maybe three

9    other instances, correct?

10   A.   I believe there were four.

11   Q.   Four other instances, and three of those were one

12   application; is that right?

13   A.   I would have to review them.  Specifically.

14   Q.   But nothing like the number of events that occurred on

15   November 5th, 2016?

16   A.   No.

17   Q.   There would have been maybe -- one of those had two

18   applications and the rest had one.

19             Does that sound right to you?

20   A.   I couldn't tell you until I reviewed the reports again.

21   Q.   So the FBI and the Tennessee Bureau of Investigation

22   would have been impeded by this report because they would

23   have been mislead by him saying "multiple times"?

24   A.   I believe it would be the fact that he is saying that he

25   did it multiple times, and also because he's including "to

1  gain compliance." And in that part, he was not trying to get
2  him to comply in the last tase.
3  Q.   So you're telling the jury you would have been impeded
4  by a report that would have taken you directly to the video
5  in the exact area of booking in the exact time, and you would
6  have been able to count up every tase that occurred; is that
7  right?
8  A.   Which is what we did when we were told that it happened.
9  Q.   So you were not impeded in any way?
10  A.   The investigation would not have occurred until we saw
11  the video, which would have led us back to the report. If I
12  had looked at this report without the video being seen first,
13  then we would probably not have done an excessive force
14  investigation.
15  Q.   If I --
16           THE COURT:  Let her finish.
17           Are you finished?
18           THE WITNESS:  Sure.
19  BY MR. STRIANSE:
20  Q.   Did I understand what you're telling the jury is a
21  supervisor sees something on Channel 5 and calls you; is that
22  right?
23  A.   Yes.
24  Q.   And you would have presented yourself at the Cheatham
25  County jail in Ashland City?  Correct?

1   A.    Yes.

2   Q.    And you would have asked to see any reports of

3   November 5, 2016, particularly what the -- the CBS affiliate

4   here in Nashville had just shown on television?

5   A.    I believe that is not the way it went.  But yes, we

6   asked for reports, and I believe we asked for all reports

7   involving any incident with Mr. Norris.

8   Q.    And you immediately found this report --

9   A.    Yes.

10   Q.    -- correct?

11   A.    We asked for it; they gave it to us.

12   Q.    And you went directly to the video?

13   A.    We had seen the video first, I believe.  But yes.

14   Q.    So you're telling the jury that you were somehow

15   obstructed and impeded in this investigation because

16   Mr. Bryant said "multiple times"?

17   A.    Reviewing this, if you had seen "multiple times to gain

18   compliance," that would not have had us go into any further.

19   Q.    You told us about this audio interview that you did of

20   Mr. Bryant on August the 2nd, 2016; is that right?

21   A.    Yes.

22   Q.    And I assume that either you or Special Agent Atkins

23   called him up and said that you wanted to interview him?

24   A.    I believe it was Agent Atkins, yes.

25   Q.    And he was not represented by a lawyer?

```
 1   A.   He came with no lawyer.
 2   Q.   And he was there voluntarily?
 3   A.   He was.
 4             MS. MYERS:  Objection.  Relevance.
 5             MR. STRIANSE:  Why can't I ask about the
 6   circumstances of the interview?
 7             MS. MYERS:  Well, it's making some implication
 8   that his statements were obtained under some sort of illegal
 9   situation.
10             MR. STRIANSE:  No.
11             THE COURT:  Overruled.
12             MR. STRIANSE:  Absolutely not.
13             THE COURT:  Proceed.
14   BY MR. STRIANSE:
15   Q.   No.  If there's any confusion about that, absolutely
16   not.  He certainly was not in custody.
17             He was there voluntarily, is all I'm saying?
18   A.   He was.
19   Q.   And he answered all your questions?
20   A.   He did.
21   Q.   Did he tell you that Mr. Norris was resisting the
22   officers that night and fighting with the officers?
23             MS. MYERS:  Objection.
24             THE COURT:  On what basis?
25             MS. MYERS:  Hearsay.
```

```
1              THE COURT:  Overruled.
2              MS. MYERS:  He's not --
3              THE WITNESS:  Yes.
4    BY MR. STRIANSE:
5    Q.   Did he tell you that Mr. Norris was unnaturally strong
6    for someone his size?
7    A.   Yes.
8    Q.   Did he tell you that Mr. Norris was high on drugs?
9              MS. MYERS:  Objection.  Your Honor, may we
10   approach?
11             THE COURT:  On what basis?
12             MS. MYERS:  This was the subject of a motion in
13   limine.
14             THE COURT:  Okay.  Come.  Come up.  Okay.
15             (Bench conference outside the hearing of the
16             jury.)
17             MS. MYERS:  Your Honor, so we filed a motion in
18   limine as part of our omnibus motion in limine --
19             THE COURT:  I've got it.
20             MS. MYERS:  -- to ensure that the defendant's
21   statements would not be elicited in a manner that was not
22   consistent with the rules.
23             We're allowed to admit statements of a party
24   opponent.  He's admitting statements of his own client that
25   are not a party opponent.  And he can't do that without
```

```
 1  having his defendant testify, which apparently he plans to
 2  have him testify.  So he can elicit that testimony through
 3  the defendant.
 4          MR. STRIANSE:  They put her on to -- there's an
 5  audio recording of this.  They decided not to play it.
 6  They've only asked limiting questions about what he actually
 7  told them.
 8          I don't know why I can't elicit a more complete
 9  picture of what he told the agent.  She's claiming that she's
10  forming her opinion based on her review of everything.
11  Well. . .
12          MS. MYERS:  But he's not asking about her opinion
13  of everything; he's asking about specific --
14          THE COURT:  There's audio, I guess, that you
15  didn't ask about; is that correct?
16          MR. STRIANSE:  That's correct.
17          MS. MYERS:  Well, he's asking about specific
18  statements that the defendant said --
19          THE COURT:  During the audio.
20          MS. MYERS:  The audio was not admitted.
21          THE COURT:  That's not my question.  Overruled.
22  Let's proceed.
23          (Jury present.)
24  BY MR. STRIANSE:
25  Q.   He told you that it appeared to him and other officers
```

