1        IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF TENNESSEE
2                  AT NASHVILLE

3    UNITED STATES OF AMERICA        )
                                     )
4                                    )
                                     )
5    v.                              )   Case No.
                                     )   3:18-cr-00144
6    MARK BRYANT                     )

7

8

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10   BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                         TRANSCRIPT

12                            OF

13                       PROCEEDINGS

14                    February 7, 2019

15                    Trial Volume 4A

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19            APPEARANCES ON THE FOLLOWING PAGE

20

21

22

23   PREPARED BY:
                  LISE S. MATTHEWS, RMR, CRR, CRC
                      Official Court Reporter
24                   801 Broadway, Room A839
                       Nashville, TN 37203
25              lise_matthews@tnmd.uscourts.gov

```
 1           For the Government:  Sara E. Myers
                                  U.S. Attorney's Office
 2                                (Nashville Office)
                                  Middle District of Tennessee
 3                                110 Ninth Avenue South
                                  Suite A961
 4                                Nashville, Tennessee 37203-3870

 5                                Michael J. Songer
                                  U.S. Department of Justice
 6                                Criminal Division
                                  950 Pennsylvania Avenue, NW
 7                                Washington, DC 20530

 8
             For the Defendant:   Peter J. Strianse
 9                                Tune, Entrekin & White, P.C.
                                  31 Deaderick Street
10                                Suite 1700
                                  Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2              Thursday, February 7, 2019

 3

 4                  INDEX OF WITNESSES

 5
    WITNESSES:                                      PAGE
 6

 7  MARK MITCHELL BRYANT
         (CONTINUED) DIRECT EXAMINATION BY MR. STRIANSE    5
 8       CROSS-EXAMINATION BY MR. SONGER                   33
         REDIRECT EXAMINATION BY MR. STRIANSE              81
 9
    JAMES MARTIN BARNUM III
10       DIRECT EXAMINATION BY MR. STRIANSE                88
         CROSS-EXAMINATION BY MS. MYERS                    94
11
    DWAYNE TYRONE JONES
12       DIRECT EXAMINATION BY MR. STRIANSE                97
         CROSS-EXAMINATION BY MS. MYERS                   101
13
    JEFFREY KEY
14       DIRECT EXAMINATION BY MR. STRIANSE               111
         CROSS-EXAMINATION BY MS. MYERS                   121
15       REDIRECT EXAMINATION BY MR. STRIANSE             122

16

17
                        EXHIBITS
18
                             MARKED  RECEIVED   WITH-
19  GOVERNMENT'S EXHIBIT     FOR I.D. IN EVD.   DRAWN

20   25      Mark Bryant's Use of Force    68        68
             Report — 6/1/16
21   26      Mark Bryant's Incident        70        70
             Report — 6/29/16
22   27      Mark Bryant's Incident        73        73
             Report — 7/13/17
23

24

25
```

1    The above-styled cause came on to be heard on

2  February 7, 2019, before the Honorable Waverly D. Crenshaw,

3  Jr., District Judge, when the following proceedings were had,

4  to-wit:

5           (Jury not present.)

6           THE COURT:  All right.  Be seated.  Good morning.

7           Before we bring the jury in and get Mr. Bryant

8  back on the stand, Mr. Strianse, do you anticipate witnesses

9  after Mr. Bryant?

10          MR. STRIANSE:  I do, Your Honor.

11          THE COURT:  Okay.  How many?

12          MR. STRIANSE:  We have a total of three witnesses

13 after Mr. Bryant.

14          THE COURT:  All right.  Then let's go ahead and

15 proceed with Mr. Bryant.  When we do our morning break, I'll

16 take up the jury charge issue so we can start getting that

17 ready.

18          MR. STRIANSE:  Yes, sir.

19          THE COURT:  All right.  Bring in the jury.

20          Mr. Bryant, if you want to go back to the witness

21 stand.

22          THE WITNESS:  Yes, sir.

23                MARK MITCHELL BRYANT,

24 called as a witness by Defendant, was previously sworn and

25 testified as follows:

1

2          (Jury present.)

3          THE COURT:  All right.  Be seated.  Good morning.

4   Okay.

5          We're going to continue with the testimony from

6   Mr. Bryant.

7          You can proceed, Mr. Strianse.

8          MR. STRIANSE:  Thank you, Your Honor.

9

10          DIRECT EXAMINATION (CONTINUED)

11   BY MR. STRIANSE:

12   Q.   Good morning, Mr. Bryant.

13   A.   Good morning.

14   Q.   We ended yesterday discussing the events of the

15   8:00 p.m. episode on November 5, 2016; is that correct?

16   A.   Yes, sir.

17   Q.   What does the surveillance camera in the jail capture?

18   A.   Video.

19   Q.   Does it capture any sound?

20   A.   No, sir.

21   Q.   In terms of the recording capabilities of the Taser

22   device, what does that record?

23   A.   Audio and video.

24   Q.   Now, you've obviously been in the courtroom all this

25   week; is that right?

1  A.   Yes, sir.

2  Q.   And you've seen and heard the government exhibits

3  regarding the video and the sound; is that correct?

4  A.   Yes, sir.

5  Q.   Now, you were also able to review the jail video and the

6  Taser video separately; is that right?

7  A.   Yes, sir.

8  Q.   And that was in preparation for trial --

9  A.   Yes, sir.

10  Q.   -- correct?

11        Are the sound and the video that we're seeing this

12  week synchronized correctly?

13  A.   Not perfectly, no, sir.

14  Q.   And in what way is the sound and the video not in sync?

15  A.   It's just not exactly synched up with the actions as

16  they're happening.  And it may be just a second or two

17  seconds.  And the video's a little jumpy.  It just doesn't --

18  it just doesn't look exactly right.

19  Q.   Did that -- can you give us any example of the practical

20  effect of it not being synched up?

21  A.   It just appears like I'm starting -- like the audio --

22  the Taser audio starts -- you start hearing the clicking

23  before there's any movement.  For example, on the 10:20 video

24  and the 8:00 p.m. video, the Taser is on one leg, and that's

25  when the approximate 20-second tase happens.

1          And then it stays there on that leg, and I know I
2    moved to another spot, the other leg.  And it shows clearly
3    in the video I moved to another spot, but the audio has
4    already quit with the tasing sound.
5    Q.    I had a few more questions about that 7:59, 8:00 p.m.
6    Taser incident involving Mr. Norris.
7    A.    Yes, sir.
8    Q.    How many times did you tase him during that episode?
9    A.    Four.
10   Q.    Tell the jury why it was necessary to tase him four
11   times.
12   A.    His arm was -- was free and we needed to secure it.  If
13   he continued to be free, he could have got completely out of
14   that chair, hurt somebody, hurt himself.
15   Q.    What was -- what was your intent in using the Taser
16   during that episode?
17   A.    To get him to comply with my orders.
18   Q.    And what were your orders?
19   A.    To move his arm back into position so we could secure
20   it.  Nothing more.
21   Q.    Forgive me.  Go ahead.
22   A.    That's it.  Nothing more.
23   Q.    Prior to actually applying a tase, were you giving
24   commands?
25   A.    Yes, sir.

1 Q. What sort of commands were you giving to Mr. Norris?

2 A. Stop resisting. Comply. Please comply.

3 Q. During that 8:00 p.m. episode, was it your intent to

4 purposefully violate the law when you were tasing Mr. Norris?

5 A. No, sir.

6 Q. Did you have the intent to purposely violate any policy?

7 A. No, sir.

8 Q. What was your understanding on November the 5th, 2016,

9 about the existing Taser policy at the Cheatham County jail?

10 A. Least amount of force necessary to gain compliance.

11 Q. Were you aware of any limits on the number of tases that

12 you could use?

13 A. There was no number of applications or durations in the

14 policy.

15 Q. Had you actually read the Taser policy that was in

16 effect at that time?

17 A. Yes, sir.

18 Q. Is there anything in the Taser policy, the written

19 policy, that was promulgated by the Cheatham County sheriff's

20 office that said anything about the number of tases?

21 A. No, sir.

22 Q. Was there anything in writing in that general order that

23 said anything about the duration of tases?

24 A. No, sir.

25 Q. We saw during that 8:00 p.m. episode that there was a

1  tase of a length of 25 seconds.

2  A.    Approximately.

3  Q.    And you've heard a lot about that this week?

4  A.    Yes, sir.

5  Q.    Tell the jury, in that moment, were you aware of the

6  length of that tase?

7  A.    No, sir.

8  Q.    Why was it that you felt like there -- there was -- it

9  was necessary at that moment in time to tase Mr. Norris?

10  A.    He was still fighting Jeff Key, and he needed to get his

11  arm where we wanted it to go so we could finish securing him

12  to that chair.

13  Q.    In what way was he fighting Officer Key?

14  A.    He was just resisting Mr. Key's attempts to move his

15  arm.  He was just stronger than Mr. Key.

16  Q.    And Mr. Key's not a small person; is that right?

17  A.    No, sir.

18  Q.    How tall is Mr. Key?

19  A.    Six feet.

20  Q.    And how much was he weighing back at that time in

21  November of 2016?

22  A.    Probably around 200 pounds.

23  Q.    What sort of relationship did you have with your

24  colleagues on the second shift?

25  A.    They were all my friends, my -- my family.

1  Q.    You felt like you had a close relationship?

2  A.    Yes, sir.

3  Q.    Would you all do things outside of work?

4  A.    Yes, sir.

5  Q.    At any point in time during these episodes on second

6  shift, when you used the Taser, did any of your colleagues

7  tell you to -- that you were doing anything wrong?

8  A.    No, sir.

9  Q.    Did any of them tell you to stop?

10  A.    No, sir.

11  Q.    Any of them tell you -- did they object in any way?

12  A.    No, sir.

13  Q.    Did you feel like you had the kind of relationship with

14  them that they would have said something?

15  A.    Absolutely.

16  Q.    After the last tase of that 8:00 p.m. incident, I think

17  it was the 15-second tase, was Mr. Norris secured?

18  A.    Yes, sir.

19  Q.    Tell the jury what was done immediately after he was

20  secured.

21  A.    We gave him water.  We took his vitals.  We continued to

22  check on him.  There wasn't any issues after 8:00 p.m. until

23  10:20, when we went to transport him.  Just continuously

24  checking on him, giving him water.  Got one set of vitals,

25  but he fought us when we were doing that, but we got them.

1   Q.   Now, was there jail video of that interaction?

2   A.   Yeah.  Yes, sir.

3   Q.   We've not seen that this week?

4   A.   Not here in the Court, no, sir.

5   Q.   What time was your shift ending on November 5, 2016?

6   A.   10:00 p.m.

7   Q.   And what time does the third shift start its work?

8   A.   Same time.

9   Q.   Did you stay over on the third shift on Saturday night?

10   A.   Yes, sir.

11   Q.   And explain to the jury why you stayed over.

12   A.   Third shift is a shorter-staffed shift.  And I knew how

13   hard it was dealing with Mr. Norris, and I just wanted to

14   make sure that they didn't have to do it without enough help.

15   Q.   And did you know the members of the third shift that

16   would be coming on at around 10:00?

17   A.   I didn't know for sure, but after they got there I knew.

18   Q.   Okay.  And did that factor in any way into your

19   decision?

20   A.   Somewhat.

21   Q.   And explain to the jury what you mean.

22   A.   One of the officers, Mr. Moelter, was -- he had been

23   there about a year, but he was still clearly intimidated by

24   inmates.  So I didn't feel like he was going to be the

25   strongest officer.

1    Mr. Montgomery, very big man, very smart man, not

2  a very agile man.

3    I just felt like the only person there other than

4  myself was Dwayne Jones and Rebecca Burney that could really

5  handle the situation.  So that's why I did it.

6  Q.   At some point when third shift got there, was a decision

7  made to take Mr. Norris to the hospital there in Ashland

8  City?

9  A.   It wasn't really a decision.  After you verbalize

10 suicidal ideations, you have to get medically cleared before

11 you can go to Middle Tennessee Mental Health.  So that's the

12 reason he was being transported.

13 Q.   At some point in time during that evening was the Mobile

14 Crisis Center contacted?

15 A.   Yes.

16 Q.   What is the Mobile Crisis Center?

17 A.   It's just a person that comes in to do a quick

18 evaluation to determine whether the individual needs to be

19 treated further, psychologically.

20 Q.   And was that done on Saturday, November 16th?

21 A.   Yes, sir.  November 5th?

22 Q.   I'm sorry?

23 A.   November --

24 Q.   November 5th, forgive me, 2016.

25 A.   Yes, sir.

1  Q.    And did someone come to the jail from the Mobile Crisis

2  Center?

3  A.    Yes.

4  Q.    And as a result of that evaluation, what was decided?

5  A.    That he needed to be taken to get his medical evaluation

6  and put on the list to get a bed at Middle Tennessee Mental

7  Health.

8  Q.    Now, as third shift was starting, Mr. Norris was still

9  in the restraint chair; is that right?

10 A.    That's right.

11 Q.    What was the plan for getting him from the jail to the

12 hospital in Ashland City?

13 A.    Well, normally the plan is just to put the belly chain,

14 handcuffs, shackles, walk him out the door.  But we decided

15 since he was so combative that we needed to alter that plan

16 to take one hand at a time, secure it, put the shackles on

17 while he was still in the chair with the belt around his legs

18 so he couldn't get free and hurt anybody or hurt himself.

19 Q.    And how did that plan work out?

20 A.    Eventually it worked out okay.  But it was a -- it was a

21 struggle the whole way.  It's just not -- we couldn't foresee

22 how -- how strong he was and how determined he was to not

23 comply with our orders.

24 Q.    And sort of walk the jury through.

25        This occurred at the booking counter?

1  A.    Yes.

2  Q.    This transition that we're talking about?

3  A.    Yes.

4  Q.    And walk them through -- well, what was the plan

5  regarding the transition out of the chair into the belly

6  chain and the other devices?

7  A.    Well, the plan was to only let one limb free at a time,

8  basically, and secure that limb back to either the chain, the

9  bar, the chair, whatever needed to be done to make sure he

10 wasn't flailing, kicking, head butting, injuring anybody or

11 himself.

12 Q.    How was he ultimately brought from the booking area to

13 the transport, the sally port?

14 A.    In the chair.

15 Q.    Between 10:25 and 10:30 or so on third shift, you can be

16 seen tasing Mr. Norris seven times; is that right?

17 A.    I want to say it was six.

18 Q.    Six times.

19 A.    The seventh time was Mr. Montgomery.

20 Q.    Forgive me.  Mr. Montgomery had the seventh time when he

21 was trying to get him in the vehicle?

22 A.    That's right.

23 Q.    And in that series of tases, there was an 11-second

24 tase?

25 A.    Yes, sir.

1    Q.    Do you remember that?

2    A.    Yes, sir.

3    Q.    Right before that tase -- and the jury can form their

4    own judgment -- there seems to be some activity around the

5    chair; is that right?

6    A.    Yes, sir.

7    Q.    Explain to the jury what you saw and what you reacted

8    to?

9    A.    I just saw him make a quick motion, and I reacted, and

10   my reaction was to put that Taser on his leg.

11   Q.    What sort of action did he take?

12   A.    He had jerked his leg up when -- when it's not in the

13   cuff, it's not going to be right up against the chair.

14   There's about a foot of wiggle room.  And he had jerked his

15   knee up, and Ms. Burney was right down there.  And I just

16   wasn't going to stand there and let him knee her in the face.

17   Q.    And that's Rebecca Burney who testified yesterday?

18   A.    That's right.

19   Q.    Now, is that really fully captured on the video that we

20   saw?

21   A.    I don't know that you see the jerking motion, but I

22   wouldn't have just dove in there and started tasing him for

23   no reason.

24   Q.    How many officers were around you during that 10:25 to

25   10:30 third shift episode?

1  A.   Five or six.

2  Q.   After Mr. Norris was secured and transported to the

3  hospital there in Ashland City, did any of those five or six

4  colleagues say anything to you about that last episode --

5  A.   No, sir.

6  Q.   -- tasing?

7        You may have an exhibit book in front of you

8  there, Mr. Bryant.

9  A.   Yes, sir.

10 Q.   If you would, turn to Government's Exhibit 19.

11        I assume after these episodes that you wrote

12 reports; is that correct?

