IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF TENNESSEE
2                          AT NASHVILLE

3

   UNITED STATES OF AMERICA        )
4                                   )
                                    )
5                                   )
   v.                               ) Case No.
6                                   ) 3:18-CR-00144
                                    )
7    MARK BRYANT                    )

8

9
   ------------------------------------------------------------
10
   BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE
11
                          TRANSCRIPT
12
                             OF
13
                         PROCEEDINGS
14
                      February 7, 2019
15
                      Trial Volume 4B
16
   ------------------------------------------------------------
17

18

19
                APPEARANCES ON THE FOLLOWING PAGE
20

21

22

23  PREPARED BY:
                   DEBORAH K. WATSON, RPR, CRR, LCR
24                    Official Court Reporter
                      801 Broadway, Room A839
25                     Nashville, TN 37203
                 debbie_watson@tnmd.uscourts.gov

```
 1   For the Government:   SARA E. MYERS
                          U.S. Attorney's Office
 2                        (Nashville Office)
                          Middle District of Tennessee
 3                        110 Ninth Avenue South
                          Suite A961
 4                        Nashville, Tennessee 37203-3870

 5                        MICHAEL J. SONGER
                          U.S. Department of Justice
 6                        Criminal Division
                          950 Pennsylvania Avenue, NW
 7                        Washington, DC 20530

 8
     For the Defendant:   PETER J. STRIANSE
 9                        Tune, Entrekin & White, P.C.
                          315 Deaderick Street
10                        Suite 1700
                          Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                 Thursday, February 7, 2019

3

4                   INDEX OF PROCEEDINGS

5                                      PAGE

6   GOVERNMENT'S CLOSING ARGUMENTS            4

7   DEFENDANT'S CLOSING ARGUMENTS            23

8   GOVERNMENT'S CLOSING ARGUMENTS            37

9

10   JURY CHARGE                               40

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came on to be heard on

2     February 7, 2019, before the Honorable Waverly D. Crenshaw,

3     Jr., District Judge, when the following proceedings were had,

4     to-wit:

5               (Jury present.)

6               THE COURT:  Ladies and gentlemen, we'll start with

7     closing arguments, first from the Government, then the

8     Defendant, and then the Government will have the last word.

9     I'll remind the Court security officers that when the lawyers

10    start their argument, no one will enter or leave.

11              All right.

12              MR. SONGER:  Thank you, Your Honor.

13              "You don't like it, do you?  I'll keep going until

14    I run out of batteries."

15              That's how the Defendant taunted a defenseless

16    teenager while he tortured him.  That's how the Defendant

17    taunted Jordan Norris as he sent electricity pulsing through

18    Jordan's body causing him to seize up in pain.  That's how

19    the Defendant taunted Jordan while he tased him four times

20    for 50 seconds.

21              At 8:00 p.m., on October 5th, 2016, most of Jordan

22    Norris's body was tied down in a restraint chair.  Three

23    large officers stood over him.  He was not a threat.  He

24    couldn't escape.  He was completely defenseless.  Jordan was

25    a skinny 18-year-old.  The Defendant was almost twice

Jordan's size.  He was a former wrestler.  He was a
supervisor in the jail that night, and he'd worked in
corrections for years.  He had been trained on how to deal
with people like Jordan.  But that night, he chose to ignore
his training.

As Jordan was tied down and defenseless, the
Defendant tased him repeatedly for 50 seconds, the longest
tases that officers who worked at the Cheatham County Jail
had ever seen.  The Defendant kept the trigger pulled down to
tase Jordan for those 50 seconds even though he had been
trained that a taser can cause terrible pain after just a
second or two, and had been instructed never to tase someone
for more than three 5-second bursts in a single incident.

The Defendant had been trained that if he did tase
someone for a prolonged period, it would have serious health
risks.  It would burn the flesh.  It could damage internal
organs.  It could even cause death.  But as Jordan screamed
that night, the Defendant kept the trigger pulled down.

Then two hours later, Defendant did it again.  He
tased Jordan while he was handcuffed and shackled and sitting
in a chair just waiting to go to the hospital.

Again, the skinny teenager was completely
defenseless.  Every part of his body was restrained.  But
once again, the Defendant held the trigger down to keep the
cycle going beyond what was normally cut off, beyond what he

1  was trained to do, for 11 more seconds.  1, 2, 3, 4, 5, 6, 7,
2  8, 9, 10, 11 seconds of the Defendant shocking Jordan with a
3  taser for no reason.

4        The Defendant kept tasing Jordan until his flesh
5  looked like raw hamburger meat that had been ground up.
6  That's what it looked like to Officer Caitlin Marriott.
7  Caitlin told you that watching the Defendant assault Jordan
8  with a taser was so traumatic that just hearing the sound of
9  the taser still today makes her cry; so traumatic that she
10 can't even be around other officers when they test a taser.
11 She asks them to walk outside where she can't hear it so
12 she's not taken back to that night when she witnessed the
13 Defendant torture a defenseless teenager.

14        Now, Jordan had been acting out that night and the
15 Defendant didn't like it, so he punished him with electric
16 shock and pain.  That is a crime.  The Defendant knew he was
17 wrong, so he filed false reports to try to cover it up.
18 That's a crime, too.  Over the last four days, you've heard
19 from officers who were present both times the Defendant
20 inflicted punishment on Jordan with the taser.  You've seen
21 the videos, and you've heard the Defendant's own words on
22 those videos.  You know that Jordan was being disruptive that
23 night.  No one in this courtroom will tell you different.

24        Officers on the scene told you that they had to
25 pull Jordan out of the cell, that he -- they had to strap him

into a restraint chair.  And then when Jordan fought and
resisted being put in that chair, that they had to tase him
several times with those brief 5-second bursts that they had
been taught to use, and that that was fully justified and
appropriate.  But those officers also told you that there was
no justification for what happened later, when the Defendant
came back an hour later when Jordan was restrained and in the
chair and had been calm, and tased him for 50 seconds.

And there was no justification for what the
Defendant did two hours after that when he tased him again
for 11 more seconds when Jordan was just waiting to go to the
hospital in handcuffs and shackles and a belly chain and a
leg band and everything else.

You can see all of that just by watching the
videos.  Common sense tells you that it's wrong for an
officer to use a taser to punish someone who is restrained
and not a threat.  The Defendant's own training told him just
that.  It is unlawful to use a taser to punish someone.  It's
unlawful to use more force than is necessary, much less to do
it for 50 seconds and then again for another 11 seconds.

After hearing all the evidence in the case, you
know what the Defendant did was wrong, and you know that the
Defendant knew it was wrong, too.  You heard the Defendant's
own words taunting Jordan, showing that he didn't have any
legitimate law enforcement purpose.  He was using a taser to

1  inflict pain on a restrained teenager.

2         It's also clear the Defendant knew he was wrong

3  because after he tased, he went to the other officers on his

4  shift and he told them not to file their own reports.  Then

5  the Defendant submitted reports that left out virtually all

6  the details about what happened.  The Defendant knew he

7  couldn't justify what happened, so he filed false reports to

8  try to cover it up.

9         The Defendant thought he could cover his tracks

10  with those false reports and get away with it because he was

11  wearing a badge, because he was the supervisor in charge of

12  the jail that night.  By trying to cover up the crimes that

13  he committed in uniform and on duty, he tried to put himself

14  above the law.  He did a disservice to all the law

15  enforcement officers who put on their own uniforms every day

16  to protect and serve, not punish and torture.  Officers who

17  know that in this country, in our Constitution, justice

18  happens in a courtroom, not in a restraint chair.

19         I'd like to take a minute now to talk to you about

20  how the evidence you've heard fits together with the law that

21  Judge Crenshaw will instruct you on in just a bit.

22         As you've heard, the Defendant is charged with

23  four different crimes in the indictment.  Each of those

24  crimes is made up of elements or just parts, and the

25  Government has the burden to prove each of those elements

1  beyond a reasonable doubt.  We embrace that burden.  The
2  evidence in this case overwhelmingly proves the Defendant is
3  guilty of each of the four crimes.

4          Let's talk first about Counts 1 and 2, the two
5  assaults on Jordan at 8:00 and 10:30.  Those counts share the
6  same elements.  There are four elements that you have to find
7  for each count.  Number one, that the Defendant acted under
8  color of law; two, that the Defendant deprived the victim of
9  a right protected by the United States Constitution; three,
10  that the Defendant acted willfully; and four, that the
11  Defendant caused Jordan bodily injury or that the Defendant
12  used a dangerous weapon.

13          So let's start with the first element, color of
14  law.  That just means that the Defendant either used or
15  misused his official authority, and there's no question about
16  that here.  At the time of both assaults, the Defendant was
17  on duty, in uniform, working as a corrections officer inside
18  the Cheatham County Jail.  So that element is satisfied
19  beyond a reasonable doubt.

20          The second element that you must find is that the
21  Defendant deprived Jordan of a right protected by the
22  Constitution.  And the right at issue here is based on
23  Jordan's status inside of the jail.  He was a pretrial
24  detainee which means he hadn't been convicted of a crime; he
25  was waiting to get his day in court.

1    And as a pretrial detainee, Jordan had a right to

2   be free from excessive force that amounts to punishment.

3   That just means that an officer can't use physical force to

4   punish somebody like Jordan.  To use force, an officer has to

5   have a legitimate law enforcement reason.

6    Now, corrections officers have a tough job.  They

7   have to deal with difficult and even dangerous inmates.  As

8   you've heard, there are situations where force is necessary.

9   That's why they're given weapons to carry, including tasers.

10    When Jordan was being disruptive on November 5th,

11  officers could lawfully pull him out of his cell and strap

12  him into a restraint chair.  When he fought and struggled

13  getting into the chair, officers could lawfully use those

14  short bursts of a taser, just as they've been trained to do,

15  to get him under control and restrained.

16    But the power to use force is a tremendous power,

17  and it's a serious responsibility.  And that's why officers

18  like the Defendant are trained on what types of force are

19  lawful and what type of force is not.  They're trained so

20  they don't abuse their power and don't abuse the men and

21  women who are in their custody.

22    You didn't hear any of the law enforcement

23  officers who testified in this case say that it's okay to use

24  force to punish someone, to retaliate against somebody who is

25  acting out, or to take out of your frustration by lighting

somebody up with a taser.  No officer said that because using force to punish is a crime.

Now, you've seen the videos.  You've heard the testimony of officers who are present, who had the same training as the Defendant.  And they told you that Jordan was difficult, he was belligerent at times that night, but that there was no threat that justified tasing him when the Defendant did at 8:00 and at 10:30, certainly not for anywhere near as long as the Defendant tased him.

So let's focus for a moment on Count 1.  This is the assault that happened at 8:00.  When you get back to the jury room, you look at this video and ask yourself:  What kind of threat existed here?

There is none.  Jordan had been in the restraint chair for over an hour.  Most of the time, he had been calm. There are straps over his shoulders and around his waist and across his legs.  His left arm and hand is fully strapped in. Officer Key is using the full weight of his body to control Jordan's right hand and right arm.  Officer Marriott is holding his head all the way back.  He's swearing a spit mask.

Officer Josh Marriott and Officer Caitlin Marriott, who you can see just on the edge of the screen, both testified that in this posture, Jordan simply was not a threat, that there was no justification for what the

1    Defendant did next.

2              (Playing video.)

3              MR. SONGER:  Now, you heard that a standard taser

4    cycle lasts 5 seconds.  That's one pull of the trigger.  But

5    you saw on the taser logs and you heard testimony that those

6    four tases lasted 50 seconds.  And later that night, the

