1            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
2                       AT NASHVILLE

3      UNITED STATES OF AMERICA,        )
                                        )
4                 Plaintiff,            )
                                        )
5      v.                               )   Case No.
                                        )   3:18-cr-00144
6      MARK BRYANT,                     )
                                        )
7                 Defendant.            )

8

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10   BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                          TRANSCRIPT

12                             OF

13                         PROCEEDINGS

14                     January 10, 2020

15                      Trial Volume 4

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19              APPEARANCES ON THE FOLLOWING PAGE

20

21

22

     PREPARED BY:
23                 LISE S. MATTHEWS, RMR, CRR, CRC
                       Official Court Reporter
24                    801 Broadway, Room A839
                        Nashville, TN 37203
25                lise_matthews@tnmd.uscourts.gov

APPEARANCES:

       For the Plaintiff:   Peter J. Strianse
                          Tune, Entrekin & White, P.C.
                          315 Deaderick Street
                          Suite 1700
                          Nashville, Tennessee 37238

       For the Defendant:   Sara E. Myers
                          U.S. Attorney's Office
                          (Nashville Office)
                          Middle District of Tennessee
                          110 Ninth Avenue, S
                          Suite A961
                          Nashville, Tennessee 37203-3870

                          Michael J. Songer
                          U.S. Department of Justice
                          Criminal Division
                          950 Pennsylvania Avenue, N.W.
                          Washington, DC 20530

I N D E X

Friday, January 10, 2020


INDEX OF PROCEEDINGS

PAGE

PLAINTIFF'S CLOSING STATEMENT                    5

DEFENDANT'S CLOSING STATEMENT                   23

PLAINTIFFS' REBUTTAL CLOSING STATEMENT          43

JURY CHARGE                                     49

JURY VERDICT                                    95

1    The above-styled cause came on to be heard on

2   January 10, 2020, before the Honorable Waverly D. Crenshaw,

3   Jr., District Judge, when the following proceedings were had,

4   to-wit:

5        (Jury not present.)

6        THE COURT:  All right.  Be seated.  Good morning.

7        Are we ready for the jury?

8        MS. MYERS:  Yes, Your Honor.

9        THE COURT:  Say again?

10       MS. MYERS:  Yes, Your Honor.

11       THE COURT:  Mr. Strianse, are you ready for the

12   jury?

13       MR. STRIANSE:  Yes, Your Honor.

14       THE COURT:  Do you all need to adjust the podium?

15       MR. SONGER:  We probably should, Your Honor.

16       THE COURT:  Let's not break it.

17       All right.  Bring in the jury.

18       (Jury present.)

19       THE COURT:  All right.  Be seated.  Good morning.

20       I'll remind the court security officer to seal the

21   courtroom so that there's no distractions during the lawyers'

22   closing.

23       All right.  Mr. Songer, go ahead.

24       MR. SONGER:  Yes, Your Honor.

25       THE COURT:  Go ahead.

1    MR. SONGER:  Thank you.

2

3            PLAINTIFF'S CLOSING STATEMENT

4    MR. SONGER:  "You don't like it, do you?  I'll

5 keep going till I run out of batteries."  That's how the

6 defendant taunted a defenseless teenager while he tortured

7 him.  That's what the defendant taunted Jordan Norris while

8 he shot electricity into Jordan's body, causing him to seize

9 up in pain.  That's what the defendant taunted Jordan while

10 he tased him four times for 50 seconds, ten times as long as

11 a standard Taser cycle.  The defendant kept tasing Jordan

12 until his flesh looked like raw hamburger meat.  That's what

13 it looked like to Officer Caitlin Marriott.

14           Caitlin told you that she was so traumatized by

15 watching the defendant assault Jordan that she stopped

16 carrying a Taser at the jail for the next two years.  She

17 couldn't even be around other officers when they tested their

18 Tasers.  She asked them to step outside so she wouldn't have

19 to hear the sound, the sound that would take her back to that

20 night that she witnessed the defendant torture a restrained

21 teenager.

22           Two hours later that night, the defendant did it

23 again.  He tased Jordan again for 11 more seconds while he

24 was handcuffed and shackled and just waiting to go to the

25 hospital.  Again, Jordan was not a threat.  But once again,

1  the defendant kept the trigger pulled down to keep the Taser

2  cycle going far beyond the standard cycle he had been trained

3  to use, to inflict more pain.

4       Now, the officers who were on the scene that night

5  told you that there was no justification for what the

6  defendant did.  Officers Josh and Caitlin Marriott and Key

7  and Ola and Montgomery and Hannah.  They told you that this

8  was not a close call.  This was not the case of an officer

9  who just barely crossed the line.

10       The defendant tased Jordan four times for 50

11  seconds.  Those officers told you that tases that long were

12  unheard of in any situation, much less on a restrained

13  teenager.

14       Now, the defendant tried to tell you that all of

15  those officers are wrong, that he was just trying to follow

16  his policy to the best he could.  But he's trying to mislead

17  you the same way he misled his own boss, Lt. Hannah, by

18  filing false reports to cover this up.  He's asking you to

19  ignore what you can see for yourself on the video and what

20  you heard from the other officers who were on the scene.

21       You know the defendant's story doesn't add up

22  because you saw the video.  You saw that Jordan was not a

23  threat at the time that the defendant assaulted him.  And you

24  heard the defendant's words taunting Jordan while he did it.

25  Those words show that the defendant knew he didn't have any

1  legitimate law enforcement purpose for what he was doing.  He
2  was using the Taser to punish Jordan.
3           You know the defendant's story doesn't add up
4  because he tried to cover it up.  He told the other officers
5  who were there not to write reports about what happened; then
6  he wrote his own reports that left out the key facts that
7  showed what he really did.
8           The defendant left out so much that his boss,
9  Lt. Hannah, told you that he didn't even know a serious
10 incident had happened in the jail until he got a call from
11 Jordan's family a week later.  And when he got that call,
12 Lt. Hannah went back and pulled the reports to see what had
13 happened.  And the defendant's report was so misleading that
14 Lt. Hannah thought a different officer was the one who had
15 assaulted Jordan at 8:00.
16          Well, the defendant's coverup did not stop there.
17 Several months later, when the FBI came to talk to the
18 defendant about what he had done, he lied to them.  He told
19 the FBI that the second assault, the one where Jordan was
20 handcuffed and shackled and just waiting to go to the
21 hospital, didn't even happen.
22          The defendant thought that he could cover his
23 tracks with those lies and false reports and get away with it
24 because he was wearing a badge, because he was the supervisor
25 in charge of the jail that night.  By trying to cover up the

crimes that he committed while on duty and in uniform, he
tried to place himself above the law.  He did a disservice to
all the law enforcement officers who put on their uniforms
every day to protect and serve, not punish and torture.

I would like to take a few minutes now to talk to
you about how the evidence you've heard this week fits
together with the law that Judge Crenshaw will instruct you
in just a bit.  As you know, the defendant is charged with
five different crimes in the indictment.  Each crime is made
up of elements, or parts, and the government has the burden
to prove each element beyond a reasonable doubt.  The
evidence you've heard overwhelmingly proves all five of those
crimes.

So let's talk first about Counts One and Two.
Count One is the assault at 8:00 and Count Two is the assault
at 10:30.  You have to find the same four elements for both
of those counts.

Number one, that the defendant acted under color
of law.  And the Court will instruct you that the parties
have agreed that that element is already proven.  So you can
set it aside.  Number two is that the defendant deprived
Jordan of a right that's protected by the Constitution.
Number three, that the defendant acted willfully.  And number
four, that the defendant either caused Jordan bodily injury
or used a dangerous weapon.

1    So, since the first element is proven, let's focus
2  on the second element that the defendant deprived Jordan of a
3  right protected by the Constitution.  The right at issue here
4  is based on Jordan's status in the jail that night.  He was a
5  pretrial detainee.  He hadn't been convicted of a crime.  He
6  was waiting for his day in court.  As a pretrial detainee,
7  Jordan had a due process right not to be subjected to
8  excessive force by an officer that amounts to punishment.
9    And when you're evaluating that element, I would
10  ask you to keep in mind there were actually three different,
11  separate incidents involving Jordan at the jail that night.
12  At 7:00, officers had to pull Jordan out of his cell when he
13  was banging his head against the wall, and Officer Bratton
14  tased him.  That is not charged as a crime in this case.
15  Then, at 8:00, the defendant tased Jordan four times for 50
16  seconds while he was strapped into the restraint chair.  That
17  is Count One.  Then, at 10:30, while Jordan was just waiting
18  to go to the hospital, the defendant tased him again for
19  another 11 seconds.  And that's Count Two.
20    So don't let the defendant confuse you about the
21  timing.
22    Now, corrections officers, as you've heard, have a
23  tough job.  They have to deal with people who can be
24  difficult and dangerous.  And there are absolutely situations
25  where force has to be used for a legitimate law enforcement

1    purpose.  And you heard that when Jordan was being

2    disruptive, when he was having an issue with his cellmate and

3    he was banging his head on the wall, officers pulled him out

4    of the cell and they strapped him into a restraint chair.

5    And when Jordan fought being put into the chair, Officer

6    Bratton used several of those five-second stuns of the Taser,

7    just like officers had been trained to do, to get him under

8    control and get him restrained.  And that was justified.

9            But the officers on the scene told you that there

10   was no justification for what the defendant did later.  When

11   he came back an hour later and assaulted Jordan for 50

12   seconds after he was tied down in the restraint chair.  And

13   they told you that there was no justification for what the

14   defendant did two hours after that, when he assaulted Jordan

15   again while he was handcuffed and shackled and just waiting

16   to go to the hospital.

17           So let's talk about Count One.  This is the

18   assault at 8:00.  Now, I'm not going to show you the video

19   again; you watched it twice yesterday.  And of course, you

20   can watch it as many times as you like when you get back to

21   the jury room.  But I would ask you to look at this picture.

22           Jordan had been strapped in the restraint chair

23   for an hour at this point.  Now, the defendant told you

24   yesterday that the reason he had to tase Jordan for 50

25   seconds was that Jordan had gotten his right arm -- right

1  forearm loose from that chair.

2          But you can see that Officer Key, who's kneeling

3  to Jordan's right, has both hands on that arm.  And you saw

4  in the video that that right arm barely moved the entire

5  time, the entire 50 seconds that the defendant tased him.

6  And you saw in the video that Officer Marriott, the man

7  standing behind Jordan, kept his head held back the entire

8  time, the entire 50 seconds.

9          All three of those officers, Officer Marriott,

10 Officer Key, and Officer Caitlin Marriott, who is just off

11 the screen, told you that there was no justification for the

12 defendant to tase Jordan in that situation.  Certainly not

13 for 50 seconds.

14          Now, the defendant told you yesterday that his

15 approach to dealing with inmates was to give respect and get

16 respect.  He is not giving Jordan respect.  He is giving him

17 punishment and electricity and pain.

18          And by assaulting Jordan, while he was the

19 supervisor in charge of the jail that night, the defendant

20 put these other officers in a tough spot.  We already talked

21 about Officer Caitlin Marriott, and how she stopped carrying

22 a Taser in the jail for two years because she was so

23 disturbed by what the defendant did.

24          You should also consider Officer Josh Marriott and

25 Officer Key, the officers who were holding Jordan down in

that situation.  They were put in the difficult situation of
watching their supervisor use force that they knew was wrong.
And the defendant was not just their supervisor; he was also
their friend.  The defendant was Josh Marriott's roommate.

You saw Officer Key and Officer Marriott when they
testified this week.  You saw the looks on their faces.  They
did not want to be in this courtroom testifying against their
friend.  But they told you what you can see on the video,
that there was no justification for tasing Jordan when he was
tied down and not a threat.

So now let's look at Count Two.  This is the
assault at 10:30.  Now, you heard and you saw on the video
that a few minutes before this Jordan had been struggling
with officers as they tried to get him under control and
restrained so they could put him in the chair and move him
outside to a car and take him to the hospital.  And you heard
that the defendant tased Jordan several times during that
sequence when he was struggling.  Those tases are not charged
as crimes in the indictment.

But then officers got Jordan under control.  He
calmed down.  He had been sitting like this for over a minute
and a half.  His hands are cuffed, his feet are shackled, and
there's a belly chain that connects to his handcuffs so that
he could barely move his arms.  He's just sitting there.
He's not trying to hit anyone or kick anyone or threaten

1   anyone.  He's just sitting there surrounded by seven officers
2   just waiting to go to the hospital.
3            That's when the defendant assaulted him again,
4   shot electricity into his body for 11 more seconds.  For no
5   reason.  The officers who were in the jail that night told
6   you that there was no reason to tase Jordan in that posture
7   for even one second.
8            Officer Ola, you can see standing right next to
9   Jordan, told you that he was shocked when the defendant
10  started tasing Jordan for no reason.  That's the word he
11  used, shocked.  He said he was carrying a Taser that night,
12  and if he had seen any reason to tase Jordan, he would have
13  done it because he was right there, but he didn't.  Ola told
14  you that later, when the FBI came to talk to him about what
15  happened, that he was ashamed.  He was afraid he was going to
16  get in trouble for not trying to stop the defendant's
17  assault.  So he told the FBI that he had walked away and he
18  didn't see the defendant tase Jordan after he was put in
19  handcuffs.  Now, Ola later admitted what you can see in the
20  video, that he was right there.  He did see the defendant's
21  assault.  And he lied to cover it up because he was ashamed.
22           Officer Montgomery on the left side of the screen
23  also told you that he saw the defendant tase Jordan for no
24  reason.  He told you there was no reason to tase Jordan in
25  this posture for even one second.

