UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cr-00144 |
| | ) | Chief Judge Crenshaw |
| MARK BRYANT | ) | |

**ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS
PURSUANT TO LCrR 32.01(e), MDTN**

Defendant **Mark Bryant** comes before the Court for sentencing after having been convicted at a second trial of two counts of use of excessive force/deprivation of rights under color of law. (*Verdict Form*, Docket Entry 104). Mr. Bryant was acquitted of Counts Three (falsifying a document, 18 U.S.C. § 1519), Four (falsifying a document, 18 U.S.C. § 1519) and Five (false statement, 18 U.S.C. § 1001), of the superseding indictment. (Docket Entries 70 & 104). The first trial resulted in a hung jury. (Docket Entry 58). Mr. Bryant submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a).

The U.S. Probation Office has calculated, under the U.S. Sentencing Guidelines, a total offense level of 31, with a resulting advisory Guideline range of 108 to 135 months. *Revised* Presentence Report, p. 25. Respectfully, Mr. Bryant seeks a variance from the guidelines based upon the wrongful conduct of the victim, the Defendant's role as an irreplaceable caregiver for his father, his good works and service to the community, his susceptibility to abuse in prison, and the successive State prosecution for the identical conduct.

**A Mitigated Sentence is Warranted in Light of the Wrongful Conduct of the Victim, the Defendant's Role as an Irreplaceable Caregiver for his Father, his Good Works and Service to the Community, his Susceptibility to Abuse in Prison, and the Successive Prosecution for the Identical Conduct as well as the 18 U.S.C. § 3553(a) Factors**

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary to comply" with the purposes of sentencing set forth in the second paragraph of the statute. In undertaking its analysis, the Court must give consideration to the advisory sentencing range recommended by the Guidelines and any relevant Guideline Policy Statements, as well as other traditional sentencing factors. *See* 18 U.S.C. § 3553(a).

Nearly twenty years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en banc).* The Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Gall v. United States,* 532 U.S. 38, 49 (2007); *accord Cunningham v. California*, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Instead the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id.* Moreover, the Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[1] *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that

---

[1] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No,* ABA Journal, Oct. 2013, at 53.

sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.") The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines.

1. **The Nature and Circumstances of the Offense**

On November 5, 2016, Mark Bryant was a Correctional Officer/Corporal/Shift Supervisor at the Cheatham County Jail in Ashland City, Tennessee. The Cheatham County Jail was built 40 years ago to house 120 inmates. In 2016, it routinely housed 150 or more. On that night, there were six Correctional Officers to safeguard the security of those 150 inmates as well as themselves. The job of these six Officers was to preserve some semblance of internal order and some measure of discipline in the facility. As of Saturday, November 5, Mark Bryant had worked at the jail for approximately 14 months. A hard worker and responsible officer, he rose through the ranks quickly. He was hired on August 20, 2015 and promptly named the Field Training Officer in October 2015. By November 2015, he was supervising his first shift; by June 2016, he was elevated to Corporal/Shift Supervisor.

On November 5, 2016, Mr. Bryant was working as a Corporal/Shift Supervisor for the second shift between the hours of 2:00 p.m. and 10:00 p.m. Second shift in a local jail on a Saturday night is extremely busy, punctuated by the booking of new arrestees being transported to the facility. At approximately 6:45 p.m., Cpl. Bryant was at his desk in the Booking Office watching the live camera footage from the cells, as he was required to do. It was at this time that he first observed Jordan Norris banging his head on the solid steel door of Cell 4 in the booking

3

area. (Mr. Norris had arrived at the jail on November 3 and was still being held in booking without bond.) The events in Cell 4 caused Cpl. Bryant to leave his Office and proceed to Cell 4 where he asked Mr. Norris to stop banging his head on the door. Mr. Norris refused to comply and Cpl. Bryant unlocked the cell door and respectfully asked Mr. Norris to stop hitting his head and advised him that he was "going to hurt [himself]." Initially, Norris complied and returned to his bunk. No sooner had Cpl. Bryant closed the door to Cell 4 and returned to the Booking Control Room, Mr. Norris was banging his head again on the cell door. At that point, Cpl. Bryant, accompanied by Correctional Officer Jeff Key, return to Cell 4, enter the cell and escort Mr. Norris out of Cell 4. During this extraction, Mr. Norris fought and resisted violently. Correctional Officers (CO) Daniel Bratton and Josh Marriott assisted Officers Bryant and Key as they struggled to control Mr. Norris, who was exhibiting extraordinary strength.