1  that Mr. Norris was high on some on some kind of drugs; is

2  that right?

3  A.    Yes.

4  Q.    And he -- did he direct you to Caitlin Johnson?

5  A.    Yes.

6  Q.    To talk to Caitlin Johnson about what she had learned

7  about his use of drugs in the jail?

8          MS. MYERS:  Objection.  Hearsay.  Another person,

9  Caitlin Johnson, the words of her.

10          MR. STRIANSE:  I wasn't asking for what Caitlin

11  Johnson said.  I said, "Did he direct you?"

12          THE COURT:  Sustained.

13          Reask your question.

14 BY MR. STRIANSE:

15 Q.    Did he direct you to interview Caitlin Johnson, now

16 Marriott, about what she had learned about drugs he ingested

17 in the jail?

18          MS. MYERS:  Objection.  Calls for hearsay.

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm sorry.  Restate the question for

21 me.

22 BY MR. STRIANSE:

23 Q.    Did he -- did Mr. Bryant tell you that you should talk

24 to Caitlin Johnson, who was working as a correctional officer

25 in the jail at that time to determine what kind of drugs

```
1   Mr. Norris had ingested while in jail?
2   A.   He didn't direct me to talk to her, but he mentioned her
3   name, yes.
4   Q.   In -- in conjunction with drugs that Mr. Norris had
5   taken in jail?
6   A.   Yes.
7   Q.   Did Mr. Bryant tell you that in his interactions with
8   Mr. Norris, he was telling him to stop resisting?
9   A.   Yes.
10  Q.   Telling him to relax?
11  A.   I don't remember that.
12  Q.   Asking him to please comply?
13  A.   Yes.
14  Q.   Saying that "I will tase you if you don't obey"?
15  A.   I don't remember that.
16          MR. STRIANSE:  May I have one moment, Your Honor?
17          THE COURT:  Sure.
18          MR. STRIANSE:  That's all.  Thank you.
19          THE COURT:  All right.  Redirect.
20          MS. MYERS:  No further questions, Your Honor.
21          THE COURT:  All right.  You can step down.
22                   (Witness dismissed.)
23          THE COURT:  All right.  Call your next witness.
24          MS. MYERS:  The United States rests its case.
25          THE COURT:  All right.  Ladies and gentlemen, at
```

this point, you've heard all the evidence at this point from the Government's case in chief.  And I'm going to ask you -- I'm going to excuse you for the day and have you come back in the morning at 8:30, and we'll continue with the trial.

Question?

PROSPECTIVE JUROR:  Do you not want us earlier on Wednesday?

THE COURT:  No.  I think we'll be okay -- having talked to the lawyers, I think we'll be okay.  And I know you've got somebody who's got to come from Clarksville.  So let's -- let's go with 8:30.

And thank you for being here on time in the morning.  Remember, you can't talk about the case to anyone, even among yourselves.  You can't let anyone else talk to you about the case.  And do not do any kind of investigation until, you know, 8:15 tomorrow.  Just put the case out of your mind.

And remember, we can't start unless everyone's here.  So be careful.

You're excused.

(Jury not present.)

THE COURT:  All right.  Be seated.

Mr. Strianse, do you have a motion?

MR. STRIANSE:  Yes, Your Honor.

Your Honor, I realize that counts -- comes now the

defendant, Mark Bryant, pursuant to Rule 29 of the Federal
Rules of Criminal Procedure and moves for a motion for
judgment of acquittal as to all counts.