13 A.   I don't know if I wrote them after or I started during

14 and finished up after.  It's -- reports can be an ongoing

15 process.

16 Q.   But before you went home on Saturday, November 5th, or

17 the early morning hours of Sunday, November 6th, you had

18 prepared reports; is that right?

19 A.   Yes, sir.

20 Q.   Take a look at what's up on the screen.  That is

21 Government's Exhibit 19.

22        Do you have 19 in front of you?

23 A.   Yes, sir.

24 Q.   And what is Government's Exhibit 19?

25 A.   It's my report on the incident of the night.

1  Q.   And take -- take a look at the box at the top.  It's got
2  the date, correct?
3  A.   Yes, sir.
4  Q.   And the time is what?
5  A.   1855.
6  Q.   Which is 6:55 p.m.; is that right?
7  A.   Correct.
8  Q.   And then take a look at the end of the narrative
9  paragraph.
10          Do you see another military time?
11 A.   2122.
12 Q.   Which is what time?
13 A.   9:22 p.m.
14 Q.   And what were you trying to convey on this incident
15 report between those hours?
16 A.   I was trying to put as much information that I could for
17 the events that happened throughout the night.
18 Q.   If you would, go ahead and read that into the record.
19 A.   (As read):
20          While watching cameras in the booking office, I
21          saw that Inmate Norris had an aggressive posture
22          towards another inmate in Cell 4.  Deputy Key and
23          I responded to the cell, and Inmate Norris was
24          threatening inmate Hefner with physical violence.
25 Q.   Let me stop you right there.  I would like to go over

1  this line by line.

2         That first sentence that you read about watching

3  cameras, seeing Inmate Norris had an aggressive posture, is

4  that an accurate statement?

5  A.   Yes, sir.

6  Q.   Were you trying to truthfully report what you saw?

7  A.   Yes, sir.

8  Q.   The second sentence that you just read about Deputy Key

9  and you responding to the cell, was that an accurate

10  statement of what you were trying to record?

11  A.   Yes, sir.

12  Q.   Then pick up where you were, and let's take a sentence

13  at a time.

14  A.   (As read):

15         -- threatening Inmate Hefner with physical

16         violence upon our entry of the cell.  I instructed

17         Inmate Norris to step out of the cell.

18  Q.   Was that accurate?

19  A.   Yes, sir.

20  Q.   Go to the next sentence.

21  A.   "He went back to the bunk in his cell."

22  Q.   Was that true?

23  A.   Yes.

24  Q.   Go ahead.

25  A.   I told Inmate Norris to come with me again.

1  Q.  Was that accurate?

2  A.  Yes, sir.

3  Q.  Go ahead.

4  A.  He did not comply.

5  Q.  Was that also true?

6  A.  Yes, sir.

7  Q.  Go ahead.

8  A.  (As read):

9          Deputy Key and I escorted him out of the cell

10         and placed him against the wall outside the cell

11         and instructed him to put his hands behind his

12         back.

13 Q.  Was that a truthful statement?

14 A.  Yes, sir.

15 Q.  Go ahead.

16 A.  (He resisted.)

17 Q.  Was that true?

18 A.  Yes, sir.

19 Q.  Go ahead.

20 A.  (As read):

21         FTO Marriott arrived.  We forced him to comply

22         with joint locks and drive stun Taser applied by

23         Deputy Bratton upon his arriving.

24 Q.  And what were you describing there?

25 A.  The events of 1855.

```
1   Q.   Okay.  Were those the events outside the Cell 4 door?
2   A.   That is correct.
3   Q.   Were you trying to describe those accurately?
4   A.   Yes, sir.
5   Q.   Did you feel like you described it accurately?
6   A.   Yes, sir.
7   Q.   How far did you go in school?
8   A.   I graduated high school.
9   Q.   Okay.  Go ahead.
10  A.   (As read):
11              We then placed him in the restraint chair with
12          handcuffs still applied.
13  Q.   Was that true?
14  A.   Yes, sir.
15  Q.   Go ahead.
16  A.   "Inmate Norris resisted."
17  Q.   Was he resisting?
18  A.   Yes, sir.
19  Q.   Go ahead.
20  A.   (As read):
21              Pressure points and additional drive stun Taser
22          applications were utilized to achieve compliance.
23  Q.   Was that an accurate summary of what you did?
24  A.   That would be part of the 8:00 p.m. continuation.
25  Q.   Go ahead.
```

```
1   A.    "Deputy Bratton and I tased."
2   Q.    What did you mean when you said, "Deputy Bratton and I
3   tased"?
4   A.    Throughout the events of the night, we were the two that
5   used the Taser.
6   Q.    Okay.  You weren't trying to indicate that during the
7   8:00 p.m. incident that Bratton had tased?
8   A.    No, sir.
9   Q.    Go ahead.
10  A.    (As read):
11              Deputy Key and FTO Marriott applied pressure
12          point techniques.
13  Q.    Was that accurate?
14  A.    Yes, sir.
15  Q.    Go ahead.
16  A.    (As read):
17              After approximately 15 minutes in the chair, I
18          moved his hands to the soft restraints.
19  Q.    Let me ask you about that.
20              What were you trying to convey there?
21  A.    You know, when I wrote this report, I didn't remember
22  the event -- even though it was just a couple of hours, I
23  didn't remember exactly the order.  You know, it went from
24  7:00 p.m., approximately, to 7:20 p.m., where we were moving
25  him -- doing the transition from his cuff behind his back to
```

1  the soft restraints, and then 8:00 p.m. is when I actually
2  utilized the Taser. I didn't get it chronologically correct.
3  But I still wasn't lying about anything.
4  Q. How long were you and your colleagues dealing with
5  Mr. Norris on Saturday, November 5th?
6  A. From 1855 until 10:00 p.m., and then I continued on past
7  that.
8  Q. Give the jury some idea of how tiring or exhausting or
9  stressful this was.
10 A. It was very stressful. You know, thinking about it
11 today, it still is -- it's very stressful for my family, my
12 friends. It's -- it's definitely an episode that I'll never
13 forget.
14 Q. Let's go ahead and finish this up. The last couple of
15 sentences.
16 A. Yes, sir.
17 Q. Go ahead.
18 A. Did I finish up after "approximately 15 minutes in the
19 chair"?
20 Q. You finished up with "soft restraints."
21 A. Okay. I'm sorry. (As read):
22         Inmate Norris then stated that he wanted to
23      hurt others and hurt himself.
24 Q. Was that accurate?
25 A. Yes, sir.

Q.    What kind of things do you remember Mr. Norris saying?

A.    Just that he wanted us to kill him, that he wanted to kill people.  Other than that, I don't have a clear recollection of what he was saying.

Q.    What were your impressions of Mr. Norris's mental state as you were dealing with him that evening?

A.    My assumption was drugs.  Maybe some kind of psychiatric issue, but I'm not qualified to say for sure either one of those, actually.

Q.    And when you say -- you worked in the jail for a couple of years; is that right?

A.    Yes, sir.

Q.    And you worked at the Tennessee Department of Correction for a couple of years?

A.    Yes, sir.

Q.    When you talk about an inmate being under the influence of drugs, in a situation like this, what kind of drugs are you talking about?

A.    For this particular incident, I assumed methamphetamine because he was so hyper, so agitated.  And I had seen that plenty of times before.  Meth is a pretty big problem in Cheatham County and I'm sure around the country.

Q.    Any other drugs come to mind?

A.    I didn't have any experience with any other drugs. There was some talk of bath salts.  I've only heard about

1  that, you know, on TV.  Never -- never known for sure that I
2  seen it in person.
3  Q.    And if --
4            MR. SONGER:  Your Honor, I object to this line of
5  questioning.  The defendant has no expertise in what type of
6  drugs may or may not have been used.
7            THE COURT:  All right.  Sustained.
8  BY MR. STRIANSE:
9  Q.    Go ahead and read that last sentence.
10 A.    (As read):
11            Mobile Crisis and Nurse Joshua --
12            That's incorrect.  That would have been Nurse
13 Jessica -- "were notified."
14 Q.    Was Nurse Jessica on duty that night?
15 A.    She was 24/7 on call.
16 Q.    Okay.  She was on call?
17 A.    Yes.
18 Q.    She wasn't physically with you at the jail?
19 A.    No.  She's only in the building from 6:00 a.m. until
20 2:00 p.m., Monday through Friday.
21 Q.    And who was the correctional officer that notified
22 Mobile Crisis?
23 A.    I believe it was me.
24 Q.    And who was the correctional officer that notified
25 Nurse -- is it Jessica?

```
 1   A.    Correct.
 2   Q.    Jessica?
 3   A.    That would be me, too.
 4   Q.    Okay.  And why were you notifying both Mobile Crisis and
 5   Nurse Jessica?
 6   A.    Because of the suicidal ideations.
 7   Q.    Okay.  And go ahead and read the last sentence.
 8   A.    "Mobile Crisis arrived at 2122."
 9   Q.    That would have been 9:22?
10   A.    Yes, sir.
11   Q.    Was that accurately reported?
12   A.    To the best of my recollection, yes, sir.
13   Q.    And Mobile Crisis would have done their evaluation at
14   that time?
15   A.    Yes, sir.
16   Q.    Okay.  And you prepared this report at 2148; is that
17   right?
18   A.    I completed it at 2148.
19   Q.    Completed it.
20         Did you have any intent to mislead anyone in
21   putting this report together?
22   A.    No, sir.
23   Q.    What did you think -- what is the procedure and protocol
24   at the Cheatham County jail when a correctional officer
25   prepares a report?
```

1  A.   We put it in the lieutenant's box.  And that's like a
2  mailbox that's in booking.
3  Q.   And that goes to Lt. JJ Hannah?
4  A.   That's right.
5  Q.   And I assume you knew that all of your actions were
6  being recorded by surveillance?
7  A.   Yes, sir.
8  Q.   In your experience there for two years, what does
9  JJ Hannah do with these reports that he received?
10 A.   After he reviews them, he files them in the appropriate
11 file.  For instance, this one would have gone into
12 Mr. Norris's file.
13 Q.   And I assume if -- if Lt. Hannah had any questions, he
14 would ask you?
15 A.   Yes, sir.
16 Q.   If you would, take a look at Government's Exhibit 20.
17            And for the record, it's up on the screen now.
18            What is Government's Exhibit 20?
19 A.   It's another incident report.
20 Q.   And this is a much shorter one; is that correct?
21 A.   Yes, sir.
22 Q.   And what was your purpose in putting this second
23 incident report together?
24 A.   It was third shift, and I just felt like it was another
25 time frame.

1   Q.   And let me ask you a question.  I notice on Government's
2   Exhibit 19 and Government's Exhibit 20 at the box at the top,
3   "Nature of Incident," you put "Use of force"?
4   A.   Yes, sir.
5   Q.   Did you do separate use of force reports that night?
6   A.   I thought I did.  But I haven't seen my use of force
7   report.
8   Q.   But you designated the nature of the incident as use of
9   force?
10  A.   Yes, sir.
11  Q.   And what are you memorializing here in this 2220,
12  10:20 p.m., report?
13  A.   All the actions that I took while we were trying to
14  prepare Mr. Norris to transport to the ER for his medical
15  evaluation.
16  Q.   And this is what was occurring on the third shift; is
17  that right?
18  A.   Yes, sir.
19  Q.   Now, I'm sure you're going to be asked in a few minutes
20  why in either 19 or 20 do you not break out each of the
21  tasing incidents in the report.
22  A.   I had no idea how many durations or applications.  I
23  knew it was multiple.  I had no idea how long any of them
24  were.
25  Q.   Were you familiar with the actual policy regarding

1  reports?

2  A.   Yes, sir.

3  Q.   And I think that's one of the government's exhibits

4  here; is that correct?

5  A.   It is.

6  Q.   If you could turn to that.

7        And when you get there, let us know what number

8  you're at.

9        I would like to direct your attention to page 3 of

10  Government's Exhibit 1.

11  A.   I'm there.

12  Q.   Is it possible to put that up?

13        And for the record, we're seeing page 3 of

14  Government's Exhibit 1.  Is it possible to make it just a

15  little bit bigger?  Like 7.1.  Thank you.

16        We've made 7.1 of Government's Exhibit -- page 3

17  of Government's Exhibit 1 a little bit larger.

18        Do you see that?

19  A.   Yes.

20  Q.   Go ahead and read that into the record.

21  A.   (As read):

22            A written report shall be submitted to

23            supervisors whenever an officer, whether on duty

24            or off duty, discharges a firearm for any reason

25            other than training, practice, or recreation;

                    takes an action that results in or is alleged to

                    have resulted in injury or death of a person;

                    applies force through the use of force -- any

                    weapon -- of any weapon; uses force that could

                    result in injury, such as punches, kicks, and neck

                    restraints.

Q.    And this is the Cheatham County sheriff's office general

order that was in effect on November 5, 2016; is that right?

A.    Yes, sir.

Q.    Do you see anything in that general order that requires

you to set forth the number and the duration of every tase?

A.    No, sir.

Q.    Do you see anywhere in that directive where you're

required to put the serial number of the Taser that was used?

A.    No, sir.

Q.    If we could, let's turn back to Government 20.

          Mr. Bryant, were you trying to mislead anyone at

the jail in preparing this report?

A.    No, sir.

Q.    Were you trying to in any way obstruct or impede

anybody's review of this?

A.    No, sir.

Q.    And let me ask you this:  In terms of a review of this,

there was no -- when were you first in contact with the jail

administration about this incident?  Let me ask it that way.

1  A.   I want to say the middle of the following week,

2  JJ Hannah or maybe Bobby Whitt called down to the duty office

3  to come down to the office and talk to them.

4  Q.   And describe what happened when you went upstairs.

5  A.   Went upstairs and he showed me my report first.

6  Q.   And who is the "he" we're talking about?

7  A.   I'm sorry.  JJ Hannah.  Bobby Whitt was also in the

8  room.  David Isherwood was also in the room.  Those are

9  assistant jail administrators.  They showed me my report.

10  Then they showed me a Taser video that was approximately 20

11  seconds long and asked me for my justification.

12         And I gave them my justification of Mr. Norris was

13  fighting us in the restraint chair, had an arm loose, and we

14  needed to secure it.

15  Q.   Do you remember specifically discussing the 20-second

16  tase?

17  A.   With JJ at that point in time?

18  Q.   With JJ Hannah.

19  A.   Yes, sir.

20  Q.   And how was it left when you walked out of the

21  administration office --

22         MR. SONGER:  Objection, Your Honor.  This calls

23  for hearsay.

24         THE COURT:  Well, he's just -- overruled.  He's

25  asked him his impression of when that meeting was over.  He

1  can state what's in his mind when the meeting is over.  That
2  doesn't require any out-of-court statement.
3          THE WITNESS:  Would you ask me again, please.
4  BY MR. STRIANSE:
5  Q.   When you left that meeting with JJ Hannah and Isherwood
6  and Bob Whitt, how was it left with you?
7  A.   That there was going to be an internal investigation and
8  they would let me know their findings.
9  Q.   Did you ever hear anything back?
10 A.   Not until I asked about it.
11 Q.   And when was it that you decided to follow up and ask?
12 A.   Probably first week of February.  I know it was in
13 February sometime.
14 Q.   And how did you go about doing that?
15 A.   I was already in a meeting with the sheriff and JJ, and
16 at the end of that meeting, I asked about it.
17 Q.   And what did they tell you the status was?
18          MR. SONGER:  Objection.
19          MR. STRIANSE:  Your Honor, this --
20          THE COURT:  Go ahead.
21          MR. STRIANSE:  -- this is a verbal act.  It's
22 nonhearsay.
23          THE COURT:  Any response from the government?
24          MR. SONGER:  He's asking the witness to repeat
25 what another person who's not testifying told him.  It's

1  hearsay.

2          MR. STRIANSE:  But it's a verbal act and it's

3  nonhearsay.