7    Defendant tased Jordan 6 more times for 47 more seconds for a

8    total of 97 seconds within just a couple of hours.

9              You heard from officer after officer, the officers

10   who work in the Cheatham County Jail every day who deal with

11   difficult and sometimes dangerous inmates, none of them had

12   ever seen or even heard of tases that long.

13             Now, Officer Josh Marriott told you that the

14   Defendant's tases were unjustified and they were wrong.

15   Officer Josh Marriott was standing right there.  He was put

16   in the difficult position of having to watch his supervisor

17   use force that he knew was wrong.  And Defendant Bryant was

18   not just Marriott's supervisor.  They were friends.  They

19   used to be roommates.  But despite that friendship, Officer

20   Marriott knew there was no justification for what he'd seen,

21   and he told you that in court.

22             So now let's focus for a moment on Count 2.  This

23   is the assault at 10:30.  You heard and saw that Jordan had

24   been fighting with officers a few moments before this when

25   they were trying to get him restrained and prepared to be

1  moved to the hospital.  And during that sequence, the

2  Defendant tased Jordan several times, and those tases are not

3  charged as crimes in the indictment.  But then Jordan calmed

4  down.

5       The officers got him fully restrained.  He was put

6  in handcuffs and shackles and a belly chain and leg

7  restraints.  And he was just sitting there ready to go to the

8  hospital.  He's not trying to get away or to threaten anyone.

9  He's not even saying anything mean to any of the officers.

10  He's just waiting to go to the hospital, and that's when the

11  Defendant used his taser again for 11 seconds when it was

12  totally unnecessary.

13       Now, two officers . . .

14       (Playing video.)

15       MR. SONGER:  Now, two officers who were at the

16  jail that night, who you can see in the video, told you that

17  there was no reason for what Defendant Bryant did, that there

18  was no reason to tase Jordan in that situation at all, much

19  less for 11 more seconds, more than twice the normal taser

20  cycle.

21       That's what Sergeant Ola told you.  Sergeant Ola

22  was also carrying a taser that night.  He was the taser

23  instructor at the jail.  And he testified that if there had

24  been any reason to tase Jordan, he would have done it.  But

25  he never even thought about using his taser because there was

1  no legitimate reason.

2          Now, Sergeant Ola was shocked when the Defendant

3  started tasing Jordan for no reason.  And afterwards, he

4  realized it was wrong, but he didn't report it.  He told you

5  that he feared that he would be retaliated against if he

6  turned in a fellow officer.  He told you that he feels like

7  he failed Jordan that night by not standing up for him, that

8  he's ashamed of it, and that it's shame he will have to live

9  with for the rest of his life.

10          Because he was ashamed an officer that he had

11  trained did that to someone, first time he met with the FBI,

12  he lied and he told them that he wasn't there; he had walked

13  away, and he didn't see the Defendant tase Jordan for those

14  11 seconds while he was in handcuffs.

15          Sergeant Ola later admitted what you can all see

16  for yourself on the video, that he was standing right there

17  and he did see the Defendant tase Jordan for no reason for 11

18  seconds, and that he lied about it because he was ashamed.

19  He admitted that to you in court and he pleaded guilty.

20          Officer Montgomery also told you that he was there

21  and he saw the Defendant tase Jordan for no reason at 10:30.

22  Like Sergeant Ola, Officer Montgomery told you that there was

23  just no threat whatsoever that justified what the Defendant

24  did.  Of course, there wasn't.  You can see that for yourself

25  on the video.  Common sense tells you that there's no

justification for the Defendant to tase a handcuffed and
restrained person who is just sitting in a restraint chair.

The Defendant retaliated against Jordan because he
had been acting crazy earlier that night and the Defendant
didn't like it, so he came back and he punished him with a
taser. That violates the Constitution. And that's been
proven beyond a reasonable doubt.

The next element requires you to find that the
Defendant acted willfully. That just means that the
Defendant knew what he was doing was wrong, but he did it
anyway. And here the Defendant absolutely knew that he was
wrong. His training, his experience, and his own words prove
it. The Defendant admitted to the FBI that he kept holding
the trigger down to keep those taser cycles going beyond the
5-second limit. His hand didn't slip. It wasn't an
accident. The Defendant knew that he had tased Jordan longer
than his training allowed.

After the incident was over, the Defendant
confided in Officer Josh Marriott that he was afraid he was
going to get in trouble because he knew he had gone too long.
And during that 8:00 tase when the Defendant tased Jordan
four times for 50 seconds, you can hear the Defendant's own
words taunting Jordan, removing any doubt about whether he
had a legitimate purpose or if he was using that force to
punish. He told Jordan, "You don't like it, do you? I will

keep going until I run out of batteries."

Ladies and gentlemen, you can also apply common sense. The Defendant knew, just like any person trained or untrained would know, that if a teenager is in a restraint chair with seven officers or four officers standing around, fully restrained, it's wrong to tase him. It's wrong to keep Jordan in pain when there was no justification for doing it for even 1 second, much less for 11 seconds or 50 seconds. Applying common sense to this evidence tells you all you need to know. This was obviously wrong, and the Defendant knew it.

It's also clear the Defendant knew he was wrong because he ignored his own training about how he was supposed to act. You heard from officers who went through the exact same training course that the Defendant did. And they were crystal clear: You can never use a taser to punish someone. You cannot use a taser to tase someone who is in handcuffs. You cannot tase someone for more than 5 seconds at a time or for more than 15 seconds in a single incident.

The Defendant violated every one of those standards. Every one of them. The other officers knew it was wrong. They had the same training as the Defendant. The Defendant knew it was wrong. That's more than enough evidence to prove the Defendant knew what he was doing wrong, but he did it anyway.

1          But there's more.  Consider what the Defendant
2    himself did after he tased Jordan.  He filed false reports
3    that left out what he had done, that didn't disclose how many
4    times he tased Jordan or for how long.  In fact, he went one
5    step further.  He went to the other officers on his shift and
6    he told them not to submit reports.  The Defendant just
7    didn't want there to be a record of what had happened because
8    he knew he couldn't justify what he had done.

9          That's why nine months later, when the FBI
10   interviewed him about how he used force that night, he told
11   them that it didn't even happen, that he never tased Jordan
12   at 10:30 after he was restrained.  He admitted today that
13   what he told the FBI was wrong, was not accurate.

14          Now, the final element that the Government has to
15   prove for Count 1 and Count 2 is that the Defendant caused
16   Jordan bodily injury or that the Defendant used a dangerous
17   weapon.  Now, to find the Defendant guilty, you don't have to
18   find both of those things.  One or the other is enough so
19   long as you all agree on that one.

20          But here the evidence overwhelmingly proves both.
21   Let's talk first about bodily injury.  It has a specific
22   definition under the law.  It doesn't have to be a serious
23   injury.  It includes any injury to the body.  A bruise, a
24   cut, even just physical pain satisfies this element.

25          So you can ask yourself:  When the Defendant was

repeatedly assaulting Jordan with the taser, did it hurt?  Of course, it did.  You saw the video; you can see Jordan's eyes as he's being tased.  You heard from Officer Caitlin Marriott who saw Jordan's wounds a couple of days later and described them as raw, ground-up hamburger meat.  You heard from Special Agent Joy Wright who told you that even almost a year later, scars consistent with taser burns were still visible on Jordan's body.

So that element has been satisfied beyond a reasonable doubt.

The Defendant, to be clear, also used a dangerous weapon.  You heard testimony that a taser causes intense pain, burns the skin, can damage internal organs, can even lead to death.  So there's no doubt that when the Defendant repeatedly used a taser on Jordan, he was using a dangerous weapon.  That's a separate way that the Government has also proven that last element.

So now let's consider Counts 3 and 4.  These are the counts that relate to the Defendant obstructing justice by filing false reports about these assaults.  Count 3 relates to the false report the Defendant filed about the 8:00 assault, and Count 4 relates to the false report the Defendant filed about the 10:30 assault.

There are three elements that you have to find for each of those two counts.  One, that the Defendant knowingly

falsified a document, and here, that document is just the
false report the Defendant filed about each assault; two,
that the Defendant falsified the report with the intent to
impede, obstruct, or influence an investigation; and three,
that the false report related to a matter within the
jurisdiction of some federal agency.

So I'll start with the last element because it's
not really in dispute here.  The Government does not need to
prove that the Defendant knew that a federal agency had
jurisdiction to investigate this case, only that, in fact,
the federal government did have the authority to investigate.
And there's no question about that.

You heard from Special Agent Wright that the FBI
has the authority to investigate Civil Rights crimes like
this one and that, of course, the FBI is an agency of the
federal government.  So that element has been proven.

So let's turn to the next element, that the
reports are false.  Now, a report can be false because a
Defendant put false information in it.  It can also be false
because the Defendant left out information that's material.
And that just means information that's important or
significant such that leaving it out of the report makes the
report misleading.

Here, with both reports, the Defendant purposely
left out almost every important fact about these incidents.

1   What's left in those reports conflicts with the video that

2   you all saw and the eyewitness testimony that you heard.

3           So let's look at the reports one at a time.

4   First, Count 3.  This is the false report about the 8:00

5   tasing.  Now, the Defendant left out almost every important

6   fact about this incident.  He left out that when he tased

7   Jordan, Jordan's legs, body, and left arm were strapped into

8   the restraint chair, that his right arm was held by Officer

9   Key.  He left out that Jordan was already wearing a spit

10  mask.  He left out that he tased Jordan four different times,

11  which violated the jail's policy.  And he left out that those

12  four tases lasted 50 seconds which not only violated the

13  jail's policy, but were the longest tases anyone had ever

14  seen in the jail.

15          Without those facts, read this report.  You have

16  no idea what really happened.  Think about how this report

17  compares to the video you watched.  A supervisor looking at

18  that report would have no idea that they would need to go to

19  the video and investigate to see if this was appropriate.

20  And that is exactly what the Defendant wanted.  That makes

21  his report false and misleading.

22          But there's another reason the report is false.

23  Look at the time at the top of the report.  1855 or 6:55 p.m.

24  That's significant because you know from the video and the

25  taser logs and all the witnesses who testified that the

1   Defendant did not tase Jordan at 6:55 p.m.

2         That's when Officer Bratton tased him, before

3   Jordan was restrained in the restraint chair. The Defendant

4   wrote "Bratton and I tased." That's deeply misleading. The

5   Defendant wrote a report that made it seem like he tased

6   Jordan when he was unrestrained at 6:55 when it was

7   appropriate to tase him, not at 8:00 when Jordan was fully

8   strapped into the chair when it was not appropriate.

9         Now let's look at Count 4, the report relating to

10   the 10:30 assault. Once again, the Defendant purposely left

11   out virtually all the facts that show what really happened

12   here, the facts that show that the Defendant committed a

13   crime. He left out the fact that Jordan was in handcuffs,

14   that his feet were shackled, that he was wearing a belly

15   chain, that his legs were restrained with a belt. The report

16   leaves out that there were seven officers present to control

17   the situation. He only put one other officer's name on this

18   report.

19         He also left out how many times he tased Jordan

20   and that that final tase, the one where Jordan is handcuffed

21   and shackled and just sitting there waiting to go to the

22   hospital, lasted 11 seconds where he had to keep the trigger

23   down more than twice as long as a normal cycle.

24         Those are precisely the type of facts that the

25   Defendant himself included in the other reports he did when