1    Of course there wasn't.  You saw that just by
2  watching the video.  Common sense tells you that, the
3  teenager is surrounded by seven officers and handcuffed and
4  shackled and belted into a restraint chair, there is no
5  reason to tase him.  Certainly not for 11 seconds, more than
6  twice as long as officers had been trained to tase someone.
7    So that proves the defendant violated Jordan's
8  rights.
9    The next element you must find is that the
10 defendant acted willfully.  That just means that the
11 defendant knew what he was doing was wrong, but he did it
12 anyway.  And the defendant absolutely knew what he was doing
13 was wrong.  You can apply your common sense here, too.
14   You know that if a teenager has most of his body
15 tied down and he's surrounded by multiple officers, there is
16 no reason to tase him.  Certainly not for 11 seconds or 50
17 seconds.  Applying your common sense to that evidence tells
18 you all you need to know.  This is obviously wrong, and the
19 defendant knew it.
20   But you also know the defendant acted willfully
21 from his own words.  Right after he assaulted Jordan for 50
22 seconds in the restraint chair, the defendant told his
23 friend, Officer Marriott, that he was afraid that he was
24 going to get in trouble because he went too far, because he
25 tased too long.  He just admitted it.

        And during the assault, you heard on video the
defendant taunting Jordan, telling him, "You don't like it,
do you?  I'll keep going until I run out of batteries."

        Sometimes it's hard to know what's going on in
somebody else's head, but here it's easy because, while the
defendant was assaulting Jordan, he couldn't keep his mouth
shut.

        And perhaps most importantly, you know the
defendant knew he was wrong because he tried to cover up what
he did.  He told other officers on the scene not to submit
reports even though he knew that the jail's policy required
those officers to report what they saw.  And then he wrote
his own reports that left out all the key facts showing what
he actually did.  The defendant didn't want there to be a
record of what really happened because he knew he could not
justify his abuse of Jordan.

        Even yesterday during his cross-examination, the
defendant still could not admit to you the basic facts of
what happened.  He kept trying to argue that he was pulling
the trigger, but maybe the Taser wasn't making contact with
Jordan's body.  You can see on the video that the Taser is
pressed rock solid against his body the entire time the
defendant is tasing him.  He just knew that he couldn't
justify that he had done that.

        That's more than enough evidence to show the

defendant knew he was wrong.  But there's more.  It's also
clear the defendant acted willfully because he ignored his
own training.  You heard from officers who went through the
same training that the defendant did.  Many of them were his
friends.  And each one of them was crystal clear about the
core principles.  Officers do not use a Taser to punish
someone.  The defendant did.  Officers do not tase someone
who has already been placed in handcuffs.  The defendant did.
Officers do not use more force than is necessary to stop a
threat.  The defendant did.  And officers never tase anyone
more than three five-second bursts.  The defendant did.  He
went way beyond that.

      The defendant violated every one of those
standards.  The other officers knew it was wrong; they had
the same training; the defendant knew it was wrong.

      That proves that the defendant acted willfully.

      Now, the final element you must find for Counts
One and Two is that the defendant either caused bodily injury
to Jordan or used a dangerous weapon.  And the evidence
clearly proves both of those things here.  You heard Officer
Caitlin Marriott describe the injury on Jordan's body as
looking like raw hamburger meat.  You saw the injury 11 days
later, after it started to heal.  And you heard Agent Wright
testify there were still scars on Jordan's body almost a year
later.  So that element has been proven.

        Now, the defendant also used a dangerous weapon.
You heard that officers were instructed never to tase someone
more than three five-second bursts because a Taser is
dangerous.  Because it burns the skin.  It can damage
internal organs.  It can even cause death.  So when the
defendant assaulted Jordan with a Taser, of course he used a
dangerous weapon.  That's another way that the government has
proven the final element for Counts One and Two.

        So now let's consider Counts Three and Four.
Those are the counts that charge the defendant with writing
the false reports.  Count Three is the false report the
defendant wrote about the 8:00 assault and Count Four is the
false report about the 10:30 assault.

        You have to find the same three elements for both
of those counts:  Number one, that the defendant falsified a
document; number two, that the defendant falsified the report
with the intent to impede, obstruct, or influence an
investigation; and, number three, that the report related to
a matter within the jurisdiction of a federal agency, which
here is the FBI.

        So let's turn to the first element, that the
reports are false.  Now, a report can be false because an
officer puts false information in it.  It can also be false
because you leave out information that's material, which just
means information that's important, such that leaving it out

1  makes the report misleading.  And both of those things

2  happened here.  The defendant put false statements in his

3  reports and he left out almost all the key facts that showed

4  what actually happened.

5          So let's look at the reports one at a time.  This

6  is the report for Count Three, the false report the defendant

7  filed about his assault at 8:00.

8          If we could blow it up, please.

9          The defendant did not report that when he tased

10  Jordan, Jordan was strapped into a restraint chair.  He did

11  not report that he tased Jordan four times, which violated

12  the jail's policy.  The defendant did not report that those

13  four tases lasted 50 seconds, which not only violated policy,

14  but was unheard of.

15          Without those facts, Lt. Hannah didn't know what

16  happened when he saw this report after he got that call from

17  Jordan's family.

18          Now, the defendant then made the report even more

19  misleading by writing, "Bratton and I tased."  You've seen us

20  talk about that language this week.  The defendant made it

21  sound like he and Officer Bratton tased Jordan at the same

22  time.  But in reality, you know that Officer Bratton tased

23  Jordan at 7:00 when Jordan was being pulled out of the cell,

24  when it was justified to use a Taser.  The defendant tased

25  Jordan an hour later, at 8:00, when Jordan was already

strapped down and surrounded by officers, when there was no
justification.

When Lt. Hannah read this report, he told you that
he didn't even know which officer had assaulted Jordan at
8:00.  He thought Officer Bratton had done it.  And that's
exactly what the defendant wanted him to think.  That report
is false and misleading.

So now let's look at Count Four.  This is the
false report the defendant filed about the 10:30 incident.
Once again, the defendant left out all the key facts that
show what really happened, all the facts that show he
committed a crime.  The defendant left out how many times he
tased Jordan and how long those tases lasted.  The defendant
left out that at the time of that last 11-second tase Jordan
was in handcuffs and a belly chain and shackles and was
strapped into the chair with a belt and had a belt around his
legs.  None of that information's in there.

Jordan was surrounded by seven officers, but the
defendant only listed two of them on the report.  He also
wrote that he tased Jordan to -- quote, to gain compliance.
The very last line of that report.  But you know from the
video and from Officers Ola and Montgomery that Jordan was
compliant at the time that defendant tased him.  He was
sitting there waiting to go to the hospital.  That report is
false.

1    Now, the next element that you have to find for

2  Counts Three and Four is that when the defendant wrote those

3  false reports, he had the intent to impede, obstruct, or

4  influence an investigation.  You don't have to find that he

5  actually did obstruct anything, just that that was his

6  intent.

7    And the defendant's intent is obvious.  The

8  defendant went to other officers who were there and told them

9  not to submit reports, even though they were required to.

10 And then he submitted his own reports that left out almost

11 all the key facts.  And you know that the defendant leaving

12 out those reports [sic] this night was no accident, because

13 the facts that the defendant left out of both of these

14 reports are precisely the facts that he put in the other

15 reports that he filed when he used a Taser other times.  The

16 reports that you saw, the reports that the defendant filed

17 both before and after the night that he assaulted Jordan

18 Norris.  The defendant knew what facts he had to put in

19 reports.  He left them out the night of Jordan's assault to

20 cover up what he did.

21    Now, the final element for Counts Three and Four

22 is federal jurisdiction.  And there's no dispute about that

23 here.  You heard from Special Agent Wright that civil rights

24 violations like this one are within the jurisdiction of the

25 FBI, and that, of course, the FBI is a federal agency.

1   That's why we're sitting here in federal court.

2            So the government has proven each element of Count

3   Three and Four beyond a reasonable doubt.

4            Now, the last count, Count Five.  It charges the

5   defendant with knowingly making a materially false statement

6   about a matter within the jurisdiction of a federal agency.

7   And, in other words, it charges the defendant with lying to

8   the FBI about something that's important to the FBI's

9   investigation.

10           And you heard the defendant's lie for yourself on

11  tape.  When the FBI came to talk to the defendant about what

12  he had done to Jordan that night, the video of that first

13  assault for Count One, when he tased Jordan four times for 50

14  seconds, that had already been made public.

15           But the video of the second assault, the one where

16  Jordan was handcuffed and shackled and just waiting to go to

17  the hospital, that had not been released.  The public hadn't

18  seen it.  The defendant's own supervisor hadn't seen it.  And

19  the FBI hadn't seen it.  So the defendant thought he could

20  lie to cover up that assault.

21           And that's what he did.  The defendant walked the

22  FBI agent through everything he did with Jordan that night.

23  And he told the agents that at the end of the night, officers

24  restrained Jordan with handcuffs and shackles and put him in

25  a restraint chair and then moved him outside so he could be

put in a car and taken to the hospital.  It was a detailed
description.

The agent followed up and asked Jordan point
blank -- excuse me -- asked the defendant point blank, "Was
there any use of force done during that transition from the
jail to the car?"  And the defendant lied.  He said, "Not
after we put the belly chain on him."  You heard him say
that.  The FBI didn't realize the defendant lied until later,
when they discovered the video showing exactly what you saw
in court, that after officers had restrained Jordan in
handcuffs and a belly chain and leg shackles, the defendant
leaned down and tased him again, shot electricity into his
body for 11 more seconds for no reason.

The defendant admitted -- you heard him
yesterday -- that that was the only time in his career that
he had ever tased someone who was in a belly chain and
handcuffs.  He remembered clearly during that interview all
the other details about how Jordan was restrained, how he was
moved outside, how Jordan was acting.  He didn't just forget
that he assaulted him on the way out the door, that he gave
him one for the road.  He lied to cover it up.

People in a community count on law enforcement
officers to be honest and to uphold the law.  The defendant
banked on that trust that people have in law enforcement and
he exploited it.  He abused his power, he abused Jordan

Norris, and he abused that public trust.  The defendant
thought that he could keep the trigger pulled down, thought
he could assault Jordan and then file false reports and lie
to the FBI and make it all go away.

But he was wrong.  You know that it's wrong for an
officer to torture a young man who was troubled but was not a
threat.  You know that it's wrong for someone to place
themselves above the law.  You know that in this country,
under our Constitution, justice happens in a courtroom, not
in a restraint chair.

Now it's up to you to hold the defendant
accountable, to reach the conclusion demanded by the evidence
that you've heard.  The defendant is guilty.

THE COURT:  All right.  Mr. Strianse.

MR. STRIANSE:  Thank you, Your Honor.

DEFENDANT'S CLOSING STATEMENT

MR. STRIANSE:  What would you be willing to do for
$13.25 an hour?  It's 6:45 p.m. on November 5, 2016.  You're
in charge of the second shift at the Cheatham County Jail in
Ashland City.  You're almost five hours into your eight-hour
shift.  You're almost home, literally and figuratively.  The
shift's almost over.  But then in your office and you look up
at the TV monitor that's giving you a live feed from Cell 4
in the booking area, and you see that you have a problem.

1    You have a very big problem.  It's you and five other

2    correctional officers that are there at the second shift to

3    guard, feed, maintain 150 to 200 inmates in a jail that's

4    designed to hold roughly 122 inmates.

5            Look into your heart and tell -- tell me if it

6    wouldn't be awfully tempting --

7            THE COURT:  Yes.

8            MR. SONGER:  May we approach?

9            THE COURT:  Why don't you approach.

10            (Bench conference outside the hearing of the

11            jury.)

12            MR. SONGER:  I'm sorry to object.  But he's asking

13    the jury to put the jury in the defendant's shoes explicitly.

14            MR. STRIANSE:  This is argument.  I'm trying to

15    give the perspective of the defendant.

16            THE COURT:  You can't give a Golden.

17            MR. STRIANSE:  I'm sorry.  What?

18            THE COURT:  I said, you can't ask the jury,

19    though, to put themselves in his role.

20            MR. STRIANSE:  I can ask them to have the

21    perspective --

22            THE COURT:  Of the defendant.

23            MR. STRIANSE:  -- of the defendant, what his

24    perspective was that night.