Although the government euphemistically characterized Mr. Norris to the trial jury as "difficult," during the course of both trials in this Court, COs variously described Mr. Norris as "possessed," "out of his mind," "drugged," "aggressive," and, "possessed of extreme, unnatural strength." The video of the initial extraction reveals that four Officers, with an aggregate weight of 1,000 pounds, could not control him, could not cuff him, and fought to place him in a restraint chair. CO Bratton was forced to tase Norris four times to get him into the restraint chair. The video clearly shows Norris actively resisting, stiffening his torso and limbs, and flailing his arms.

Once placed in the restraint chair, at approximately 7:59 p.m., Norris can be seen struggling against the chair. Unfortunately, the chair was old and threadbare. The Velcro restraint devices did not fully engage and Norris was able to loosen the restraints and physically move the chair across the concrete jail floor. He was combative, actively resisting and spitting at the

4

officers. A spit mask had to be placed over Norris' head as a result of his combative behavior. The video revealed that his right hand worked free as he struggled to remove the mask. While his right arm was unsecured, he was tased again. At 10:20 p.m., when Norris was being readied by COs for transport to the hospital, he continued to fight efforts to restrain him. Norris was taken to the Middle Tennessee Mental Health Institute and diagnosed with a severe major depressive disorder with acute psychotic features accompanied by auditory and visual hallucinations. The psychiatrist from MTMHI, advanced by the Defense at both trials, concluded that Norris was suffering from delirium, was emotional unstable, unpredictable and violent.

Prior to the filing of a civil lawsuit against the Cheatham County Jail, Sheriff Breedlove and the supervisory staff at the Jail were fully supportive of Cpl. Bryant and concluded that the force used by Bryant and other COs was "justified." In fact, Sheriff Breedlove praised his street officers for the investigation and arrest of Jordan Norris.

> Jordan Norris let it be known he was going to kill any Deputy who tried to arrest him. He was armed with stolen weapons. A drug dealer by trade and on the fast track to live the Thug Life. The team, armed with a search warrant, invited themselves into the "House of Norris" on Little Pond Creek with such dynamic quickness.... Great job Cheatham SWAT!! [Ironically, Mr. Norris posted Sheriff's Breedlove's comments to his *Instagram* account.]

*See Attachment 1*, Jordan Norris, *Instagram* Post, p. 11 of the attachment. However, once the suit was filed and News Channel 5 carried a story with the leaked jail surveillance video, suddenly Cpl. Bryant's conduct was unacceptable and had violated some nonexistent, incoherent taser policy.

At trial, the government insisted that Cpl. Bryant's conduct was contrary to the training he received and the policy of the Cheatham County Sheriff's Office and the Jail that was in place

5

at the time. At the first trial, which resulted in a hung jury, Lt. J.J. Hannah, Jail Administrator, the number one supervisor in charge of the jail, testified that "at the time of the [Jordan Norris] incident, we didn't have much of a policy on tasers." Hannah elaborated that "there was a five second rule with [the taser set to] prongs [which would be projected from the taser from a distance into the body of the subject]." However, there was "no time limit with drive stun [the technique used exclusively by the COs in their encounter with Jordan Norris]." Hannah noted that there was no prohibition in the policy to tasing someone who was restrained. Hannah's testimony at the first trial was confirmed by Government Exhibit 1 (offered at both trials) regarding the taser policy contained in "Cheatham County Sheriff's Office General Order," entered February 4, 2015, in effect at the time of the Norris incident which set no drive stun limits and made no mention of a limitation to three, five second bursts. Significantly, the Taser Training Academy Certification Test, offered as Government Exhibit 3, taken by Bryant and all other COs on duty that night contained no questions regarding the limits on the number of stuns to be administered or the duration of stuns.