I realize what the standard of proof is at this
time and that the Court is constrained to view the evidence
in the light most favorable to the Government at this point.

There were just a few comments I wanted to make in
terms of Counts One and Two.  As the Court knows, the
elements are set forth in the pamphlet of instructions that
you've prepared for the jury.  I think that the alleged
infringement of any constitutional guarantee in this case has
to be viewed in the light of the conduct of Mr. Bryant and
the goal of the jail in maintaining security that night.

Also, the element of willfulness is something that
the Court will need to take into consideration.  I realize
that this is going to be a credibility determination for the
jury.  But just to preserve the record, I do want to make
that motion.

I do want to do a little bit of a deeper dive on
the 18 U.S.C. 1519 counts.  The Court's just heard some
direct examination and cross-examination on the 1519 counts.
Those are Counts Three and Four.

The Government's Exhibit 19 and Government's
Exhibit 20, the Court's had a chance to look at them and hear
the testimony.  Government's Exhibit 19, which corresponds to

Count Three of the indictment embraces a period from 1855, which is 6:55, to at least 10:22 p.m. in the evening, and it's signed off even later. It seems to be sort of, in my view -- I say this respectfully -- sort of some metaphysical perjury or an effort to obstruct. It's a summary narrative. It talks about the events that occurred at 6:55 in front of Cell Number 4, the physical confrontation, the drive stun incident involving Daniel Bratton. It then describes the events of 8:00 p.m. in the restraint chair.

Now, it's -- it may not be written like an English major would have written it, but through the prism of four hours after dealing with this all night and giving a -- I think a complete narrative, I don't know how the FBI could have been impeded or instructed by such a report.

It has the exact date, the exact time. They would have been able and they were able to go directly to the jail, pull the footage from the exact time. So the notion that they were somehow impeded or obstructed in their investigation does not seem to really make sense.

Similarly with Count Four, which is Government's Exhibit 20, that's the report that embraces the events of 10:20 p.m. where Mr. Bryant, in a summary fashion, says that he drive-stun tased Mr. Norris multiple times. There's nothing apparently false on -- on the face of either one of these narrative reports. And again, I don't know how a

rational juror could find an intent to impede with all of the correct information, helpful information, that's put on the reports. I think if he was endeavoring to obstruct justice, there would be some overt false statements in those reports or there would be no reports that would be done at all.

So, even under the standard that we're operating under now, I don't think that it satisfies the elements.

THE COURT: All right. Let's hear from the Government.

MR. SONGER: Your Honor, I think there's an overwhelming amount of evidence that would allow this to at least go to the jury, but to the extent it would be helpful to Court, I would be happy to address the counts in whatever depth would be most useful.

But since defense counsel focused on Counts Three and Four, I'll at least briefly respond to a couple of points there.

On Count Three, evidence was received that Defendant Bryant submitted one report about that night -- about that shift, about the tasing that happened at 8:00. That report didn't list the time of the tasing. Instead, it listed a different time that corresponded to a different incident where there would have been a better justification for tasing. And instead -- and he tried to shoehorn the tasing he did at 8:00 into that early report at 6:55.

1    You heard Special Agent Wright talk about the
2 sequence of events, about how Defendant Bryant suggested that
3 he had tased immediately after Jordan was placed in the
4 restraint chair, before officers had even gone ahead and put
5 his hands into soft restraints. And in fact, he tased almost
6 an hour after that, after his hands had been put into the
7 soft restraints. And that was deceptive.
8    But, in addition to those mistakes or those false
9 statements, reports can be material not -- can be false, not
10 just for direct false statements that are put in them but
11 also for material information that's left out of them. And
12 the fact that the defendant did not report that he had used
13 the longest tase in the history of this jail is certainly a
14 material fact that was not disclosed. So it's false for both
15 of those bases.
16    Count Four, the 10:30 report, the analysis would
17 be similar. The defendant again left out almost every key
18 fact about the incident: How many times he tased, how long
19 those tases lasted, the fact that Jordan was restrained at
20 the time of the tase, which, based on all the testimony we've
21 heard about training, is a critical circumstance in
22 determining whether or not a tase is justified. He left all
23 that out of the report.
24    He also put a false statement in the report. He
25 said that he had to tase because Jordan failed to follow

commands and he had to tase to gain compliance.  And as you
heard from Special Agent Wright, at the time of that last
11-second tase -- and this is what the video shows too --
that just simply is not true.  It was false.  Jordan wasn't
refusing to comply with any command; he was just tased.

So that's more than enough information to show
that in fact those reports were false.  Defense counsel
suggested that the reports did not, in fact, impede the FBI
in its investigation.  That's not an element.  We only have
to prove that the defendant had the intent to impede or
influence the administration of justice.