4          THE COURT:  Okay.  Overruled.

5          THE WITNESS:  One more time, please.

6  BY MR. STRIANSE:

7  Q.   You told us that you were back in the office in

8  February, correct?

9  A.   In the sheriff's office, actually.

10 Q.   The sheriff's office?

11 A.   Uh-huh.

12 Q.   And you inquired about the status of this?

13 A.   That's right.

14 Q.   And what were you told?

15 A.   I was told that I was clear and they felt that it was

16 justified.

17 Q.   And who was telling you that?

18 A.   JJ Hannah and Sheriff Mike Breedlove.

19 Q.   And you continued to work until when?

20 A.   July 28th is -- I was getting ready to go to work, and

21 JJ called me and told me to stay home.  I had been put on

22 administrative leave --

23 Q.   That would be --

24 A.   -- pending investigation.

25 Q.   That would be July 28 of 2017?

1  A.   Yes, sir.

2  Q.   And what had happened almost immediately in advance of

3  July 28, 2017?

4  A.   The civil suit was made public.

5           MR. STRIANSE:  Your Honor, those are my questions.

6           THE COURT:  All right.  Cross-examination.

7

8                      CROSS-EXAMINATION

9  BY MR. SONGER:

10  Q.   Good morning, Mr. Bryant.

11  A.   Good morning, Mr. Songer.

12  Q.    In your direct testimony this morning you gave this jury

13  a very detailed explanation for why you had to tase Jordan at

14  10:30 for 11 seconds.

15           Do you remember that?

16  A.   Yes, sir.

17  Q.   You said that you and other officers had to put Jordan

18  in a belly chain, right?

19  A.   Yes, sir.

20  Q.   And had to put him in cuffs?

21  A.   Yes, sir.

22  Q.   Had to put him in shackles?

23  A.   Yes, sir.

24  Q.   And while he was sitting there in a belly chain, you

25  were watching really closely, and you saw a quick motion, I

1    think you said, that wasn't even visible on the camera.

2            Is that right?

3    A.    Yes, sir.

4    Q.    So, as a result of that quick motion, you then responded

5    and tased him for 11 seconds while he was wearing a belly

6    chain, right?

7    A.    Yes, sir.

8    Q.    And you remember all that in pretty vivid detail?

9    A.    Yes, sir.

10   Q.    Now, you earlier -- I believe in August of 2017, you

11   interviewed with the FBI, didn't you?

12   A.    Yes, sir.

13   Q.    About this case?

14   A.    Yes, sir.

15   Q.    And when you met with agents from the FBI, you -- I

16   believe it was one Special Agent from the FBI and one agent

17   from the Tennessee Bureau of Investigation; is that correct?

18   A.    That's correct.

19   Q.    And you promised to tell them the truth, right?

20   A.    Yes, sir.

21   Q.    You understood that lying to the FBI is a crime?

22   A.    Yes, sir.

23   Q.    And as a law enforcement officer yourself, I'm sure you

24   understood the importance of providing truthful information

25   when you're questioned by law enforcement?

A.    To the best of my knowledge, yes, sir.

Q.    Okay.  Our system of justice depends on people being honest when they speak with the FBI, right?

A.    Sure.

Q.    And in that interview, they talked to you about this incident, correct?

A.    Yes, sir.

Q.    You told them about moving Jordan out to -- putting him in the restraint chair, getting him secured, and moving him out to the transport vehicle so he could go to the hospital?

A.    Yes, sir.

Q.    And you knew they were investigating what force you had used this night, right?

A.    Yes, sir.

Q.    And during that interview, you were asked whether you had -- whether any force had been used on Jordan during that transition to the -- to the transport vehicle out of the jail, right?

A.    Yes, sir.

Q.    And you responded, "Not after we got the belly chain on him"?

A.    Possibly.

Q.    Possibly?  That is what you said.  You said, "Not after we got the belly chain on him"; isn't that right?

A.    Okay.

```
 1   Q.    You agree with that, that is what the told the FBI?
 2   A.    Maybe.  I don't remember.
 3   Q.    Okay.  Well, that interview was audio recorded, wasn't
 4   it?
 5   A.    Yes, sir.
 6   Q.    And you've listened to that recording in preparation for
 7   your testimony?
 8   A.    Yes, sir.
 9   Q.    Okay.  So why don't we listen to -- why don't we listen
10   to the clip when you're talking about this.
11   A.    Okay.
12            MR. SONGER:  Your Honor, let's play for the
13   witness the portion of that audio interview that starts at 26
14   minutes and 33 seconds.
15               (Audio playing as follows:
16               Answer:  We wheeled him outside in the chair to
17               the car, and then transitioned him from the chair
18               directly into the car.  And Sgt. Ola was there.
19               Question:  You wheeled him out in the restraint
20               chair?
21               Answer:  Yes, sir.
22               Question:  Now, was he -- was there any use of
23               force done during this transition from -- from the
24               jail to the car?
25               Answer:  Not after we got the belly chain on
```

1          him.)
2   BY MR. SONGER:
3   Q.   You told the FBI that you did not use any force after
4   you got the belly chain on him, right?
5   A.   Yes.
6   Q.   And that's false?
7   A.   That is false.  But it was just a mistake.  It wasn't on
8   purpose.
9   Q.   Uh-huh.  It's false.
10          You falsely told the FBI that you did not use
11  force when they were investigating your use of force, right?
12  A.   Not --
13  Q.   Correct?
14  A.   Nine months after the incident, yes, sir, I mistakenly
15  made that statement.
16  Q.   My question is, the information you told the FBI is
17  false.
18          That's correct, right?
19  A.   But not on purpose.
20  Q.   But it was false.
21          Do you agree with that?
22  A.   But not on purpose.
23  Q.   My question is, was it false?
24  A.   It was inaccurate.
25  Q.   It wasn't accurate.  All right.

1           And that was more than a year ago, and now -- now
2    you have a different explanation, right?
3    A.   I have had the opportunity to review reports and video
4    and audio since then.
5    Q.   How many other times in your career have you tased
6    someone who was already placed in a belly chain?
7    A.   I don't think that's ever happened before.
8    Q.   That's the only time, right?
9    A.   Yes.
10   Q.   Only time in your career you tased someone who was in
11   handcuffs?
12   A.   Not that I remember.
13   Q.   What about, have you ever tased someone who was in
14   shackles before?
15   A.   I don't believe so.
16   Q.   No.  And Jordan that night was in shackles and handcuffs
17   and a belly chain, completely restrained, and you tased him
18   for 11 seconds, right?  That's true?
19   A.   Yes.
20   Q.   And then the FBI -- the FBI wanted to talk to you about
21   that incident and you just forgot about it?
22   A.   It was nine months after the incident.  And I had no
23   access to audio, video, or my reports to refresh my memory.
24   Q.   All right.  So let's go back and talk a little bit about
25   your experience as a corrections officer.

```
 1   A.   Yes, sir.
 2   Q.   You worked at the Tennessee Department of Corrections
 3   before you came over to Cheatham County, right?
 4   A.   That is correct.
 5   Q.   And before you started there, you went through some
 6   training on how to be a corrections officer?
 7   A.   Very extensive.
 8   Q.   Yeah.  I think you said four-week course, right?
 9   A.   Yes, sir.
10   Q.   Tell you everything you need to know?
11   A.   Approximately.
12   Q.   Yep.  They covered how to use force appropriately?
13   A.   Yeah.  There was a use of force continuum for the State,
14   sure.
15   Q.   Sure.  And that includes some discussion of how to use
16   Tasers?
17   A.   We didn't carry Tasers at the State.  There was a Taser
18   available, but it was only used by the shift supervisor --
19   Q.   Why is it --
20            (Reporter interruption for clarification.)
21            THE COURT:  Yeah.  Don't --
22            MR. SONGER:  I apologize.  I talked over you.
23            THE COURT:  That's okay.  Slow down for the court
24   reporter.
25            MR. SONGER:  No problem.
```

```
1              THE COURT:  You let him finish before you answer.
2    And he's going to let you finish when you answer.
3              THE WITNESS:  Yes, Your Honor.
4              THE COURT:  Ask the question.
5    BY MR. SONGER:
6    Q.    I apologize.  There was some discussions of Tasers in
7    that training that you took with the State?
8    A.    That's correct.
9    Q.    And then you worked there for two years?
10   A.    Yes, sir.
11   Q.    And then you came over to the Cheatham County sheriff's
12   office in August of 2015; is that right?
13   A.    Yes, sir.
14   Q.    And when you started at Cheatham County, you were given
15   a copy of their policies?
16   A.    Yes, sir.
17   Q.    That you signed that you had received them, right?
18   A.    Yes, sir.
19   Q.    And you read them?
20   A.    I didn't read them right then, but they gave me the
21   policy and procedure on a thumb drive.
22   Q.    But at some point you read them and you familiarized
23   yourself with them?
24   A.    Yes.
25   Q.    Okay.  You agreed to follow those policies?
```

1  A.    Yes, sir.

2  Q.    And those policies include a section on use of force,

3  right?

4  A.    Yes, sir.

5  Q.    And it mentions Tasers?

6  A.    Yes, sir.

7  Q.    And the policy instructs officers that they should use a

8  Taser in accordance with their training, right?

9  A.    Yes, sir.

10 Q.    And then you did receive training on how to use a Taser

11 at the sheriff's office, right?

12 A.    Yes, sir.

13 Q.    That was taught by Gary Ola?

14 A.    Yes, sir.

15 Q.    You took that training in October of 2015?

16 A.    Uh-huh.

17 Q.    Okay.  You heard Officer Josh Marriott testify about

18 that training a couple days ago, right?

19 A.    Yes, sir.

20 Q.    And you heard Officer Marriott say that he was taught in

21 that training you shouldn't use a Taser more than three times

22 for five seconds each, right?  Do you remember him saying

23 that?

24 A.    I do remember him saying that, yes, sir.

25 Q.    And you're friends with Officer Marriott?

1  A.    Yes, sir.

2  Q.    And you guys used to live together?

3  A.    Yes, sir.

4  Q.    And you took the same training courses he did?

5  A.    Yes, sir.

6  Q.    And you knew that you were obligated to follow the

7  principles that were presented to you in training, right?

8  A.    Absolutely.

9  Q.    Now, at the end of that training class, you had an

10 opportunity to ask any questions that you wanted if you

11 wanted clarification about any of the standards about using a

12 Taser, didn't you?

13 A.    I don't know if it was invited for us to come ask

14 questions to the instructor, but I'm sure that would have

15 been an option if we had questions.

16 Q.    Sure.  And Sgt. Ola, he worked at the sheriff's office

17 the whole time you were there, right?

18 A.    Yes.

19 Q.    So I imagine you had access to his contact information?

20 A.    Sure.

21 Q.    You could have reached out to him any time if you wanted

22 clarification on what the policy was?

23 A.    I didn't have any need to have the policy clarified.  I

24 had it on the computer in the booking office anytime I wanted

25 to look at it.

1 Q.   Sure, but he was available.  You could have if you

2 needed to, right?

3 A.   Sure.

4 Q.   And you were a supervisor at the jail, correct?

5 A.   Yes, sir.

6 Q.   You were a corporal?

7 A.   Yes, sir.

8 Q.   All right.  And sometimes you were the supervisor in

9 charge of the whole shift?

10 A.   Yes, sir.

11 Q.   And as a supervisor, I imagine part of your role is to

12 make sure that policies of the jail are followed on your

13 shift?

14 A.   Absolutely.

15 Q.   To make sure that nobody's rights are violated?

16 A.   Sure.

17 Q.   And that includes policies for using Tasers?

18 A.   Yes, sir.

19 Q.   All right.  So let's go over some of the basic

20 principles.

21        I think you testified earlier that back in 2016,

22 you knew it was important to use the least amount of force

23 necessary; is that right?

24 A.   Yes, sir.

25 Q.   That was your guiding principle?

1  A.    Yes, sir.

2  Q.    So you knew that it was wrong for officers to use more

3  force than was necessary in a given situation?

4  A.    Yes, sir.

5  Q.    And then, just a moment ago, I think you -- you said

6  that there was nothing specifically in your policy that you

7  saw that limited how long you could use a Taser for; is that

8  right?

9  A.    That's correct.

10 Q.    All right.  Is there anything -- is there anything in

11 the written policy that you got that says that if an inmate

12 is lying on the ground that you can't run up and kick them in

13 the face?

14 A.    No, sir.

15 Q.    It's not in there?

16 A.    No, sir.

17 Q.    Would you run up and kick an inmate in the face if they

18 were lying on the ground?

19 A.    No, sir.

20 Q.    Okay.  So there are lots of things that aren't

21 specifically written in the policy that you still knew were

22 wrong, right?

23 A.    So you want me to say that I thought what I was doing

24 was wrong?

25 Q.    I'm just asking that, even if something isn't

1    specifically limited by the policy, if you knew that if that
2    thing was more force than necessary, you still knew it would
3    be wrong to do it, right?
4    A.    What I did that night was not more force than was
5    necessary.  It was absolutely necessary.
6    Q.    That's not what I asked you.  I asked you if you knew
7    whether something, in the policy or not, if it was more force
8    than was necessary, it was wrong?  You understood that?
9    A.    Sure.
10   Q.    All right.  You understood that officers were not
11   allowed to use force, Tasers or otherwise, to punish someone,
12   right?
13   A.    That is correct.
14   Q.    You couldn't use a Taser to retaliate against someone
15   for something that they did?
16   A.    Absolutely not.
17   Q.    You knew that it's not appropriate to use a Taser just
18   because you don't like what they're saying?
19   A.    No, that would not be appropriate at all.
20   Q.    You knew you couldn't tase someone just because they
21   were yelling or cursing at you?
22   A.    No.
23   Q.    Even if it makes you angry?
24   A.    I didn't get angry.
25   Q.    Even if you did, you couldn't tase them, right?

1  A.    That's correct.

2  Q.    And you also knew that using a Taser must be justified

3  at the time that it's used, right?

4  A.    Yes, sir.

5  Q.    So, in other words, you couldn't tase someone because of

6  something they did earlier?

7  A.    No.

8  Q.    Now, you knew you couldn't use a Taser to retaliate

9  against an inmate for something the inmate had done earlier?

10  A.    No.  That wouldn't be within policy.

11  Q.    You knew that if an inmate had been fighting but then

12  was subdued, you couldn't then use a Taser, right?

13  A.    That's right.

14  Q.    So you knew that it was wrong to use force on someone

15  who was no longer a threat, correct?

16  A.    A threat is relative.

17  Q.    I'm not sure what you mean by that.

18         But if someone is no longer a threat, you can't

19  use force on them, can you?