he tased someone at the jail, both before and after this incident. You saw those reports today. He just didn't include those facts in the reports about this incident. You're in the jury box; ask yourself, why would he do that.

Now, the final element that has to be proven for Counts 3 and 4 is that the Defendant intended to impede, obstruct, or influence the administration of justice. Now, that element is proven by most of the same evidence that we've already discussed. The Defendant told other officers not to submit reports. Then he submitted his reports that left out almost all the key facts. He left them out. He left out key facts about the 10:30 incident again when he talked to the FBI when he claimed it didn't even happen.

He did all that because he didn't want there to be an accurate and complete and truthful record of what happened because he knew he couldn't justify it. So he submitted false reports to try to cover up what he did.

People in the community count on law enforcement officers to be honest, to uphold the law. The Defendant banked on that trust and then he exploited it. He abused his power, he abused Jordan, and he abused that public trust.

The Defendant thought he could keep the trigger pulled down, could repeatedly assault Jordan, and then just write false reports and get away with it. But he was wrong. You know that it's wrong for an officer to torture a young

man who was troubled but was not a threat.  You know that no one is above the law.

And now it's up to you.  Hold the Defendant accountable for what he did to reach the conclusion demanded by the evidence in this case:  The Defendant is guilty.

THE COURT:  All right.

MR. STRIANSE:  Thank you.

Good afternoon, ladies and gentlemen.

Mark Bryant risked his life every day at the Cheatham County Jail for $13.25 an hour, and his superiors gave him about $2 worth of training.  After sitting here for most of this week, I respectfully suggest to you that one thing is painfully clear:  Prior to the civil lawsuit being filed in connection with this incident in July of 2017 and the Channel 5 News exposé that followed, there was simply no consistent, clear taser policy in place at the Cheatham County Jail on November 5, 2016.

You heard from JJ Hannah.  We called JJ Hannah in our case.  He is the jail administrator.  He is the man that was in charge of the jail on November 5, 2016.  He admitted to the FBI and to the TBI, when he was interviewed back in August of 2017 shortly after the civil lawsuit was filed and that he reiterated here in open court, that at the time of this Jordan Norris incident, November 5, 2016, we didn't have much of a policy on tasers.  There was no limit on drive

stun.  Absolutely nothing about three 5-second bursts being a
limit on the number of tases that could be administered.

Also in the policy at that time, there was no
prohibition against tasing someone who was restrained if they
were still resisting.

If you were too flabbergasted by JJ Hannah's
testimony and you need to look at something to confirm what
he told you, when you get back there, take a look at
Exhibit 1, Government's Exhibit 1.  That's the Cheatham
County Sheriff's Office general order.  It's the taser policy
that was in effect February 4, 2015.  That was the policy
that was in effect at the time of this November 2016
incident.

And as you thumb through Government's Exhibit 1 in
your looseleaf, it's the second document in.  And I would ask
you to take a look at 6.2.2 which is on page 2 and read it
for yourself.  And then you can judge that what Hannah was
telling you is absolutely true.  No drive-stun limits, no
mention of this three 5-second bursts that you kept hearing
over and over again this week.

I'd also ask you, when you go to retire to
deliberate on this case, take a look at Government's
Exhibit 3.  That is the taser training -- taser academy --
excuse me -- certification test.  That is the 20-question
test that they wanted all the correctional officers to get

1    100 percent on.  You look at that in Government's Exhibit 3.

2    See if there is one question on that test that addresses

3    itself to the length of any stun or the number of any stun.

4            That was the test that Mark Bryant took on

5    October 23rd, 2015.  That was the eight-hour class, supposed

6    to be an eight-hour class that was over in three hours.  And

7    he told you that he was never recertified.

8            Now, JJ Hannah confirmed for you-all that the old

9    policy, the pre-lawsuit policy, had none of the limits that

10   you heard about from the Government this week.  You got to

11   hear the Government's proof this week, and probably one of

12   the biggest ironies in this case is that the guy that the

13   Government selects to carry the ball for them on what the

14   taser policy was in November of 2016, which is a critical

15   issue in your consideration of this case, is Gary Ola.

16   That's the individual that they want you to rely on as to

17   what the policy was in effect in November of 2016.

18           And, of course, the irony is, this is the same guy

19   that was prosecuted by these people for lying twice to the

20   FBI and the TBI.  Once up in Ashland City in August of 2017

21   when he said, "I wasn't there, I didn't see these tasing

22   incidents," and then nine months later right across the hall,

23   right outside of these doors, he lied to an FBI agent when he

24   was here in the federal building.

25           This is probably the only building in America

where you can be convicted for lying to the federal
government about 10 feet outside that door and then the same
federal government puts him on the witness stand and expects
you to give him the full faith and credit on his oath.

　　　　　The Government doesn't even believe him.  They've
prosecuted him as a liar, as a perjurer, but they want you to
believe him beyond a reasonable doubt.  And listen to what
the Judge tells you about reasonable doubt.  Proof of such a
convincing character that you would act upon it and rely upon
it in the most important of all of your affairs.  Would you
act and rely upon anything important in your lives based on
what Gary Ola told you?

　　　　　So it's against this backdrop, ladies and
gentlemen, that on November 5th, 2016, two worlds collide.
You have the collectively untrained from the second shift
that encounter the uncontrollable.

　　　　　And, ladies and gentlemen, this is not a Lifetime
channel movie.  The Government wants you to believe that
Jordan Norris was just a skinny teenager acting out.  Is that
really what you heard?  Is that really a fair
characterization of what happened on November 5th, 2016?
Whoever has the best story wins?  We don't have to worry
about what really the facts are in the case?

　　　　　You heard proof in this case this was a profoundly
troubled young man possessed, according to the correctional

officers, of unnatural strength.  We called the doctor from

Middle Tennessee Mental Health Institute, Dr. Small, who

testified yesterday, diagnosed him with severe major

depressive disorder with acute psychotic features.  And I

said, "Well, Doctor, what is a psychotic feature?  What does

that piece mean?"

        It means that he was having auditory and visual

hallucinations.  He was assaulting people in the jail.  He

was suffering from delirium, and he told you what delirium

was; that he was labile.

        And I said, "What does labile mean?"

        That he was emotionally unstable, unpredictable,

and violent.

        You heard the testimony of Mr. Montgomery, the guy

that used to be a jailer, now he's a 911 dispatcher, the big

man that sat in front of you.  Someone his size told you it

took all that they could do, the collective strength of these

correctional officers, I think he said to control one arm at

a time of Jordan Norris.

        Josh Marriott testified for the Government.  And

he described in his interview with the FBI and the TBI back

in August of 2017.  And, remember, that was five days after

he had gotten placed on administrative leave for his role in

this incident.  And then he reiterated on the witness stand

the same thing, that in his encounter with Jordan Norris on

1  that night, November 5, 2016, he was possessed.  He was out

2  of his mind.  He was the craziest incident that Marriott had

3  ever experienced in his role as a correctional officer, that

4  he thought he was on drugs or having a mental breakdown, that

5  Jordan Norris presented to him the most difficult inmate he

6  had ever dealt with in trying to place into a restraint

7  chair.

8         And then he punctuated his comments, both in the

9  interview and in his testimony before you on Tuesday, that

10  "everything we did was necessary," meaning everything that

11  they did on the second shift to control Jordan Norris was

12  necessary.

13         Now, remember those candid and unvarnished

14  statements were made right after he was placed on

15  administrative leave.  Well, evidently that was then and this

16  is now.  Now and his wife -- now he and his wife are back

17  working full time for Cheatham County.  He's been elevated to

18  a road officer.  His wife is working back in the jail.  And

19  he's put a little bit different spin on it.  He told you that

20  after this incident, he stopped carrying a taser.  I don't

21  know why he told you that.  I don't know if he wanted to

22  convey that this incident had such a profound effect on him

23  that he could no longer carry a taser.

24         On cross-examination, I said, "Well, didn't you

25  continue to carry a taser from November 5, 2016, until

July 28 of 2017 when you were placed on administrative
leave?"  And he admitted, "Well, yeah, I did continue to
carry a taser."

You may be wondering, well, how does all of this
relate to the charges in the indictment, your consideration
of the proof against Mark Bryant, and the ultimate question
whether the Government has proven beyond a reasonable doubt
that he has committed these four offenses in the indictment.
I think the Judge is going to tell you, when he reads you the
instructions as to what the law is, that in order to convict
Mark Bryant of depriving Jordan Norris of his Constitutional
rights on November 5th, 2016, the Government has to prove
every element of the offense, not just one.  They have to
prove every element of the offense.

And one of the essential elements, probably the
most essential element that the Government has to prove, is
that he acted willfully, that he -- and read that when you
get back to the jury room -- that Mark Bryant acted with
specific intent or the specific purpose to do something that
the law forbids.  That's the definition of willfulness, that
he basically acted in open defiance and reckless disregard of
his training and the law.

Ask yourselves, when you get back there to discuss
the issues in this case, as you're evaluating Mark Bryant's
interactions with Jordan Norris on November 5, 2016, ask

1    these kinds of questions:  Did Mark Bryant intentionally do

2    something that was forbidden by his taser training?

3            And look at the taser training.  No limitations on

4    the amount of tases, no limitations on the duration of the

5    tases.  And then remember what Hannah told you: the fact that

6    they really didn't have much of a taser policy in place at

7    the time of this incident.

8            Then ask yourselves, did Mark Bryant intentionally

9    do something in open defiance of his taser training?  Well,

10   this is the same taser training that Hannah said there wasn't

11   much to it and there were no limits.

12           Did Mark Bryant intentionally do something in

13   reckless disregard of his taser training?  You read the taser

14   training and you'll see no limitations whatsoever.

15           Then ultimately, engaging the willfulness element

16   in this case, did Mark Bryant act with a bad purpose or, in

17   reality, did Mark Bryant act on bad or simply insufficient

18   information?

19           In determining if Mark Bryant acted willfully --

20   and again, willfulness is an essential element of Counts 1

21   and 2 -- the Judge will tell you that you must consider

22   whether Mark Bryant knew through his training that his

23   actions on that night were unlawful.  Given the state of the

24   taser training on November 5, 2016, how could you ever answer

25   that question yes, that he knew that his actions were

unlawful, when he was interacting with Jordan Norris on that night?  You must also consider whether he knew that he was violating any department policy.

Well, you read the department policy and see if he was violating it.

And then there's something that I think is even more significant when you're weighing this issue of willfulness, and I would ask you to factor it into your discussions.  It's sort of an unusual circumstance.  So many times when somebody violates the law, there may not be any witnesses to it.  You don't know exactly what's going on. Here, everything that Mark did on November 5, 2016, was in the immediate presence of the entire second shift and the entire third shift, his coworkers, who were actively assisting him in trying to quell the disturbance that was caused by Jordan Norris.

And ask yourselves when you get back there.  I think it's remarkable; I don't know if you think it's remarkable:  Not one coworker objected in any way.  Not one told him, "Hey, Mark, you are violating the policy by what you're doing with that taser."  No one interceded.  No one stopped him.  Gary Ola, the person in charge of training the taser at the jail is standing right there at 10:20 when it's going on.  And he's assisting the officers, says absolutely nothing to Mark.

1    No one wrote a report.  They didn't have to run up

2 to Mark and say -- and embarrass themselves and get in a

3 conflict with Mark Bryant.  They knew where the box was that

4 had JJ Hannah's name on it.  They could have put a report

5 anonymously or put their name on it and said, "We object to

6 what happened."  It never happened.