25            THE COURT:  I think you just have to be careful --

1  I don't know that he has violated that.  And I'm not finding
2  he has.
3          I just think you have to be careful not to ask
4  them to put themself in his shoes.  That's absolutely
5  correct.
6          MR. STRIANSE:  Okay.
7          (Jury present.)
8          MR. STRIANSE:  It would have been awfully tempting
9  for Mark Bryant to look the other way, to not look at the TV
10 monitor anymore, and left -- and let the third shift men and
11 women deal with this problem.
12         That's not what Mark Bryant did that night in his
13 role as the corporal of the second shift in charge of the
14 employees and really the de facto person in charge of the
15 jail.  And he had to deal with what turned out to be an
16 impossible situation that was frankly caused by Jordan
17 Norris.
18         And I certainly don't mean any disrespect to
19 Jordan Norris or to Jordan Norris's family, but we do have to
20 talk about the reality of the situation and the reality of
21 this case.
22         Now, after all of the violence and drama
23 associated with the extraction at the Cell 4 door at about
24 6:58, when they finally, four very large men, about a
25 thousand pounds of men, finally got Jordan Norris under

1   control, had him cuffed behind his back and put him in the

2   restraint chair, that would have been another opportunity for

3   Mark Bryant and the second shift officers to just sort of

4   check out and say, "Hey, we're close to three hours before

5   the third shift comes.  Let's just leave him in the restraint

6   chair and let's just leave him cuffed."

7           But Mark Bryant and his colleagues didn't take

8   that easy off-ramp at about 7:00 or 7:15.  They followed the

9   protocol.  They took him out of the cuffs and moved him to

10  the -- to the so-called soft restraints on a chair that may

11  have been as old as the jail, 1978.  Talk about no good deed

12  goes unpunished to try to take care of the comfort of Jordan

13  Norris by moving his hands to the front.

14          I'll ask you, ladies and gentlemen, when you

15  deliberate later today and you get around that table in the

16  jury room, ask yourselves, would you have heard the whole

17  story about what happened on November 5, 2016, if you just

18  heard the government's presentation of the evidence during

19  the direct examination of their witnesses during their case

20  in chief before they rested in this case?

21          I hope you noticed what I noticed during the

22  presentation of the government's case, that a certain theme

23  developed.  The testimony seemed to ping-pong back and forth

24  between some real extremes, some real polar opposites.

25          Three years after the fact, when the witnesses

1   that the government called came in here on their direct
2   examination, it was everything was bad, everything was
3   negative about Mark Bryant.

4          Then you may remember -- because under our system,
5   I have an opportunity to confront and cross-examine the
6   witnesses -- I got up and said, well, wait a second.  This
7   became public in July -- I think it was July 27th of --
8   July 21st, I think, of 2017, and in early August, you were
9   meeting with the FBI and the TBI at the district attorney's
10  office in Ashland City.  I said, "Don't you remember giving
11  those statements?"

12         Now, timing is critical.  You may remember that
13  they did meet with the district attorneys -- or the TBI and
14  the FBI at the district attorney's office and gave these
15  so-called typewritten statements.

16         Now, those statements that they gave in August of
17  2017 were favorable to Mark Bryant and favorable to the other
18  correctional officers and defending the actions that they had
19  done on November 5, 2016.  But, remember, the timing is
20  critical.  There was no criminal charges in August of 2017.

21         But, later, after Mark Bryant gets charged,
22  attitudes change, self-preservation kicks in.  Inmate Norris,
23  as he was known to the correctional officers when this
24  happened in November and when he was -- when they were
25  interviewed by the TBI and the FBI in August, the person that

they described in those interviews as being -- and these are
their words -- you may remember me cross-examining them with
the results of those August 2017 interviews.  They described
him as "crazed," "possessed," "having an altered mental
state," "a profoundly troubled young man possessed of
unnatural strength."

      We learned from Dr. Small that he had been
diagnosed with severe major depressive disorder with acute
psychotic features.  Emotionally unstable.  Unpredictable,
violent.  That's how the officers described him.

      But that "inmate Norris" becomes "Jordan" now,
three years after the fact, because none of these
correctional officers wanted to end up in the dock with Mark
Bryant.  What was fine and appropriate and necessary when
these officers were being interviewed in the district
attorney's office back in August of 2017, just days or weeks
after it became public, suddenly became excessive and
gratuitous when he was charged -- Mr. Bryant was charged in a
criminal case, and then they come in here to testify.

      Now, you heard Mr. Marriott testify.  He told one
version on his direct examination.  On cross-examination,
when I got up, I walked him through his August statement.  He
said in August that this was the craziest incident he had
ever dealt with.  He had seen a lot of people who were on
drugs, but Norris was out of his mind.  He thought that he

was on drugs or having a mental breakdown.  That he was

possessed.  That he was not in his right state of mind.

         And then he punctuated it by saying, "Everything

that we did on the second shift on November 5, 2016, was

necessary."  He didn't say anything about going too far.  It

had to be three years after the fact for him to get on the

witness stand and say that "I think Mark Bryant went too

far."

         So the differences between the trial testimony

that you heard three years after the fact here in this

courtroom this week and what these individuals said in August

of 2017 are just so extreme and would be comical but for the

serious consequences that would await Mark Bryant if you all

returned a verdict of guilty based on what you heard in this

case.

         His -- his wife, Caitlin Johnson Marriott,

testified this week.  She's Mr. Marriott's wife.  And if you

remember, for some reason they asked her, "Well, did you

interact with Jordan Norris the day before this happened?"

         "Oh, I did.  No problems whatsoever."

         Again, this is the Jordan story, not the inmate

Norris story.

         And then I pulled out her August 2017 interview at

the district attorney's office.  I said, "Well, didn't you

tell the TBI and the FBI that Mr. Norris was real snappy when

1  you dealt with him the day before?"

2         And then I took her through all the other

3  descriptors that she gave during that audio interview that

4  was typed up.  In August she said:  There was no way to get

5  Jordan Norris calmed down.  He was trying to fight other

6  inmates.  He was fighting the whole time.  Jordan Norris was

7  "fighting bad," was the word that she used.  He was flailing,

8  kicking, trying to spit, cursing.  Even in the chair he was

9  still fighting.  Fighting, trying to get his arm out and get

10  away from Jeff Key.  Still combative in the restraint chair.

11         And then she candidly admitted in August that

12  Sgt. Gary Ola, who supposedly did the training of these

13  officers, never reviewed this type of an extreme scenario

14  with the correctional officers in the training or at any

15  other time.

16         And she said in August of 2017, "We," meaning the

17  correctional officers, "weren't trained about the Taser use

18  in relation to a restraint chair."  And then she in August

19  said the Taser was used on Norris only when his arm was out

20  of the cuff, and that he wasn't tased after his arm was

21  restrained.

22         She also told you that Mr. Norris told her that he

23  had ingested three packs of bath salts.  Again, this is all

24  in August.  That was the time that she explained in August of

25  2017 that she was having a conversation with him after he was

returned from the Middle Tennessee Mental Health Institute.
And you remember he was diagnosed with auditory and visual
hallucinations. And she indicated that he was having two
conversations -- and this was when he was returned from the
hospital -- one with her and one with some imaginary person.

But she comes in here this week and tells a much
different story, how profoundly she is disturbed by
everything that happened, how this has impacted her life
going forward. Did she say anything remotely close to that
in August of 2017 when she met with the agents?

Now, she has not been charged with making any sort
of a false statement to the TBI or the FBI. I would
respectfully suggest that her statement in August is totally,
utterly inconsistent with this testimony that she gave you
this week.

So ask yourselves, why would the government in the
direct examination present such a one-sided, slanted, edited
version of the events? If you had not heard about these
interviews that were conducted by the TBI and the FBI in
August, you would have never known the rest of the story. So
you were presented really some alternative facts, some new
facts, some three-years-after-the-fact facts. That's what
you heard this week during the trial. Anything that was
inconsistent with the story that they wanted you to believe
this week, the Jordan story, the Lifetime movie story, was

summarily excluded.  They don't want anything to interrupt the story that they would like you to latch on to in this case.

They talk about Gary Ola being shocked by what he saw.  Ladies and gentlemen, does that make any sense to you?  You saw Mr. Ola.  And I have no ax to grind with Mr. Ola.  I mean, he's given his professional life to Cheatham County.  But he is seen in that 10:20 interval in the booking area on the camera, and he is present.  He sees Jordan Norris having the belly chain and the cuffs and the shackles, and he is giving advice to Cpl. Montgomery to use the Taser.

Then he comes in here three years after the fact, and it's like a mortal sin to use the Taser if a person is restrained in any way.  And they are relying on Gary Ola to provide you the training component.  The reason they have to rely on Gary Ola to do it is because there is nothing in any documentation that you have been presented that confirms this three-application, five-second tase.

You heard from Michael Montgomery.  He is the man who's now with 911 in Cheatham County.  He was the third shift corporal.  He's the one that the baton was passed to at 10:00 on November 5, 2016.  What did he tell the investigators back in August of 2017 before the new reality of what you heard in court this week?  He said, "When we" -- and I asked him about this.  This is in the record.  "When we

first did the training, I don't think there was any policy
about how long you could tase someone or the number of
times."  This man is the supervisor of the third shift and
had worked many years at the jail.

There is a policy now that came out the first day
of the investigation that addresses the length of time and
number of times a person can be tased.  It is now -- now no
more than for five seconds and three times for each incident.

That's -- what he's referring to is Defendant's
Exhibit Number 4.  And think about that:  Defendant's Exhibit
Number 4.

The judge is going to tell you that Mr. Bryant as
a criminal defendant has no obligation to present any
evidence.  It rests entirely on the government to prove his
guilt of each crime and each and every element of the crime
by proof beyond a reasonable doubt.  Don't you think it would
have been candid of the government to show you Defendant's
Exhibit 4 in their case?  Sergeant Breedlove's letter.

Take a look at Defendant's Exhibit 4.  This is the
best evidence that there was no coherent Taser policy that
was in effect at the Cheatham County Jail on November 5,
2016.  I'm not going to read the whole thing, but just a
couple of things.

"There are a few changes that will take place
effective this date," and the date is July 30th, 2017.

"Those changes include that there would be henceforth three" -- "no more than three applications, no more than five seconds per application."

Now, we know that was not the policy November 5, 2016. Officer Bratton, who testified, told you he thought he had tased three times. But the official record, and Ms. Wright confirmed it, was it was four times for five seconds. We didn't see Mr. Bratton over at this table, nor did we see Mr. Montgomery over at this table, who tased an individual, Jordan Norris, at about 10:33 or so on November 5, 2016, when he was in the belly chain and the cuffs and the shackles.

And you saw Officer Montgomery's very skeletal report about that event. Well, they're not doing English diagramming of sentencings [sic] for Mr. Montgomery. Mr. Montgomery is not seated with us over here. His composition deficiencies have evidently been excused by the government.

And where is Sheriff Breedlove? He couldn't jump on Briley Parkway and drive 20 miles to the courthouse to explain his new policy, when literally his department and his jail is on trial in the United States District Court for the Middle District of Tennessee.

So what does he do? He sends his amnesia victim/jail administrator JJ Hannah. You heard him testify.

1    You heard me ask him questions about his August 2017

2    interview at the district attorney's office.  He couldn't

3    remember anything.  I was surprised he could even say that he

4    walked the one block from his office to the district

5    attorney's office and even remembered being there.

6            But the one thing that he had to admit was that

7    there was no Taser policy in effect on November 5, 2016.  He

8    couldn't look you in the eye and say, "Well, I just -- I

9    can't remember.  I can't remember."  The reason was because

10   he had testified before and it was taken down by a court

11   reporter and there was a transcript of it.  So he had to

12   admit that there was -- at the time of the Norris incident,

13   "We," meaning the Cheatham County Sheriff's Office, "didn't

14   have much of a policy on Tasers."  We're talking about

15   November 5, 26- -- 2016.  There was no time limit on

16   drive-stun, nothing about three five-second bursts, no

17   prohibition about tasing someone that was restrained.

18           So how does all of this have anything to do with

19   the job that you all are going to have to do later this

20   afternoon?  You're going to have to reconcile the facts that

21   you've heard here in the courtroom with the instructions that

22   the judge is going to give you after these arguments.

23           I think when you do that analysis you're going to

24   determine that, in order to convict Mark Bryant of depriving

25   Mr. Norris's constitutional rights on November 5, 2016, there

are a number of elements of the offenses that are named in
Counts One and Two that the government has to prove beyond a
reasonable doubt.  One of those essential elements is that
Mark Bryant acted willfully.  And that's a legal term that
Judge Crenshaw is going to define for you.  And I think he's
going to -- the judge will tell you that "willfully" means
that Mark Bryant acted with the specific intent or the
specific purpose to do something that the law forbids.

Well, that's a good definition, but it's not real
helpful.  And I think that the instructions that the judge
gives you, though, get very helpful after that general
description.  That he acted in open defiance and reckless
disregard of his training and in reckless disregard of the
law.