*Downward Variance/Departure Pursuant to U.S.S.G. § 5K2.10 – Wrongful Conduct of Victim*

Mr. Bryant respectfully moves the Court for a downward variance/departure pursuant to § 5K2.10 which permits a downward variance/departure "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior." Based upon the nature and circumstances of this offense, the conduct of Jordan Norris while in the custody of the Cheatham County Sheriff warrants such a variance. In deciding the extent of a sentence reduction under the Guideline, the policy statement to Section 5K2.10 instructs that certain factors should be considered by the Court, including, the persistence of the victim's conduct and any efforts by the

6

defendant to prevent confrontation; the danger reasonably perceived by the defendant including the victim's reputation for violence;[2] and, the danger actually presented to the defendant [and others] by the victim. By delineating these factors, the Guidelines contemplate where the victim's conduct posed actual or reasonable perceived danger to the defendant, with an emphasis on physical danger. *See United States v. LeRose*, 219 Fed.3d 335, 340 (4th Cir. 2000). A number of circuits have permitted the admission of evidence that a plaintiff was on drugs at the time of the incident in excessive force cases. *See Boyd v. City & County of San Francisco*, 576 F.3d 938, 948-49 (9th Cir. 2009) (upholding a ruling that allowed evidence that a decedent had been on drugs at the time of a police shooting because the evidence "was highly probative of the decedent's conduct, particularly in light of [the decedent's] alleged erratic behavior...."); *See also, Turner v. White*, 980 F.2d 1180, 1182-83 (8th Cir. 1992); and, *Saladino v. Winkler*, 609 F.2d 1211, 1214 (7th Cir. 1979).

### 2. The History and Characteristics of the Defendant

Mark Bryant is a 42-year-old devoted son, brother, and nephew, who enjoys strong family support and has an outstanding work history. Those who truly know him and have had the benefit of observing a lifetime of his conduct and behavior praise his kindness and gentle nature.

> We have known Mark as a baby, little boy, teenager and young adult. We have watched him at work and at play and have seen him make good life choices along the way. He has always had a strong work ethic and could always be depended on.... We have witnessed Mark be kind and gentle with his grandparents, aunts, uncles and parents. [He is] a loyal, gentle giant.

---

[2] *Attachment 1* is a copy of certain postings from the *Instagram Account* of Jordan Norris after the incident at the jail became public by virtue of the civil lawsuit and the intense News Channel 5 coverage. The images posted by Norris glorify gun violence, money, and drug trafficking.

*Letter*, Laughrie & David Tucker, Aunt & Uncle. (Docket Entry 121-1, Page ID# 2134). The *Revised* PSR discloses that Mr. Bryant's father "suffered a 'psychotic break' during the 1990s." As his mother has aged, Mr. Bryant has taken a greater role in caring for his father.[3]

> Mark's dad suffers from conditions that make him volatile at times. Mark managed those times with gentleness and patience and understanding.... Mark loves and appreciates his parents.

*Letter*, Joyce Striclyn, Aunt. *Id.* at Page ID# 2135. The PSR also discloses continuous, uninterrupted employment over the past 24 years. PSR ¶¶ 80-84.

> After graduation, Mark joined the workforce and became independent. He set goals and was not afraid to work hard to reach those goals. At a very young age, Mark purchased a home. He became a very productive member of society.

*Letter*, Lisa S. Tucker, Family Friend. *Id.* at Page ID# 2140. His work ethic and devotion to his parents is a theme that is repeated by those who truly know him.

> He works every day and has since he was in high school. He is self-sufficient and strives to be both a good man and a good citizen. He is also devoted to his parents and helps them when he is needed.

*Letter*, Lynn Spain, Family Friend, *Id.* at Page ID# 2142. Mr. Bryant has also been active in his community.