And here there's plenty of evidence that he was
intending to impede, whether in fact he was successful or
not.  For one, he went to other officers who worked on his
shift and he told them not to submit their own reports to
contradict what he said.  And then, after doing that, he
filed his own report that left out all the key facts.

So you can certainly -- the jury can certainly
find based on that that he was intending to impede.
Particularly because this is the only incident where the
defendant left out that types of information.  As Special
Agent Wright said, every other time the defendant had used a
Taser in the jail, he had included precisely this type of
information, even though those incidents were much less
significant.  In those cases the defendant had only, you

know, used the Taser once or twice for five seconds or less.
Here, when he used it repeatedly for more than 50 seconds, he
left out that detail.

So there's more than enough evidence to support
those two counts.  I think the same is true for Counts One
and Two.  I don't know if it would be beneficial for the
Court to talk through those.  I would be happy to if you have
questions.

THE COURT:  All right.  Thank you.

Mr. Strianse, do you want the last word here?

MR. STRIANSE:  No, Your Honor.

THE COURT:  All right.  I'm going to deny the
motion.  I think in Counts One and Two it's a classic jury
determination for them to weigh the evidence presented and
determine the credibility, whether or not it satisfied the
legal standard.

I think on Counts Three and Four, there are
misstatements that are in Exhibits 19 and 20 that could,
depending on how the jury reads those misstatements,
omissions, or direct statements made by Mr. Bryant, could
satisfy the standard.  So I'm going to deny the motion in all
respects.

So, with that, you're going to share your first
three witnesses -- do we know who your first three witnesses
are tomorrow?

```
 1            MR. STRIANSE:  Judge, I want to just check with
 2    people's schedules, and I told the Government I'll email them
 3    those names.
 4            THE COURT:  Okay.  Well, now they've got to get
 5    ready.
 6            MR. STRIANSE:  I understand.  I'm going to do that
 7    right now.
 8            THE COURT:  So you're going to get that to them
 9    before 6:00?
10            MR. STRIANSE:  Yes, sir.
11            THE COURT:  Okay.  All right.
12            Anything else in anticipation -- any other issues
13    y'all anticipate tomorrow or in the defendant's case?
14            Go ahead.
15            MR. SONGER:  Your Honor, if I could flag one
16    additional issue for the Court.  The motion in limine that we
17    filed last night, we believe there is significant authority
18    supporting that position.  If it would be beneficial to the
19    Court, we could attempt to file, you know, a more fulsome
20    motion that would set out some of that authority to allow the
21    Court to decide on that before the defense starts presenting
22    their case tomorrow.
23            THE COURT:  I thought we took care of most of that
24    today.  You're going to call JJ Hannah?
25            MR. STRIANSE:  That's my intent, yes.
```

1          THE COURT:  I think that will take care of it.

2          MR. SONGER:  Well, Your Honor, our concern is that

3   Lt. Hannah, my understanding, is going to be asked to testify

4   about determinations that he made after the fact,

5   investigations that he did after the fact, and what he did or

6   didn't say about this incident after it happened.  I think

7   that type of evidence is inadmissible.

8          THE COURT:  Okay.  I think we have to wait and let

9   me hear what JJ Hannah says.  From the papers -- was he the

10  jailer?

11         MR. STRIANSE:  He is the jail administration.

12         THE COURT:  Yeah.  In Tennessee, you have you have

13  "the jailer" that's in charge.  Let's see what his

14  responsibilities were and the extent of his knowledge and his

15  action and we can make a judgment.

16         MR. SONGER:  Okay.

17         THE COURT:  All right.

18         Anything else, Mr. Strianse?

19         MR. STRIANSE:  No, Your Honor.

20         THE COURT:  All right.  And, Mr. Bryant, I hope

21  and trust that you and Mr. Strianse have had a conversation

22  about your right to testify or not?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  It sounds like you're going to elect

25  to testify.  But I just want to make sure that conversation

1    is taking place and you know from me that you have a right
2    not to testify.
3              THE DEFENDANT:  Yes, Your Honor.
4              THE COURT:  And if you decide not to testify, I
5    would tell the jury that they can't consider that; they can't
6    discuss it; it could not come up in the discussion because
7    the Constitution guarantees you that right.
8              THE DEFENDANT:  I understand, Your Honor.
9              THE COURT:  All right.  Anything else?
10             MR. SONGER:  Nothing further, Your Honor.
11             THE COURT:  All right.  Thank you.
12             (Court adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1    REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7    proceedings held in open court on February 5, 2019, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case

9    No. 3:18-cr-00144; that said proceedings in connection with

10   the hearing were reduced to typewritten form by me; and that

11   the foregoing transcript (pages 1 through 285) is a true and

12   accurate record of said proceedings.

13         This the 24th day of March, 2019.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25