20  A.    There's always a chance for threat.

21  Q.    There's always a chance?

22  A.    Always.

23  Q.    So you can just always tase someone?

24  A.    No.

25  Q.    Okay.  So --

```
1   A.    But you can always be prepared to do that.
2   Q.    All right.  So those things are just common sense,
3   right?  That you can't -- can't tase someone unless there's a
4   justification at that time, right?
5   A.    Yes, sir.
6   Q.    It's common sense?
7   A.    Yes, sir.
8   Q.    All right.  I'm going to ask you a couple questions
9   about Jordan now.
10            You remember him, right?
11  A.    Yes, sir, I do.
12  Q.    He was 18 years old?
13  A.    Approximately.
14  Q.    He was about 5'9"?
15  A.    Yeah.  That sounds good.
16  Q.    Weighed about 160 pounds?
17  A.    160, 170, sure.
18  Q.    All right.  And you're a pretty big strong guy, right?
19  A.    I wouldn't say strong, but I'm big.
20  Q.    And you used to be a wrestler?
21  A.    In high school.
22  Q.    Yeah.  And at the time of the incident, you were about
23  320 pounds?
24  A.    Yes, sir.
25  Q.    You're 6'2"?
```

```
 1  A.   Yes, sir.

 2  Q.   You told the FBI you were twice Jordan's size?

 3  A.   Yes, sir.

 4  Q.   Okay.  So let's focus now on the -- on this -- the night

 5  we've been talking about --

 6  A.   Yes, sir.

 7  Q.   -- November 5th, 2016.

 8            That night I think you said you were working

 9  second shift.  That's 2:00 to 10:00 p.m., right?

10  A.   Yes, sir.

11  Q.   And a little before 7:00, you helped some other officers

12  take Jordan out of his cell?

13  A.   Yes, sir.

14  Q.   Do you remember that?

15            And while you were taking him out of his cell,

16  there was a struggle, right?

17  A.   Yes.

18  Q.   And Officer Bratton used his Taser a few times to help

19  get Jordan under control; is that right?

20  A.   Yes, sir.

21  Q.   And after he used the Taser, you guys got him into the

22  restraint chair; is that right?

23  A.   Yes, sir.

24  Q.   Got him strapped in?

25  A.   Yes, sir.
```

```
1   Q.   Then, about 15 minutes later, give or take, you took his
2   hands out of handcuffs and put his hands into the chair's
3   restraints?
4   A.   That's correct.
5   Q.   So, to do that, you had to get both of his hands free
6   and then put both of his hands into the chair restraints; is
7   that right?
8   A.   He was being very cooperative at that point.
9   Q.   Okay.  But isn't it right --
10          (Reporter interruption for clarification.)
11          THE COURT:  Yeah.  A little bit slower.  We've got
12  all day.  And let him finish the answer.
13          Go ahead.
14  BY MR. SONGER:
15  Q.   I'll break it up to make it easier.
16          So in this process you took his handcuffs off,
17  right?
18  A.   Yes, sir.
19  Q.   All right.  So both of his hands were free?
20  A.   Yes, sir.
21  Q.   And then, with both his hands free, you put them both
22  into the chair's restraints?
23  A.   Yes.
24  Q.   And no officer had to tase him to make that happen?
25  A.   He wasn't cooperating, but he wasn't fighting.
```

1    Mr. Bratton came around and put the Taser to his abdomen --
2    Q.    Okay.    The only question was, was he tased?    As you put
3    his hands into the chair restraints?
4    A.    He knew the Taser was right there.
5    Q.    Was -- yes or no, sir?    Was he tased as his hands were
6    put in the chair restraints?
7    A.    No, sir.
8    Q.    Thank you.    All right.
9            And you didn't tase Jordan at all during any of
10   that sequence, correct?
11   A.    That is correct.
12   Q.    Now, after that, Jordan stayed in the chair for the next
13   hour or so.
14           And I think you testified yesterday that most of
15   that time he was calm, right?
16   A.    It was about 40 minutes, but yes, sir.    Between the time
17   we finished that transition until 8:00 p.m.
18   Q.    And most of those 40 minutes Jordan was calm?
19   A.    I would have to look at the -- actually, I have it right
20   here.    We can talk about it if you like.
21   Q.    Sure.    Let's look at the Taser log.
22           You've seen this before, right?    This is the
23   restraint chair log, correct?
24   A.    Yeah.
25   Q.    We've put up on the screen.    I believe this is

1  Exhibit 24, Government's Exhibit 24.

2  A.    Yes.

3  Q.    All right.  You can see that you initialed at 7:26 and

4  7:38 that Jordan was calm?

5  A.    Yes.

6  Q.    Okay.  And that's what you remember, right, that for

7  most of that period he was calm?

8  A.    After seeing the -- this document, for sure I remember

9  it.

10  Q.    Okay.  And I think you testified that you didn't really

11  have any other problems with him until about 8:00?

12  A.    That's right.

13  Q.    All right.  So then -- yeah, let's put up what's been

14  marked as Exhibit -- it's been shown before -- as Exhibit 10.

15  And we're going to start at 2 minutes and 40 seconds into

16  this exhibit.

17          Now, so you recognize this as a scene around 8:00

18  when you and some other officers had to go back over and deal

19  with Jordan, right?

20  A.    Yes, sir.

21  Q.    That's you kneeling right in front of him?

22  A.    Yes, sir.

23  Q.    Okay.  And you're holding his arm.

24          Is that Officer Key who is also holding his arm?

25  A.    Yes.

1  Q.   All right.  Let's play the clip.

2            (Video played.)

3  BY MR. SONGER:

4  Q.   All right.  Now, in that clip we just watched, Jordan's

5  sitting in the chair and he doesn't hit anybody, does he?

6  A.   No.

7  Q.   Doesn't kick anyone?

8  A.   No.

9  Q.   Officer Marriott has got his head pulled all the way

10 back?

11 A.   Yes, sir.

12 Q.   All right.  And you asked Officer Caitlin Marriott -- I

13 think she was Caitlin Johnson then, right?

14 A.   I understand who you're talking about.

15 Q.   Yeah.  You asked her to bring you a Taser, correct?

16 A.   Yes, sir.

17 Q.   And then you took it and you put it up to Jordan's

18 chest?

19 A.   Yes, sir.

20 Q.   And when you put it up to his chest, Jordan doesn't jerk

21 his arm, did he?

22 A.   Not that I recall.

23 Q.   Didn't move his legs?

24 A.   Maybe.  I don't remember.

25 Q.   Did you see anything in that video where he moves his

1  legs?

2  A.    I haven't seen anything yet.

3  Q.    Okay.  His head's held back, right?

4  A.    Yes.

5  Q.    Okay.  Does he have a spitting mask on right now?

6  A.    Yes, sir.

7  Q.    So he can't spit on you, right?

8  A.    Yes, sir.  That's correct.

9  Q.    And Officer Marriott's got control of his head so he

10  can't head butt you, right?

11  A.    Not at this juncture.

12  Q.    There's straps over his upper arms?

13  A.    Yes, sir.

14  Q.    And his left hand is tied down in the restraint chair?

15  A.    Properly, yes.

16  Q.    And there's a strap over his legs, right?

17  A.    Over his lap.  Yes, sir.

18  Q.    Yeah, there's one over his lap.  There's also one over

19  his legs by his feet?

20  A.    Close to his ankles, yes, sir.

21  Q.    All right.  So in this posture, Jordan's not capable of

22  running away, is he?

23  A.    No, sir.

24  Q.    Can't escape?

25  A.    That wasn't my concern.

```
1   Q.   All right.  He doesn't have a weapon?
2   A.   That was not my concern.
3   Q.   But you knew he didn't have a weapon, though, right?
4   A.   I was not concerned about him having a weapon.
5             Yes, I knew he didn't have a weapon.  I apologize.
6   Q.   Okay.  You know he's not capable of reaching for a
7   weapon, right?
8   A.   He could have grabbed something off of Jeff or off of me
9   to -- you know, we can be hypothetical if you would like.
10  Q.   I understand your testimony.
11            You think he can reach a weapon from this posture
12  right here?
13  A.   Yeah, he could have gotten something off of Jeff Key or
14  myself.
15  Q.   Okay.  If you took one step back, he wouldn't be able to
16  reach you, right?
17  A.   That is correct.
18  Q.   Let's play the next clip.
19            (Video played.)
20  BY MR. SONGER:
21  Q.   Okay.  You just tased him for five seconds, right?
22  A.   Yes, sir.
23  Q.   Jeff Key's still holding his arm?
24  A.   Yes, he is.
25  Q.   The entire time Jeff Key had two hands on his arm?
```

1   A.    Yes.

2   Q.    Jordan's arm never moved up in that clip, even a little

3   bit?

4   A.    Not that I saw.

5   Q.    You testified a moment ago, I believe, that you tased

6   Jordan in part because his arm was free; do you remember

7   saying that?

8   A.    That sounds about right.

9   Q.    Yeah.  Okay.  And during that clip he didn't kick

10  anybody, did he?

11  A.    No, sir.

12  Q.    Didn't head butt anyone?

13  A.    No, sir.

14  Q.    All right.

15        Right now he's all the way back in the chair away

16  from you, right?

17  A.    That's what it looks like, yes, sir.

18  Q.    Let's play the next clip.

19        (Video played.)

20  BY MR. SONGER:

21  Q.    You just tased him for five more seconds?

22  A.    Yes, sir.

23  Q.    So we're up to ten seconds now?

24  A.    Yes, sir.

25  Q.    And Jordan still hasn't hit anybody?

56

```
1   A.   No, sir.
2   Q.   Hasn't kicked anybody?
3   A.   No, sir.
4   Q.   Let's play the next clip.
5            (Video played.)
6   BY MR. SONGER:
7   Q.   You just tased him for 25 seconds, right?
8   A.   Approximately.
9   Q.   Yeah.  So we're up to 35 seconds now?
10  A.   Yes, sir.
11  Q.   And every one of those 25 seconds, his right arm was
12  down by his side, right?
13  A.   Mr. Key was struggling significantly in that picture.
14  Q.   Did his arm stay by his side the entire time you were
15  tasing?
16  A.   That's because that's where Mr. Jordan wanted his arm to
17  be.
18  Q.   Is it correct that his arm stayed by his side the entire
19  time you were tasing him?
20  A.   Approximately.
21  Q.   Approximately?  What does that mean?
22  A.   It moved up and down.  You could see Mr. Key struggling
23  with it.  Mr. Key's in the way at some point in that video.
24  You can't see it all the whole time.
25  Q.   Okay.  And the entire time you remember tasing him,
```

Case 3:18-cr-00144    Document 65    Filed 03/24/19    Page 56 of 126 PageID #: 800

1    Jordan didn't kick anybody?

2    A.    No, sir.

3    Q.    Didn't hit anybody?

4    A.    No, sir.

5    Q.    Didn't head butt anybody?

6    A.    No, sir.

7    Q.    Now, you tased him for those 25 seconds straight

8    through, right?

9    A.    Yes, sir.

10   Q.    You never pulled the Taser off of him for a second to

11   see if he would comply?

12   A.    I'm sure there was some movement.  When you get -- when

13   you get tased, you don't just stand still and take it.  You

14   move.

15   Q.    My question is whether you took the Taser off of him to

16   give Jordan a chance to comply without being tased during

17   those 25 seconds?

18   A.    I don't believe I did.

19   Q.    No, you didn't.  All right.

20          You also said some things during that 25-second

21   tase, right?

22   A.    Yes, sir.

23   Q.    You said, "It sucks.  You don't like it, do you?"

24   A.    I may have said something like that.  I didn't hear that

25   exactly.

```
 1   Q.    Did you hear your voice say that in the video?
 2   A.    I didn't hear those words.  I didn't hear "It sucks."
 3   Q.    Why don't we. . .
 4               (Video played.)
 5   BY MR. SONGER:
 6   Q.    Did you hear it that time?
 7   A.    I didn't hear "It sucks," no, sir.
 8   Q.    Can we turn it up louder?
 9               (Video played.)
10               THE WITNESS:  Still don't hear it.
11   BY MR. SONGER:
12   Q.    Okay.  So what you heard is just "You don't like it, do
13   you?"
14   A.    Yeah.
15   Q.    That's your voice?
16   A.    Yes.
17   Q.    You said that?
18   A.    Yes.
19   Q.    Okay.  And you also said, "I'll keep going until I run
20   out of batteries"?
21   A.    That sounds like what I've heard, yes.
22   Q.    That's what you said during this tase, right?
23   A.    Play it again.  I didn't -- I didn't hear it.
24               MR. SONGER:  Okay.  Can we play that clip, please.
25               (Video played.)
```

 1           THE WITNESS:  I still don't hear it clearly, no.

 2   BY MR. SONGER:

 3   Q.   "I'll keep going until I run out of batteries."

 4           You didn't hear that in that clip?

 5   A.   I didn't hear it clearly, no.

 6   Q.   Okay.  Did you tell the FBI that that sounds like

 7   something you would have said?

 8   A.   No.  I said it sounded like my voice.

 9   Q.   Sounded like your voice?

10   A.   Yes.

11   Q.   And it sounds like your voice here too?

12   A.   Yes.

13   Q.   This is your voice we're listening to here on the tape?

14   A.   Yes, sir.

15   Q.   Okay.  Let's play the next clip, please.

16           (Video played.)

17   BY MR. SONGER:

18   Q.   You just tased him again for 15 seconds, right?

19   A.   Approximately.

20   Q.   So now we're up to 50 seconds, right?

21   A.   Yes, sir.

22   Q.   And again, just like last time, you didn't take any

23   break in the middle of that 15 seconds to see if Jordan would

24   comply?

25   A.   Well, according to that video, the Taser was still going

1    far after I had moved it from his leg.

2    Q.    Right.  You explained just a moment ago that the video

3    and the audio weren't synched up by a second or two, right?

4    A.    It looked like more like three or four seconds.

5    Q.    Okay.  But during the time you were tasing, you never

6    took the Taser off Jordan to see if he would comply; is that

7    correct?

8    A.    Yeah, there was four different tasings.  So I took it

9    off in between each one.

10   Q.    During the 15-second tase that we just watched, you

11   never took the Taser off Jordan's body to see if he would

12   comply, correct?

13   A.    No.

14   Q.    That statement is correct, you never took it off?

15   A.    That is correct.

16   Q.    Now, again, Jordan's arm, his right arm, the one you

17   said is free, stays down by his side the whole time, right?

18   A.    Mr. Key is still struggling with him.  Yes, it is down

19   by his side because that is where Mr. Norris wanted his arm

20   to be.

21   Q.    But every second in that tase, in fact Jordan's arm was

22   down by his side, right?

23   A.    That is correct.

24   Q.    An his left arm was strapped into the chair during every

25   one of those 50 seconds?

1  A.   That's right.

2  Q.   His head was held back during every one of those 50

3  seconds?

4  A.   That's right.

5  Q.   His feet were contained during every one of those 50

6  seconds?

7  A.   That's right.

8  Q.   He never tried to kick you?

9  A.   That's right.

10  Q.   All right.  And at this point you knew how a Taser

11  worked, right?

12  A.   Yes, sir.

13  Q.   You knew that if you squeeze the trigger once, it would

14  automatically cut off after five seconds?

15  A.   That's right.

16  Q.   So you knew you had to hold the trigger down to keep it

17  going for the 50 seconds that we watched?

18  A.   Yes, sir.

19  Q.   Okay.  Thank you, Ms. Hughes.

20       Let's talk now for a minute about the incident at

21  10:30.

22  A.   Yes, sir.

23  Q.   That's when you tased Jordan again right before he went

24  to the hospital?

25  A.   Yes, sir.

1  Q.    And there were a number of tases in that sequence while

2  you were getting Jordan restrained and moved outside, right?

3  A.    That's right.

4  Q.    I think you testified just a moment ago on direct that

5  you tased him six times in that sequence?

6  A.    That's right.

7  Q.    Okay.  Do you know how long those tases lasted?

8  A.    I don't have that recollection, but it's in this book

9  right here.

10 Q.    Okay.  Why don't we take a look at that.  I believe it's

11 Exhibit 23.  That's been previously admitted.

12 A.    I'm ready.

13 Q.    Thank you.

14       And if you go down and look, starting -- I believe

15 it's line 967.

16 A.    Yes, sir.

17 Q.    Do you see the time there is 2225 or 10:25 p.m.?

18 A.    That's right.

19 Q.    Okay.  And that's when you tased Jordan during this

20 sequence, right?

21 A.    Yes, sir.

22 Q.    And the fourth column over, that shows the number of

23 seconds that those tases lasted?

24 A.    Yes, sir.

25 Q.    So reading down, the six tases were 12, 5, 5, 8, 6, and

1  11 seconds; is that right?

2  A.    Yes.  That's accurate.

3  Q.    Is that consistent with what you remember?

4  A.    No, I don't remember at the time how many times it was

5  or their durations.

6  Q.    But the Taser record's recorded automatically?  Right?

7  You don't have any reason to think this is wrong, do you?

8  A.    No.  Not at all.

9  Q.    So I apologize for trying to do math, but if we add

10 these up, 12 plus five plus five is 22, plus eight is 30,

11 plus six is 36, plus 11 is 47.

12           So that's 47 more seconds that you tased, right?

13 A.    I agree with that math.

14 Q.    Thank you.  And that's on top of the 50 seconds that you

15 tased Jordan earlier?

16 A.    That is correct.

17 Q.    So now we're up to 97 seconds that you've tased him in

18 about a two and a half hour period?

19 A.    97 seconds, that's how long the trigger was pulled, yes,

20 sir.

21 Q.    Yes.  And I think you testified on -- just a moment ago,

22 you told this jury that you knew Jordan was suicidal before

23 you started tasing him?

24 A.    He had said that he wanted to die, yes.

25 Q.    Yeah.  So that's what you thought, you thought he was

1    suicidal, so much that you were going to have him examined,

2    right?