7    I think, ladies and gentlemen, that is the best

8 evidence that there was really no taser policy on November 5,

9 2016, because none of the officers that were operating under

10 the taser policy objected one whit to what Mark Bryant had

11 done that evening.

12    And then ask yourselves, how were they applying

13 the taser policy?  Think about Daniel Bratton who came to the

14 aid of Key and Bryant at the door outside of Cell 4 at about

15 6:55.  You have Bratton who tases Jordan Norris to get him

16 subdued four times.  He thought it was three, but the

17 official record says four times outside the door of Cell 4.

18 Part of that time, he's cuffed.  At least one of those tases,

19 Jordan Norris is cussed.

20    So over a period of 50 seconds, Daniel Bratton

21 tased Jordan Norris four times for a total of 20 seconds.

22 Nobody said boo about that.  Nobody said that that violated

23 the policy.  I think I know why nobody said anything about

24 it, because Daniel Bratton's picture was not plastered on

25 Channel 5 News after this lawsuit was filed in July of 2017.

1          What did Mark Bryant do after he filed those

2     reports?  And what did the jail do after he filed those

3     reports in November?  About a week later, the reports went to

4     Hannah.  Hannah acted on those reports.  These are the same

5     reports that the Government's trying to convince you are made

6     out of whole cloth and have no details in them.

7          Well, Hannah got him, he read them, called Mark up

8     to the office.  Mark Bryant meets with JJ Hannah, he meet --

9     all the administrative guys.  Mr. Isherwood, Mr. Whitt.  They

10    discussed the incident, they discussed the fact of this

11    20-second tase that happened at 8:00.  Mark Bryant gives his

12    version, gives his justification.  Never hears anything back.

13         Mark, the person that they're trying to convince

14    you is willfully violating the law and scoffs at the law and

15    is an assaultive person, what does he do?  Does he forget

16    about it?  Does he bury it?  No.  In February of 2017, he

17    goes back up to the second floor and knocks on the door.

18    What's the status of the investigation, the internal

19    investigation that was being conducted by Hannah and the guys

20    on the second floor?  What do they tell him?  Sheriff tells

21    him, "You're clear.  It was justified.  Don't worry about

22    it."

23         Everything is fine until July 21st of 2017 when a

24    civil lawsuit is filed.  Then all of a sudden, it's not okay

25    anymore.  All of a sudden, the jail is embarrassed.  All of a

sudden, Sheriff Breedlove is embarrassed.  People are asking questions about the training.

I just want to talk very briefly about these reports that the Government insists are lies that were intended to mislead investigators.  When you get back there, take a look at Government's Exhibit 19.  Government's Exhibit 19 corresponds to Count 3 in the indictment, this false statement, this obstruction of justice that he's charged with.

A few minutes ago, the Government was telling you, left out all the details.  No details in this at all.

You can read it.  You've heard the proof.  You ask yourselves what was left out?  What else could have been in there?  How could this have in any way impeded anyone's investigation?  And I'm not going to read it to you, but it's a summary from 6:55 through 9:22.  And it takes you through every relevant event and every person that was involved that night.  The -- what happened in Cell 4, how they have to go to Cell 4 to extract Jordan Norris because he's threatening another inmate, the fact that he didn't comply, the fact that they had this confrontation with him outside of Cell 4, what happened in terms of the drive stuns when he was in the restraint chair, additional drive stun applications.  Everything is in this report.

But they want you to believe that this somehow

impeded an investigation when within one week, Hannah got it in his box and was calling downstairs to talk to Mark.

And then a second shift officer puts together Government's Exhibit 20. Mark Bryant finished up his shift, and he told you the reasons why he thought it was important to stay around and help the people on third shift. And he writes a report for third shift to describe what happened at 10:20 p.m.

And again, the Government wants you to believe that this summary of what happened somehow had the intent that he was intending to impede or stop an investigation. All evidence to the contrary. It gave them all the information that they needed to know: the date, the time, the event. It wasn't filed two weeks after the event. It was filed that night and went to the right place.

Ladies and gentlemen, I want to thank you on behalf of Mark Bryant and his family for your attention and your participation this week. We know how difficult it is to serve on a jury, to drive downtown, to be away from your families and your work.

I want to leave you with one thought. There is a chasm between the presumption of innocence and proof beyond a reasonable doubt. And the Government, in presenting a case to you, has to build a bridge strong enough to carry each one of you across from the presumption of innocence to proof

beyond a reasonable doubt.  It's a very heavy burden.  It's a
very strict burden.  Proof of such a convincing character
that you would be willing to act upon it, rely upon it in the
most important of all of your affairs.

I respectfully suggest to you, ladies and gentlemen,
that the Government does not build a bridge strong enough to
bring all 12 of you over with a taser policy in effect on
November 5, 2016, that sets no limits; that we have a
situation where we bring JJ Hannah in who tells you, "We
didn't have much of a taser policy in November of 2016."

The Government doesn't build that bridge by giving you
Gary Ola as the source of information as to what the taser
policy was at the time.  The man convicted of making false
statements is the one they rely on and want you to rely on to
take his word as to what the policy is.  They don't build
that bridge strong enough to get all 12 of you over with no
proof that Mark Bryant acted willfully.

If you read that willfulness instruction, and you
consider the things that we've talked about this afternoon,
that is an essential element, given what the taser policy
was, that cannot be proven.  And, ladies and gentlemen, they
also don't do it with any proof of bodily injury.  This was
handled in the most casual way by the Government.  You heard
no competent proof of any bodily injury.  They presented no
medical proof.  We were the only ones that presented any

medical proof:  Dr. Small from Middle Tennessee Mental Health Institute.  Not even a photograph of any injuries that supposedly were associated with the tasing incident.

They put Special Agent Joy Wright on the witness stand to say that she met with him in 2017.  Don't you think the FBI has the ability to gather the records from the Ashland City hospital, to ask Jordan Norris, "Well, you complain about a wound to your knee.  Where were you treated?  Did you take a picture of it?"

No, they just want to come in here and say inflammatory things like, "Well, it looked like hamburger meat or ground meat."  And you've not seen any sort of demonstrative evidence to back that up.

Ladies and gentlemen, thank you for your time and attention.  I think if you consider the facts of this case, if you read Judge Crenshaw's instructions very carefully, particularly on willfulness, there's really only one verdict in this case: that the Government has failed to prove this case beyond a reasonable doubt, and Mark Bryant should be acquitted of all four counts.

THE COURT:  All right.  I calculate you've got about four minutes.

MS. MYERS:  Thank you, Your Honor.

This is not a case about training or policies.  This is a case about the difference between right and wrong,

appropriate use of force and excessive force, and when the
Defendant crossed the line. You saw and you heard evidence
again and again in this case demonstrating when the Defendant
crossed the line. You even had the benefit of hearing, in
the Defendant's own words, that his voice commands respect in
the jail. And when he did not get that respect on the night
of November 5th, 2016, when he did not get the respect that
he wanted from Jordan Norris, he punished him. He punished
him by tasing him repeatedly to excess by any standard, even
by the Defendant's own standard.

"The least amount of force necessary." Ask
yourself: How many times did the Defendant make that
statement, "the least amount of force necessary"? And when
you watch those videos, you've seen them so many times
already, you ask yourself: Was that the least amount of
force necessary to combat a threat? There was no threat.
No. To get him to put his arm down because he didn't like
where it was even when it was restrained? No. That is
excessive force. That is violating someone's Constitutional
right.

And if you listen to the defense, he would have
you believe that it's the Wild West in the Cheatham County
Jail, that they can tase anybody for as long as they want for
as many times as they want. And that is simply not true.
That is simply not common sense. You are not asked to check

your common sense at the door. There are limits. You heard
about those limits. You heard about them from Josh Marriott
who was in the same training class with the Defendant who
learned that you could tase someone for three, 5-second
bursts. And that was clear to him. He understood the rules.
He didn't have any trouble understanding what that meant.

        In addition to that, to what we heard testimony
about, about the limits in the training, which he knew about,
he knew about and violated. And when you look at Officer
Bratton's use of force and the Defendant's use of force, it
is clear. Bratton pulled the taser off of him, less than
5-second bursts. That's what we heard from him. That is not
what we heard from the Defendant.

        What we heard from the Defendant was that he held
the trigger down again and again for a total of 97 seconds
that night. 97 seconds of excruciating pain. You heard
people testify what it's liked to be tased. You heard the
Defendant state that he did not want to volunteer to be tased
again because he knew what that pain felt like. But he held
the trigger down with no reason, no justification, and then
he lied about it in the reports.

        And when you go back to the jury room and you
start deliberating, one of you can take out your clock and
you can sit there for 97 seconds.

        THE COURT: Okay. If -- you need to wrap up, you

should -- you can wrap up.

MS. MYERS:  Thank you, Your Honor.

Look at the reports.  But most importantly, look at the ones that he filed before and after.  The details that he included, the material facts he included, and the ones that he did before this incident and the ones he did after.  That is his intent, right there: to cover this up.  "I'll keep doing it until I run out of batteries."

You've seen the evidence.  You know what needs to happen.  The evidence demands that you find him guilty on all four counts.  Hold him responsible.

THE COURT:  All right.  Ladies and gentlemen, the court officer is now going to pass to you a copy of the instructions so you can follow along.

All right.  Again, the courtroom doors will be held secure until I complete the charge.

Members of the jury, now that you've heard the evidence and the argument, it becomes my duty to give you the instructions of the Court as to the law applicable to this case.

It is your duty as jurors to follow the law as I shall state it to you and to apply the law to the facts as you find them from the evidence in this case.  You are not to single out one instruction alone as stated in the law, but must consider the instructions as a whole.  Neither are you

to be concerned with the wisdom of any rule of law as stated by me.

        The lawyers may have referred to some of the governing rules of law in their arguments.  If, however, there is any difference between the law as stated by the lawyers and that stated in these instructions, you are, of course, to follow these instructions.

        Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case or what that opinion is.  It is not my function to determine the facts, but yours.

        You have two main duties as jurors.  First, one is to decide what the facts are from the evidence that you saw and heard here in the courtroom.  Deciding what the facts are is your job, not mine, and nothing that I've said or done during this trial was meant to influence your decision about the facts in any way.

        Your second duty is to take the law that I give you, apply it to the facts, and decide if the Government has proved the Defendant guilty beyond a reasonable doubt.  It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial and these instructions.  All of

1  the instructions are important and you should consider them

2  together as a whole.

3          Perform these duties fairly.  Do not let bias,

4  sympathy, or prejudice that you may feel toward one side or

5  the other influence your decision in any way.

6          You must make your decision based only on the

7  evidence that you saw and heard here in court.  Do not let

8  rumors, suspicions, or anything else that you may have seen

9  or heard outside of court influence your decision in any way.

10         The evidence in this case includes only what the

11  witnesses said while they were testifying under oath, the

12  exhibits that I allowed into evidence, the stipulations that

13  the lawyers agreed to, and any facts that I have judicially

14  noticed.

15         Nothing else is evidence.  The lawyers' statements

16  and arguments are not evidence.  Their questions and

17  objections are not evidence.  My legal rulings are not

18  evidence.  And my comments and questions are not evidence.