I would ask you, ladies and gentlemen, when you
set about to do this difficult work this afternoon, that you
discuss carefully this concept of willfulness and read those
instructions carefully.  And as you're evaluating Mark
Bryant's interactions with Jordan Norris on November 5, 2016,
I would respectfully suggest the questions you should be
discussing is did Mark Bryant intentionally do something that
was forbidden by his training, this training that was as --
as clear as mud, based on the testimony that you've heard.

And remember, Mr. Hannah, the jail administrator,
had to admit that there was no policy in effect at the time,

1  which is confirmed by Mr. Breedlove.

2          Then, did Mark Bryant intentionally do something

3  in open defiance of his Taser training?  Did he do something

4  in reckless disregard of his Taser training?

5          Well, all of those questions are going to come

6  back to, well, what the heck was the Taser training?  What

7  have we heard about that?

8          And then, ultimately, did Mark Bryant act with a

9  bad purpose, or did -- or did Mark Bryant just be --

10 confronted with an impossible situation and was acting really

11 on bad information that had never been properly conveyed in

12 any training to him?  And remember that this element of

13 willfulness absolutely must be proven beyond a reasonable

14 doubt to convict Mark Bryant of Counts One and Two.  Because

15 you have to determine, was Mark Bryant willfully violating

16 some Cheatham County Sheriff's Office departmental policy.

17         I think there's another unusual circumstance about

18 the -- the activities of the correctional officers in the

19 wake of this incident.  They come in here three years after

20 the fact and they want you to believe that something was done

21 wrong and that it offended all of their sensibilities.  Not

22 one of them reported anything to Lt. Hannah when -- after

23 this happened.  Not anybody told Mark Bryant -- and you saw

24 them all huddled around on the video from 6:58 to 10:33 at

25 night, multiple, multiple officers, even Gary Ola, the

1  teacher -- not one person stops Mark Bryant and says, "Well,
2  what are you doing?  You know we have this policy.  You can't
3  do this."  No one did that at all.  No one who -- who even
4  wanted to remain anonymous wrote a note and put it in the box
5  that's hanging on Lt. Hannah's door.

6          Another thing you may have noticed -- and I hope
7  you're not buying into through the presentation of the
8  government's case is some of this prosecution in some ways
9  was really by implication or innuendo.  Let me tell you what
10 I'm talking about.  There were certain words that were thrown
11 out, like "punish" and "retaliate," and just sort of left
12 hanging in the air, sort of untethered to any facts.  But
13 they were just sort of thrown out there.

14         And then they never asked the follow-up question.
15 They never asked, "Well, Mr. Witness, did you -- is it your
16 opinion that Mark Bryant was punishing Jordan Norris or he
17 was retaliating against Jordan Norris?"  They didn't want to
18 ask the question.  I'm not sure they wanted the answer, but
19 they wanted whatever mileage they could get out of that sort
20 of an innuendo.

21         Well, I asked the question.  And you heard the
22 responses from his colleagues.  Not one correctional officer,
23 whether they were called by the government or I called them,
24 would say that he was trying to punish or retaliate against
25 Jordan Norris.  You heard what they said about Cpl. Mark

Bryant's demeanor and his style in dealing with inmates. I think Dwayne Jones called him Cpl. Words. And I said, "What does 'Cpl. Words' mean?" Cpl. Words meant to Dwayne Jones that he was the guy that always wanted to talk through a problem.

And then Jeff Key said he was not a hands-on guy. That was not his style. I imagine that there are some correctional officers that are hands-on guys, that have a very low threshold for people that are misbehaving in the jail and don't hesitate about putting hands on somebody.

You heard nothing about that at this trial about Mark Bryant. In fact, you heard quite the opposite. His supervisor, Mr. Barnum, who testified, said he was a textbook great employee, an excellent correctional officer. And then he also endorsed the style that he had. You heard Ms. Burney testify. And this relates to the incident at the end of that very long, exhausting day. And I think that's also relevant, the time and the stress and the anxiety dealing with someone for four hours or so.

And then the government comes in here, like we're in 6th grade composition class with a red Sharpie and they are criticizing the way that the reports were written, and we're sort of arguing about angels on the head of a pin. And I know that you all must have been shaking your heads this week about the diagramming and the dissecting that we were

1  doing of these reports.  I'll just say read the reports and

2  see if Mark Bryant was knowingly or intentionally trying to

3  impede some investigation.

4          Certainly didn't impede JJ Hannah.  He had him in

5  the office in about a week to talk to him about it.  And

6  Rebecca Burney told you why she thought the use of the Taser,

7  the 11-second tase that I'm sure you're going to hear a lot

8  more about, was justified.  That his legs, she thought, were

9  free.  She thought he was kicking.  And she thought it was

10  perfectly appropriate.

11          The remaining counts of the indictment, just very

12  briefly, Three and Four, are the so-called false reports that

13  were designed to impede an investigation.

14          I think I mentioned this before, but Count Four

15  deals with that 10:33 incident or the 10:20 incident.  But I

16  think it's significant that Montgomery wrote a report that

17  did not disclose the fact that he had tased Mr. Norris when

18  Mr. Norris was in the belly chain and had the shackles on

19  him.

20          And then Count Five -- and this is the last count

21  in the indictment -- is the false statement count, that Mark

22  Bryant made a false statement to the FBI on August 2nd, 2017,

23  when he met with investigators over at the district

24  attorney's office.

25          Now, remember, by this point in time, it was in

1   the media.  And Mark Bryant was front and center in the

2   media.  His -- it was his tasing that was shown on Channel 5

3   news, the local CBS affiliate.  He was on administrative

4   leave.  He could have said to the FBI and the TBI, "Thanks,

5   but no thanks.  I sort of see where this thing is heading.

6   Thank you, but no thank you, I'm not going to come talk to

7   you."

8           Well, he voluntarily walks on down to the district

9   attorney's office in Ashland City and answers every question

10  that they ask him.  He knew it was going to be recorded.  He

11  knew it was going to be a typewritten statement.  He didn't

12  run and get a lawyer.  He didn't hide behind the Fifth

13  Amendment protection that he most certainly, like any

14  citizen, could have invoked.  He went and talked to the

15  investigators.

16          Now, the investigators -- I think they're going to

17  try to lead you to believe, well, the investigators, they

18  didn't really know what happened.  They certainly knew what

19  happened at 10:30 or so with this tasing that happened in the

20  booking right before Jordan Norris was taken to the hospital.

21          Well, Mark Bryant -- this was ten months removed

22  from that event.  Now, there is no benefit of the doubt for

23  Mark Bryant when they asked him that direct question, "Do you

24  remember tasing Norris when he was in a belly chain?"

25          He said, "No, I don't think so.  No, I don't

remember that." Well, that becomes a false statement that's in Count Five.

Ladies and gentlemen, when you start your deliberations, you're going to read some preliminary instructions, and one is proof beyond a reasonable doubt, proof of such a convincing character that you would be willing to rely upon it and act upon it in the most important of your own personal affairs.

Well, when you evaluate what you've heard here this week; the fact that there's no Taser policy that was in effect on November 5, 2016; the fact that on that video that you saw, it's real evidence that there was no Taser policy -- Bratton does it four times for five seconds; Montgomery does it to a man that's restrained. And I think, ladies and gentlemen, that those kinds of deficiencies in the government's proof means that the government has not proven this case beyond a reasonable doubt. They have not proven beyond a reasonable doubt that Mark Bryant acted willfully in his interaction with Jordan Norris on that night.

And I guess a lot of this case is really about the blame game. In the government's sort of idealized version of this -- and, again, I mean no disrespect to Mr. Norris or his family in any way -- but there is absolutely no responsibility being placed by the government on the shoulders of Jordan Norris. They just want to come up with

1  this teenager, troubled teenager story, that you all are

2  supposed to accept hook, line, and sinker, when that's not

3  the reality that the second shift was dealing with on

4  November 5, 2016.  The reality of what they were dealing with

5  is really represented in the interviews that were conducted

6  on August 7 or early August of 2017, all the things that

7  we've talked about.

8           Ladies and gentlemen, I want to thank you on

9  behalf of Mr. Bryant and his family for your time and

10 attention this week.  I know it's difficult to be away from

11 home and be away from your jobs and other responsibilities.

12 And we thank you.  I think when you evaluate this case fully,

13 it is my hope that you will see that the government has not

14 proven this case beyond a reasonable doubt and that you will

15 follow the instructions and follow your duty to acquit Mark

16 Bryant.

17          THE COURT:  All right.  Ladies and gentlemen, the

18 government gets a rebuttal, and you have 11 minutes left.

19          MS. MYERS:  Ladies and gentlemen --

20          THE COURT:  I'm sorry, Ms. Myers, you do need to

21 step closer back from the jury.

22          MS. MYERS:  Thank you.

23

24          PLAINTIFFS' REBUTTAL CLOSING STATEMENT

25          MS. MYERS:  Ladies and gentlemen, you've heard a

lot of testimony over the past few days.  And you've also at
the very beginning of this case, when you came in here for
jury selection, you took an oath and you said that you were
going to apply the law as given to you by the judge to the
facts.  And you are the trier of the facts in this case.

You get to judge the credibility of the witnesses
that you've seen on this stand in this case, and you get to
apply the law that the judge reads you.  And you will be able
to do that.  You took an oath to do that.  And I know that
you will.

Now, the defendant is wanting you to look and
answer a question of whether there was a violation of policy,
a violation of training.  And the defendant is wanting you to
answer the wrong question.  He wants you to answer the wrong
question because he can't answer the right one.  And that
question you will be read in the jury instructions, what you
have to determine when you are evaluating what the defendant
did to Jordan Norris the night of November 5th, 2016.  And
that is, did the defendant use more force than was reasonable
under the circumstances?  That is the question.  And that is
what you will hear the judge read to you.  Not a violation of
policy or training.

You've already heard from witnesses that the
defendant violated those policies that existed back on
November 5th of 2016.  That question has been answered for

you.  And that is not one that you have to answer.

Was it more force than was reasonably necessary under the circumstances?  And of course the answer is no. None of that -- none of those tases that have been charged in this case were reasonably necessary.  Counts One and Two, the 8:00 incident and the 10:20 incident, those tasings, those assaults, were not reasonably necessary.

And you heard officer after officer come in here and testify that there was no justification for what the defendant did to Jordan Norris.  No justification.  And they said that over and over again.  And these were the defendant's friends.  They worked with him day in and day out.  Josh Marriott -- Officer Marriott even roomed -- he was the roommate of the defendant.

And when the defendant told his friends not to write reports -- not just his friends, but his inferiors; he was their boss -- when he told his friends and people who were beholden to him, who had to follow his instructions, not to write a report at 8:00 p.m., they did it.  He was their boss.  He was their friend.  He was their roommate.

You heard several officers come in and talk about the policy from November 5th of 2016.  The defendant knew it. The least amount of force necessary.  When you watch those videos, you ask yourself, was that the least amount of force necessary for someone who was restrained in a chair, tied

down, and held down by officers and tased repeatedly for 50
seconds?  No.  Of course that was not reasonable.  And of
course, it was not necessary.  You heard that testimony as
well over and over again.  You did not hear a single officer
say that that 50-second tase, four times at 50 seconds, was
justified.  Even the ones that the defendant called:  Officer
Key.  He didn't have to call anyone.  He didn't have to
testify.  But he did.  And when you look at what they told
you, Officer Key, his good friend, when you look at that and
you hear what he had to say, that of course four times at 50
seconds wasn't justified, you get to weigh the credibility of
those witnesses.

And that was not easy for his friends to come in
here and admit that their friend, the defendant, did those
horrible things that were not justified to Jordan Norris.

And the government -- the United States has made
no secret that Jordan Norris was a very troubled individual.
People who testified, officers who have experience dealing
with people who have drug addiction issues, recognized that
Jordan had a drug addiction issue.  They recognized that
something -- that that was something that was important.
They also recognized that he had some mental health issues,
that he was suicidal that night.

And then you heard the defendant say that, even
though he knew that Jordan Norris was suicidal that night, he

still lit him up.  He shot electricity into his body for a total of 97 seconds.  Suicidal and someone who had a drug addiction problem.  And that each tase has to be justified in that moment.  Could he justify it?  No, he could not.

Everyone seems to know that there were limits to tasing, three five-second bursts.  Who doesn't know that?  The defendant.  Who is the outlier in this scenario?

You heard from Officer Marriott, who attended the same training as the defendant.  He remembered from the training that it was three five-second bursts.  You heard from Officer Ola.  It's always been three five-second bursts.  And he teaches that in every single training.  Everyone seems to remember that, except for the defendant.  Everyone seems to have a very clear memory, except for the defendant.  Everyone knew the policy, the policy that references the Taser training -- and you can go back and look at that, Exhibit 1 and Exhibit 41, the ones that existed at the time.

You heard from some of the defendant's witnesses that he called about how he was a textbook employee, as Mr. Strianse put it.  Well, a textbook employee follows the letter of what's right, tells the truth, and tells the truth because that is the textbook thing that an employee should do.