---

[3] Courts may consider situations where the defendant is an irreplaceable caretaker of children, elderly, and/or seriously ill family members, and the extent of the departure/variance appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration. *United States v. Pereira*, 272 F.3d 76, 81-83 (1st Cir. 2001); *United States v. Faria*, 161 F.3d 761, 762 (2d Cir. 1998); *see, e.g., Aguirre*, 214 F.3d at 1123-24 (affirming four-level downward departure for family circumstances thus reducing range from 108-135 months to 70-87 months, where defendant's common law husband died during her incarceration, leaving 8-year-old son with custodial parent); *United States v. Dominguez*, 296 F.3d 192, 194, 199 (3d Cir. 2002) (reversing district court's decision not to depart where the district court misapprehended its authority, and stating that on remand district court could depart four levels where the defendant posed no risk to society, was sole caretaker of elderly parents, father had brain surgery and heart attack and was physically and mentally impaired, and mother had severe arthritis and heart problems). Such cases may involve defendants who take care of emotionally ill family members. *See, e.g. United States v. Haversat*, 22 F.3d 790, 797-98 (8th Cir.1994) (approving of defendant's wife's mental illness as a basis for departure but remanding due to inappropriately reduced sentence); and, *United States v. Leon*, 341 F.3d 928 (9th Cir.2003).

> [Mark Bryant] helped me at Clarksville Academy when I got my first head coaching job in 2010. I was in need of many things and Mark was a huge help with mowing the field and setting things up on game night when I couldn't. We were neighbors for many years. He was great to my two boys and my late wife. My wife (Marisa) passed away in 2011 with Ovarian Cancer. We had some issues at my house that made it difficult for my wife to get around. Mark came over and fixed the steps, the kitchen, and the deck with new steps over a period of a few months and never asked for a penny.[4]

*Letter*, Todd Hood, Head Football Coach, Rossview High School. *Id.* at Page ID# 2141.

Mr. Bryant testified consistently at both trials that he had no intent to violate the law or any jail policy in his interaction with Jordan Norris. As the Corporal/Shift Commander responsible for his fellow officers and the other 149 inmates crammed into the old, decaying facility, he was focused on the safety of everyone in the jail. His fellow Correctional Officers recognized and appreciated his management style and his overriding concern to protect inmates and staff.

> I met Mark Bryant in the Fall of 2015, shortly after starting a nursing position at the Cheatham County Jail. I quickly developed a professional relationship with Mark. He became a (sic) not only a friend to me but a support system within the jail. A woman in a place of position and in health care can be very difficult in the correctional environment and having Correctional Officers with you that you can trust is a valuable asset. I could count on Mark to

---

[4] Even before *Booker*, the Sixth Circuit acknowledged that charitable works and service to the community were an acceptable reason for a district court to grant a downward departure from the Guidelines. *United States v. Crouse*, 145 F.3d 786, 789, 790 (6th Circuit 1998) (noting that the Guidelines do not "limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case."). *See also United States v. Tocco*, 200 F.3d 401, 433-434 (2000) (acknowledging that community service is a valid basis for departure, but emphasizing that it is devotion of time that is significant, not merely the ability of a wealthy individual to donate large sums of money). Other circuits also recognized charitable works as a valid justification for downward departure from the Guidelines. *See United States v. Cooper*, 394 F.3d 172, 176-177 (3rd Cir. 2005) (authorizing departure based on the defendants' "good works" and emphasizing that the defendant's works included "hands on personal sacrifices which have a dramatic and positive impact on the lives of others. . ."); *United States v. Serafini*, 233 F.3d 758, 773 (3rd Cir. 2000) (downward departure justified by defendant's generosity of time as well as money).

9

> not only be there to protect my personal safety while interacting with my patients, but also to ensure that I was able to carry out my duties as their only nurse in a timely efficient manner.... I also counted on Mark to be my eyes and ears when I was not within the facility, if there was a health concern [with an inmate].... I have seen Mark in not only professional situations but also personal be the mediator, using his words to help diffuse a difficult situation of disagreement, the voice of reason in so many situations.

*Letter*, Jessica Treicler, LPN & Former Co-Worker at the Cheatham County Jail. *Id.* at Page ID# 2138.

> When Mark started at the jail, I had only been there for about a month or two. I was new to corrections and wasn't experienced on handling situations with inmates, but whenever I needed any help or had any questions Mark would always help me. He always said using your words helped a lot more than going hands on.... [H]e treated me with respect, that most females in that line of work didn't get.