3    A.    That was standard protocol.  Anyone that says they want

4    to hurt themselves, that's what we're supposed to do to make

5    sure they don't.

6    Q.    Right.  You tased him for -- you tased him -- you sent

7    electricity into his body for 97 seconds after you knew he

8    was suicidal?

9    A.    Yes, sir.

10   Q.    That's correct?  All right.

11          Okay.  Ms. Hughes, can we bring up Exhibit 15,

12   which is already in evidence, and just stop it there for one

13   moment, please.

14          Sir, do you recognize this scene?

15   A.    Yes, sir.

16   Q.    This is after officers got Jordan restrained and you're

17   getting ready to take him outside to the transport vehicle;

18   is that right?

19   A.    That is right.

20   Q.    This is right before you tased him for that last time

21   for that 11 seconds?

22   A.    I'm not sure.  I'm not sure where we're at in the video

23   right here.

24   Q.    All right.  Well, we'll watch it in a moment, but can

25   you tell us first, Jordan's handcuffed right now, isn't he?

1  A.   I can't see his hands.
2  Q.   Could we zoom in on -- on his hands?  No?  Okay.
3            All right.  We'll watch the video in a minute.
4            His legs have been put in shackles?
5  A.   I think at this point, yes.  But I can't see them.
6  Q.   Yeah.  And there's a strap around his legs, too?
7  A.   I can't see it, but I think so, yes.
8  Q.   All right.
9            And you've got the belly chain on him?
10 A.   Again, can't see it, but I think so, yes.
11 Q.   Yep.  You've also got a lap band holding him into the
12 chair?
13 A.   There is a lap band on that chair.
14 Q.   Can we play the clip 6:27 to 6:54.
15           (Video playing.)
16           MR. SONGER:  Can you stop, it please.
17           Can we back up a couple seconds.
18 Q.   Could you see on the video there that he was handcuffed?
19 A.   You know, I wasn't looking at his hands.  I'm sorry.
20 But I'm assuming if we're fixing to wheel him out the door
21 that, yeah, we had handcuffs on him.
22 Q.   Yeah.  This is what we talked about earlier.
23           He was handcuffed and they were connected to the
24 belly chain?
25 A.   Sure.

```
 1   Q.    His legs were in shackles?

 2   A.    Yes, sir.

 3   Q.    How many officers were standing around when you tased

 4   him?

 5   A.    One, two, three, four, five, six -- seven.

 6   Q.    Seven officers?

 7   A.    Yes.

 8   Q.    Okay.  Let's talk now about the reports you filed this

 9   night.  If we could first please put up Exhibit Number 19.

10   Okay.

11         Now, when officers use force, they're required to

12   file an incident report, right?

13   A.    Yes, sir.

14   Q.    Also required to file a use of force report?

15   A.    Yes, sir.

16   Q.    And those reports are the jail's official record of what

17   happens in an incident, right?

18   A.    Yes, sir.

19   Q.    They might be used to support charges against an inmate?

20   A.    Sure.

21   Q.    They might be used to protect an officer if an inmate

22   later makes a complaint about what happened?

23   A.    Sure.

24   Q.    If a civil lawsuit is filed, they could be important

25   evidence?
```

1  A.    Yes, sir.

2  Q.    Could be evidence in court?

3  A.    Yes, sir.

4  Q.    So you would agree that it's important to document the

5  key facts about what happened?

6  A.    I agree with that.  Yes.

7  Q.    All right.  And how many times did you use a Taser when

8  you were at the Cheatham County jail other than this night?

9  A.    Four other incidents.

10  Q.    Four other times.  Okay.

11        Did you file reports in those incidents?

12  A.    I did.

13  Q.    Why don't we look at a couple of those.

14        Your Honor, may we show the witness what I'll mark

15  as Government's Exhibit 25, which is the next one in the

16  sequence?

17              THE WITNESS:  Thank you.

18              THE COURT:  25 is not in evidence yet.

19              MR. SONGER:  That's right.

20              THE COURT:  Okay.

21  BY MR. SONGER:

22  Q.    Do you recognize the document I just handed you?

23  A.    Yes, sir.

24  Q.    This is a use of force report that you submitted on

25  June 1st, 2016; is that right?

A.   Yes, sir.

Q.   That's your signature on the bottom?

A.   Yes, sir.

Q.   This is an accurate version of the report you filed, right?

A.   Yes, sir.

          MR. SONGER:  All right.  Your Honor, the Government would move to introduce this as Exhibit Number 25.

          MR. STRIANSE:  No objection.

          THE COURT:  All right.  Admitted.

          (Whereupon Plaintiff Exhibit 25 was marked for identification and received in evidence.)

          MR. SONGER:  May we publish it to the jury?

          THE COURT:  Yes.  Do you have an extra copy?

          MR. SONGER:  We do.

          THE COURT:  Thanks.

BY MR. SONGER:

Q.   This is a use of force report that you filed -- it's -- like we said, June 1st, 2016, right?

A.   Yes, sir.

Q.   And that's -- that's about five months before the incident with Jordan that we've been taking about?

A.   Yes, sir.

Q.   And this was relating an incident you had with an inmate named Joseph Francis?

1  A.    Yes, sir.

2  Q.    Now, this report that you wrote, if you look in the

3  narrative --

4          If we can blow that up a little bit.

5          It gives the reason that you tased Inmate Francis,

6  right?  It says that the inmate was resisting while you were

7  trying to get him to cuff?

8  A.    Yes, sir.

9  Q.    Okay.  The report also includes the part of the body

10  that you tased him on.

11          It says "between the shoulder blades," right?

12  A.    It does.

13  Q.    And it says exactly how long that -- or it says

14  approximately how long that tase lasted, five seconds, right?

15  A.    Yes, it does.

16  Q.    Okay.  And the narrative makes clear that you tased this

17  inmate one time?

18  A.    Yes, sir.

19  Q.    All that information's in the report?

20  A.    Yes, sir.

21  Q.    Okay.  You can put that aside.

22          I'm now going to show you a second report.  And

23  we'll mark this as Government's Exhibit 26.  Thank you.  Let

24  me give you extra copies.  Thanks.

25  A.    Thank you.

```
 1  Q.    Thank you.
 2         What I just handed you is an incident report that
 3  you wrote June 29th, 2016; is that right?
 4  A.    Yes, sir.
 5  Q.    Is that your signature at the bottom of the report?
 6  A.    Officer's signature, yes.
 7  Q.    Yes.  And does this appear to be an accurate copy of the
 8  report that you filed?
 9  A.    Yes, sir.
10         MR. SONGER:  The Government moves Exhibit
11  Number 26 into evidence.
12         MR. STRIANSE:  No objection.
13         THE COURT:  Admitted.
14         (Whereupon Plaintiff Exhibit 26 was marked for
15          identification and received in evidence.)
16         MR. SONGER:  May we publish it?
17         THE COURT:  Yes.
18  BY MR. SONGER:
19  Q.    Okay.  So the date on this report is June 29th, 2016,
20  right?
21  A.    Yes, sir.
22  Q.    And that's just a little over four months before the
23  incident with Jordan?
24  A.    Yes, sir.
25  Q.    And you were a corporal that night, right?
```

1  A.    Yes.

2  Q.    The assistant shift supervisor?

3  A.    Yes.

4  Q.    Same as you were the night that -- when Jordan was

5  tased?

6  A.    Yes.

7  Q.    All right.  And this report relates to an incident where

8  you had to tase an inmate named Mario Driver; is that right?

9  A.    Yes, sir.

10 Q.    And the report explains that you were putting that

11 inmate in a restraint chair, right?

12 A.    Yes, sir.

13 Q.    It indicates how many times you used a Taser; that you

14 had tased him twice, right?

15 A.    Yes, sir.

16 Q.    And the report includes -- specifies how long each one

17 of those tases lasted, right?

18 A.    Yes, it does, just like the other report.  It was a

19 single tasing, or in this case, two tasings, which is much

20 different from the --

21 Q.    I'm sorry.  My question is, this report indicates that

22 you tased him two separate times; is that right?

23 A.    That is correct.

24 Q.    And it indicates that each one of those you put in the

25 tase lasted five seconds; is that right?

```
1   A.    Yes.
2   Q.    Okay.
3   A.    But can I finish what I was saying?
4   Q.    And you also included --
5   A.    I guess not.
6   Q.    Excuse me?
7              THE COURT:  You'll get a chance for your lawyer to
8   ask you questions on redirect.
9              Go ahead.
10  BY MR. SONGER:
11  Q.    You also include the reason that you tased him each of
12  those two separate times for five seconds?
13  A.    Yes, sir.
14  Q.    Right?
15  A.    Yes, sir.
16  Q.    And if you look at the top -- excuse me.
17             If you could zoom in on the first few lines.
18             You listed the officers who were involved in the
19  report?
20  A.    Yes.
21  Q.    And you listed yourself and two other officers,
22  Mr. Meyers and Mr. Temple?
23  A.    Yes, sir.
24  Q.    Okay.  Officer Meyers and Officer Temple, they didn't
25  tase anyone in this incident, right?
```

```
1   A.    No, sir, not to my knowledge.
2   Q.    Right.  But you still included them on the report?
3   A.    That's correct.
4   Q.    Okay.  We can take that down.  All right.
5              Now I'm going to show you what we'll mark as
6   Government's Exhibit 27.
7              Is this an incident report that you filed on
8   July 13th, 2017?
9   A.    Yes, sir.
10  Q.    And again, if you look at the officer's signature in the
11  bottom, that's your name, right?
12  A.    Yes, sir.
13  Q.    Does this appear to be an accurate version of the report
14  you filed that night?
15  A.    Yes, sir.  We had gone to electronic signatures at this
16  point.
17  Q.    Got it.
18             Your Honor, we would offer Exhibit 27 into
19  evidence.
20             THE COURT:  Any objection?
21             MR. STRIANSE:  No objection.
22             THE COURT:  Admitted.
23             (Whereupon Plaintiff Exhibit 27 was marked for
24             identification and received in evidence.)
25             MR. SONGER:  Thank you.  May we publish it?
```

```
 1            THE COURT:  Yes.
 2   BY MR. SONGER:
 3   Q.   So this incident happened just a little bit after the
 4   incident with Jordan, right?
 5   A.   Months after.
 6   Q.   A few months after.  Yeah.
 7            And again, you had had to use a Taser on an
 8   inmate.
 9            I think this inmate's name was Mr. Kenneth Payne?
10   Is that correct?
11   A.   That's incorrect.
12   Q.   I'm sorry.  What is the inmate's name?
13   A.   Taylor Akins.
14   Q.   Taylor Akins is the one that you tased.  Okay.
15            And again the report indicates that you tased him
16   one time?
17   A.   Yes, sir.
18   Q.   It says how long that tase lasted, right?
19   A.   Yes, sir.
20   Q.   It says one five-second trigger pull?
21   A.   Yes, sir.
22   Q.   All right.  And the report also indicates that you then
23   handcuffed the inmate after you tased him, right?
24   A.   Yes, sir.
25   Q.   And if you look -- go up to the top of the report now,
```

1  you listed all four officers who were involved, correct?

2  A.   Yes, sir.  Everyone that I mentioned in the body of the

3  report.

4  Q.   Right.  And the other three officers that are listed

5  there, none of them used a Taser, did they?

6  A.   No, they did not.

7  Q.   But you still included them in the report?

8  A.   Yes, I did.

9  Q.   All right.  So now let's look at the reports that you

10  filed on November 5th, 2016, after your encounter with

11  Jordan.  First, if we can look at Exhibit 19, please.

12          This is the report that you filed on second shift,

13  right?

14  A.   Yes, sir.

15  Q.   This is the only report that you filed covering

16  everything that happened on that shift, including the -- the

17  four tases for 50 seconds that you did at 8:00, right?

18  A.   Yes, sir.

19  Q.   That's covered here?

20          And you admitted when you met with the FBI that

21  you should have done a separate report for those 8:00 tases,

22  right?

23  A.   I said that before I had seen my report.

24  Q.   But --

25  A.   And after seeing my report, I see that it was all

1    encompassing for the shift.

2    Q.    But you told --

3    A.    Yes, I said that.

4    Q.    During that interview, you said, "I should have done a

5    separate report for the 8:00 incident," right?

6    A.    That was with the knowledge I had at the time.

7    Q.    Okay.  But that is what you said?

8    A.    Yes.

9    Q.    All right.  And the only reference in this report to you

10   tasing anyone is the one line that says "Bratton and I

11   tased."

12              Do you see that?

13   A.    I do.

14   Q.    No other reference to your tases in that report, right?

15   A.    I didn't have that information fresh on my mind.

16   Q.    So the question is, any other reference to your tasing

17   in this report other than those five words that are

18   highlighted?

19              MR. STRIANSE:  Your Honor, I object to that.

20   Mischaracterization of the report.

21              THE COURT:  Overruled.  It's cross-examination.

22              THE WITNESS:  Anything else would be speculation.

23   BY MR. SONGER:

24   Q.    My question is, is there any reference in the report to

25   your tases other than those five highlighted words?

1  A.    No, sir.

2  Q.    And you say, "Bratton and I tased."

3        Deputy Bratton, he tased Jordan when officers were

4  removing Jordan from his cell a little bit before 7:00,

5  right?

6  A.    That's right.

7  Q.    And you tased Jordan after he was in the restraint chair

8  around 8:00, correct?

9  A.    That is right.

10 Q.    This report does not say how many times you tased

11 Jordan, does it?

12 A.    No, it doesn't.

13 Q.    It doesn't say how long any of those tases lasted?

14 A.    That is correct.

15 Q.    It doesn't include the specific justification for any of

16 those tases, does it?

17 A.    Give me a moment.  I'll read it.

18        "He did not comply."

19 Q.    Does it specify any justification for the second tase or

20 the third tase or the fourth tase?

21 A.    No, sir.  There's no details like that.

22 Q.    Okay.  Does the report say that Officer Marriott was

23 holding back Jordan's head at the time you tased him?

24 A.    No.  It only says that. . .

25 Q.    No, it doesn't.  Does it say that Jordan was wearing a

1  spit mask?

2  A.    No, sir.

3  Q.    Does it say that you tased him for 25 seconds in one

4  burst?

5  A.    No, sir.

6  Q.    Does it say that you then immediately tased him again

7  for 15 seconds?

8  A.    No, sir.

9  Q.    Okay.  Let's -- let's look at the 10:30 report now.

10  That's Exhibit Number 20.  It's already in evidence.

11            This is the only report that you filed related to

12  all the tases that happened while Jordan was being restrained

13  and moved to the hospital, right?

14  A.    Yes, sir.

15  Q.    And you told us just a moment ago that there were seven

16  officers present during that incident?

17  A.    That's how many I counted, yes, sir.

18  Q.    And this report only lists you and one other person,

19  right?

20  A.    Yes, sir.

21  Q.    And if we can look at the narrative.

22            You tased Jordan six times, correct?

23  A.    That is correct.

24  Q.    During this -- during this incident?

25  A.    That is correct.

1    Q.    The period covered by this report?

2    A.    Yes, sir.

3    Q.    The report does not say you tased him six times, does

4    it?

5    A.    No, it does not.

6    Q.    It doesn't say how long any of those tases lasted, does

7    it?

8    A.    No, sir, it does not.

9    Q.    It doesn't say before your 11-second tase, Jordan was

10   handcuffed, right?

11   A.    It does not say that.

12   Q.    Doesn't say that he was shackled?

13   A.    Does not say that.

14   Q.    Doesn't say that there's a strap around his legs?

15   A.    No, sir, it does not.

16   Q.    Doesn't say there's a strap around his waist?

17   A.    It does not.

18   Q.    Doesn't say that he was wearing a belly chain?

19   A.    It does not say that.

20   Q.    You didn't put that in the report, did you?

21   A.    I did not put that in the report.

22   Q.    Just like you didn't tell it to the FBI?

23   A.    I'm sorry?

24   Q.    Just like you didn't -- just like you didn't tell the

25   FBI about it?

1    A.    What did I not tell the FBI?

2    Q.    That you tased him after he was wearing a belly chain.

3    A.    That's accurate.

4    Q.    Yep.  You didn't report it this night; you didn't report

5    it to the FBI, right?