19         During the trial, I did not let you hear the

20  answers to some of the questions that the lawyers asked.  I

21  also ruled that you could not see some of the exhibits that

22  the lawyers wanted you to see.  And sometimes I ordered you

23  to disregard things that you saw or heard, or I struck things

24  from the record.

25         You must completely ignore all of these things.

Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.  Make your decision based only on the evidence as I have defined it here, and nothing else.

Now, some of you may have heard the terms "direct evidence" and "circumstantial evidence."  Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one or say that one is any better evidence than the other. You should consider all of the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

1         Another part of your job as jurors is to decide

2 how credible or believable each witness was.  This is your

3 job, not mine.  It is up to you to decide if a witness's

4 testimony was believable and how much weight you think it

5 deserves.  You are free to believe everything that a witness

6 said or only part of it or none of it at all.  But you should

7 act reasonably and carefully in making these decisions.

8         Let me suggest some things for you to consider in

9 evaluating each witness's testimony.

10         Ask yourself if the witness was able to clearly

11 see or hear the events.  Sometimes even an honest witness may

12 not have been able to see or hear what was happening and may

13 make a mistake.

14         Ask yourself how good the witness's memory seemed

15 to be.  Did the witness seem able to accurately remember what

16 happened?  Ask yourself if there was anything else that may

17 have interfered with the witness's ability to perceive or

18 remember the events.

19         Ask yourself how the witness acted while

20 testifying.  Did the witness appear honest, or did the

21 witness appear to be lying?

22         Ask yourself if the witness had any relationship

23 to the Government or the Defendant or anything to gain or

24 lose from the case that might influence the witness's

25 testimony.  Ask yourself if the witness had any bias or

prejudice or reason for testifying that might cause the
witness to lie or to slant the testimony in favor of one side
or the other.

Ask yourself if the witness testified
inconsistently while on the witness stand, or if the witness
said or did something or failed to say or do something at any
other time that is inconsistent with what the witness said
while testifying.  If you believe that the witness was
inconsistent, ask yourself if this makes the witness's
testimony less believable.  Sometimes it may; other times it
may not.  Consider whether the inconsistency was about
something important or about something unimportant in detail.
Ask yourself if it seemed like an innocent mistake or if it
seemed deliberate.

Ask yourself how believable the witness's
testimony was in light of all the other evidence.  Was the
witness's testimony supported or contradicted by other
evidence that you have found believable?  If you believe that
a witness's testimony was contradicted by other evidence,
remember that people sometimes forget things, and that even
two honest people who witnessed the same event may not
describe it exactly the same way.

These are only some of the things that you may
consider in deciding how believable each witness was.  You
may also consider other things that you think shed some light

1    on the witness's believability.  Use your common sense and

2    your everyday experience in dealing with other people, and

3    then decide what testimony you believe and how much weight

4    you think it deserves.

5           You should use your common sense in weighing the

6    evidence.  Consider it in light of your everyday experience

7    with people and events, and give it whatever weight you

8    believe it deserves.  If your experience tells you that

9    certain evidence reasonably leads to a conclusion, you are

10   free to reach that conclusion.

11          As you know, the Defendant has pled not guilty to

12   the crimes charged in the indictment.  The indictment is not

13   evidence at all of guilt.  It is just the formal way that the

14   Government tells the Defendant what crimes he is accused of

15   committing.  It does not even raise any suspicion of guilt.

16          Instead, the Defendant starts the trial with a

17   clean slate with no evidence at all against him, and the law

18   presumes that he is innocent.  This presumption of innocence

19   stays with him unless the Government presents evidence here

20   in court that overcomes the presumption and convinces you,

21   beyond a reasonable doubt, that he is guilty.

22          This means that the Defendant has no obligation to

23   present any evidence at all or to prove to you in any way

24   that he is innocent.  It is up to the Government to prove

25   that he is guilty, and this burden stays on the Government

from start to finish.  You must find the Defendant not guilty
unless the Government convinces you beyond a reasonable doubt
that he is guilty.

The Government must prove every element of the
crimes charged beyond a reasonable doubt.  Proof beyond a
reasonable doubt does not mean proof beyond all possible
doubt.  Possible doubts or doubts based purely on speculation
are not reasonable doubts.  A reasonable doubt is a doubt
based on reason and common sense.  It may arise from the
evidence, the lack of evidence, or the nature of the
evidence.

Proof beyond a reasonable doubt means proof which
is so convincing that you would not hesitate to rely and act
on it in making the most important decisions in your own
lives.

If you are convinced that the Government has
proved the Defendant guilty beyond a reasonable doubt, say so
by returning a guilty verdict.  If you are not convinced, say
so by returning a not guilty verdict.

One more point about witnesses.  Sometimes jurors
wonder if the number of witnesses who testified makes any
difference.  Do not make any decisions based only on the
number of witnesses who testify.  What is more important is
how believable the witnesses were, how much weight you think
their testimony deserves.  Concentrate on that, not the

1　numbers.

2　　　　　There is one more general subject that I want to

3　talk to you about before I begin explaining the elements of

4　the crimes charged.

5　　　　　The lawyers for both sides objected to some of the

6　things that were said or done during the trial.  Do not hold

7　that against either side.  The lawyers have a duty to object

8　whenever they think that something is not permitted by the

9　Rules of Evidence.  Those Rules are designed to make sure

10　that both sides receive a fair trial.

11　　　　　And do not interpret my rulings on their

12　objections as any indication of how I think the case should

13　be decided.  My rulings were based on the Rules of Evidence,

14　not on how I feel about the case.  Remember that your

15　decision must be based only on the evidence that you saw and

16　heard here in court.

17　　　　　The Government and the Defendant have agreed or

18　stipulated to certain facts.  Therefore, you must accept the

19　following stipulated facts as proved:

20　　　　　1:  On November 5, 2016, Defendant Mark Bryant was

21　employed as a corporal in the Cheatham County Jail in Ashland

22　City, Tennessee.

23　　　　　2:  On November 5, 2016, Defendant Mark Bryant was

24　on duty working at the Cheatham County Jail from 2:00 p.m.

25　until at least 10:30 p.m., Central Standard Time.

1          3:  Defendant submitted two incident reports

2    relating to events at the Cheatham County Jail on November 5,

3    2016.  The time listed on one report is 1855, and the time

4    listed on the second report is 2220.

5          That concludes the part of my instructions

6    explaining your duties and the general rules that apply in

7    every criminal case.  In a moment, I will explain the

8    elements of the crimes that the Defendant is accused of

9    committing.

10          But before I do that, I want to emphasize that the

11   Defendant is only on trial for the particular crimes charged

12   in the indictment.  Your job is limited to deciding whether

13   the Government has proved the crimes charged.

14          Also keep in mind that whether anyone else should

15   be prosecuted and convicted for these crimes is not a proper

16   matter for you to consider.  The possible guilt of others is

17   no defense to a criminal charge.  Your job is to decide if

18   the Government has proved this Defendant guilty.  Do not let

19   the possible guilt of others influence your decision in any

20   way.

21          The Defendant has been charged with several

22   crimes.  The number of charges is not evidence of guilt, and

23   this should not influence your decision in any way.  It is

24   your duty to separately consider the evidence that relates to

25   each charge and to return a separate verdict for each one.

1    For each charge, you must decide whether the Government has

2    presented proof beyond a reasonable doubt that the Defendant

3    is guilty of that particular charge.

4            Your decision on one charge, whether it is guilty

5    or not guilty, should not influence your decision on any of

6    the other charges.

7            As I previously told you, the indictment is not

8    any evidence at all of guilt.  It is just the formal way that

9    the Government tells the Defendant what crimes he is accused

10   of committing.  It does not even raise any suspicion of

11   guilt.

12           The indictment alleges that:

13           Count 1:  On or about November 5, 2016, in the

14   Middle District of Tennessee, Mark Bryant, while acting under

15   color of law, willfully deprived Jordan Norris, a person

16   known to the Grand Jury, of the right, secured and protected

17   by the Constitution and laws of the United States, to be free

18   from the deprivation of liberty without due process of law,

19   which includes the right to be free from the use of

20   unreasonable force amounting to punishment.

21           Specifically, Mark Bryant used a Taser on Jordan

22   Norris multiple times without legal justification while

23   Jordan Norris was in a restraint chair and surrounded by

24   multiple officers.  One of these Taser cycles lasted

25   approximately 25 minutes, and a second cycle lasted

approximately 15 seconds -- 25 seconds, and a second cycle
lasted approximately 15 seconds.

The offense resulted in bodily injury to Jordan
Norris and the offense included the use of a dangerous
weapon, all in violation of Title 18, United States Code,
Section 242.

Count 2:  On or about November 5, 2016, in the
Middle District of Tennessee, Mark Bryant, while acting under
color of law, willfully deprived Jordan Norris, a person
known to the Grand Jury, of the right, secured and protected
by the Constitution and the laws of the United States, to be
free from the deprivation of liberty without due process of
law, which includes the right to be free from the use of
unreasonable force amounting to punishment.

Specifically, as officers prepared to transport
Jordan Norris to a medical facility, Mark Bryant used a Taser
on Jordan Norris without legal justification after Jordan
Norris was placed in handcuffs and was surrounded by multiple
officers.  The Taser cycle lasted for approximately 11
seconds.  The offense resulted in bodily injury to Jordan
Norris, and the offense included the use of a dangerous
weapon, all in violation of Title 18, United States Code,
Section 242.

Count 3:  On or about November 5, 2016, in the
Middle District of Tennessee, Mark Bryant, in relation to and

in contemplation of a matter within the jurisdiction of the

Federal Bureau of Investigation, an agency of the United

States, knowingly falsified a document with the intent to

impede, obstruct, and influence the investigation and proper

administration of the matter within the jurisdiction of a

federal agency.

Specifically, Mark Bryant falsified a Cheatham

County Sheriff's Department report dated November 5, 2016,

for a use of force incident involving detainee Jordan Norris

by omitting the material information that Mark Bryant tased

Jordan Norris multiple times for a total of approximately 50

seconds at approximately 8:00 p.m., and by falsely reporting

the sequence of events related to Mark Bryant's use of a

Taser on Jordan Norris at approximately 8:00 p.m., under

different circumstances from Officer --

Remind me.  Who's D.B.?

MR. SONGER:  Your Honor, Daniel Bratton.

THE COURT:  -- Daniel Bratton's use of a Taser at

6:55 p.m., all in violation of Title 18, United States Code,

Section 1519.

Count 4:  On or about November 5, 2016, in the

Middle District of Tennessee, Mark Bryant, in relation to and

in contemplation of a matter within the jurisdiction of the

Federal Bureau of Investigation, an agency of the United

States, knowingly falsified a document with the intent to

impede, obstruct, and influence the investigation and proper

administration of the matter within the jurisdiction of a

federal agency.

Specifically, Mark Bryant falsified a Cheatham

County Sheriff's Department report dated November 5, 2016,

for a use of force incident involving detainee Jordan Norris

by omitting the material information that Mark Bryant tased

Jordan Norris for approximately 11 seconds at approximately

10:30 p.m. while Jordan Norris was compliant, all in

violation of Title 18, United States Code, Section 1519.

Next, I want to say a word about the date

mentioned in the indictment.  The indictment charges that the

crimes happened on or about November 5, 2016.  The Government

does not have to prove that the crimes happened on that exact

date, but the Government must prove that the crimes happened

reasonably close to that date.

I will now explain to you the elements of each of