And the defendant knew how to write reports.  He knew how to write reports because you can see what's in

evidence, that he knew how to write them before.  And that he put all the important details in them.  Look at what he didn't put in his reports that are on trial here.  What's the difference?  I ask you to go back and look at those.  These are not compositional errors.  No.  They are material facts that he left out.

And why did he leave them out?  Why did he lie?  Because he knew that what he did was wrong.

The defendant really tried to confuse the timeframe here.  And the timeframe is very clear.  There are three separate incidents:  The removal from the cell at 7:00, the tasings in the chair at 8:00 --

THE COURT:  Ms. Myers, you have one minute left.

MS. MYERS:  Thank you.

-- the hospital at 10:20.

No reports at 8:00 p.m.

7:00 p.m., he told people not to write reports, and he referred officers back -- his own administration, JJ Hannah -- to look here.  Not there, but here.  And that's what they did.  When they had these reports, they went back to 7:00 p.m.  Look here; don't look there.

The defendant wants you to look at the interviews from July.  Interviews.  Don't look here, because when you look at November 5th, you will see that what he did was wrong.

1          And then, I want you to look at the reports.  I

2    want you to look at the reports from 8:00 p.m. and compare it

3    to what happened.  Does that describe what happened?  No.

4          Then the next one.  Does that report describe what

5    happened?  No.  Absolutely not.

6          THE COURT:  Ms. Myers, if you could wrap up your

7    argument.

8          MS. MYERS:  Thank you, Your Honor.

9          Don't let the defendant mislead you like he misled

10   the administration and the other people that night.  Don't

11   let him mislead you.  Find him guilty.

12

13                          JURY CHARGE

14         THE COURT:  All right.  Ladies and gentlemen, you

15   now have heard all of the arguments and you've heard all of

16   the evidence.  So we're going to take a break so you can

17   refresh yourselves.

18         Now, when you return, you'll find on your chair a

19   copy of the charge.  And as I said yesterday, you're free to

20   mark on it, highlight it, do as you please.  It's an aid for

21   you to follow the instructions that I give you.  So at this

22   point, we will -- we'll come back at 10:30.

23         (Recess.)

24         (Jury not present.)

25         THE COURT:  All right.  Be seated.  I understand

```
 1    we want to take up something before the jury comes back in.
 2                 MR. SONGER:  Yes, Your Honor.  Very briefly.  The
 3    defense closing mentioned several times that Sheriff
 4    Breedlove was not called as a witness and could have come
 5    down here and testified.  There was a motion in limine
 6    excluding those types of references to witnesses who would be
 7    equally available to call from either side.  So I think it
 8    would be appropriate for the Court to include a limiting
 9    instruction with the charge given to the jury that they
10    should disregard that.
11                 THE COURT:  Mr. Strianse?
12                 MR. STRIANSE:  Your Honor, I don't have any
13    objection to that.
14                 THE COURT:  Do you have a proposed limiting
15    instruction?
16                 MR. STRIANSE:  I would say, I didn't mention
17    witness.  I just generally mentioned, where is Mr. Breedlove?
18                 THE COURT:  And there is a provision already
19    here -- let's take a look and see if that covers it.
20                 Page 19.  It touches on that.  And then we. . .
21                 MR. SONGER:  Your Honor, we would propose just
22    adding -- slightly modifying that existing instruction to say
23    that -- to instruct the jury they should not make decisions
24    based only on the number of witnesses who testified or which
25    witnesses testified.
```

1          THE COURT:  Well --

2          MR. SONGER:  Did or did not --

3          THE COURT:  -- which witnesses testified --

4          MR. SONGER:  Or whether a witness -- or whether a

5    person did or did not testify, or something to that effect.

6          THE COURT:  Yeah.  I think there's something in

7    here on that.

8          And then we come back again on page 9.  I say, "Do

9    not speculate about what a witness might have said."  I think

10   pages 8 and 9 sort of -- the definition of what is evidence.

11         MR. SONGER:  Your Honor, what if we just added one

12   sentence to that instruction that says something along the

13   lines of "You should not consider the fact that any

14   particular individual was not called to testify in this

15   case."

16         THE COURT:  But I know we tell them they can

17   consider what evidence they have and what evidence is not

18   there.  I mean, they can look at the absence of evidence.  I

19   think -- I think -- I think that's covered in the existing

20   instructions.  So I'm going to proceed with what we have.

21         All right.  Bring in the jury.

22         (Jury present.)

23         THE COURT:  All right.  Be seated.

24         All right.  So everyone should have a copy of the

25   instructions to follow along.

1    Members of the jury, now it is time for me to give
2  you instructions about the law that you must follow in
3  deciding this case.
4    I will start by explaining your duties and the
5  general rules that apply in every criminal case.  Next, I
6  will explain the elements, or parts, or the crimes that the
7  defendant is accused of committing.  I will also explain some
8  rules that you must use in evaluating particular testimony
9  and evidence.  And last, I will explain the rules that you
10  must follow during your deliberations in the jury room and
11  the possible verdicts you may return.
12    Please listen very carefully to everything I say.
13    You have two main duties as jurors.  The first one
14  is to decide what the facts are from the evidence that you
15  saw and heard here in the courtroom.  Deciding what the facts
16  are is your job, not mine, and nothing that I have said or
17  done during this trial was meant to influence your decision
18  about the facts in any way.
19    Your second duty is to take the law that I will
20  give you, apply it to the facts, and decide if the government
21  has proved the defendant guilty beyond a reasonable doubt.
22  It is my job to instruct you about the law, and you are bound
23  by your oath that you took at the beginning of the trial to
24  follow the instructions that I give you, even if you
25  personally disagree with them.  This includes the

instructions that I gave you before and during the trial and these instructions.  All the instructions are important, and you should consider them together as a whole.

The lawyers may have talked about the law during their arguments.  But if what they said is different from what I say, you must follow what I say.  What I say about the law controls.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

As you know, the defendant has pled not guilty to the crimes charged in the indictment.  The indictment is not any evidence at all of guilt.  It is just the formal way that the government tells the defendant what crime he is accused of committing.  It does not even raise any suspicion of guilt.

Instead, the defendant starts the trial with a clean slate, with no evidence at all against him, and the law presumes that he is innocent.  This presumption of innocence stays with the defendant unless the government presents evidence here in court that overcomes the presumption, and convinces you beyond a reasonable doubt that he is guilty.

This means that the defendant has no obligation to present any evidence at all, or to prove to you in any way that he is innocent.  It is up to the government to prove

 1  that the defendant is guilty, and this burden stays on the
 2  government from start to finish.  You must find the defendant
 3  not guilty unless the government convinces you beyond a
 4  reasonable doubt that he is guilty.
 5          The government must prove every element of the
 6  crimes charged beyond a reasonable doubt.  Proof beyond a
 7  reasonable doubt does not mean proof beyond all possible
 8  doubt.  Possible doubts or doubts based purely on speculation
 9  are not reasonable doubts.  A reasonable doubt is a doubt
10  based on reason and common sense.  It may arise from the
11  evidence, the lack of evidence, or the nature of evidence.
12          Proof beyond a reasonable doubt means proof which
13  is so convincing that you would not hesitate to rely and act
14  on it in making the most important decisions in your own
15  lives.  If you are convinced that the government has proved
16  the defendant guilty beyond a reasonable doubt, say so by
17  returning a guilty verdict.  If you are not convinced, say so
18  by returning a not guilty verdict.
19          You must make your decision based only on the
20  evidence that you saw and heard here in court.  Do not let
21  rumors, suspicions, or anything else that you may have seen
22  or heard outside of court influence your decision in any way.
23          The evidence in this case includes only what the
24  witnesses said while they were testifying under oath, the
25  exhibits that I allowed into evidence, any stipulations that

the lawyers agreed to, and any facts that I have judicially
noticed.

Nothing else is evidence.  The lawyers's
statements and arguments are not evidence.  Their questions
and objections are not evidence.  My legal rulings are not
evidence.  And my comments and questions are not evidence.

During the trial I did not let you hear the
answers to some of the questions that the lawyers asked.  I
also ruled that you could not see some of the exhibits that
the lawyers wanted you to see.  And sometimes I ordered you
to disregard things that you saw or heard, or I struck things
from the record.

You must completely ignore all these things.  Do
not even think about them.  Do not speculate about what a
witness might have said or what an exhibit might have shown.
These things are not evidence, and you are bound by your oath
not to let them influence your decision in any way.  Make
your decision based only on the evidence, as I have defined
it here, nothing else.

You should use your common sense in weighing the
evidence.  Consider it in light of your everyday experience
with people and events, and give it whatever weight you
believe it deserves.  If your experience tells you that
certain evidence reasonably leads to a conclusion, you are
free to reach that conclusion.

1          Now, some of you may have heard the terms "direct

2    evidence" and "circumstantial evidence."

3          Direct evidence is simply evidence, like the

4    testimony of an eyewitness, which, if you believe it,

5    directly proves a fact.  If a witness testified that he saw

6    it raining outside and you believed him, that would be direct

7    evidence that it was raining.

8          Circumstantial evidence is simply a chain of

9    circumstances that indirectly proves a fact.  If someone

10   walked into the courtroom wearing a raincoat covered with

11   drops of water and carrying a wet umbrella, that would be

12   circumstantial evidence from which you could conclude that it

13   was raining.

14         It is your job to decide how much weight to give

15   the direct and circumstantial evidence.  The law makes no

16   distinction between the weight that you should give to either

17   one or say that one is any better evidence than the other.

18   You should consider all the evidence, both direct and

19   circumstantial, and give it whatever weight you believe it

20   deserves.

21         Another part of your job as jurors is to decide

22   how credible or believable each witness was.  This is your

23   job, not mine.  It is up to you to decide if a witness's

24   testimony was believable, and how much weight you think it

25   deserves.  You are free to believe everything that a witness

said, or only part of it, or none of it at all.  But you should act reasonably and carefully in making these decisions.

Let me suggest some things for you to consider in evaluating each witness's testimony.

Ask yourself if the witness was able to clearly see or hear the events.  Sometimes even an honest witness may not have been able to see or hear what was happening and may make a mistake.

Ask yourself how good the witness's memory seemed to be.  Did the witness seem able to accurately remember what happened?  Ask yourself if there was anything else that may have interfered with the witness's ability to perceive or remember the events.

Ask yourself how the witness acted while testifying.  Did the witness appear honest?  Or did the witness appear to be lying?

Ask yourself if the witness had any relationship to the government or the defendant or anything to gain or lose from the case that might influence the witness's testimony.  Ask yourself if the witness had any bias, or prejudice, or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.

Ask yourself if the witness testified

inconsistently while on the witness stand or if the witness
said or did something or failed to say or do something at any
other time that is inconsistent with what the witness said
while testifying.  If you believe that the witness was
inconsistent, ask yourself if this makes the witness's
testimony less believable.  Sometimes it may; other times it
may not.  Consider whether the inconsistency was about
something important or about some unimportant detail.  Ask
yourself if it seemed like an innocent mistake or it seemed
deliberate.

And ask yourself how believable the witness's
testimony was in light of all the other evidence.  Was the
witness's testimony supported or contradicted by other
evidence that you found believable?  If you believe that a
witness's testimony was contradicted by other evidence,
remember that people sometimes forget things, and that even
two honest people who witness the same event may not describe
it exactly the same way.

These are only some of the things you may consider
in deciding how believable each witness was.  You may also
consider other things that you think shed some light on the
witness's believability.  Use your common sense and your
everyday experience in dealing with other people, and then
decide what testimony you believe and how much weight you
think it deserves.

1        In reaching your verdict, you are to consider only

2  the evidence in this case.  However, you are not required to

3  set aside your common sense, and you have the right to weigh

4  the evidence in the light of your own observations and

5  experiences.  Do not decide the case based on implicit

6  biases, which are hidden thoughts that can impact what we see

7  and hear, how we remember what we see and hear, and how we

8  make important decisions.

9        As we discussed in jury selection, everyone,

10  including me, has feelings, assumptions, perceptions, fears,

11  and stereotypes; that is, implicit biases that we may not be

12  aware of.  Because you are making very important decisions in

13  this case, I strongly encourage you to evaluate the evidence

14  carefully and to resist jumping to conclusions based on

15  personal likes or dislikes, generalizations, gut feelings,

16  prejudices, sympathies, stereotypes, or biases.  The law

17  demands that you return a just verdict, based solely on the

18  evidence, your individual evaluation of that evidence, your

19  reason and common sense and these instructions.  Our system

20  of justice is counting on you to render a fair decision based

21  on the evidence, not on biases.

22        One more point about witnesses.  Sometimes jurors

23  wonder if the number of witnesses who testified makes any

24  difference.

25        Do not make any decisions based only on the number

1   of witnesses who testified.  What is important is how

2   believable the witnesses were, and how much weight you think

3   their testimony deserves.  Concentrate on that, not on

4   numbers.

5          There is one more general subject that I want talk

6   to you about before I begin explaining the elements of the

7   crimes charged.

8          The lawyers for both sides objected to some of the

9   things that were said or done during the trial.  Do not hold

10  that against either side.  The lawyers have a duty to object

11  whenever they think that something is not permitted by the

12  rules of evidence.  Those rules are designed to make sure

13  that both sides receive a fair trial.