*Letter*, Ms. Harley Durham, Former Co-Worker at the Cheatham County Jail. *Id.* at Page ID# 2146. Given Mr. Bryant's former position as a Correctional Officer, he is much more susceptible to abuse in prison. Sentencing courts have historically taken into consideration the impact of conditions of confinement on punishment, and susceptibility to abuse is a valid reason for a downward departure under the Guidelines or a downward variance. *Koon v. United States*, 518 U.S. 81, 116 S. Ct. 2035, 135 L.Ed.2d 392 (1996) (approving downward departure for susceptibility to abuse in prison for police officers).

The Court is aware that Mr. Bryant still faces a separate, successive State prosecution for this identical conduct. District Judges may also consider the "hardship" imposed by successive prosecutions in deciding whether to depart or vary downward. *Koon*, 518 U.S. at 112. In *Koon*, the court found that the District Court did not abuse its discretion in granting a downward departure based on successive State and federal prosecutions. *Id.* ("District Court did not abuse

10

its discretion in determining that a 'federal conviction following a state acquittal based on the same underlying conduct ... significantly burden[ed] the defendants.'")

### 3. The Purpose of Sentencing

There is no risk of recidivism in this case, especially in light of Mr. Bryant's age. For all offenders in Criminal History Category I, the recidivism rate is 15.2%. For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. For those who have been employed, the rate is 12.7%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Mr. Bryant who are educated, have been employed, the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) [hereinafter *Measuring Recidivism*]. Finally, offenders like Mr. Bryant with no criminal history points have a lower rate of recidivism. *See* Sent'g Comm'n, *Recidivism and the "First Offender"* (May 2004) [hereinafter *First Offender*].

Based on all of the factors present with Mr. Bryant, the Court can reasonably find that he poses no risk of re-offending in any manner. Accordingly, the sentencing concerns of "incapacitation" and "protecting the public from further criminal activities by the defendant" are non-existent in this case, which means the need for a prison sentence of any length is significantly diminished here.

The case law, too, makes clear that in imposing the lowest sentence sufficient to account for the need to protect the public from further crimes of Mr. Bryant, this Court should consider the statistically low risk of recidivism presented by Mr. Bryant's history and characteristics. *See, e.g., United States v. Darway,* 255 Fed.Appx. 68, 73 (6th Cir. 2007) (upholding downward

11

variance on basis of defendant's first-offender status); *United States v. Hamilton,* 323 Fed.Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt,* 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina,* 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera,* 567 F.Supp.2d 271, 279 (D. Mass 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F.Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Given the media coverage and the resulting damage to Mr. Bryant's reputation, this is a factor for the Court to consider in fashioning a reasonable sentence for this defendant in this case. *See United States v. Gaind,* 829 F.Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil,* 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and

emotional toll of two lengthy public trials); *United States v. Samaras,* 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

4. **The Kinds of Sentences Available**

The Court has the authority and discretion to impose a wide range of sentencing alternatives. *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). Mr. Bryant has been specifically deterred from engaging in any future activity that could be deemed criminal. Any sentence imposed in a federal criminal case satisfies the need for general deterrence.

    Respectfully submitted,

    TUNE, ENTREKIN & WHITE, P.C.
    315 Deaderick Street, Suite 1700
    Nashville, TN 37238
    (615) 244-2770
    pstrianse@tewlawfirm.com

    S/ Peter Strianse
    PETER J. STRIANSE
    Attorney for Defendant Bryant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent via the Court's electronic filing system unless not registered and, in that event deposited in the United States mail, postage prepaid, to:

> Sara Beth Myers
> Assistant United States Attorney
> Middle District of Tennessee
> 110 Ninth Avenue South, Suite A-961
> Nashville, TN 37203-3870
>
> Michael J. Songer
> Attorney
> Civil Rights Division, Criminal Section
> U.S. Department of Justice
> 950 Pennsylvania Ave. N.W.
> Washington, D.C. 20530
>
> **VIA EMAIL**
> Michael Wilson
> Senior U.S. Probation Officer
> Michael_Wilson@tnmp.uscourts.gov

this 2nd day of November, 2020.

> S/ Peter J. Strianse
> PETER J. STRIANSE

14