6    A.    I didn't remember it.

7    Q.    Now, when you were at the Tennessee Department of

8    Corrections -- I think you said that you were tased?

9    A.    Yes.

10   Q.    For five seconds or less, I assume?

11   A.    No.  It was more.

12   Q.    How long?

13   A.    I don't know.

14   Q.    So you know what it feels like --

15   A.    I do.

16   Q.    You know that it hurts?

17   A.    Yes, I do.

18   Q.    You know that it burns?

19   A.    I didn't receive any burns from that tasing.

20   Q.    Now, I think you said that you were offered an

21   opportunity when you took Sgt. Ola's training class to be

22   tased again?

23   A.    Yes.

24   Q.    And you passed on that.

25         You said you didn't want to experience that again,

1  correct?

2  A.   Wasn't necessary.

3  Q.   Right.  You didn't want to feel that pain again; is that

4  right?

5  A.   That's right.

6  Q.   Because you knew what it was like?

7  A.   Yes.

8  Q.   And you tased Jordan for 97 seconds when you knew he was

9  already suicidal?

10  A.   I held the trigger for 97 seconds.

11          MR. SONGER:  That's all I have for now.

12          THE COURT:  All right.  Redirect.

13

14                    REDIRECT EXAMINATION

15  BY MR. STRIANSE:

16  Q.   Mr. Bryant, I'm going to ask them to replay your

17  August 2nd, 2017 interview with the TBI and the FBI in just a

18  moment, that clip that you heard at the beginning of your

19  cross-examination.

20          Do you remember that?

21  A.   Yes.

22  Q.   And that was an interview that was conducted where?

23  A.   I believe it was at the DA's office in Cheatham County.

24  Q.   And you were requested to appear for the interview; is

25  that right?

1  A.    That's right.

2  Q.    And by August of 2017, you had been placed on

3  administrative leave; is that correct?

4  A.    Yes, I was on leave at that time.

5  Q.    And you appeared voluntarily?

6  A.    That's right.

7  Q.    Answered all the questions; is that right?

8  A.    That's right.

9  Q.    Now, I want you to listen carefully to this recording.

10 You were very quick to say what you said was false, but I

11 want you to really listen to the recording.

12         Can you play 2366.

13         (Audio played:

14           Answer:  We wheeled him outside in the chair to

15           the car and then transitioned him from the chair

16           directly into the car.  I believe Sgt. Ola was

17           there.

18           Question:  So you wheeled him out in the

19           restraint chair?

20           Answer:  Yes, sir.

21           Question:  Now, was he -- was there any use of

22           force done during this transition from -- from the

23           jail to the car?

24           Answer:  Not after we got the belly chain on

25           him.)

1  BY MR. STRIANSE:

2  Q.   Now, what interval are they talking about during that

3  interview?

4  A.   From the last tasing, where we get him turned around and

5  we start going out the door to the car.

6  Q.   What's going on in the sally port when he gets in the

7  car?

8  A.   What's going on in the --

9  Q.   You didn't tase him in the sally port, did you?

10  A.   The vehicle sally port that leads to the outside?

11  Q.   Yes, sir.

12  A.   No, sir.

13  Q.   And who tased him outside?

14  A.   Mr. Montgomery.

15  Q.   What did you understand this -- this time of the evening

16  to be addressing itself to when you were being interviewed?

17  A.   The movement from the booking office to the transport

18  vehicle.

19  Q.   Could he be shown Government's Exhibit 19.

20       Do you remember being asked questions a few

21  minutes ago about the sentence, "Deputy Bratton and I tased"?

22       Could you highlight that again.  Thank you.  And

23  highlight -- yeah.

24       Do you see what's highlighted for the record?  We

25  have 19 up on the screen.  "Deputy Bratton and I tased"?

1  A.  Yes, sir.

2  Q.  And you were asked a few minutes ago if that's the only

3  reference in the report to tasing.  Do you remember those

4  questions?

5  A.  Yes, sir.

6  Q.  Take a look -- look at the line right above it.

7          What does it say?  (As read):

8              Additional drive stun Taser applications were

9          utilized?

10  A.  Yes, sir, that's what it says.

11  Q.  Did you miss that before?

12  A.  I -- yeah, I guess so.  It wasn't highlighted, so I was

13  focused on what was highlighted.

14  Q.  And what were you trying to convey to JJ Hannah or any

15  superior that would have read this report?

16  A.  That there was more than one tasing that occurred.

17  Q.  You were asked about failing to include Josh Marriott

18  holding his head.

19          Do you remember that?

20  A.  Yes, sir.

21  Q.  Take a look at that line right above what they've

22  highlighted for us and go to the left margin.

23          What do you see?  What words do you see?

24  "Pressure points"?

25  A.  Yes, sir.

1  Q.    What were you referring to in "pressure points"?

2  A.    When Mr. Marriott was holding Mr. Norris's head.

3  Q.    Right.  He's holding his head and he's got his hands up

4  under his chin; is that right?

5  A.    Along the jaw.

6  Q.    And you identify Mr. Marriott in the "Officers Involved"

7  line?

8  A.    Yes.

9  Q.    So if JJ Hannah had a question about anything in the

10  report, he could talk to you, Josh Marriott, Jeff Key, or

11  Daniel Bratton?

12  A.    That is correct.

13            MR. STRIANSE:  That's all.

14            THE COURT:  All right.  You can step down.

15            THE WITNESS:  Thank you.

16                  (Witness dismissed.)

17            THE COURT:  All right.  Ladies and gentlemen,

18  let's take our morning break and come back in about 15

19  minutes.

20            (Brief recess.)

21            (Jury not present.)

22            THE COURT:  All right.  Be seated.

23            MR. STRIANSE:  Your Honor, can I address the Court

24  on some scheduling?

25            THE COURT:  Yes.

1          MR. STRIANSE:  We had the truncated day yesterday.

2          THE COURT:  For which you have my apologies.

3          MR. STRIANSE:  And a couple of my witnesses are

4  law enforcement individuals, and there's one witness by the

5  name of Jeff Key who was available yesterday.  He's on his

6  way now.  It's probably going to be 11:30.  I've got two very

7  short witnesses, and that's going to leave us with a little

8  bit of a gap.

9          THE COURT:  Okay.

10         MR. STRIANSE:  And I didn't know how the Court

11 wanted to --

12         THE COURT:  Well, let's do those two short

13 witnesses.  We can talk about the charge, which I think we

14 may have agreement on.  And I can tell you the one little

15 change I made that's consistent with the pattern.  And then

16 let them have lunch.  How long is Mr. Key going to take?

17         MR. STRIANSE:  Mr. Key won't be long either.

18         THE COURT:  Okay.

19         MR. STRIANSE:  Probably a, you know, ten-minute-

20 on-direct kind of witness.

21         THE COURT:  So while you all are at lunch, go

22 ahead and get your thoughts together for closing.

23         So is the Government going to have rebuttal?

24         MS. MYERS:  Yes, Your Honor.

25         THE COURT:  How many witness and who?

```
 1            MS. MYERS:  No, argument.  Not rebuttal witnesses.
 2            THE COURT:  Okay.  So then the case will be
 3    closed.  And while y'all are lunch, I can give you a little
 4    bit more time if you want to get your thoughts together for
 5    closing.
 6            So as soon as Mr. Key is done, we might take a
 7    quick break and then come back and do closing.
 8            MR. STRIANSE:  Okay.  What time should I have
 9    Mr. Key here then, Your Honor?
10            THE COURT:  As soon as he can get here.
11            MR. STRIANSE:  Okay.  Thank you.
12            THE COURT:  So we're ready to bring in the jury?
13            MR. STRIANSE:  Yes, sir.
14            THE COURT:  All right.
15            Did you all inspect the exhibits yesterday?
16            MR. STRIANSE:  Yes, sir.
17            MS. MYERS:  Yes, we did.
18            THE COURT:  Thanks.
19            (Jury present.)
20            THE COURT:  All right.  Be seated.
21            Okay.  Call your next witness.
22            MR. STRIANSE:  James Barnum.
23            COURT OFFICER:  I didn't hear you?
24            MR. STRIANSE:  James Barnum.
25            COURT DEPUTY:  Please raise your right hand.
```

1              JAMES MARTIN BARNUM III,

2    called as a witness by Defendant, was duly sworn and

3    testified as follows:

4

5              COURT DEPUTY:  Please be seated.

6              Please pull the microphone close and state your

7    full name and spell your last name.

8              THE WITNESS:  James Martin Barnum III.  The last

9    name is B-a-r-n-u-m.

10

11              DIRECT EXAMINATION

12   BY MR. STRIANSE:

13   Q.   Good morning, Mr. Barnum.

14   A.   Good morning.

15   Q.   Where do you live?

16   A.   Roberts Sound, in Adams.

17   Q.   And were you formally employed at the Cheatham County

18   sheriff's office?

19   A.   Yes, I was.

20   Q.   And when did you work at the Cheatham County sheriff's

21   office?

22   A.   April of 2014 until February of last year.

23   Q.   And do you know Mark Bryant?

24   A.   Yes, I do.

25   Q.   And explain to the jury how you know Mark Bryant.

1  A.   I know Mark when he started at the jail.  I was his

2  corporal.  We became friends after working together.  He was

3  promoted to FTO shortly after he started there with

4  experience from working at the State.

5         A couple months later down the road, he was then

6  promoted to corporal, when I moved to a different shift.

7  We've became good friends ever since.

8  Q.   Did you all work the same shift together?

9  A.   Yes, we did.

10  Q.   And that means you would have been together -- what? --

11  five or six days out of each week?

12  A.   We were together four days a week for the duration that

13  I worked with him.

14  Q.   And how many months were you all together?

15  A.   Roughly six or seven.  I don't know the exact dates of

16  when I was transitioning shifts.

17  Q.   And would you also see Mark Bryant outside of work?

18  A.   Yes, sir.

19  Q.   Do you feel like you came to know him pretty well?

20  A.   Absolutely.

21  Q.   When you were his supervisor there at the jail, what

22  kind of employee was Mark Bryant?

23  A.   By definition, one of the best that I've ever had.  He

24  was always on time.  Did exactly as you asked of him.  Was

25  dedicated.

Q.    And were you as his supervisor responsible for doing
evaluations of Mark Bryant?

A.    Me and my corporal at the time, Roger Temple, we were
both responsible for him.

Q.    And what sort of evaluations would you prepare for Mark
Bryant?

A.    There was a policy book that we had to go through --
well, it was more of a training book, not a policy book, but
it was a book that classified, from appearance to timely
manner, to dedication, to confidence of the job -- it covered
pretty much every aspect of do you know your job or not.

Q.    How did -- how did Mark get along with his colleagues
there at the jail?

A.    Mark got along with everybody.  I mean, he genuinely got
along with everybody.

Q.    And you indicated that he was a field training officer?

A.    Yes, sir.

Q.    Did you have the opportunity to see him in action as a
field training officer?

A.    As a -- as his sergeant, I was responsible to still
evaluate my corporal and FTO officer even while he was
training other people on shift.

          So yes, I did have to observe him.

Q.    And did you note anything about his style as a field
training officer?

1  A.    He was unique in the sense that no matter what type of

2  person they were, how they learned, he could convey the right

3  way to them to learn the process.

4  Q.    And the "they" you're talking about is other

5  correctional officers; is that right?

6  A.    Yes, sir.

7  Q.    Did you see Mark Bryant interact with inmates?

8  A.    Yes, sir.

9  Q.    And tell the jury a little bit about Mark's style in

10  interacting with inmates.

11  A.    Mark is the definition of cool, calm, and collected.

12  When he would talk to an inmate, whether they be calm,

13  hostile, sad, depressed, just waking up, or whatever it may

14  be, Mark was always cool.  He was always calm, kept his

15  composure.  If there was a person that was hostile, he was

16  very good at neutralizing them back to a calm or even just a

17  neutralized setting, much better than most other officers

18  I've ever worked with or witnessed.

19  Q.    How would you describe Mark Bryant's temperament as he

20  interacted with inmates?

21  A.    He -- again, for lack of better words, he was always

22  cool, calm, collected, could keep his composure more than 90

23  percent of the people I've ever worked with.

24  Q.    Was Mark Bryant the kind of correctional officer that,

25  in the vernacular, wanted to go hands on with inmates?

A.    Absolutely not.  A lot of people have nicknames for
friends and colleagues that they work with.  Became very
apparent that Mark was literally nicknamed "FTO Use His
Words" for the sense that --
Q.    What did that mean?
            THE COURT:  All right.  Slow down.  Just slow
down.  The court reporter can only go so fast.  Start over
again.
BY MR. STRIANSE:
Q.    Say that again.
A.    He was known as "FTO Use His Hands" -- or "Use His
Words."  "Use His Words."  He was known for trying to
neutralize the situation before having to escalate that,
going to any sort of force, no matter if it was somebody that
couldn't get bond or they just found out that they were being
divorced or they found out that they're being sentenced to
ten years.  If an inmate got hostile, Mark was very good at
neutralizing it, and he was also very good at not having to
go hands on with an individual.
Q.    And you --
            MS. MYERS:  Your Honor, I'm going to object.  Once
again, I'm going to renew our objection to all of this
character evidence.
            THE COURT:  Okay.  I ruled on that prior to trial
and stand by that ruling.

1          Proceed.

2     BY MR. STRIANSE:

3     Q.   I think you've already told us, how long were you

4     working at the sheriff's office in the jail?

5     A.   About the time that he -- well, when he started -- is

6     that what you're asking?

7     Q.   No, no.  Your career.

8     A.   Before I left, it was just shy of four years.  And when

9     I left, I was the most senior officer working on the floor

10    there.

11    Q.   And when you left, at separation what was your rank?

12    A.   I was sergeant.  He was not.

13    Q.   And did you go through the Taser training when you

14    worked there at the jail?

15    A.   Yes, sir, I did.

16    Q.   What was -- as you understood it, what was the Taser

17    policy as of November 5, 2016?

18    A.   It was fairly vague.  It was pretty much that the -- it

19    is used as a last means of use of force.  It's our highest

20    level of use of force in the jail, considering we don't carry

21    firearms in the building or knives or anything like that.  We

22    didn't have batons.

23          It was used as a device to stop an inmate from

24    harming themselves, another person, combativeness, all of the

25    such.  At the time there was no real -- that I can recall,

1  there was no real duration amount that you could use it for
2  or the duration of the uses itself.
3  Q.    So there was no limit on the number of stuns?
4  A.    Not that I recall, sir.
5  Q.    And no limit on the length or the duration?
6  A.    Not that I can recall, sir.
7  Q.    Do you have a -- an opinion as to Mark Bryant's
8  character for truthfulness?
9  A.    Yes, I do.
10 Q.    And what --
11 A.    He is by far one of the most honest people I know of.
12 Whether he is in the right or in the wrong as a person,
13 whether it was work related or not, he would be the one to
14 tell us.
15 Q.    Would you believe Mark Bryant under oath in a court of
16 law?
17 A.    Absolutely, without a doubt.
18         MR. STRIANSE:  Thank you, Mr. Barnum.
19         THE COURT:  All right.  Cross.
20
21                    CROSS-EXAMINATION
22 BY MS. MYERS:
23 Q.    Good morning, Mr. Barnum.
24 A.    Good morning.
25 Q.    Now, were you Taser trained at this time, on

1   November 5th of 2016?

2   A.   Yes, I was.

3   Q.   And you're familiar with those policies?

4   A.   As best I can remember, yes.

5   Q.   So you're familiar then -- were you trained by Gary Ola?

6   A.   Yes, I was.

7   Q.   And you're familiar that you are only permitted to tase

8   a person for three times in five-second bursts?

9   A.   That -- to my knowledge, that policy came out after Mark

10  was initially indicted on this situation.

11  Q.   Oh, I'm not talking about the policy.  I'm talking about

12  the training from Gary Ola.

13  A.   I -- like I said, ma'am, I cannot recall specifics of

14  it.  It was quite some time ago.

15  Q.   You don't remember your Taser training?

16  A.   I remember the majority of it.

17  Q.   But not that specific point today?

18  A.   Not that I can recall, ma'am.

19  Q.   And you were not at the Cheatham County jail on

20  November 5th of 2016?

21  A.   No, ma'am.  I was on vacation.

22  Q.   And you didn't see the defendant tase Jordan Norris for

23  a total of 50 seconds, then, around 8:00 p.m.?