the charges in the indictment.

Counts 1 and 2 of the indictment accuse the

Defendant of, while acting under color of law, willfully

depriving someone else of a right secured and protected by

the Constitution and laws of the United States, in violation

of Title 18, United States Code, Section 242.  For you to

find the Defendant guilty of Count 1 or 2, you must be

convinced that the Government has proved each and every one

of the following elements beyond a reasonable doubt:

First, that the Defendant has acted under color of state law;

Second, that the Defendant deprived the victim, Jordan Norris, of a right which is secured by the Constitution or laws of the United States.  Here, the right at issue is Jordan Norris's right to be free from the deprivation of liberty without due process of law.  This right includes the right to be free from an officer's use of objectively unreasonable force while awaiting trial;

Third, that the Defendant acted willfully;

And fourth, that the Defendant's conduct resulted in bodily injury to Jordan Norris or that the Defendant used a dangerous weapon.

If you are convinced that the Government has proved all of these elements of the charge, say so by returning a guilty verdict on the charge.  If you have a reasonable doubt about any one of these elements for the charge, then you must find that -- the Defendant not guilty of the charge.

I will now provide you with additional instructions regarding some of these elements.

A person acts under color of law if he is an official or employee of a government, and he uses or abuses power he possesses because of his official position.  A

1  Government official, such as a police officer, acts under

2  color of law if he is performing his official duties, even if

3  he misuses or abuses his official authority by doing

4  something the law forbids.  Whether a Government official

5  acts under color of law depends on the nature of his actions,

6  not merely whether he is on duty or in uniform.

7          I instruct you that if you find that the Defendant

8  was an officer in the Cheatham County Jail, and that he acted

9  or gave the appearance of acting as a jail officer at the

10 time of the charged incident, then you may find that he acted

11 under color of law and that this first element is satisfied.

12         The second element that the Government must prove

13 with respect to Counts 1 and 2 is that the Defendant deprived

14 Jordan Norris of his right not to be deprived of liberty

15 without due process of law.  A pretrial detainee; that is,

16 someone who has been arrested for violating the law but is

17 presumed innocent because they have not been convicted of the

18 crime for which they have been arrested, is presumed

19 innocent.  Therefore, he may not be punished while awaiting

20 trial.  This means that the pretrial detainee may not be

21 subjected to an officer's use of objectively unreasonable

22 force while he is awaiting trial.

23         Not every use of force by a law enforcement

24 officer against a pretrial detainee is unconstitutional.  An

25 officer may use force to maintain the safety of himself and

1    other officers, to prevent a riot, to similarly maintain

2    discipline, or restore order in a jail or prison facility, or

3    to accomplish other legitimate law enforcement goals, even

4    when some force is objectively necessary to carry out a

5    legitimate law enforcement objective; however, officers may

6    not use more force than objectively reasonable to achieve

7    that goal.

8                An officer may not use force merely because an

9    arrestee questioned an officer's authority, insults the

10   officer, uses profanity, or otherwise engages in verbal

11   provocation unless the force was otherwise objectively

12   reasonable at the time it was used.  An officer may not use

13   force solely to punish, retaliate against, or seek

14   retribution against another person.

15               If you determine that the Defendant used physical

16   force against Jordan Norris, you must then decide whether

17   that force was objectively unreasonable.  You should evaluate

18   the reasonableness from the point of view of an ordinary and

19   reasonable officer on the scene and at the moment the force

20   was used.  In making your determination, you should consider

21   all of the facts and circumstances, including the amount of

22   the force used; the relationship between the need for the use

23   of force and the amount of force used; the extent of Jordan

24   Norris's injury, if any; any effort made by the Defendant to

25   temper or to limit the amount of force; the severity of any

security problem at issue; the threat, if any, reasonably
perceived by the Defendant; and whether Jordan Norris was
actively attempting to escape or resisting orders given by
the Defendant or other law enforcement authorities.

In determining whether the force used was
reasonable under all of the facts and circumstances, keep in
mind that force that is objectively reasonable at the
beginning of an encounter may not be justified, even seconds
later, if the objective justification for the use of force
has been eliminated.

A person acts willfully if he acts voluntarily and
intentionally with a specific intent to do something the law
forbids.  Here, that means that you may find the Defendant
acted willfully if you find that he acted in open defiance or
reckless disregard of a pretrial detainee's right to be free
from a law enforcement officer's use of objectively
unreasonable force.

It is not necessary for the Government to prove
that the Defendant was thinking in legalistic terms at the
time of the incident or that he had an appreciation that his
conduct was prohibited by a particular provision of the
criminal code or by the Constitution.  You must, however,
find that the Defendant acted with the bad purpose of doing
what the Constitution forbids.  In this context, you must
find that the Defendant intended to use more force than was

1    reasonable under the circumstances.

2            In determining whether the Defendant acted

3    willfully, you may consider any facts or circumstances you

4    deem relevant to shed light on what was in the Defendant's

5    mind.  For example, you may consider the manner in which any

6    constitutional violation was carried out and the duration of

7    any constitutional violation.  You may also consider what the

8    Defendant said; what the Defendant did or failed to do; how

9    the Defendant acted; and whether the Defendant knew, through

10   training or experience, that his actions were unlawful and

11   whether he knew that they violated department policy or his

12   own training.

13           Intent is a state of mind.  Ordinarily, there is

14   no way that a Defendant's state of mind can be proved

15   directly, because no one can read another person's mind and

16   tell what that person is thinking.  But a Defendant's state

17   of mind can be proved indirectly from the surrounding

18   circumstances.  This includes things like what the Defendant

19   said, what the Defendant did, how the Defendant acted, and

20   any other facts or circumstances in evidence that show what

21   was in the Defendant's mind.

22           You may also consider the natural and probable

23   results of any acts that the Defendant knowingly did, and

24   whether it is reasonable to conclude that the Defendant

25   intended those results.

1        It is not a defense that the Defendant may also

2   have been motivated by greed, anger, or some other emotion,

3   provided that the intent that I have described to you was

4   present.  You may, however, consider such motivations, as

5   well as any malice displayed by the Defendant, in determining

6   whether the Defendant acted willfully, as I have described

7   that term to you.  This, of course, is all for you to decide.

8        The Government has introduced evidence of policies

9   and training the Defendant received at the Cheatham County

10  Jail.  This evidence has been admitted for a limited purpose.

11  You may use it only to determine whether the Defendant acted

12  willfully, as I have just described that state of mind to

13  you.

14        It is, of course, wholly up to you to determine

15  whether the Defendant violated any rule or acted in

16  contravention of his training.  If you find that he acted in

17  contravention of policies or training, then I caution you

18  that not every instance of inappropriate behavior on the part

19  of a Government employee rises to the level of a federal

20  constitutional violation.

21        It is possible for a Government employee to

22  violate department policy or act contrary to his training

23  without violating the United States Constitution, just as it

24  is possible for a Government employee to violate the

25  Constitution without violating a specific policy.  For this

reason, proof that a Defendant violated policy or acted contrary to training is relevant to your determination of willfulness, but it is not relevant to your determination that the Defendant violated Jordan Norris's constitutional rights.

In other words, if you determine that the Defendant violated a policy of the Cheatham County Jail or acted contrary to his training, you should consider that evidence only in determining whether the Defendant acted willfully. You should not consider that evidence in determining whether the Defendant's actions violated the Constitution in the first instance.

Bodily injury means any injury to the body, no matter how minor or temporary; and it includes any cut, abrasion, bruise, burn, disfigurement, illness, physical pain, or impairment of a bodily member -- of a body member or mental faculty.

The Government need not prove that the Defendant intended to cause bodily injury. The Government also need not prove that a Defendant's acts were the sole cause of bodily injury. The Government must simply prove that the offense resulted in bodily injury to Jordan Norris.

A dangerous weapon is any instrument capable of inflicting death or serious bodily injury, including extreme physical pain.

1          Counts 1 and 2 of the indictment charge both that

2     the offense resulted in bodily injury to Jordan Norris and

3     that the offense involved the use of a dangerous weapon.

4     However, the Government does not have to prove both that the

5     offense resulted in bodily injury and that a dangerous weapon

6     was used.  Proof beyond a reasonable doubt of one of these

7     factors is enough to prove this element.

8          But in order to return a guilty verdict, all 12 of

9     you must agree that the same factor has been proved.  That

10    is, all of you must agree that the Government proved, beyond

11    a reasonable doubt, that the offense resulted in bodily

12    injury, or all of you must agree that the Government proved,

13    beyond a reasonable doubt, that the offense involved the use

14    of a dangerous weapon.  If all of you unanimously agree that

15    the Government has proven one or both of these factors beyond

16    a reasonable doubt, then this element has been satisfied.

17         Counts 3 and 4 of the indictment accuse the

18    Defendant of knowingly falsifying a document with the intent

19    to impede, obstruct, or influence the investigation or proper

20    administration of a matter within the jurisdiction of a

21    department or agency of the United States, in violation of

22    Title 18, United States Code, Section 1519.

23         For you to find the Defendant guilty of Counts 3

24    or 4, the Government must prove each and every one of the

25    following elements beyond a reasonable doubt:

1          First, that the Defendant knowingly falsified a

2     document;

3          Second, that the Defendant, acting in relation to

4     or in contemplation of the investigation or proper

5     administration of a matter, intended to impede, obstruct, or

6     influence the investigation or proper administration of that

7     matter;

8          And third, that the matter was within the

9     jurisdiction of an agency of the United States, here, the

10    Federal Bureau of Investigation or FBI.

11         If you're convinced that the Government has proved

12    all of these elements for a charge, say so by returning a

13    guilty verdict on the charge.  If you have a reasonable doubt

14    about any one of these elements for a charge, then you must

15    find the Defendant not guilty of the charge.

16         I will now provide you with additional

17    instructions regarding some of these elements.

18         A Defendant falsifies a document by including

19    within that document any untrue statement or by omitting from

20    that document or record any material fact.

21         A Defendant acts knowingly if his act is done

22    voluntarily and intentionally, not because of mistake or

23    accident.

24         To prove that the Defendant, acting in relation to

25    or in contemplation of the investigation or proper

administration of a matter, intended to impede, obstruct, or
influence the investigation or proper administration of that
matter, the Government does not need to show that a federal
investigation was underway at the time the Defendant engaged
in obstructive conduct.

There is no requirement that the matter or
investigation have been pending or imminent at the time of
the obstruction, but only that the acts were taken in
relation to or in contemplation of any such matter or
investigation. There is also no requirement that the
falsification would naturally or probably result in
obstruction of the investigation.

In determining whether the Defendant had the
required intent, you may consider all the circumstances of
the case, including, among other things, any statements made
or omitted, any acts done or omitted by that person, and any