14         And do not interpret my rulings on their

15  objections as any indication of how I think the case should

16  be decided.  My rulings were based on the rules of evidence,

17  not on how I feel about the case.  Remember that your

18  decision must be based only on the evidence that you saw and

19  heard here in court.

20         That concludes the part of my instructions

21  explaining your duties and general rules that apply in every

22  criminal case.  In a moment, I will explain the elements of

23  the crimes that the defendant is accused of committing.

24         But, before I do that, I want to emphasize that

25  the defendant is only on trial for the particular crimes

charged in the indictment. Remember that your job is limited to deciding whether the government has proved the crimes charged.

The defendant has been charged with multiple crimes. The number of charges is no evidence of guilt, and this should not influence your decision in any way. It is your duty to separately consider the evidence that relates to each charge and to return a separate verdict for each one. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge. Your decision on one charge, whether it's guilty or not guilty, should not influence your decision on any other charge.

Next, I want to say a word about the dates mentioned in the indictment. The indictment charges the crimes happened on or about November 5, 2016, and August 2, 2017. The government does not have to prove that the crimes happened on those exact dates, but the government must prove that the crimes happened reasonably close to those dates.

Although the indictment charges that a statute was violated by acts that are connected by the word "and," it is sufficient if the evidence establishes a violation of the statute by any one of the acts charged. Of course, this must be proved beyond a reasonable doubt.

As I have told you previously, the indictment is

1    not any evidence at all of guilt.  It is just the formal way

2    that the government tells the defendant what crimes he is

3    accused of committing.  It does not even raise any suspicion

4    of guilt.

5              I will now read to you the indictment.

6              1.  The Cheatham County Sheriff's Office operated

7    the Cheatham County Jail, a correctional facility in Ashland,

8    Tennessee, in the Middle District of Tennessee, that housed

9    detainees arrested on state criminal charges.

10             2.  On or about November 5, 2016, Jordan Norris

11   was a detainee who had not yet been arraigned and who was

12   housed in the Cheatham County Jail while he awaited trial.

13             3.  On or about November 5, 2016, Defendant Mark

14   Bryant was a corporal at the Cheatham County Jail and was

15   certified to carry a Taser.

16             4.  On or about November 5, 2016, corrections

17   officers removed Jordan Norris from his cell at the Cheatham

18   County Jail and placed him in a restraint chair near the

19   jail's booking area.

20             Count One.

21             On or about November 5, 2016, in the Middle

22   District of Tennessee, Mark Bryant, while acting under color

23   of law, willfully deprived Jordan Norris, a person known to

24   the grand jury, of the right, secured and protected by the

25   Constitution and the laws of the United States, to be free

1  from the deprivation of liberty without due process of law,

2  which includes the right to be free from the use of

3  unreasonable force amounting to punishment.

4          Specifically, Mark Bryant used a Taser on Jordan

5  Norris multiple times without justification while Jordan

6  Norris was in a restraint chair and surrounded by multiple

7  officers.  One of these Taser cycles lasted approximately 25

8  seconds, and a second cycle lasted approximately 15 seconds.

9  The offense resulted in bodily injury to Jordan Norris, and

10  the offense included the use of a dangerous weapon, all in

11  violation of Title 18, United States Code, Section 242.

12          Count Two.

13          On or about November 5, 2016, in the Middle

14  District of Tennessee, Mark Bryant, while acting under color

15  of law, willfully deprived Jordan Norris, a person known to

16  the grand jury, of the right, secured and protected by the

17  Constitution and the laws of the United States, to be free

18  from the deprivation of liberty without due process of law,

19  which includes the right to be free from the use of

20  unreasonable force amounting to punishment.

21          Specifically, as officers prepared to transport

22  Jordan Norris to a medical facility, Mark Bryant used a Taser

23  on Jordan Norris without legal justification after Jordan was

24  placed in handcuffs and was surrounded by multiple officers.

25  The Taser cycle lasted for approximately 11 seconds.  The

offense resulted in bodily injury to Jordan Norris, and the offense included the use of a dangerous weapon, all in violation of Title 18, United States Code, Section 242.

Count Three.

On or about November 5, 2016, in the Middle District of Tennessee, Mark Bryant, in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, knowingly falsified a document with the intent to impede, obstruct, and influence the investigation and proper administration of the matter within the jurisdiction of a federal agency.

Specifically, Mark Bryant falsified a Cheatham County Sheriff's Department report dated November 5, 2016, for a use of force incident involving detainee Jordan Norris by omitting the material information that Mark Bryant tased Jordan Norris multiple times for a total of approximately 50 seconds at approximately 8:00 p.m., and by falsely reporting the sequence of events related to Mark Bryant's use of a Taser on Jordan Norris at approximately 8:00 p.m. under different circumstances from Officer Daniel Bratton's use of a Taser at 6:55 p.m., all in violation of Title 18, United States Code, Section 1519.

Count Four.

On or about November 5, 2016, in the Middle

District of Tennessee, Mark Bryant, in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, knowingly falsified a document with the intent to impede, obstruct, and influence the investigation and proper administration of the matter within the jurisdiction of a federal agency.

Specifically, Mark Bryant falsified a Cheatham County Sheriff's Department report dated November 5, 2016, for a use of force incident involving detainee Jordan Norris by omitting the material information that Mark Bryant tased Jordan Norris for approximately 11 seconds at approximately 10:30 p.m. while Jordan Norris was compliant, all in violation of Title 18, United States Code, Section 1519.

Count Five.

On or about August 2, 2017, in the Middle District of Tennessee, Mark Bryant did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the executive branch of the government of the United States.

Specifically, Mark Bryant falsely told an agent with the Federal Bureau of Investigation that, on or about November 5, 2005 -- 2016, he did not use force after officers restrained Jordan Norris with a belly chain to transition him

from the jail to a vehicle.  In truth and fact, Mark Bryant tased Jordan Norris for approximately 11 seconds after he was restrained with a belly chain and handcuffs, as described in Count Two, all in violation of Title 18, United States Code, Section 1001.

The defendant, Mark Bryant, has pled not guilty to all counts in the indictment and is presumed innocent until the government proves beyond a reasonable doubt that he is guilty.

I will now explain to you the elements of each of the counts in the indictment.

Counts One and Two of the indictment accuse the defendant of, while acting under color of law, willfully depriving someone else of a right secured and protected by the Constitution and laws of the United States, in violation of Title 18, United States Code, Section 242.  For you to find the defendant guilty of Count One or Two, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

First, that the defendant has acted under color of state law;

Second, that the defendant deprived the victim, Jordan Norris, of a right that is secured by the Constitution or laws of the United States.  Here, the right at issue is Jordan Norris's right to be free from the deprivation of

liberty without due process of law.  This right includes the right to be free from an officer's use of objectively unreasonable force while awaiting trial;

Third, that the defendant acted willfully; and

Fourth, that the defendant's conduct resulted in bodily injury to Jordan Norris or that the defendant used a dangerous weapon.

If you are convinced that the government has proved all of these elements for a charge, say so by returning a guilty verdict on that charge.  If you have a reasonable doubt about any one of these elements for a count, then you must find the defendant not guilty of that count.

I will now provide you with additional instructions regarding some of these elements.

A person acts under color of a law if he is an official or employee of a government that uses or abuses power he possesses beyond -- because of his official position.

The parties have stipulated that Defendant Mark Bryant was acting under color of state law during the conduct charged in Counts One and Two of the indictment.  I therefore instruct you that this element has been established.

The second element that the government must prove with respect to Count One and Two is that the defendant deprived Jordan Norris of his right not to be deprived of

liberty without due process of law.  A pre-trial detainee --
that is, someone who has been arrested for violating the law
but is presumed innocent because they have not yet been
convicted of the crime for which they have been arrested --
is presumed innocent; therefore, he may not be punished while
awaiting trial.  This means that the pre-trial detainee may
not be subject to an officer's use of objectively
unreasonable force while he is awaiting trial.

Not every use of force by a law enforcement
officer against a pre-trial detainee is unconstitutional.  An
officer may use force to maintain the safety of himself and
others -- officers, to prevent a riot, to similarly maintain
discipline or restore order in a jail or prison facility, or
to accomplish other legitimate law enforcement goals.

Even when some force is objectively necessary to
carry out a legitimate law enforcement objective, however,
officers may not use more force than objectively reasonable
to achieve that goal.  An officer may not use force merely
because an arrestee questions an officer's authority, insults
the officer, uses profanity, or otherwise engages in verbal
provocation, unless the force was otherwise objectively
reasonable at the time it was used.  An officer may not use
force solely to punish, retaliate against, or seek
retribution against another person.

If you determine that the defendant used physical

force against Jordan Norris, you must then decide whether that force was objectively unreasonable.  You should evaluate reasonableness from the point of view of an ordinary and reasonable officer on the scene and at the moment the force was used.

In making your determination, you should consider all the facts and circumstances, including the amount of the force used; the relationship between the need for the use of force and the amount of force used; the extent of Jordan Norris's injury, if any; any effort made by the defendant to temper or to limit the amount of force; the severity of any security problem at issue; the threat, if any, reasonably perceived by the defendant; and whether Jordan Norris was actively attempting to escape or resisting orders given by the defendant or other law enforcement authorities.

In determining whether the force used was reasonable under all the facts and circumstances, keep in mind that force that is objectively reasonable at the beginning of an encounter may not be justified -- even seconds later -- if the objective justification for the initial use of force has been eliminated.

A person acts willfully if he acts voluntarily and intentionally with the specific intent to do something the law forbids.  Here, that means that you may find the defendant acted willfully if you find that he acted in open

defiance or reckless disregard of a pretrial detainee's right
to be free from a law enforcement officer's use of
objectively unreasonable force.

It is not necessary for the government to prove
that the defendant was thinking in legalistic terms at the
time of the incident, or that he had an appreciation that his
conduct was prohibited by a particular provision of the
criminal code or by the Constitution.

You must, however, find that the defendant acted
with the bad purpose of doing what the Constitution forbids.
In this context, you must find that the defendant intended to
use more force than was reasonable under the circumstances.

In determining whether the defendant acted
willfully, you may consider any facts or circumstances you
deem relevant to shed light on what was in the defendant's
mind.  For example, you may consider the manner in which any
constitutional violation was carried out and the duration of
any constitutional violation.  You may also consider what the
defendant said; what the defendant did or failed to do; how
the defendant acted; and whether the defendant knew through
training or experience that his actions were unlawful, and
whether they knew that they violated department policy or his
own training.

Intent is a state of mind.  Ordinarily, there is
no way that a defendant's state of mind can be proved

directly, because no one can read another person's mind and tell what that person is thinking.  But a defendant's state of mind can be proved indirectly from the surrounding circumstances.  This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind.

You may also consider the natural and probable results of any acts that the defendant knowingly did, and whether it was reasonable to conclude that the defendant intended those results.

It is not a defense that the defendant may also have been motivated by greed, anger, or some other emotion, provided that the intent that I have described to you was present.  You may, however, consider such motivations, as well as any malice displayed by the defendant, in determining whether the defendant acted willfully, as I have described that term to you.  This, of course, is all for you to decide.

The government has introduced evidence of policies and training the defendant received at the Cheatham County Jail.  This evidence has been admitted for a limited purpose. You may use it only to determine whether the defendant acted willfully, as I have just described that state of mind to you.

It is, of course, wholly up to you to determine

1  whether the defendant violated any rule or acted in
2  contravention of his training or policy.  If you find that he
3  acted in contravention of policies or training, then I
4  caution you that not every instance of inappropriate behavior
5  on the part of a government employee rises to the level of a
6  federal constitutional violation.  It is possible for a
7  government employee to violate department policy or act
8  contrary to his training without violating the United States
9  Constitution, just as it is possible for a government
10 employee to violate the Constitution without violating a
11 specific policy.

12        For this reason, proof that a defendant violated
13 policy or acted contrary to training is relevant to your
14 determination of willfulness, but is not relevant to your
15 determination that the defendant violated Jordan Norris's
16 constitutional rights.

17        In other words, if you determine that the
18 defendant violated a policy of the Cheatham County Jail or
19 acted contrary to his training, you should consider that
20 evidence only in determining whether the defendant acted
21 willfully; you should not consider that evidence in
22 determining whether the defendant's actions violated the
23 Constitution in the first instance.

24        Bodily injury means an injury to the body, no
25 matter how minor or temporary, and it includes any cut,

abrasion, bruise, burn, disfigurement, illness, physical
pain, or impairment of a bodily member or mental faculty.
The government need not prove that the defendant intended to
cause bodily injury.  The government also need not prove that
a defendant's acts were the sole cause of bodily injury.  The
government must simply prove that the offense resulted in
bodily injury to Jordan Norris.

A dangerous weapon is any instrument capable of
inflicting death or serious bodily injury, including extreme
physical pain.