24  A.   No, I was not -- I was not there.  I did not see it.

25  Q.   And you were also not there to witness the defendant

```
 1   then two hours later tase Jordan Norris again when he was
 2   handcuffed, belly chained, and shackled into a chair?
 3   A.    Like I said, ma'am, I was on vacation.
 4   Q.    And you didn't have an opportunity to review the reports
 5   that the defendant wrote regarding those incidents?
 6   A.    No, ma'am, I did not.  Not for about three or four days.
 7   I didn't come back until the following Monday, I believe.
 8   Q.    So you haven't seen anything in relation to this
 9   incident?
10   A.    No, I did at the time.  But I don't -- like I said, I
11   wasn't there for the duration of the situation.
12   Q.    So you can't speak to any of the reports that the
13   defendant wrote regarding those?
14   A.    No, ma'am.  Because I can't recall them off the top of
15   my head.
16              MS. MYERS:  Thank you.
17              THE WITNESS:  Yes, ma'am.
18              THE COURT:  Redirect?
19              MR. STRIANSE:  No redirect, Your Honor.
20              THE COURT:  All right.  You can step down.
21                    (Witness excused.)
22              THE COURT:  All right.  Call your next witness.
23              MR. STRIANSE:  Call Dwayne Jones.
24              THE COURT:  I'm sorry.  Say the name again?
25              MR. STRIANSE:  Dwayne Jones.  Excuse me.
```

 1          COURT DEPUTY:  Please raise your right hand.

 2

 3                    DWAYNE TYRONE JONES,

 4   called as a witness by Defendant, was duly sworn and

 5   testified as follows:

 6

 7          COURT DEPUTY:  Please be seated.

 8          Please pull the microphone close and state your

 9   full name and spell your first name.

10          THE WITNESS:  Dwayne Tyrone Jones, D-w-a-y-n-e.

11

12                   DIRECT EXAMINATION

13   BY MR. STRIANSE:

14   Q.   Good morning, Mr. Jones.

15   A.   Good morning.

16   Q.   How are you employed, sir?

17   A.   At the Cheatham County Sheriff's Department.

18   Q.   And what are your current duties at the Cheatham County

19   Sheriff's Department?

20   A.   I'm a patrol deputy.

21   Q.   And how long have you been in patrol?

22   A.   About a year and a half now.

23   Q.   Do you know the defendant in this case, Mark Bryant?

24   A.   Yes, sir.

25   Q.   I want to direct your attention back to Saturday,

1    November the 5th, 2016, and ask where were you working at

2    that date?

3    A.    I was working inside as a jail deputy.

4    Q.    And how long had you worked as a jail deputy as of

5    November 5, 2016?

6    A.    Maybe five, six months.

7    Q.    Do you remember what shift you were working on Saturday,

8    November 5, 2016?

9    A.    Yes, sir.  I was on the third shift.

10   Q.    And when does the third shift begin?

11   A.    10:00 p.m.

12   Q.    And what time did you report to work on that Saturday

13   night?

14   A.    I don't remember specifically, but I'm usually there 30

15   minutes prior.

16   Q.    And was there a situation, an ongoing situation

17   occurring at the jail when you arrived?

18   A.    Yes, sir.

19   Q.    And if you would, explain to the members of the jury

20   what you saw when you came to work that Saturday night.

21   A.    When I reported to work that night, they were trying to

22   get Jordan Nelson into the restraint chair.  He was very

23   combative.  He wasn't very cooperative.  And we just jumped

24   right in it to try to secure him properly to the restraint

25   chair.

1 Q.   And you used -- I think you used the name of a former

2 Green Bay Packer, Jordan Nelson.

3          Did you mean Jordan Norris?

4 A.   Jordan Norris, I'm sorry.

5 Q.   Describe for the members of the jury what you observed

6 about Mr. Norris's behavior.

7 A.   He wasn't complying to any verbal commands.  The reason

8 behind putting him in the chair at that time was because he

9 had assaulted another inmate.  He was fighting.  He was very

10 strong.  He wasn't listening.  And I mean, he was belting out

11 a lot of military terminology but had never been in the

12 military.  So. . .

13 Q.   Do you remember any of the things that he was saying?

14 A.   Not specifically.

15 Q.   Based on your experience as an officer, did you form any

16 judgment that there was something wrong with him?

17 A.   I assumed that he was on some type of narcotic.  But as

18 far as him individually, no, I didn't assume anything.

19 Q.   Now, was Mr. Norris tased in your presence when you were

20 working third shift that night?

21 A.   I believe so.  Yes.

22 Q.   And if you -- to the best of your recollection, tell the

23 members of the jury what you remember about the tasing

24 episode.

25 A.   I remember we were trying to get him into the patrol car

1  to transport him for a mental evaluation, and he was trying

2  to kick out the windows.  And a Taser was used to try to flex

3  his feet so we can contain him.

4  Q.    Okay.  When you say "flex his feet," explain to the

5  members of the jury what you're talking about.

6  A.    Well, usually when you tase someone, the limbs go numb

7  and you're able to manipulate them.

8  Q.    Now, do you remember an episode in the -- in the booking

9  area when he was in the restraint chair, Mr. Norris was in

10 the restraint chair, and he was tased by Mr. Bryant?

11 A.    Yes, sir.

12 Q.    And do you remember what Mr. Norris was doing at that

13 time?

14 A.    At that point we were trying to restrain his feet.

15 Q.    And were his feet restrained?

16 A.    No.

17 Q.    Now, you were there on third shift; is that right?

18 A.    Yes, sir.

19 Q.    And you were present when he -- when Mr. Norris was

20 being tased?

21 A.    Yes, sir.

22 Q.    Do you have an opinion as to whether the tasing was

23 necessary that was done in your presence?

24         MS. MYERS:  Objection.  We don't know which tasing

25 he's talking about.  There's been testimony of several.

 1          THE COURT:  All right.  Why don't you reask the

 2     question, Mr. Strianse.

 3     BY MR. STRIANSE:

 4     Q.    You were in the booking area.

 5               You remember that?

 6     A.    Yes, sir.

 7     Q.    Do you remember being with several other officers around

 8     Mr. Norris?

 9     A.    Yes, sir.

10     Q.    And Mr. Norris is in the restraint chair?

11     A.    Yes, sir.

12     Q.    My question to you, sir, is did you see him being tased

13     when he was in that restraint chair?

14     A.    Yes, sir.

15     Q.    Do you remember why he was being tased?

16     A.    Because he was not compliant.

17     Q.    Did you believe the tasing was necessary?

18     A.    At that point, yes.

19               MR. STRIANSE:  Those are my questions.

20               THE COURT:  All right.  Cross.

21

22                    CROSS-EXAMINATION

23     BY MS. MYERS:

24     Q.    Good morning, Officer Jones.

25     A.    Good morning.

1  Q.    So when the defendant tased Jordan that night, right

2  before he was wheeled out into the sally port, Jordan was not

3  posing a threat to anyone at that time?

4  A.    Are you asking me?

5  Q.    Yes.

6  A.    No, ma'am.

7  Q.    And you were interviewed by the FBI on May 4th of 2018?

8  A.    Yes.

9  Q.    And you told them the truth?

10 A.    Yes.

11 Q.    And you told them that you did not think there was any

12 reason for the defendant to tase Jordan because he was

13 confined?

14 A.    At that point?

15 Q.    Yes, at that point.

16 A.    When he was tased, he was not confined all the way.

17 Q.    We're talking about the tase that you just mentioned

18 before, where he was not posing a threat.  The 11-second tase

19 where he was wheeled out to the sally port.

20 A.    I may be getting confused, because there was two

21 different nights.  There was no 11-second tase.

22 Q.    We're talking about November 5th of 2016.

23        Do you remember November 5th of 2016?

24 A.    Yes, ma'am.

25 Q.    And do you remember the defendant tasing Jordan

1  Norris --
2  A.    Yes, ma'am.
3  Q.    And you remember the defendant tasing him multiple times
4  that night?
5  A.    Yes, ma'am.
6  Q.    And you just testified that when the defendant tased
7  Jordan, right before he was wheeled out to the sally port,
8  that the defendant was not posing a threat to anyone at that
9  time?
10  A.    Well, it wasn't right before he was wheeled out.  When
11  he tased him, his leg was not restrained.
12  Q.    Well, what I --
13  A.    So maybe I misunderstood the question or you took my
14  answer the wrong way.
15  Q.    So there was several tasings?
16  A.    Yes, ma'am.
17  Q.    And that night you witnessed those tasings?
18  A.    Yes, ma'am.
19  Q.    And some of those times you testified that he was not
20  completely restrained?
21  A.    Yes, ma'am.
22  Q.    I am referring to the last tase, the one that the
23  defendant did right before he was wheeled out to the sally
24  port.
25              And you testified that at that time the defendant

1  was not posing -- the victim, Jordan Norris, was not posing a
2  threat to anyone at that time.
3  A.    I'm --
4  Q.    Would you like to see the video to have your
5  recollection --
6  A.    Yes, ma'am.
7  Q.    So is it your testimony here today that you don't
8  remember an 11-second tase that night?
9  A.    Yes, ma'am.
10         THE COURT:  You need to speak into microphone.
11         THE WITNESS:  Yes, ma'am.
12         MS. MYERS:  I have no further questions.
13         THE COURT:  Okay.
14         MR. STRIANSE:  I have nothing further.
15         THE COURT:  All right.  You can step down.
16              (Witness excused.)
17         (Bench conference outside the hearing of the
18         jury.)
19         THE COURT:  Can the lawyers approach for a second.
20         So your last witness is en route.
21         MR. STRIANSE:  Is en route.  Can be here probably
22  11:30.  He's coming from Pleasant View.
23         THE COURT:  So why wouldn't we just go ahead and
24  let them eat lunch, put on your witness at noon.
25         MR. STRIANSE:  Okay.

1          THE COURT:  Or do you all want -- I can give you a
2     little bit more time to get your closing together.
3          MR. STRIANSE:  I would rather put him on at noon.
4          THE COURT:  Oh, we're going to put him on at noon.
5     I'm just trying to figure out -- because I would like to go
6     right into closing.
7          MR. SONGER:  Okay.  Sorry.
8          THE COURT:  So I would like to go right into
9     closing.
10          MR. STRIANSE:  That's fine.
11          THE COURT:  So if you all want some additional
12     time at lunch, now is the time for it.
13          MR. SONGER:   I think we would appreciate a little
14     bit of extra time before we come back for Officer Key.
15          THE COURT:  All right.  Well, let's come back at
16     noon -- I'm sorry.  Well, I think we're still going to be
17     fine.  Let's go ahead and do it at noon.  And then I'll give
18     you all a few minutes after the last witness.  I think we're
19     going to need a few minutes to finalize the charge anyway.
20          MR. STRIANSE:  Okay.
21          THE COURT:  And the charge is substantially the
22     same.  It wasn't in the order that I think makes it flow for
23     a lay jury.  So I've changed the order of some stuff.  And
24     we'll get that to you maybe -- maybe when you first come
25     back.  And I'll give you a chance to look at that.  Then we

1  can have the charge conference.  Then we'll close, and then

2  I'll charge and they can start deliberation.

3              Okay?  Okay.

4              Well, you're going to see all this.  But we can

5  wait on this.  I just changed the one about Ola to follow the

6  pattern:  The government has promised him that he may receive

7  a recommendation to the Court for a reduced sentence.

8              MS. MYERS:  Well, his testimony was, and it's not

9  how the plea agreement --

10              THE COURT:  Because you've still got to file the

11  5-K, right?

12              MS. MYERS:  Right.  If in our determination he has

13  been truthful and --

14              THE COURT:  Yeah.  We haven't promised him that he

15  is going to -- so --

16              And the reason I put that in --

17              MR. STRIANSE:  The conditional language is --

18              THE COURT:  Yeah.  The second bracket language

19  should be based on some other -- such as a recommendation.

20  So that's the reason I put -- that's why I did that, exactly

21  for that.  They used the word "promise."  That's why I used

22  the word "promise."

23              MS. MYERS:  Right.  I know it's been amended --

24              THE COURT:  But you put it that he may receive a

25  recommendation.  Yeah.  You've promised you may do it.

1      MR. SONGER:  Your Honor, I'm just worried that can

2 be confusing, the promise you "may" do something.

3      THE COURT:  You do promise you may.  You've

4 promised that you may file a 5-K.

5      MR. SONGER:  That's right.  I would --

6      THE COURT:  You've also heard testimony that the

7 government has promised him.  So that's where I took it from.

8      MS. MYERS:  And I understand that.  I do know it

9 has been amended before.

10      THE COURT:  Well, if you can find me the

11 amendment, this is my latest version that they sent me in

12 2019.

13      MS. MYERS:  Oh, I was referring to what has been

14 done in other cases, I believe in this Court for this

15 particular instruction.  I can show you that.

16      THE COURT:  You talking about Oakes?

17      MS. MYERS:  I don't --

18      THE COURT:  I think we did it for Oakes.

19      MS. MYERS:  We may have modified it in that case.

20      THE COURT:  Well, take a look at the 19, because I

21 may have gotten it wrong in Oakes.

22      MS. MYERS:  Thank you.

23      THE COURT:  So I'm going to send them to lunch.

24 We'll come back and do Key at noon.  Then we'll do -- you'll

25 have the new charge when you come out.  And then we'll do the

1  charge conference and then -- so you'll have a little break
2  to get your thoughts together.
3          MS. MYERS:  So back at noon.
4          MR. SONGER:  Thank you.
5          THE COURT:  And then we decided the closing will
6  be limited to -- I have my notes.
7          MR. SONGER:  I thought we said --
8          THE COURT:  Thirty- --
9          MR. STRIANSE:  I don't think we ever --
10         THE COURT:  I don't think I said an hour.
11         MS. MYERS:  I don't think we set a limit.
12         MR. SONGER:  I don't think we set a limit.
13         MR. STRIANSE:  We talked about opening statements.
14         THE COURT:  Oh, okay.  Who is doing the opening?
15  I mean, the closing?
16         MR. SONGER:  I'm going to do the closing.
17         THE COURT:  How much time do you all want?
18         MR. STRIANSE:  I think mine would probably be
19  about 20 minutes.
20         MS. MYERS:  I need about 45, Your Honor, to go
21  through all the different elements for the four different
22  charges.
23         THE COURT:  Twenty minutes, 45.
24         MS. MYERS:  And then I would have a very short
25  rebuttal.

    1              THE COURT:  Well, that's going to be included in
    2    your time.
    3              MR. SONGER:  If we needed to, we could make it
    4    work to do both in 45.
    5              MS. MYERS:  We could.
    6              THE COURT:  Let's say 35.  Thirty-five for both
    7    sides.
    8              MR. SONGER:  Your Honor, really, to get through --
    9    explain all the different elements, we really need more than
   10    35 minutes.  If Your Honor could give us even five more
   11    minutes.
   12              THE COURT:  Okay, 40 minutes.
   13              MR. SONGER:  Thank you.
   14              MS. MYERS:  Thank you, Your Honor.
   15              THE COURT:  You don't have to use it all.  But
   16    that's 40 for both of you.
   17              MS. MYERS:  Thank you.
   18              MR. SONGER:  Thank you.
   19              THE COURT:  All right.
   20              (Jury present.)
   21              THE COURT:  All right.  Ladies and gentlemen,
   22    we're going to go ahead and take a little bit earlier lunch
   23    break now and have you back about 12:00, 12:05.  I anticipate
   24    there will be one final witness.  Then I anticipate that
   25    we'll -- I'll need to talk to the lawyers just a bit.  Then

we'll have closing arguments.

And then I'll charge you, and then this afternoon, I anticipate you're going to be able to start your deliberations.

So while you're at lunch, again, it would be improper to talk about the case in any respect.  It would be totally inappropriate for you to make any decision, because you haven't heard the law.  So you don't know what law applies in the case yet.

So, again, have lunch.  Don't talk about the case. Don't let anyone else talk to you about the case.  Don't do any investigation about the case.  Be back at noon.  And we'll start about 12:05.  And you'll be able to get to your deliberations later today.  Take care.