other circumstances you deem relevant and reliable. You may
also consider the natural and probable results of any acts
that the Defendant knowingly did, and whether it is
reasonable to conclude that he intended those results.

The Government is not required to prove that the
Defendant knew that the FBI's an agency of the United States,
or that he knew that a federal investigation was underway or
would occur in the future. Nor must the Government prove
that there was any actual delay or withholding of truthful

information from federal authorities.  The issue for you to determine is whether the matter the Defendant allegedly sought to obstruct was, in fact, within the jurisdiction of the FBI.

That concludes the part of my instructions explaining the elements of the charged crimes.  Next, I will explain some additional rules that you must use in considering some of the testimony and evidence.

You have heard the Defendant testify.  Earlier, I talked to you about the credibility or the believability of the witnesses.  And I suggested some things for you to consider in evaluating each witness's testimony.  You should consider those same things in evaluating the Defendant's testimony.

You have heard the testimony of witnesses who testified to both facts and opinions.  Each of these types of testimony should be given the proper weight.

As to the testimony on facts, consider the factors discussed earlier in these instructions for weighing the credibility of witnesses.

As to the testimony on opinions, you do not have to accept their opinions.  In deciding how much weight to give the opinion of each witness, you should consider the witness's qualifications and how he or she reached his or her conclusions.  You should also consider the other factors

discussed in these instructions for weighing the credibility

of witnesses.  Remember that you alone decide how much of a

witness's testimony to believe and how much weight it

deserves.

You have heard the testimony of Gary Ola.  You

have also heard that the Government has promised Mr. Ola that

he may receive a recommendation to the Court for a reduced

sentence in exchange for his cooperation.

It is permissible for the Government to make such

a promise, but you should consider Mr. Ola's testimony with

more caution than the testimony of other witnesses.  Consider

whether his testimony may have been influenced by the

Government's promise.

Do not convict the Defendant based on the

unsupported testimony of such a witness, standing alone,

unless you believe his testimony beyond a reasonable doubt.

Exhibit 3 was received into evidence containing

certain information that was distributed to Cheatham County

Taser trainees.  That exhibit contains discussion of legal

issues regarding excessive force.  It is important for you to

remember that you are to consider Exhibit 3 only for the

limited purpose of evaluating what information was presented

during Taser training and the Defendant's state of mind on

November 5, 2016.  You must not consider that exhibit for any

other purpose.  Use only these instructions as given to you

by the Court to apply the facts -- to apply to the facts that you find to render a decision in this case.

You've heard the testimony of various witnesses, and you have also heard that before this trial, some witnesses made statements that may be different from their testimony here in court. These earlier statements were brought to your attention only to help you decide how believable their testimony was. You cannot use them as proof of anything else. You can only use them as one way of evaluating the witnesses' testimony here in court.

You have heard the testimony of Gary Ola. You have also heard that before this trial, he was convicted of a crime. This earlier conviction was brought to your attention only as one way of helping you decide how believable his testimony was. Do not use it for any other purpose. It is not evidence of anything else.

You have heard the testimony about the Defendant's good character. You should consider this testimony, along with all the other evidence, in deciding if the Government has proved beyond a reasonable doubt that he committed the crime charged.

During the trial, you have seen counsel use certain summaries, charts, calculations, or similar material which were offered to assist in the presentation and understanding of the evidence. If not admitted into

evidence, this material is not itself evidence and must not
be considered as proof of any facts.

If you decide that the Government has proved the
Defendant guilty, then it will be my job to determine what
the appropriate punishment should be.

Deciding what the punishment should be is my job,
not yours.  It would violate your oaths as jurors to even
consider the possible punishment in deciding your verdict.
Your job is to look at the evidence and decide if the
Government has proved the Defendant guilty beyond a
reasonable doubt.

That concludes the part of my instructions
explaining the rules for considering some of the testimony
and evidence.  Now let me finish up by explaining some things
about your deliberations in the jury room and your possible
verdicts.

In reaching your verdict, you are to consider only
the evidence in this case.  However, you are not required to
set aside your common sense, and you have the right to weigh
the evidence in the light of your own observations and
experiences.  Do not decide the case based on implicit
biases, which are hidden thoughts that can impact what we see
and hear, how we remember what we see and hear, and how we
make important decisions.

As we discussed in jury selection, everyone,

1   including me, has feelings, assumptions, perceptions, fears,

2   and stereotypes, that is, implicit biases, and we may not be

3   aware of them.

4           Because you are making very important decisions in

5   this case, I strongly encourage you to evaluate the evidence

6   carefully and to resist jumping to conclusions based on

7   personal likes or dislikes, generalizations, gut feelings,

8   prejudices, sympathies, stereotypes, or biases.  The law

9   demands that you return a just verdict based solely on the

10  evidence, your individual evaluation of that evidence, your

11  reason and common sense, and these instructions.  Our system

12  of justice is counting on you to render a fair decision based

13  on the evidence, not biases.

14          The verdict must represent the considered judgment

15  of each juror.  In order to return a verdict, it is necessary

16  that each juror agree.  Your verdict must be unanimous as to

17  each count.  To find the Defendant guilty of a particular

18  count, every one of you must agree that the Government has

19  overcome the presumption of innocence with evidence that

20  proves his guilt beyond a reasonable doubt.  To find him not

21  guilty of a particular count, every one of you must agree

22  that the Government has failed to convince you beyond a

23  reasonable doubt.  Either way, guilty or not guilty, your

24  verdict must be unanimous as to each count.

25          Now that all the evidence is in and the arguments

1    are completed, you're free to talk about the case in the jury

2    room.  In fact, it is your duty to talk with each other about

3    the evidence and to make every reasonable effort you can to

4    reach unanimous agreement.  Talk with each other, listen

5    carefully and respectfully to each other's views, and keep an

6    open mind as you listen to what your fellow jurors have to

7    say.

8            Try your best to work out your differences.  Do

9    not hesitate to change your mind if you're convinced that

10   other jurors are right and that your original position was

11   wrong.  But do not ever change your mind just because other

12   jurors see things differently, or just to get the case over

13   with.  In the end, your vote must be exactly that: your own

14   vote.  It is important for you to reach unanimous agreement,

15   but only if you can do so honestly and in good conscience.

16           No one will be allowed to hear your discussions in

17   the jury room, and no record will be made of what you say.

18   So you should all feel free to speak your minds.  Listen

19   carefully to what the other jurors have to say and then

20   decide for yourself if the Government has proved the

21   Defendant guilty beyond a reasonable doubt.

22           The attitude and conduct of jurors at the

23   beginning of their deliberations are very important.  It is

24   rarely productive or good for a juror, upon entering the jury

25   room, to make an emphatic expression of his or her opinion on

the case or to announce a determination to stand for a
certain verdict.  When a juror does this, his or her sense of
pride may be aroused, and he or she may hesitate to recede
from an announced position if shown that it is wrong.
Remember, you are not partisans or advocates in this matter,
but judges.

Some of you may have taken notes during the trial.
Once you retire to the jury room, you may refer to your notes
but only to refresh your own memory.  Your notes are not
evidence.  You may not read from your notes to your fellow
jurors or otherwise inform them of what you have written.
The notes may contain errors or they may be misunderstood or
taken out of context.  The notes may only pertain to part of
the testimony and may not be an exact account of what was
said by a witness.

You are free to discuss the testimony of the
witnesses with your fellow jurors, but each juror must rely
on his or her own memory as to what a witness did or did not
say.

If it becomes necessary during your deliberations
to communicate with the Court, you may send me a note by the
court security officer, signed by your foreperson or by one
or more members of the jury.  No member of the jury should
even attempt to communicate with the Court by any means other
than a signed writing, and the Court will never communicate

1  with any member of the jury on any subject touching the

2  merits of the case otherwise than in writing or orally here

3  in open court.

4         Bear in mind also that you are never to reveal to

5  any person, not even to the Court, how the jury stands,

6  numerically or otherwise, on the questions before you until

7  after you have reached a unanimous verdict.

8         Remember that you must make your decision based

9  only on the evidence that you saw and heard here in court.

10 During your deliberations, you must not communicate with or

11 provide any information to anyone by any means about this

12 case.  You may not use any electronic device or media, such

13 as telephone, cell phone, smartphone, iPhone, BlackBerry, or

14 computer, the Internet, any Internet service, or any text or

15 instant messaging service, or any Internet chat room, blog,

16 or website such as Facebook, MySpace, LinkedIn, YouTube, or

17 Twitter, or to communicate to anyone any information about

18 this case or to conduct any research about this case until I

19 accept your verdict.

20        Upon retiring to the jury room, you may select one

21 of your number to act as your foreperson.  The foreperson

22 will preside over your deliberations and will be your

23 spokesperson here in court.

24        A verdict form has been prepared for your

25 convenience.  It reads as follows.

1    "We the jury, unanimously find the following.

2    Count 1.

3         1:  With respect to Count 1 of the indictment,

4    deprivation of rights under color of law, we the jury find

5    the Defendant, Mark Bryant, guilty or not guilty.

6         2:  With respect to Count 2 of the indictment,

7    deprivation of rights under color of law, we the jury find

8    the Defendant, Mark Bryant, guilty or not guilty.

9         3:  With respect to Count 3 of the indictment,

10   knowingly falsifying a document with the intent to impede,

11   obstruct, or influence the investigation and proper

12   administration of a matter within the jurisdiction of a

13   federal agency, we the jury find the Defendant, Mark Bryant,

14   guilty or not guilty.

15        4:  With respect to Count 4 of the indictment,

16   knowingly falsifying a document with the intent to impede,

17   obstruct, or influence the investigation and proper

18   administration of a matter within the jurisdiction of a

19   federal agency, we the jury find the Defendant, Mark Bryant,

20   guilty, not guilty.

21        Sign and date the verdict form below and notify

22   the court officer.  It should be signed by your foreperson

23   and dated.

24        You will take this form to the jury room, and when

25   you have reached unanimous agreement as to your verdict, you

will have the foreperson fill in the date and sign the form
which sets forth the verdict upon which you unanimously
agree.  You will then return with your verdict to the
courtroom.

Remember, the Defendant is only on trial for the
particular crimes charged in the indictment.  Your job is
limited to deciding whether the Government has proved the
crimes charged.

Also remember that whether anyone else should be
prosecuted and convicted for these crimes is not a proper
matter for you to consider.  The possible guilt of others is
no defense to a criminal charge.  Your job is to decide if
the Government has proved this defendant guilty.  Do not let
the possible guilt of others influence your decision in any
way.

Let me finish up by repeating something I said to
you earlier.  Nothing that I have said or done during the
trial was meant to influence your decision in any way.  You
decide for yourselves if the Government has proved the
Defendant guilty beyond a reasonable doubt.

So, ladies and gentlemen, you may now retire to
the jury room.  You do need to give us a minute to have the
exhibits delivered to you.  You recall that some of the
exhibits are on a CD, and you will find in the jury room a
computer has been set up.  So if you-all choose to view the