Counts One and Two of the indictment charge both
that the offense resulted in bodily injury to Jordan Norris
and that the offense involved the use of a dangerous weapon.
However, the government does not have to prove both that the
offense resulted in bodily injury and that a dangerous weapon
was used.  Proof beyond a reasonable doubt of one of these is
enough to prove that element.

But, in order to return a guilty verdict, all 12
of you must agree that the same mode or factor has been
proved.  That is, all of you must agree that the government
proved beyond a reasonable doubt that the offense resulted in
bodily injury, or all of you must agree that the government
proved beyond a reasonable doubt that the offense involved
the use of a dangerous weapon.

If all of you unanimously agree that the

government has proved one or both of these modes or factors beyond a reasonable doubt, then this element has been satisfied.  If all of you do not agree that the government has proven one or both of these modes or factors beyond a reasonable doubt, then this element has not been satisfied.

Counts Three and Four of the indictment accuse the defendant of knowingly falsifying a document with the intent to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of a department or agency of the United States, in violation of Title 18, United States Code, Section 1519.

For you to find the defendant guilty of Count Three or Four, the government must prove each and every one of the following elements beyond a reasonable doubt:

First, that the defendant knowingly falsified a document;

Second, that the defendant, acting in relation to or in contemplation of the investigation or proper administration of a matter, intended to impede, obstruct, or influence the investigation or proper administration of that matter; and

Third, that the matter was within the jurisdiction of an agency of the United States, here the Federal Bureau of Investigation.

If you are convinced that the government has

proved all of these elements, say so by returning a guilty
verdict on that count.  If you have a reasonable doubt about
any one of these elements, then you must find the defendant
not guilty on that count.

I will now provide you with additional
instructions regarding some of these elements.

A defendant acts knowingly if his act is done
voluntarily and intentionally, not because of a mistake or
some other innocent reason.

A defendant falsifies a document by including
within that document any untrue statement or by omitting from
that document or record any material fact.

To prove that the defendant, acting in relation to
or in contemplation of the investigation or proper
administration of a matter, intended to impede, obstruct, or
influence the investigation or proper administration of that
matter, the government does not need to show that a federal
investigation was underway at the time the defendant engaged
in obstructive conduct.  There is no requirement that the
matter or investigation have been pending or imminent at the
time of the -- of the obstruction, but only that the acts
were taken in relation to or in contemplation of any such
matter or investigation.  There is also no requirement that
the falsification would naturally or properly -- probably
result in obstruction of the investigation.

1          In determining whether the defendant had the
2     required intent, you may consider all the circumstances of
3     the case, including, among other things, any statements made
4     or omitted; any act done or omitted by the person; and any
5     other circumstances you deem relevant and reliable.  You may
6     also consider the natural and probable results of any acts
7     that the defendant knowingly did and whether it was
8     reasonable to conclude that he intended those results.
9          In this case, a matter is within the jurisdiction
10    of an agency of the United States if the FBI has the power to
11    exercise authority in that matter.  The government is not
12    required to prove that the defendant knew that the FBI is an
13    agency of the United States or that he knew that a federal
14    investigation was underway or would occur in the future.  Nor
15    must the government prove that there was any actual delay or
16    withholding of truthful information from federal authorities.
17         The issue for you to determine is whether the
18    matter the defendant allegedly sought to obstruct was, in
19    fact, within the jurisdiction of the FBI.
20         Count Five of the indictment accuses the defendant
21    of knowingly and willfully making a false material statement
22    in a matter within the jurisdiction of the executive branch
23    of the United States government, in violation of Title 18,
24    United States Code, Section 1001.
25         For you to find the defendant guilty of Count

1  Five, the government must prove each and every one of the

2  following elements beyond a reasonable doubt:

3  First, that the defendant made a statement to a

4  special agent of the Federal Bureau of Investigation, FBI;

5  Second, that the statement made by the defendant

6  was false;

7  Third, that the statement made by the defendant

8  was material;

9  Fourth, that the defendant acted knowingly and

10  willfully; and

11  Fifth, that the statement pertained to a matter

12  within the jurisdiction of the FBI.

13  A statement is false if it was untrue when it was

14  made and the defendant knew it was untrue at that time.

15  A material statement is one that has the natural

16  tendency to influence or is capable of influencing a decision

17  of the FBI.  For a statement to be material, it need not

18  have, in fact, mislead the FBI.

19  An act is done knowingly and willfully if it is

20  done voluntarily and intentionally and not because of mistake

21  or some other innocent reason.

22  In this case, a matter is within the jurisdiction

23  of the executive branch of the United States government if

24  the FBI has the power to exercise authority in that matter.

25  It is not necessary, however, that the government prove that

1  the defendant knew the matter was within the jurisdiction of
2  the FBI.
3          If you are convinced that the government has
4  proved all of these elements, say so by returning a guilty
5  verdict on this count.  If you have a reasonable doubt about
6  any one of these elements, then you must find the defendant
7  not guilty of this count.
8          That concludes the part of my instructions
9  explaining the elements of the crimes.  Next, I will explain
10 some rules that you must use in considering some of the
11 testimony and evidence.
12         You have heard the defendant testify.  Earlier, I
13 talked to you about the credibility or the believability of
14 the witnesses.  And I suggested some things for you to
15 consider in evaluating each witness's testimony.  You should
16 consider those same things in evaluating the defendant's
17 testimony.
18         You have heard the testimony of certain witnesses
19 who testified to both facts and opinions.  Each of these
20 types of testimony should be given the property weight.
21         As to the testimony on facts, consider the factors
22 discussed earlier in these instructions for weighing the
23 credibility of the witnesses.
24         As to the testimony on opinions, you do not have
25 to accept these opinions.  In deciding how much weight to

1  give them, you should consider the witness's qualifications
2  and how the witness reached his or her conclusions, along
3  with the other factors discussed in these instructions for
4  weighing the credibility of witnesses.
5          Remember that you alone decide how much of a
6  witness's testimony to believe and how much weight it
7  deserves.
8          You have heard the testimony of Gary Ola.  You
9  have also heard that the government has promised Mr. Ola that
10 he may receive a recommendation to [sic] the government for a
11 reduced sentence in exchange for his cooperation.  It is
12 permissible for the government to make such a promise.  But
13 you should consider Mr. Ola's testimony with more caution
14 than the testimony of other witnesses.  Consider whether his
15 testimony may have been influenced by the government's
16 promise.  Do not convict the defendant based on the
17 unsupported testimony of such a witness, standing alone,
18 unless you believe his testimony beyond a reasonable doubt.
19         You have heard the testimony of certain witnesses.
20 You have also heard that before this trial these witnesses
21 made statements that may be different from their testimony
22 here in court.  Their statements were brought to your
23 attention only to help you decide how believable their
24 testimony was.  You cannot use it as proof of anything else.
25 You can only use it as one way of evaluating the witnesses'

testimony here in court.

You have also heard evidence that certain witnesses made certain statements before this trial that were under oath that may be different from their testimony at trial. When a statement is made under oath, you may not only use it to help you decide whether you believe the witness's testimony in this trial, but you may also use it as evidence of the truth of what the witness said in the earlier statement. But when a statement is not made under oath, you may use it only to help you decide whether you believe the witness's testimony in this trial and not as proof of the truth -- and not as proof of the truth of what the witness said in the earlier statement.

You have heard the testimony of Gary Ola. You have also heard that before this trial he was convicted of a crime. This earlier conviction was brought to your attention only as one way of helping you decide how believable his testimony was. Do not use it for any other purpose. It is not evidence of anything else.

You have heard the testimony about the defendant's good character. You should consider this testimony, along with all the other evidence, in deciding if the government has proved beyond a reasonable doubt that he committed the crime charged.

The government and the defendant have agreed, or

stipulated, to certain facts.  Therefore, you must accept the following stipulated facts as proved:

     1.  On November 5, 2016, Defendant Mark Bryant was employed as a corporal in the Cheatham County Jail in Ashland City, Tennessee.

     2.  On November 5, 2016, Defendant Mark Bryant was on duty, working at the Cheatham County Jail from 2:00 p.m. until at least 10:30 p.m. Central Standard Time.

     3.  Defendant submitted two incident reports relating to events at the Cheatham County Jail on November 5, 2016.  The time listed on one report is 1855, and the time listed on the second report is 2220.

     That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

     The first thing that you should do in the jury room is to choose someone to be your foreperson.  This person will help to guide your discussions, and will speak for you here in court.  Your foreperson should direct your deliberations and ensure that your deliberations proceed in an orderly fashion.  In other words, the foreperson has the authority and the responsibility to make sure that all jurors are heard during deliberations, to ensure that all jurors

conduct themselves in a professional and respectful manner, and to maintain proper decorum.

Once you start deliberating, do not talk to the jury officer or to me or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and give them to the jury officer.  The officer will get them to me, and I will respond as soon as I can.  But I may have to talk to the lawyers about what you've asked, so it may take some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson.

One more thing about messages.  Do not ever write down or tell anyone, including me, how you stand on your votes.  For example, do not write down or tell anyone that you are split 6-6, or 8-4, or whatever your vote happens to be.  That should stay secret until you are finished.

Remember that you must make your decision based only on the evidence you saw and heard here in court.

During your deliberations, you must not communicate or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as a telephone, cell phone, smartphone, iPhone, Blackberry, or computer, the internet, any internet service, or any text or instant messaging service, any internet chat room, blog, or website such as Facebook, MySpace, LinkedIn,

YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you to inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide the case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have.

In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in this case. This would unfairly and adversely impact the judicial system. A juror who violates these restrictions jeopardizes the fairness of these proceedings,

1 and a mistrial could result, which would require the entire
2 trial process to start over.

3        Your verdict, whether it is guilty or not guilty,
4 must be unanimous as to each count.

5        To find the defendant guilty of a particular
6 count, every one of you must agree that the government has
7 overcome the presumption of innocence with evidence that
8 proved his guilt beyond a reasonable doubt.  To find him not
9 guilty of a particular count, every one of you must agree
10 that the government has failed to convince you beyond a
11 reasonable doubt.  Either way, guilty or not guilty, your
12 verdict must be unanimous as to each count.

13        Now that all the evidence is in and the arguments
14 are completed, you are free to talk about the case in the
15 jury room.  In fact, it is your duty to talk to each other
16 about the evidence and to make every reasonable effort you
17 can to reach a unanimous agreement.  Talk with each other,
18 listen carefully and respectfully to each other's views, and
19 keep an open mind as you listen to what your fellow jurors
20 have to say.  Try your best to work out your differences.

21        Do not hesitate to change your mind if you are
22 convinced that other jurors are right and that your original
23 position was wrong.  But do not ever change your mind just
24 because other jurors see things differently, or just to get
25 the case over with.

1          In the end, your vote must be exactly that -- your

2    own vote.  It is important for you to reach unanimous

3    agreement, but only if you can do so honestly and in good

4    conscience.

5          No one will be allowed to hear your discussions in

6    the jury room, and no record will be made of what you say.

7    So you should feel free to speak your mind.

8          Listen carefully to what other jurors have to say,

9    then decide for yourself if the government has proved the

10   defendant guilty beyond a reasonable doubt.

11         The attitude and conduct of jurors at the

12   beginning of their deliberations are very important.  It is

13   rarely productive or good for a juror, upon entering the jury

14   room, to make an emphatic expression of his or her opinion on

15   the case or to announce a determination to stand for a

16   certain verdict.  When a juror does that, their sense of

17   pride may be aroused and they may hesitate to recede from an

18   announced position if shown that it is wrong.  Remember, you

19   are not partisans or advocates in this matter, but judges.

20         If you decide that the government has proved the

21   defendant guilty, then it will be my job to decide what the

22   appropriate punishment should be.  Deciding what the

23   punishment should be is my job, not yours.  It would violate

24   your oath as jurors to even consider the possible punishment

25   in deciding your verdict.

1        Your job is to look at the evidence and decide if

2   the government has proved the defendant guilty beyond a

3   reasonable doubt.

4        Remember that the defendant is only on trial for

5   the particular crimes charged in the indictment.  Your job is

6   limited to deciding whether the government has proved the

7   crimes charged.

8        Also remember that whether anyone else should be

9   prosecuted and convicted for this crime is not a proper

10  matter for you to consider.  The possible guilt of others is

11  no defense to a criminal charge.  Your job is to decide if

12  the government has proved this defendant guilty.  Do not let

13  the possible guilt of others influence your decision in any

14  way.

15       Remember that if you elected to take notes during

16  the trial, your notes should be used only as a memory aid for

17  you and not shared with other jurors.  You should not give

18  your notes greater weight than your -- than your independent

19  recollection of the evidence.  You should rely upon your own

20  independent recollection of the evidence or lack of evidence,

21  and you should not be unduly influenced by the notes of other

22  jurors.  Notes are not entitled to any more weight than the

23  memory or impression of each juror.

24       Whether you took notes or not, each of you must

25  form and express your own opinion as to the facts of this

1   case.

2           Let me finish up by repeating something that I

3   said to you earlier:  Nothing that I have said or done during

4   this trial was meant to influence your decision in any way.