(Whereupon a lunch break was observed.)

(Jury not present.)

THE COURT:  All right.  Be seated.  Bring in the jury?

MR. STRIANSE:  Yes, sir.

THE COURT:  All right.

(Jury present.)

THE COURT:  All right.  Be seated.

Okay.  Call your next witness.

MR. STRIANSE:  Call Jeff Key.

COURT DEPUTY:  Please raise your right hand.

1                          JEFFREY KEY,

2     called as a witness by Defendant, was duly sworn and

3     testified as follows:

4

5                 COURT DEPUTY:  Please be seated.

6                 Please pull the microphone close and state your

7     full name and spell your last name.

8                 THE WITNESS:  Jeffrey Key, K-e-y.

9

10                    DIRECT EXAMINATION

11    BY MR. STRIANSE:

12    Q.   Good afternoon, Mr. Key.

13    A.   Good afternoon.

14    Q.   How are you currently employed?

15    A.   With the Cheatham County sheriff's office as a deputy.

16    Q.   How long have you been a deputy with the Cheatham County

17    sheriff's office?

18    A.   Three years next month, I think.

19    Q.   And what are your current assignments?

20    A.   Patrol.  I am a training officer for patrol on the

21    nightshift.

22    Q.   Was there a time that you worked as a correctional

23    officer at the Cheatham County jail in Ashland City?

24    A.   Yes.

25    Q.   Do you remember when that was that you worked?

A.   It was the first year, exactly, that I was here, which
was 2016 until 2017.

Q.   Okay.

A.   It was like, I think, February/March of that -- 2017 is
when I moved to patrol.

Q.   Do you know the defendant in this case, Mark Bryant?

A.   I do.

Q.   And how do you know Mark?

A.   We worked together on that -- in the jail.

Q.   Were you a second shift employee in the jail?

A.   I was.

Q.   I want to direct your attention to November 5 of 2016
and ask you if you were working second shift that night in
the jail?

A.   Yes.

Q.   And do you remember what rank you were at that point in
time?

A.   Just a jail deputy.

Q.   Did you -- that night on second shift, did you encounter
an inmate by the name of Jordan Norris?

A.   I did.

Q.   And if you would, tell the members of the jury when it
was that you encountered Mr. Norris on your shift.

A.   He was brought in -- I'm not sure what his charges were.
He was in Cell 4 in booking.  He -- there was some kind of

1    altercation that was going on inside of the -- that cell with

2    another inmate.  We went over and spoke with him for a few

3    minutes.

4    Q.    When you say "we," who are you referring to?

5    A.    Myself and other -- other deputies.  I think Mark Bryant

6    was with me at one point.  I'm not sure if he was with me the

7    first time or not.  Josh Marriott was in there at some point.

8    I believe Daniel Bratton was there at one point as well.

9    Q.    What was going on in Cell 4 when you initially

10   approached --

11   A.    The final report was -- when we actually had the -- the

12   contact where we had to extract him from the cell because he

13   had assaulted another inmate.

14   Q.    You sort of jumped ahead a little bit, which is good.

15             There came a point in time that evening that he

16   had to be extracted from the cell?

17   A.    Yes, sir.

18   Q.    And describe that to the jury.  What were the events

19   leading up to the extraction and the extraction itself?

20   A.    We opened the door to Cell 4, and that's when the inmate

21   had explained to us that he was --

22             MS. MYERS:  Objection.  Hearsay.

23             THE WITNESS:  The report was --

24             THE COURT:  Hold on.  Hold on.

25             MR. STRIANSE:  Your Honor, I think this is a

1  verbal act, nonhearsay.

2        MS. MYERS:  That's not nonhearsay.  It's an

3  out-of-court statement offered for the truth of the matter

4  asserted.

5        THE COURT:  Why don't you all approach.

6        MR. STRIANSE:  I don't think -- I can move on.

7        THE COURT:  All right.  You can rephrase.  That's

8  fine.

9  BY MR. STRIANSE:

10 Q.   After you had that discussion with the inmate, what

11 happened next?

12 A.   We went inside the cell and were talking to Mr. Norris

13 and were trying to get him to walk out of the cell with us,

14 what have you.

15       Instead of doing that, he sat down.  At that

16 point, we did an arm bar and kind of grabbed him and kind of

17 escorted him out.  Still wasn't much of a struggle at that

18 point, until we got him outside the cell.

19       Once we attempted to try to cuff him up and

20 restrain him, that was when he started to resist.  That's

21 also when I noticed that his strength was very unusual for

22 anyone, let alone someone of his size.

23 Q.   And how tall are you, sir?

24 A.   I'm 6'1 1/2", or something like that.

25 Q.   And how much do you weigh?

1  A.    240 pounds.

2  Q.    And how much did you weigh back then in November of --

3  A.    Probably about the same.

4  Q.    -- of '16?

5        And what were you experiencing about the strength

6  that was being demonstrated by Mr. Norris?

7  A.   I was unable to get his arms to secure them behind his

8  back.  I was -- at that point, I know I remember being quite

9  shocked at how much strength he had.

10       So we -- I looked over and -- and Josh Marriott

11  was standing to my left, I believe, in front of the booking

12  window.  I kind of motioned for him to come over, and at that

13  point, with myself, I believe Mark Bryant and Josh Marriott,

14  we were able to get him handcuffed and secured.

15  Q.   And did Daniel Bratton assist you all that evening?

16  A.   He did.  Daniel was there.  I don't know that he

17  assisted with cuffing, but he had a -- he had a Taser at that

18  point, I think, and I think he drive stunned him once or

19  maybe twice, to try to get him to comply.

20  Q.   What did you notice about Mr. Norris's mental state

21  while you were dealing with him that evening?

22            MS. MYERS:  Objection.  Calls for speculation.

23            THE COURT:  Overruled.

24  BY MR. STRIANSE:

25  Q.   How was he presenting himself to you?

A.   Very -- he acted out of the ordinary.  His eyes and his
pupils were fixed and -- were -- were huge.  He had this
stare where he opened his eyes really wide and was gritting
his teeth and was talking -- saying things that really didn't
make much sense.  And was just really aggressive.
Q.   How long have you been a correctional officer and a road
officer?
A.   At this point, I'm -- I started in '99 as a correctional
officer for about -- not quite a year before I went to the
road.  And then I took a break for about four or five years.
So probably 16 years.
Q.   Based on your experience, did you think that Mr. Norris
was under the influence of some intoxicant --
A.   Yes --
Q.   -- that night?
A.   -- I did.
Q.   Did you have any idea what he was on?
A.   I didn't have an idea.  I just -- I remember thinking
that the only other person or people that we had dealt with
in the past that had that much strength was on PCP.  So I
assumed it was something along those lines.
Q.   After you had the activity in front of the door of
Cell 4, what was the next thing that happened with
Mr. Norris?
A.   We -- we had them pull the restraint chair over and we

set him in the restraint chair.  And initially, when you put
someone in the restraint chair, their handcuffs stay on until
they calm down.

         And there's loops -- not loops, but places for
your hands in the back of that chair so that you can sit on
them without actually sitting on his arms.

         So we put him in there and we strapped him in.
And then, once he calmed down, you take the cuffs off and you
move the arms around to the -- to the arms of the chair, and
you strap them down on that -- on that -- on the arms of the
chair at that point.

         And that's, you know, initially what we did was
just put him in with the cuffs on.

Q.    So when he was first placed in the restraint chair, he
was cuffed behind his back?

A.    Yes.

Q.    And then there came a point in time that you all decided
to move his hands --

A.    Yes.

Q.    -- to the front?

A.    He calmed down somewhat, enough to where we thought we
could make it a little bit more comfortable for him to sit
there and continue to kind of calm down and not be a threat
to anyone hopefully.

Q.    And describe this restraint chair to the members of the

1  jury.

2  A.    It's a plastic -- it's a metal frame with a plastic seat

3  on it.  It has holes in the back to where the hands go.  And

4  then it has arms on it to where the straps will go around

5  your arms up here.  And then of course on the legs as well,

6  so that you can fully strap them down.  And then it has

7  straps that go across the chest on each way, so it's kind of

8  a criss-cross type thing.

9  Q.    Was this an old piece of equipment?

10  A.    It was.

11  Q.    What sort of shape was it in on November 5th, 2016?

12  A.    Well, at that point, the -- the chair failed.  Because

13  of the -- the strength that he had, he was able to loosen the

14  straps.  Once he started to become more irate again and

15  started to struggle, he was able at that pull the straps out

16  and loosen them up.  At one point he got his right arm free.

17  Q.    You were indicating -- and for the record, you were

18  indicating with your arms when you said he was able to pull

19  the straps out?

20  A.    Yes.  He was raising his arms up and fighting against

21  those straps, trying to get his arms free.

22  Q.    And tell the jury in as much detail as you can -- you

23  mentioned that he got an arm free?

24  A.    He did.  Once he got that arm free, obviously -- if --

25  if someone's restrained in a chair, there's no threat.  They

1   can struggle, but once they get an arm free, that would be

2   the only perceived threat, is whatever limb they have

3   available to be able to use.  That was my primary focus.

4           I grabbed his right arm and tried to re-restrain

5   it.  And I can remember again having a struggle, couldn't get

6   his arm to bend to be able to move it to where I needed it to

7   be to be able to re-restrain it.

8           And I -- I remember thinking, you know, with the

9   force that I'm having to use to move his arm that I feared

10  dislocating his elbow or even breaking his arm, because it

11  was like -- it was almost like trying to move a tree limb.

12  It wasn't budging very much.

13  Q.   Were you having difficulty controlling his arm?

14  A.   I was.

15  Q.   And did you perceive that as a threat?

16  A.   I did.

17  Q.   And what kind of threat could that be?

18  A.   Well, with the strength that he had, if he would have

19  grabbed me by the throat or anyone else by the throat or, you

20  know, wanted to gouge somebody's eye out or whatever, he

21  could do some damage with the strength that he had if he had

22  gotten ahold of someone like that.

23  Q.   When this right arm was free, was Mr. Norris tased?

24  A.   He was drive stunned.

25  Q.   Do you remember how many times he was drive stunned?

```
1   A.    No, sir, I don't.
2   Q.    Did you ever get a chance to see any of the video of
3   this incident?
4   A.    Not in -- not in its entirety, but basically what was
5   on -- what was on the TV news and what I think the
6   prosecution had showed me during my deposition.  Or during
7   the testimony for the Grand Jury.  I'm sorry.
8   Q.    Forgive me.  What we have seen, it appears at times that
9   the Taser sounds louder than other times.
10  A.    Yes.
11  Q.    What does that indicate?
12  A.    If it's -- if a Taser is -- you can actually pull the
13  trigger on a drive stun -- you can actually pull the trigger
14  and it makes a popping sound where it's arcing between the
15  two probes.
16            If you make contact with skin, it takes that sound
17  kind of away to where you can't really hear it as much or at
18  all, if there's any other kind of noise or what have you.
19  Q.    So what does that mean if the Taser sounds louder?
20  A.    Then it's not making any kind of contact at that point
21  if it's louder than what it was.
22            MR. STRIANSE:  Those are my questions.
23            THE COURT:  All right.  Cross-examination.
24
25
```

1                    CROSS-EXAMINATION

2   BY MS. MYERS:

3   Q.    Good afternoon, Officer Key.

4   A.    Hi.  How are you?

5   Q.    So at the time of these events, you were not Taser

6   trained?

7   A.    No, ma'am, I wasn't.

8   Q.    And when you had Jordan's arm, he was not able to grab

9   you?

10  A.    No, not at that point, because I was able to put my

11  weight on top to keep it from -- him being able to raise it

12  up.  I just couldn't control it left or right or get him to

13  bend it.

14  Q.    And he didn't grab you?

15  A.    He didn't, no.

16  Q.    And you heard the defendant make comments to Jordan when

17  you saw the media coverage that you referenced earlier?

18  A.    Yes.

19  Q.    And you didn't think those comments were appropriate?

20  A.    No.

21  Q.    And you agree that tasing someone for 25 seconds is not

22  consistent with your training?

23  A.    Now that I'm certified, no, it's not.

24  Q.    And you agree that tasing someone for 25 seconds is not

25  appropriate?

```
1   A.    No.
2              MS. MYERS:  I have no further questions.
3              THE COURT:  Redirect?
4              MR. STRIANSE:  Just one.
5
6                     REDIRECT EXAMINATION
7   BY MR. STRIANSE:
8   Q.    When was it that you were certified?
9   A.    Once I came to patrol.
10  Q.    What year was that?
11  A.    I believe it was 2017.
12             MR. STRIANSE:  That's all.
13             THE COURT:  All right.  You can step down.
14                  (Witness excused.)
15             THE COURT:  All right.  Call your next witness.
16             MR. STRIANSE:  Your Honor, Defendant Bryant rests
17  at this time.
18             THE COURT:  All right.
19             Does the Government have any rebuttal proof?
20             MS. MYERS:  No, Your Honor.
21             THE COURT:  All right.  Ladies and gentlemen, that
22  concludes all the evidence in this case.
23             The next thing in this case will be closing
24  arguments, where I told you in the beginning of the case,
25  this will be the lawyers' attempt to give you their summation
```

 1  of all the evidence for your consideration.  Of course,
 2  closing arguments are not evidence.
 3          After they finish, then I'll give you the charge.
 4  I think you'll each have -- well, I know.  You each will have
 5  a copy of what I'm going to read to you, so you can mark it,
 6  do as you please with it, and have it with you and carry it
 7  back into the jury room.
 8          At this point, the lawyers want a few minutes to
 9  collect themselves?
10          MS. MYERS:  Yes, please.
11          THE COURT:  All right.  So I'm going to give the
12  lawyers a few minutes to collect their thoughts, and probably
13  have you back out here in about ten minutes.  Thank you.
14          (Jury not present.)
15          THE COURT:  All right.  Be seated.  I think you
16  all got a draft -- my most recent draft of the charge.
17          Does the government have any objection to the
18  charge?
19          MS. MYERS:  No, we do not, Your Honor.
20          THE COURT:  All right.
21          Does the defense have any objection to the charge?
22          MR. STRIANSE:  No, Your Honor.
23          THE COURT:  All right.  Then the charge is set.
24          Recall that Juror Number 14 and -- well, actually
25  it's 13 and 14 now, ////////////, and ////////////, are

1    the alternates.  I'll charge them but then excuse them before
2    they deliberate.

3              Anything else from the government?

4              MS. MYERS:  Your Honor, we did have an issue about
5    the verdict form that I don't believe was resolved or if it
6    was --

7              THE COURT:  It was when you said you didn't have
8    any objection to the charge.  Go ahead.

9              MS. MYERS:  Sorry.  I consider the verdict form
10   separate.

11             THE COURT:  All right.

12             MS. MYERS:  But if we're fine, then that's all
13   right.

14             THE COURT:  Yeah.  I looked that up.  I read what
15   you all filed, and what you filed is in the charge.  But I
16   don't think that creates a basis for me to -- to ask those
17   separate questions in the verdict form.

18             My understanding is, unless those questions go to
19   sentencing factors, it's not -- it's not in the charge.  And
20   here it would not impact sentencing.  So that's why I didn't
21   include it.

22             MS. MYERS:  And that makes sense, Your Honor.  I
23   think that since it's in the charge --

24             THE COURT:  It's in the charge.  Oh, it's in the
25   charge.

1          All right.  Anything further on the charge or the
2   verdict form, Mr. Strianse?
3          MR. STRIANSE:  No, Your Honor.
4          THE COURT:  Okay.  How much time do you all want
5   to get yourselves ready?
6          MS. MYERS:  About ten minutes.
7          THE COURT:  Okay.
8          MS. MYERS:  Thank you.
9          (Brief recess.)
10         (Transcript continued in Volume 4B.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    REPORTER'S CERTIFICATE

2

3            I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on February 7, 2019, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 124) is a true and

12   accurate record of said proceedings.

13           This the 24th day of March, 2019.

14

15                              /s/ Lise S. Matthews
                               LISE S. MATTHEWS, RMR, CRR, CRC
16                             Official Court Reporter

17

18

19

20

21

22

23

24

25