```
1   CD, you can do so on that computer.

2           Also, previously we determined that two of you

3   will serve as alternates.  I'm going to ask you-all to go to

4   the jury assembly room, have no discussion about the case,

5   and let no one discuss it with you or any investigation in

6   case we need to use you.  And the two alternates are Fahad

7   Chaudhary and Sharon Miller.

8           So the remainder should now proceed into the jury

9   room.

10          (Jury retires to deliberate.)

11          THE COURT:  All right.  Be seated.

12          Does the Government have any objection to the

13  charge?

14          MS. MYERS:  No, Your Honor.

15          THE COURT:  Does the Defendant have any objection?

16          MR. STRIANSE:  No, Your Honor.

17          THE COURT:  Okay.  Have you-all delivered your

18  cell phone numbers to the courtroom deputy?  Yes?

19          IN UNISON:  Yes, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          (Recess.)

22          THE COURT:  All right.  Ms. Myers and Mr. Songer

23  and Mr. Strianse, we're on the record now in Case No. 18-144,

24  "United States of America vs. Mark Bryant."

25          Where is Mr. Bryant?
```

1          MR. STRIANSE:  He's right here, Your Honor.

2          THE COURT:  All right.  We've got a message from

3   the jury, okay, and it says:  Third and fourth counts.  How

4   do we determine if his short details represent, quote,

5   impending investigation, end quote, question mark.

6          Next, it says:  Can lack of details represent

7   intent, question mark.

8          And it appears to be signed by Richard Stora who

9   would be Juror No. 5.  I say it appears to be because I only

10  have initials here, R.S.C., and Mr. Stora is the only juror

11  whose first name starts with an R, so I think it must be him.

12         So "How do we determine if his short details

13  represent impending investigation?"  I think what they're

14  trying to say -- well, what does the Government think they're

15  trying to say?

16         MR. STRIANSE:  Judge, I think they're saying

17  "impeding" probably.  Maybe bad penmanship, but it's probably

18  impeding.

19         THE COURT:  It could be impeding.  Impeding.

20  Well, nevertheless, what do you -- okay.  "How do we

21  determine if his short details represent impeding,"

22  I-M-P-E-D-I-N-G?

23         MR. STRIANSE:  I would just tell them to rely on

24  the evidence and reread the instructions.

25         MR. SONGER:  I agree with that, Your Honor.  In

1   addition, I would suggest that it might be worth pointing

2   them to the applicable instructions on this element.

3            THE COURT:  Which one would that be?

4            MS. MYERS:  Page 44 is Counts 3 and 4, second

5   element, intent to impede, obstruct, or influence.

6            THE COURT:  Go ahead.

7            MS. MYERS:  So the second paragraph, Your Honor,

8   in that says:  In determining whether the Defendant had the

9   required intent, you may consider all the circumstances of

10  the case including, among other things, any statement made or

11  omitted, any acts done or omitted by that person, and any

12  other circumstances you deem relevant and reliable.

13           THE COURT:  Okay.

14           MS. MYERS:  So I think pointing them to that

15  instruction might be helpful.

16           THE COURT:  Mr. Strianse?

17           MR. STRIANSE:  Your Honor, I have no objection to

18  pointing them to that instruction.

19           THE COURT:  Okay.  I want to be careful not to --

20  of course, the Court is not to single out any part of the

21  instructions for more emphasis.  They need to look at it all

22  together, so . . .

23           MS. MYERS:  Well, Your Honor, may I propose that

24  they could look at Counts 3 and 4 elements which are pages 43

25  through 46?

1          THE COURT:  Okay.  When I -- I think here's what I

2  want to do, which I think is close to what everyone is

3  saying.  I think the response back to them is:  You need to

4  rely upon your own recollection of the evidence presented at

5  trial.  The Court would, for your -- as you remember at

6  trial, period.  The jury instructions on page 41 began --

7  address -- 41 and thereafter address Counts 3 and 4.

8          Is that acceptable to the Government?

9          MR. SONGER:  I think that's fine with the

10 Government, Your Honor.

11         MR. STRIANSE:  That's fine, Your Honor.

12         THE COURT:  All right.

13         All right.  If you-all could come up and inspect

14 the note and sign it, please.

15         Okay.  And have everybody sign it.

16         All right.  Thank you.

17         (Recess.)

18         THE COURT:  The jury has sent a note saying the

19 jury would like to conclude for the day and reconvene

20 tomorrow at 9:00 a.m., signed by Richard Stora at 5:30.

21 Bring in the jury.

22         (Jury present.)

23         THE COURT:  Ladies and gentlemen of the jury, the

24 Court has received your message.  So we're going to conclude

25 for the day and have you come back tomorrow at 9:00.  Remind

1    you once again, because this is very important:  You can't

2    have any discussions about any part of the case with friends,

3    family, or others.  That includes -- that especially includes

4    your deliberations to this point in time cannot be discussed

5    in any fashion whatsoever, with no exceptions at all.  You

6    can't talk to anyone about the case.  You can't let anyone

7    talk to you.  If anyone should try to talk to you, you need

8    to let me know first thing in the morning.  And certainly no

9    research by any means whatsoever.

10           So again, until about 8:55 tomorrow, put the case

11   out of your mind.

12           Remember, we can't start -- we cannot resume

13   deliberations until everyone is here.  We should -- I think

14   you should meet in the jury assembly room, and then you'll be

15   escorted over to your room, and you'll begin your

16   deliberations.

17           So have a safe evening.  Take care.

18           (Court adjourned.)

19

20

21

22

23

24

25

1   REPORTER'S CERTIFICATE

2

3            I, Deborah K. Watson, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7   proceedings held in open court on February 7, 2019, in the

8   matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9   3:18-cr-00144; that said proceedings in connection with the

10  hearing were reduced to typewritten form by me; and that the

11  foregoing transcript (pages 1 through 78) is a true and

12  accurate record of said proceedings.

13            This the 25th day of March, 2019.

14

15                         /s/ Deborah K. Watson
                           DEBORAH K. WATSON, RPR, CRR, LCR
16                         Official Court Reporter

17

18

19

20

21

22

23

24

25