5   You decide for yourself if the government has proved the

6   defendant guilty beyond a reasonable doubt.

7           I've prepared a verdict form that you should use

8   to record your verdict.  And you'll receive one copy of this

9   to go back with you, and it's being shown on the overhead.

10          Verdict form.

11          We, the jury, unanimously find the following:

12          1.  With respect to Count One of the indictment,

13  deprivation of rights under color of law, we find Mark

14  Bryant -- and there's a space, guilty, and a space, not

15  guilty.

16          2.  With respect to Count Two of the indictment,

17  deprivation of rights under color of law, we, the jury, find

18  Mark Bryant -- there's a space for guilty or not guilty.

19          3.  With respect to Count Three of the indictment,

20  knowingly falsifying a document with the intent to impede,

21  obstruct, or influence the investigation and proper

22  administration of a matter within the jurisdiction of an

23  agency of the United States, we find Mark Bryant guilty or

24  not guilty.

25          4.  With respect to Count Four of the indictment,

knowingly falsifying a document with the intent to impede,
obstruct, or influence the investigation and proper
administration of a matter within the jurisdiction of an
agency of the United States, we, the jury, find Mark Bryant
guilty or not guilty.

5.   With respect to Count Five of the indictment,
knowingly and willfully making a materially false statement
in a matter within the jurisdiction of the executive branch
of the United States government, we, the jury, find Mark
Bryant guilty or not guilty.

Have the verdict form signed by your foreperson,
dated by your foreperson, and then alert the court officer
that you've reached a verdict.

So, before you retire to begin your deliberations,
//////////// and ////////////, you are the alternates here,
and the court security officer will escort you back to the
jury administrator room unless -- in case we need you.
Again, please don't talk about the case or read anything
about the case in case you have to become part of the jury.

Second, give us a minute.  The exhibits will come
back to you.  There is a laptop in the jury room.  If you
have trouble using it, let us know and we'll have our IT
person come up and show you how to use it.

And then I would suggest, since it's 11:30 -- but
it's your decision -- you'll go back in the jury room, you'll

    1   find menus so the Court can order your lunch.  And it can --
    2   your lunch can be prepared, your orders fulfilled, and we'll
    3   bring you your lunch into the jury room unless you all want
    4   to do something different.
    5           Now, if you did something different, you'll all
    6   have to go together and all have to eat together and not
    7   discuss the case, then return.  I suggest, but it's your
    8   decision, that you let us order your lunch on the menus
    9   provided and bring the food to you.
   10           Of course, as you already know, there are already
   11   drinks and whatnot in the jury room.  So do consider making
   12   that the first thing you do, order your lunch.
   13           All right.  So at this point you can retire to
   14   your -- to the jury room.  Give us a minute to get you the
   15   exhibits.  And you can commence your deliberations.
   16           (Jury not present.)
   17           THE COURT:  All right.  Be seated.
   18           Any objection to the charge from the government?
   19           MR. SONGER:  No, Your Honor.
   20           THE COURT:  Or the defense?
   21           MR. STRIANSE:  No, Your Honor.
   22           THE COURT:  All right.  Please stay close by in
   23   case the Court needs to -- anything else?
   24           MR. SONGER:  No, Your Honor.
   25           THE COURT:  All sir, right.  Thanks.

```
 1                (Recess.)
 2                THE COURT:  All right.  Be seated.
 3                Okay.  We're on the record and all counsel are
 4    present and Mr. Bryant's present.
 5                I received a note from the jury.  It reads as
 6    follows (as read):
 7                    If the Taser certificate is expired, is the
 8                    user still bound by that training?  (Says valid
 9                    for one year after issuance.)  Issued on
10                    October 23, '15.  Or does recertification need to
11                    occur annually?
12                Signed by Juror Number 10, ////////////////.
13                Do you want me to read it again?  Anyone want me
14    to read it again?
15                MS. MYERS:  No, Your Honor, we got it.  Thank you.
16                THE COURT:  All right.  What does the government
17    think?
18                All right.  Mr. Strianse, what do you think?
19                MR. STRIANSE:  Your Honor, I may be conflating the
20    two trials.  I can't remember if it came up in Sgt. Ola's
21    testimony at the first trial or this trial or both.  I
22    remember some discussion about recertification, that it was
23    supposed to be on an annual basis, but it was not done.  I
24    know that we explored that in Trial Number 1.  I cannot
25    remember if it came up in Ola's testimony this time.
```

1          THE COURT:  I don't -- I vaguely remember that in

2    Trial 1.  I don't have any recollection in this trial.

3          MR. STRIANSE:  And the government's probably more

4    familiar with this exhibit than I am.  You know, that very

5    thick Taser certification, that set of documents, I don't

6    know if it makes a reference to recertification or not.

7          MR. SONGER:  I don't think it does make an

8    explicit reference.  I'm not sure what we can do other than

9    direct them to look at the evidence and testimony in the

10   record.

11         THE COURT:  Yeah.  I think we direct them back to

12   pages 8 and 9 of the charge.

13         Why don't y'all just take a look.  I was going

14   to -- let's see if they're right on -- what exhibit was that?

15         MR. STRIANSE:  Your Honor, Mr. Bryant has reminded

16   me Government's Exhibit Number 5 -- do you have your book?

17         THE COURT:  Somewhere up here.  I've got it.

18   Okay.

19         MR. STRIANSE:  It says, "This certification must

20   be renewed annually."

21         THE COURT:  And they've obviously read that

22   because they've quoted from it.

23         MR. STRIANSE:  Right.

24         THE COURT:  I think -- I think we just go back

25   to -- tell them, please -- I think I can tell them, "You must

1  make your decision based on the evidence presented at trial.
2  Please see pages 8 and 9 of the jury instructions."
3          MR. SONGER:  The government has no objection to
4  that, Your Honor.
5          MR. STRIANSE:  No objection, Your Honor.
6          MS. MYERS:  Excuse me, Your Honor.  There is
7  another good point that our agent just raised, and that is in
8  the stipulations, it does say that he was Taser certified as
9  well.  So that's another thing to direct them back to.
10          THE COURT:  Do you have handy what page that's on?
11          MS. MYERS:  Yes.  I'm sorry, Your Honor.  It's
12  actually in the indictment.
13          THE COURT:  Okay.  But what page is the
14  stipulation?  Oh, it's not in the stipulation?
15          MS. MYERS:  It's not in the stipulations.  That's
16  our mistake.  It's in the indictment.
17          THE COURT:  I think we have to be careful not to
18  single out any one part of the trial -- of the jury charge
19  and give it undue weight.  I'm thinking that we should say
20  please consider pages 8, 9, 10, 11, and 12.
21          MR. SONGER:  We agree with that, Your Honor.
22          MR. STRIANSE:  That's fine, Your Honor.  And
23  you're not going to be directing them back to the indictment?
24          THE COURT:  Right.
25          MR. STRIANSE:  Thank you.

```
 1              THE COURT:  All right.  This is what I've written
 2    (as read):
 3                   You must make your decision based upon the
 4                   evidence presented at trial.  Please consider
 5                   pages 8, 9, 10, 11, and 12, as you consider all of
 6                   the jury instructions as a whole.
 7              MR. SONGER:  No objection.
 8              MR. STRIANSE:  No objection, Your Honor.
 9              THE COURT:  All right.  So I'll ask one attorney
10    to come and sign.
11              I printed.  I didn't try to write it.
12              Do you need a pen?  I thought y'all had those
13    fancy pens upstairs.
14              MR. SONGER:  Nothing fancy for the government.
15              THE COURT:  Nothing fancy.
16              All right.  There you go.
17              MS. MYERS:  Do you want me to come up, Your Honor?
18              THE COURT:  No.  No.  The court officer.  To the
19    jury.
20              COURT OFFICER:  Yes, sir.
21              THE COURT:  All right.  Thank you.
22              (Recess.)
23              THE COURT:  All right.  Be seated.
24              It's Friday at 5:00, and I would like to send a
25    note back to the jury:  Would the jury like to continue
```

deliberations tonight?  If so, do you want to order dinner?
Alternatively, would you like to end deliberations today and
resume Monday at 9:00 a.m.?

Any objection from the government?

MR. SONGER:  No objection, Your Honor.

MR. STRIANSE:  That's perfectly fine, Your Honor.

THE COURT:  Do you want to look at my note?

MR. STRIANSE:  No, sir.

THE COURT:  All right.  Does the government?

MR. SONGER:  We'll trust you, Your Honor.

COURT OFFICER:  I'll wait for them to make a
decision.

THE COURT:  Yeah.

(Respite.)

COURT OFFICER:  They're taking a vote now on their
decision.

THE COURT:  On what to do?

COURT OFFICER:  On to stay or to go home.

THE COURT:  Okay.

All right.  They say they're close to a verdict.
So we'll reconvene when they tell me they've done it.

(Recess.)

THE COURT:  All right.  Be seated.

The jury has reached a verdict.  So bring in the
jury.

1          (Jury present.)

2          THE COURT:  All right.  Be seated.  Ladies and

3    gentlemen of the jury, I've been informed that you've reached

4    a verdict.  I understand that, ////////, you're the

5    foreperson.

6          JUROR:  Yes.

7          THE COURT:  So I'm going to return the verdict to

8    you and let you publish it into the record.

9          Read it.

10         JUROR:  Read it.  Okay.

11         Go ahead right now?

12         THE COURT:  Sure.  "We, the jury."

13         JUROR:  We, the jury, unanimously find the

14   following:

15         Count One.  With respect to Count One of the

16   indictment, deprivation of rights under color of law, we, the

17   jury, find Mark Bryant guilty.

18         Count Two.  With respect to Count Two of the

19   indictment, deprivation of rights under color of law, we, the

20   jury, find Mark Bryant guilty.

21         Count Three.  With respect to Count Three of the

22   indictment, knowingly falsifying a document with the intent

23   to impede, obstruct, or influence the investigation and

24   proper administration of a matter within the jurisdiction of

25   an agency of the United States, we, the jury, find Mark

1  Bryant not guilty.

2          Count Four.  With respect to Count Four of the

3  indictment, knowingly falsifying a document with the intent

4  to impede, obstruct, or influence the investigation and

5  proper administration of a matter within the jurisdiction of

6  an agency of the United States, we, the jury, find Mark

7  Bryant not guilty.

8          Count Five.  With respect to Count Five of the

9  indictment, knowingly and willing making -- willfully making

10 a materially false statement in a matter within the

11 jurisdiction of the executive branch of the United States

12 government, we, the jury, find Mark Bryant not guilty.

13         THE COURT:  Okay.  If you'll return the verdict to

14 the court officer.

15         All right.  ///////////// is that your verdict?

16         JUROR:  Yes, sir, it is.

17         THE COURT:  //////////////, is that your verdict?

18         JUROR:  Yes, sir.

19         THE COURT:  //////////////, is that your verdict?

20         JUROR:  Yes, sir.

21         THE COURT:  /////////////, is that your verdict?

22         JUROR:  Yes.

23         THE COURT:  /////////////, is that your verdict?

24         JUROR:  Yes, sir.

25         THE COURT:  //////////////, is that your verdict?

```
 1              JUROR:  Yes, sir.
 2              THE COURT:  ///////////, is that your verdict?
 3              JUROR:  Yes, sir.
 4              THE COURT:  ///////////, is that your verdict?
 5              JUROR:  Yes, sir.
 6              THE COURT:  //////////, is that your verdict?
 7              JUROR:  Yes, sir.
 8              THE COURT:  //////////, is that your verdict?
 9              JUROR:  Yes, sir.
10              THE COURT:  And ///////////, is that your
11    verdict?
12              JUROR:  Yes, sir.
13              THE COURT:  Well, ladies and gentlemen, you're
14    discharged from your service.  And I want to quickly say
15    thank you for your service.  Thank you for your hard work,
16    for your diligence.  And if you -- I know the hour's late,
17    but if you could give me just a minute, I would like to come
18    back and personally thank each one of you for serving for the
19    United States District Court for the Middle District of
20    Tennessee.
21              So, if you could return to your room, I'll be
22    right there.
23              (Jury excused.)
24              THE COURT:  All right.
25              Okay.  Anything else from the government?
```

1  Anything else from the government?

2          MR. SONGER:  Your Honor, we just point out the

3  marshals are here, but we have asked -- we will inform them

4  the government will not be requesting to take Mr. Bryant into

5  custody at this time.

6          THE COURT:  Good.

7          MR. SONGER:  We would ask the Court to set

8  sentencing as expeditiously as possible.

9          THE COURT:  All right.

10         So, Mr. Bryant, you'll remain released on the same

11  terms of your pretrial status.  We'll set a sentencing --

12  I'll order the presentence report.  They're not here, but

13  I'll order the presentence report, and we'll set a sentencing

14  date by order.

15         All right.  Anything else?

16         MR. SONGER:  No, Your Honor.

17         THE COURT:  All right.  Thank you.

18         (Court adjourned.)

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on January 10, 2020, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 98) is a true and

12   accurate record of said proceedings.

13            This the 18th day of September, 2020.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25