```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                         AT NASHVILLE

 3        UNITED STATES OF AMERICA,      )
                                         )
 4                  Plaintiff,           )
                                         )
 5        vs.                            )    Case No.
                                         )    3:18-cr-00144
 6        MARK BRYANT,                   )
                                         )
 7                  Defendant.           )

 8

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10        BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR.
                       CHIEF DISTRICT JUDGE
11

12                          TRANSCRIPT

13                             OF

14                        PROCEEDINGS

15                     November 20, 2020

16                    Sentencing Hearing

17    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

18

19

20            APPEARANCES ON THE FOLLOWING PAGE

21

22

23    PREPARED BY:
                     LISE S. MATTHEWS, RMR, CRR, CRC
24                      Official Court Reporter
                         801 Broadway, Room A839
25                        Nashville, TN 37203
                    lise_matthews@tnmd.uscourts.gov
```

APPEARANCES:

       For the Plaintiff:  Sara E. Myers
                         U.S. Attorney's Office
                         (Nashville Office)
                         Middle District of Tennessee
                         110 Ninth Avenue, S
                         Suite A961
                         Nashville, Tennessee 37203-3870

                         Michael J. Songer
                         Attorney
                         Civil Rights Division
                         Criminal Section
                         U.S. Department of Justice
                         950 Pennsylvania Ave. N.W.
                         Washington, D.C. 20530

       For the Defendant:  Peter J. Strianse
                         Tune, Entrekin & White, P.C.
                         315 Deaderick Street
                         Suite 1700
                         Nashville, Tennessee 37238

```
 1                          I N D E X

 2                  Friday, November 20, 2020

 3

 4                      INDEX OF WITNESSES

 5
     WITNESSES:                                          PAGE
 6   ────────────────────────────────────────────────────────

 7   HARLEY DESTINY ALEXIS DURHAM
         DIRECT EXAMINATION BY MR. STRIANSE             16
 8       CROSS-EXAMINATION BY MS. MYERS                 20

 9   VIRGINIA KAY BRYANT
         DIRECT EXAMINATION BY MR. STRIANSE             21
10

11

12

13                        EXHIBITS

14                        (None)

15

16

17

18

19

20

21

22

23

24

25
```

1          The above-styled cause came on to be heard on

2 November 20, 2020, before the Honorable Waverly D. Crenshaw,

3 Jr., Chief District Judge, when the following proceedings

4 were had, to-wit:

5

6          THE COURT:  All right.  Be seated.

7          Good morning.

8          All right.  So we're here on Case 18-144, *United*

9 *States of America v. Mark Bryant*.  And Mr. Bryant is in the

10 courtroom.

11          If counsel can introduce themselves on the record.

12          MR. SONGER:  Good morning, Your Honor.  Mike

13 Songer for the United States.

14          MS. MYERS:  Sara Beth Myers on behalf of the

15 United States.

16          MR. STRIANSE:  Good morning, Your Honor.  Peter

17 Strianse of the Nashville Bar, here on behalf of Mark Bryant.

18          THE COURT:  All right.

19          So, Mr. Bryant, we're here today for sentencing

20 because on January the 10th of this year, the jury rendered a

21 verdict finding you guilty on Counts One and Two of the

22 superseding indictment charging you with two counts of

23 deprivation of rights under color of law in violation of 18

24 U.S.C. Section 242.  The same jury found you not guilty on

25 Counts Three, Four, and Five.

1          The statutory penalty under Count One -- for

2   Count One and Two, each, is a maximum term of ten years'

3   imprisonment, a period of supervised release of not more than

4   three years.  Probation is authorized for a period of one to

5   five years.  And you're also subject to a fine up to

6   $250,000, plus the mandatory $100 special assessment.

7          Do you understand you could be sentenced to the

8   statutory maximums today?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  You all can be seated.

11          All right.  In preparation for the sentencing,

12  I've reviewed the superseding indictment.  Of course, I'm

13  familiar with the trial, both trials, as well as your

14  sentencing position, Mr. Bryant, your sentencing memorandum,

15  as well as your response to the government's objection to the

16  presentence report.  I've also studied and considered letters

17  from family and friends, and coworkers, at Document Number

18  121, as well as the letters from your parents at Document

19  128, and one other family member, I think an aunt.

20          Additionally, I've reviewed the government's and

21  studied the government's sentencing position, the

22  government's sentencing memorandum.

23          Have you had a chance to review all of those

24  documents?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  And you've had enough time
2  to talk to Mr. Strianse in preparation for sentencing today?
3          THE DEFENDANT:  Yes, Your Honor.
4          THE COURT:  Do you want any more time to do that?
5          THE DEFENDANT:  No, Your Honor.
6          THE COURT:  All right.  Thank you.
7          Also, I've reviewed the presentence report dated
8  September 22nd, 2020.
9          Now, did you get your own copy of that presentence
10  report?
11          THE DEFENDANT:  Yes, Your Honor.
12          THE COURT:  And read it from cover to cover?
13          THE DEFENDANT:  Yes, Your Honor.
14          THE COURT:  And, again, talk to Mr. Strianse?
15          THE DEFENDANT:  Yes, Your Honor.
16          THE COURT:  And asked him questions, to the extent
17  you had questions?
18          THE DEFENDANT:  Yes, Your Honor.
19          THE COURT:  All right.  Thank you.
20          And, finally, I'll note for the record that a
21  related case, Gary Keith Ola, who has pled guilty and is
22  awaiting sentencing, I think that's scheduled in December.
23          I understand that, Mr. Strianse, you have no
24  objections to the presentence report?
25          MR. STRIANSE:  That's correct, Your Honor.

1          THE COURT:  And the government has one objection

2    that's been outlined in the papers, which I've read.

3          Does the government want to present any evidence

4    or make any further argument on that objection?

5          MR. SONGER:  No, Your Honor.  I think our position

6    is laid out in the papers we submitted.

7          THE COURT:  All right.  So the government has

8    objected to the guideline calculation in the presentence

9    report because it does not include a two-level enhancement

10   under Section 3C1.1 of the sentencing guidelines to reflect

11   Mr. Bryant's failure to admit to FBI agents that he tased

12   Jordan Norris while Mr. Norris was restrained.

13         Mr. Bryant was interviewed by an FBI agent on

14   August the 2nd, 2017, about the tasing of Norris on

15   November 5, 2016.  Mr. Bryant denied tasing Norris at

16   approximately 10:20 p.m. while Norris was restrained in

17   handcuffs, a belly chain, and leg shackles and in the process

18   of being transported for medical care.  The event was

19   captured on videotape.  It showed that Mr. Bryant, in fact,

20   tased Norris, and other evidence established that the tasing

21   lasted at least 11 seconds.

22         Count Two of the superseding indictment charged

23   Mr. Bryant with use of unreasonable force at 10:20 on

24   November 5, 2016, constituting punishment in violation of

25   Mr. Norris's constitutional rights.  At the second trial, the

1    jury unanimously found Mr. Bryant guilty on Count Two.  The

2    same jury found Mr. Bryant not guilty on Count Five that

3    charged him with a violation of 18 U.S.C. Section 1001 based

4    upon his denial to the FBI of tasing Norris on that date and

5    time.

6            The government believes that Bryant's false denial

7    on August 2, 2017, of his actions on November 5, 2016,

8    constitutes obstruction of justice because it obstructed or

9    impeded the FBI's investigation.  The government reasons that

10   the FBI agent questioning Bryant on August 2nd, 2017, was

11   not, quote, aware he had tased someone, end quote, in

12   handcuffs at 10:20 p.m.  So the, quote, FBI agent did not ask

13   Bryant questions about his justification for tasing and

14   determine whether Bryant had acted willfully, an essential

15   element of any 18 U.S.C. Section 242 violation, end quote,

16   charged in Count Two.

17           The government further argues that, quote,

18   Bryant's false statement was an especially potent obstacle to

19   the federal prosecution in this case where assessing whether

20   Bryant acted willfully was a key component of the

21   government's case.  See Document Number 127 at 11.

22           The government is correct that sentencing

23   guideline Section 3C1.1 adds two levels to the defendant's

24   offense conduct calculation when the defendant, quote, 1,

25   willfully obstructed or impeded or attempted to obstruct or

impede the administration of justice with respect to the
investigation, prosecution, or sentencing of the instant
offense of conviction, and, 2, the instructive conduct
related to, A, the defendant's offense of conviction, and any
relevant conduct or, B, closely related offenses.

The commentary in the application notes guide the
proper application of Section 3C1.1. Application Note 5B
explains that Section 3C1.1 does not apply to false
statements not under oath to law enforcement officials, like
Mr. Bryant's false statement not under oath to the FBI agent
on August 2, 2017, unless the false statement falls within
application note 4G.

That application note directs the Court to apply a
two-level enhancement to the offense level calculation when
the defendant provides, quote, a materially false statement
to a law enforcement officer that significantly obstructed or
impeded the official investigation or prosecution of the
instant offense, end quote.

The Court agrees that the government's objection
turns on whether Bryant's false statement to the FBI agent on
August 2, 2017, about his actions on November 5, 2016, quote,
significantly obstructed or impeded, end quote, the FBI's
investigation of the instant offense. To be sure, Bryant's
false statement did not actually obstruct the investigation
or prosecution because the videographic evidence and witness

1  testimony directly contradicted his lie.

2          Sixth Circuit case law applying Section 3C1.1 sets

3  several boundaries to determine whether a false statement,

4  quote, significantly obstructed or impeded, end quote, an

5  official investigation.  The first boundary point is that

6  simply lying to law enforcement is not enough to qualify for

7  the enhancement in Section 3C1.1.  Instead, the lie must,

8  quote, substantially interfere with or substantially retard

9  the investigation.  See *United States v. Brown*, 857 F.3d 334

10 at 341, Sixth Circuit, 2017, citing *U.S. v. Carter*, 510 F.3d

11 593 at 598, Sixth Circuit, 2007.

12         The defendant's lie must have an objective adverse

13 impact on the government's investigation for the enhancement

14 to apply.  See *U.S. v. Brown*, 857 F.3d at 342.  For example,

15 when the false statements to the government investigator

16 causes the government to engage in further investigation and

17 further investigation causes delay that results in expiration

18 of the criminal statute of limitations, then there is a

19 significant impact to the investigation to merit application

20 of Section 3C1.1's two-point enhancement.  See *U.S. versus*

21 *Carter*, 510 F.3d at 598 through -99.

22         The next boundary stake is that Section 3C1.1

23 requires that the defendant's lie -- misrepresentation must

24 be in -- must be in some type of active material -- must

25 be -- must be an active material false representation.  This

1   was illustrated in *United States v. Obie*, 195 F.App. 335,

2   Sixth Circuit, 2006.  In that case, the defendant made

3   statements about his use of drugs that caused the

4   government's investigation to shift in a different direction

5   away from the defendant.  The Sixth Circuit held that the

6   defendant's lie was only a, quote, failed attempt to shift

7   the investigation, end quote, not legally sufficient for the

8   Section 3C1.1 enhancement.  The Court's reasoning was, quote,

9   the focus of Section 3C1.1 is on whether the defendant, by

10   actively making material false statements and not by a

11   passive refusal to cooperate, succeeded in significantly

12   impeding the investigation, end quote.  See 195 F.App. at

13   339.

14        The Sixth Circuit cited another published

15   decision, *United States v. Williams*, 952 F.2d 1504, Sixth

16   Circuit, 1991.  That case arose from this very court, which

17   provides the final boundary plot for the Court's decision

18   here.  In *Williams*, Judge Thomas Higgins, in whose courtroom

19   we now sit, applied the enhancement in Section 3C1.1 because,

20   like Mr. Bryant, the defendant told material falsehoods to

21   government agents during the official investigation.

22        The Sixth Circuit reversed Judge Higgins, even

23   though the defendant admitted to major -- quote, unquote,

24   major lies -- to the FBI and TBI because the lies did not

25   significantly obstruct or impede the investigation.

1    The appellate court found dispositive the

2 defendant's lies hardly impeded the investigation because the

3 FBI and TBI had tape and video recordings and the cooperation

4 of others that clearly verified the defendant's criminal

5 conduct, his lies notwithstanding.

6    The Court's analysis in *Williams* squarely

7 addresses the government's arguments here about Mr. Bryant's

8 failure to be truthful to the government.  Government argues

9 that, quote, while it is correct that federal investigators

10 eventually developed overwhelming evidence of Bryant's

11 actions, multiple videotapes and cooperating witnesses,

12 Bryant's mental state during the assault remained a sharply

13 disputed issue at trial, a dispute that could have been

14 resolved if Bryant had not lied during the FBI interview.

15 See Document 127 at 11.

16    This Court adopts the words of the Sixth Circuit

17 in *Williams*.  Quote, Indeed, it seems that the government's

18 real argument is not that Defendant succeeded in misleading

19 anyone, but that his failure to confess and cooperate with

20 the government when first approached required the government

21 to continue an investigation that might otherwise have been

22 shortened, end quote, 952 F.2d at 1515.

23    This is precisely the circumstances in this case.

24 FBI Agent Joy Wright testified at trial that she started her

25 investigation into the events on November 5, 2016, regarding

Norris on August 2nd, 2017, when she interviewed Mr. Bryant. At that time she had not reviewed all of the, quote, multitude of documents, end quote, she was in the process of collecting, which included incident and use of force reports, Taser log reports from 2014 to 2017, personnel files, and multiple videotape recordings of Norris in the Cheatham County Jail.  She was just beginning to learn the circumstances of the events involving Norris.

When Bryant didn't tell her about the 10:20 p.m. event and his tasing of Norris, she lost the opportunity to ask him more questions about that particular tasing.  The multitude of documents clearly disclosed the 10:20 p.m. event.  The video recording provided a realtime account of the 10:20 event, and witnesses gave their story of the event. The 10:20 p.m. event and Bryant's actions became clear, and Agent Wright could have followed up with Bryant to get his side of the event.

At best, the government's investigation was delayed because Mr. Bryant did not reveal his actions during the August 2, 2017, interview, but, as in *Williams*, this does not and did not significantly impede the investigation. Indeed, the videotapes were practically conclusive, and Bryant's false statements on August 2, 2017, fooled no one.

The Court finds that Bryant's false representation did not significantly obstruct the investigation, so the

1 government's objection is overruled.

2          And with that, I will accept the facts contained
3 in the presentence report as true and rely upon them for
4 purposes of sentencing today.

5          So, Mr. Bryant, the first thing we have to do is
6 calculate the sentencing guideline.  It starts with a base
7 offense of 14, because the underlying offense here is
8 aggravated assault, and the applicable guideline for
9 aggravated assault, Section 2A2.2 provides that base offense
10 level.

11          We add four points for the use of a Taser, a
12 dangerous weapon, that you utilized during the assault of the
13 victim.

14          Three additional points are added for injuries to
15 Mr. Norris because of bodily injury to him.  He sustained
16 welts, burns, and bruises to his body.

17          Six points are added because at the time of the
18 offense you were a public official, the offense was committed
19 under color of law, and the offense is increased -- and at
20 the time you were a correctional officer at the Cheat- -- for
21 the Cheatham County Sheriff.

22          Two additional points are added because the victim
23 was physically restrained in the course of the offense.  He
24 was physically restrained in a restraint chair or otherwise
25 restrained in handcuffs and shackles.

1    Two more points are added for the multiple-count
2  adjustment pursuant to Section 3D1.4. And that gives a final
3  offense level of 31.
4    You have no criminal history points, so that's set
5  at Criminal History I. And, according to the guidelines,
6  they suggest to the Court and advise the Court that a total
7  offense level of 31 and a criminal history category of I
8  results in a sentencing range of 108 to 135 months'
9  imprisonment. However, here, the statutory maximum for both
10  counts of conviction is 120. So the sentencing guideline is
11  really 108 to 120 months.
12    Does the government have any objection to the
13  guideline calculation?
14    MR. SONGER: No, Your Honor, none other than the
15  previously discussed obstruction enhancement.
16    THE COURT: All right. Does the defense?
17    MR. STRIANSE: No, Your Honor.
18    THE COURT: So let me go ahead and address -- do
19  you have any argument on the request for departure?
20    MR. STRIANSE: Your Honor, I have a little bit of
21  proof and some argument.
22    THE COURT: Okay. On the departure request?
23    MR. STRIANSE: They both relate to the variance.
24    THE COURT: All right.
25    MR. STRIANSE: Shall I go forward?

```
 1              THE COURT:  Sure.
 2              MR. STRIANSE:  Call Harley Durham.
 3              COURT DEPUTY:  Please raise your right hand.
 4
 5                 HARLEY DESTINY ALEXIS DURHAM,
 6   called as a witness by Defendant, was duly sworn and
 7   testified as follows:
 8
 9              COURT DEPUTY:  Please be seated.
10              Please be sure to speak into the microphone.
11              State your full name and spell your last name.
12              THE WITNESS:  Harley Destiny Alexis Durham.
13   D-u-r-h-a-m.
14
15                      DIRECT EXAMINATION
16   BY MR. STRIANSE:
17   Q.   Good morning, Ms. Durham.
18   A.   Good morning.
19   Q.   Where do you live, ma'am?
20   A.   Ashland City.
21   Q.   In Cheatham County?
22   A.   Yes, sir.
23   Q.   And how are you currently employed?
24   A.   I am a certified teaching assistant at Cheatham Middle
25   School and a part-time dispensing optician and eye doctor in
```

1    Nashville.
2    Q.    And do you know the defendant in this case, Mark Bryant?
3    A.    Yes, sir.
4    Q.    And if you would, tell the judge how you know Mark.
5    A.    We worked together at the jail and we're friends.
6    Q.    Do you remember when you worked with him -- when you say
7    "the jail," you mean the Cheatham County Jail?
8    A.    Yes, sir.
9    Q.    Do you remember when you worked with Mr. Bryant at the
10   Cheatham County Jail?
11   A.    From 2015 until 2017.
12   Q.    And you all overlapped for about how much time?
13   A.    I think just a couple months.
14   Q.    What was your job at the Cheatham County Jail?
15   A.    A correctional officer.
16   Q.    And what was Mark's position when you all worked
17   together?
18   A.    He was my supervisor.
19   Q.    During the time that you worked with Mark Bryant, do you
20   feel like you got to know him?
21   A.    Yes, sir.
22   Q.    And have you continued a personal relationship with
23   Mr. Bryant after you both left the Cheatham County Jail?
24   A.    Yes, sir.
25   Q.    You remain in contact with him through today; is that

1  right?

2  A.   Yes, sir.

3  Q.   Tell the judge a little bit about the Mark Bryant that

4  you came to know, both by working with him and developing a

5  personal relationship with him.

6  A.   Yeah.  Mark is a fantastic guy.  He's funny, which is

7  one of the reasons why we're such good friends.  He's very

8  compassionate.  He's knowledgeable, patient, and just an

9  overall great person.

10 Q.   Now, you're married; is that right?

11 A.   Yes, sir.

12 Q.   And has your husband come to know Mark Bryant?

13 A.   Yes, sir.

14 Q.   And does he consider Mark a friend as well?

15 A.   Absolutely.

16 Q.   Tell the judge a little bit about how you saw Mark

17 Bryant perform as a correctional officer at the Cheatham

18 County Jail.

19 A.   So Mark was -- he had worked at a previous facility.

20 I've never worked at a jail before up until then.  And he was

21 very patient with working with me.  He answered any questions

22 that I had.  He told everybody on second shift to "use your

23 words."

24 Q.   And what did that mean, "use your words"?

25 A.   When there was anything going on with the inmates, there

1  was an angry inmate or there was a fight, you use your words,
2  you deescalate the situation.  We -- he tried -- other shifts
3  used use of force more than we did because we were able to
4  apply that to any situation going on.
5  Q.    In the correctional world, in that vernacular, are you
6  familiar with the phrase "go hands-on"?
7  A.    Yes, sir.
8  Q.    And what does that mean?
9  A.    That just means if you have to put hands on an inmate to
10  subdue them, separate them, or get them to comply.
11  Q.    Was Mark Bryant a "go hands-on" kind of correctional
12  officer?
13  A.    No.
14  Q.    When we were talking about your testimony, you indicated
15  that you were really frustrated the way that Mark Bryant has
16  been portrayed throughout the last four years.
17         What did you mean by that?
18  A.    He was being portrayed as a monster and somebody who
19  just doesn't have any consideration for what he does.  That's
20  not Mark.  Mark is a fantastic person.  And the way that
21  everybody is making him out to be is unbelievably untrue.
22  Q.    Did you ever know Mark Bryant to be a violent person?
23  A.    No.
24  Q.    Do you think that, whether the Court places Mr. Bryant
25  ultimately on supervised release or considers probation in

this case, that he's the kind of individual that would follow
the orders of the Court?

A.   Absolutely.

Q.   Do you think he would comply with every request that was
made of him?

A.   Absolutely.

Q.   What effect has all of this had on Mark Bryant?

A.   It's really hard to say because Mark is just such a
positive person.  He understands the consequences, but he is
very positive about it.  He doesn't let it get him down.  We
just -- we don't talk very much about it because he
understands that it upsets me more than anything.

          MR. STRIANSE:  Thank you, Ms. Durham.

          THE COURT:  All right.  Cross.


                    CROSS-EXAMINATION

BY MS. MYERS:

Q.   Good morning, Ms. Durham.

A.   Good morning.

Q.   So, Ms. Durham, you were not there to witness the
defendant's behavior on the night of November 5th, 2016?

A.   Correct.

Q.   And so you did not witness the defendant use a Taser to
shoot electricity into Jordan Norris's body?

A.   Correct.

```
 1              MS. MYERS:  I have no further questions.
 2              THE COURT:  Any redirect?
 3              MR. STRIANSE:  No, Your Honor.
 4              THE COURT:  All right.  Thank you for being here.
 5                    (Witness excused.)
 6              THE COURT:  All right.  Go ahead.
 7              MR. STRIANSE:  Call Virginia Bryant.
 8              COURT DEPUTY:  Please raise your right hand.
 9
10                    VIRGINIA KAY BRYANT,
11   called as a witness by Defendant, was duly sworn and
12   testified as follows:
13
14              COURT DEPUTY:  Please be seated.
15              Please be sure to speak into microphone.
16              THE WITNESS:  Yes, I will.
17              COURT DEPUTY:  State your full name.
18              THE COURT:  You can remove your mask if you like.
19              COURT DEPUTY:  Can you state your full name.
20              THE WITNESS:  My name is Virginia Kay Bryant.
21              COURT DEPUTY:  Can you spell your middle name.
22              THE WITNESS:  K-a-y.
23                    DIRECT EXAMINATION
24   BY MR. STRIANSE:
25   Q.   Good morning, Mrs. Bryant.
```

A.    Good morning.

Q.    You are, of course, the mother of Mark Bryant; is that right?

A.    I am.

Q.    Tell the Court a little bit about yourself.

A.    Well, I worked at Jostens Printing and Publishing for 23 seasons, making yearbooks.  And after that time, I went into the banking business.  I worked at Cornerstone Financial Credit Union as a customer service representative and as the vault teller for a time.

Q.    How old is your son Mark?

A.    Mark is 42 years old.

Q.    Tell the judge a little bit about how you and Mr. Bryant raised Mark.

A.    We raised him in a Christian home, based on Christian principles.  We attended church faithfully, Sunday school, worship, and Bible study on Sundays.  And Wednesday night Bible study for all ages.  And he attended all those -- those church services with the whole family.  And so we tried to instill in him the values contained in Christianity: Kindness, helpfulness, concern for others.

        His -- his manner of dealing with people was so gentle and kind that a group of the -- what I call the little old ladies at church just adored him.  He would speak with them.  He would hold the door for them.  He -- some of them

taught him in Bible classes.  And he was a favorite of
theirs.

Q.    Would you characterize your family as a close-knit
group?

A.    Oh, absolutely.  We're very close knit.

Q.    I want to talk a little bit about Mark when he was a
young man.

Where did he go to school?

A.    He went to school in the public school system at Norman
Smith School at Greenwood and at Clarksville High School for
one year.  He attended a small private school for two years,
but after the two years, he decided that he no longer wanted
to be on a college prep course.  So he went back into the
public school system where he could work as a co-op student.

Q.    And as a young man, as a student, did he involve himself
in sports and athletics?

A.    He did indeed.  He played youth soccer.  He played
football in junior pro, middle school, and high school.

Q.    What can you tell the judge about his work ethic?

A.    Mark is a very hard worker.  It was very difficult for
him not to be able to work for a time after he left the
Cheatham County Sheriff's Department.  But he worked very
hard at finding a job, and he did find a job where he worked
for some period of time washing trucks.

And after that, he was invited to apply with a

1    company that cause- -- that maintains internet

2    infrastructure, and rose quickly through the ranks in that

3    endeavor.  Had to learn a lot of things that he had never

4    learned before, but he is highly thought of by his

5    supervisors and actually has some supervisory duties in that

6    job.

7    Q.    Did Mark begin working at a very early age?

8    A.    Our family had a job of cleaning the large church

9    building where we went to church.  And so we took over that

10   job when Mark was seven.  So at seven, there wasn't a lot he

11   could do, but he did drag a large wheeled trash can around

12   the building, and he went in all the classrooms and the

13   offices and the bathrooms and emptied the trash cans in those

14   rooms into his big can.

15           Of course, as he grew older and was able to do

16   more things, he did take on more duties in that job.

17   Q.    Did he work in high school?

18   A.    In high school, he went to work at a car wash, and he --

19   as I said before, he went back into the public school so he

20   could work as a co-op student.  He had two classes a day, and

21   then the rest of the day he spent working at the car wash.

22   Eventually, he was made assistant manager at that car wash.

23   Q.    Did he purchase his own home at a young age?

24   A.    He did.  He was able to qualify for a mortgage by his

25   work at the car wash, and four months after he turned 18, he

1  bought his own house, which he still owns.

2  Q.    Lives there today; is that right?

3  A.    Yes.

4  Q.    You've come to both trials; is that right?

5  A.    Yes, sir.

6  Q.    Why don't you describe for the judge the kind of person

7  that your son is.

8  A.    He's the kind of person that doesn't push himself to the

9  forefront or try to draw attention to himself.  He's

10 reasonably quiet.  He's very calm in his dealings.  If he

11 sees someone's in need, he's always willing to help.  For

12 example, I have a friend who broke her arm a couple years

13 ago, and she -- the break was so severe that she had to have

14 a rod put into her dominant arm.

15         When I told Mark about it, he said, "Well, I don't

16 know much about gardening, but if she needs any heavy lifting

17 done, I certainly can do that."  So he did end up going to

18 her house, moving some heavy pots up closer to her back porch

19 so she would be able to garden that season, and emptied heavy

20 40-pound bags of potting soil into them.  She was delighted

21 because she was able to do some gardening that she didn't

22 think she was going to get to do that season.

23         Also, he took note of the fact while he was there

24 that she had two staircases going down from her back porch.

25 And neither one had a handrail.  So he came back on another

day and made two handrails for her so that she could go up

and down her stairs safely.

        Mark didn't know her.  He had never met her.  But

she was my friend, and she was in need.  So he was happy to

help.

Q.    Is that your friend Linda Earp?

A.    Yes.

Q.    And she wrote a letter on Mark's behalf --

A.    She did.

Q.    -- is that right?

A.    She did.

Q.    And your husband is here today; is that right?

A.    That is correct.

Q.    And he accompanied you to both trials; is that correct?

A.    Yes, indeed.

Q.    And I don't want to embarrass you or embarrass him, but

has he over the years suffered from some physical and mental

infirmities?

A.    He has a mental health issue with anxiety and depression

that has been quite treatment resistant and is now of 30

years' duration.

Q.    And forgive me for asking you this.  How old are you?

A.    I'm 69.

Q.    And how old is your husband?

A.    He also is 69.

1  Q.   As you all have -- have gotten older, has Mark taken a
2  greater role in helping with your husband?
3  A.   He has.  Mark has a very calming effect on his dad, and
4  they try to spend time together from time to time, and
5  actually they, with another person, built us a house at the
6  lake.  So it was a great time for my husband.  He so enjoyed
7  working with Mark and seeing how exacting he was in his
8  construction work and how meticulous he was, and just that he
9  knew a lot.  He wouldn't even let me buy a set of plans to
10 build the house.  He said, "I don't need it.  I know what to
11 do."
12 Q.   You said that your son has a calming effect on your
13 husband; is that right?
14 A.   Yes.
15 Q.   And you've been in the courtroom through those two
16 somewhat long trials.
17 A.   Yes.
18 Q.   And you saw how he was characterized by the government
19 in this case?
20 A.   I did.
21 Q.   Is -- is your son a bully?
22 A.   Not at all.  He weighed 10 pounds, 2 1/2 ounces, at
23 birth.  He's been big from the beginning.  He was always the
24 biggest, the tallest kid in his school classes.  But he never
25 bullied anyone.  And in fact, he decided early on that he

1    didn't have much use for bullies.  So not only did he not
2    bully, but he spoke up for people who were being bullied and,
3    as he said, showed up big and took care of the situation in
4    such a way that the person who was being tormented was
5    relieved of their tormenter.
6    Q.    Have you ever known your son to be a violent person?
7    A.    Not at all.  He's very calm and very laid back.  He --
8    he faces life with kindness and positivity and good humor.
9    Q.    Over the years have you found him to be a trustworthy
10   and dependable son?
11   A.    Absolutely.  Absolutely.  We have chosen him to be
12   executor of our will, so that speaks to how much we trust
13   him.
14   Q.    By the way, who is here on Mark's behalf from the
15   family?
16   A.    From the family, his two older sisters, his dad, and
17   myself.
18   Q.    After he lost his job at the Cheatham County Jail, you
19   said it took him a while to get back to work; is that right?
20   A.    Yes, sir.  A few months.
21   Q.    You told the Court about him washing trucks or something
22   like that?
23   A.    Yes.
24   Q.    When did he get this much better job involving the
25   broadband internet?

1  A.    I think he's been working at that job about two and a
2  half years.
3  Q.    How does that job suit him?
4  A.    It suits him right down to the ground.  He works by
5  himself in a room where all the equipment for the broadband
6  and internet wiring is, and he performs upgrades and repairs
7  to those elements.
8  Q.    And with the pandemic, has he been classified as an
9  essential employee with that company?
10 A.    He has been.  In fact, he had to carry a notice, a
11 government notice, in his vehicle so that he would not be
12 stopped for being out and about during lockdown times that
13 stated that he was an essential worker.
14              MR. STRIANSE:  Thank you, Mrs. Bryant.
15              THE COURT:  All right.  Cross.
16              MS. MYERS:  No questions, Your Honor.
17              THE COURT:  All right.  Thank you for being here.
18              THE WITNESS:  Thank you, sir.  Thank you for the
19 opportunity.
20                   (Witness excused.)
21              MR. STRIANSE:  Your Honor, Mr. Bryant would like
22 to address the Court at the appropriate time.
23              THE COURT:  All right.  I think we can do that.  I
24 think the government had three witnesses?  Correct?
25              MS. MYERS:  That's correct, Your Honor.

1          THE COURT:  All right.  Do you want -- let's go

2    ahead and do those.

3          MS. MYERS:  Yes.

4          Yes, Your Honor.  They are not witnesses, but they

5    would like to make victim impact statements.

6          THE COURT:  Okay.  Come forward.

7          MS. MYERS:  Your Honor, this is Mr. Chapman.

8          MR. CHAPMAN:  May I remove?

9          THE COURT:  Sure.  Please.  Thank you.  And if you

10   would state your name.

11         MR. CHAPMAN:  Pardon?

12         THE COURT:  Would you state your name?

13         MR. CHAPMAN:  William Chapman.

14         THE COURT:  And where do you live?

15         MR. CHAPMAN:  I live at 118 Sweeney Drive, Pegram,

16   Tennessee.

17         THE COURT:  All right.  Welcome.

18         MR. CHAPMAN:  Again, my name is William Chapman.

19   I'm a transportation supervisor at Vanderbilt University.  I

20   am Jordan Norris's biological uncle and was his custodial

21   parent from 2010 until his passing in 2018.

22         Throughout the Court proceedings, much was stated

23   and alleged by Cheatham County authorities that Jordan was a

24   violent person, accusing him of hitting, kicking, biting, and

25   spitting, that somehow he brought this torture and abuse by

1  Mark Bryant on himself.  Nothing could be further from the
2  truth.  Not once in the video are any of those actions seen.
3  In fact, the only violent assault witnessed in the videos is
4  committed by Mark Bryant himself.
5       This was the first time Jordan had ever been to
6  jail.  Whether as a juvenile or as an adult, Jordan had never
7  assaulted anyone, threatened anyone, or committed any violent
8  offense whatsoever.  He was not a violent monster, as
9  Mr. Bryant's defense attempted to portray.  Jordan was an
10 18-year-old kid at heart who was soft-spoken, gentle in
11 nature, and was respectful and courteous to others.  He did
12 not, nor would anyone else, deserve to be repeatedly
13 assaulted with excruciating and potentially deadly
14 high-voltage shocks.
15      The harm done to him that day did not end there.
16 Jordan had pairs of burns scattered all over his body as
17 witnessed by myself and others while he was still in custody.
18 Some of those burns were second and third degree, which
19 became infected and required treatment to help them heal.
20      The change in Jordan's personality was
21 instantaneous.  He became extremely emotionally disturbed.
22 In the initial days he cried very easily when we discussed
23 what he had endured and appeared to me to have a broken
24 spirit.
25      He complained frequently of severe chest pain and

began to have daily panic attacks.  There were many, many
days where he experienced three or four panic attacks per
day.  We would be quietly watching TV or sitting out in the
yard, and he would suddenly and without warning shut his eyes
tightly, put his hands over his ears, and had a terrified
look on his face.  He would repeat over and over, "I'm having
a panic attack."  I felt helpless because there was
nothing -- sorry -- I could do to make it stop.  It would
last two or three minutes and go away just as quickly as it
came.  On one occasion I checked his pulse and it was 128, a
sitting pulse, in the midst of this attack.

He began to have frequent nightmares, saying they
weren't just normal nightmares.  He would say he didn't even
want to describe them to me, they were so bad.  At no point
in his life had he ever talked about anything like that.

About four months after the tasings, he had his
first grand mal seizure and was unconscious for nearly an
hour.  Paramedics were called, and he spent several hours in
the emergency department at Vanderbilt.

His chest pains became worse over time, and he
complained that he thought he was going to have a heart
attack, an 18-year-old kid.

Throughout this time, I was taking him for medical
checkups and began the quest to secure a good psychologist to
help him with these developing mental and emotional

1   disturbances.  He would periodically fall into a deep and
2   prolonged depression and would spend days in his room without
3   ever wanting to leave.  He was given several prescriptions by
4   his doctor for depression, insomnia, anxiety, and even a drug
5   to help him alleviate the nightmares.  I remember thinking it
6   was odd there was a drug specifically for reducing
7   nightmares.

8           Substance abuse became a serious concern as the
9   months passed, and in March of 2018, I learned that he had
10  begun using a deadly substance.  Within two weeks of that
11  realization, Jordan passed away in his own bed.  The autopsy
12  that followed revealed significant physical damage to
13  Jordan's young heart, which explained the chest pain and the
14  fear of a heart attack.  Repeated shocks at high voltage is
15  the only plausible explanation for that physical damage.

16          When an 18-year-old states that he believes he's
17  having a heart attack, you want to rationalize it as
18  something else.  Even his doctor tried to pass it off as
19  possible indigestion or stress.  He never ordered tests that
20  would have revealed what an autopsy eventually revealed:
21  Jordan's heart was damaged by what Mark Bryant callously did
22  to him.  The seizures, the panic attacks, the nightmares, the
23  crying, and the burn scars ever present as a reminder of what
24  he endured.  Jordan Elias Norris, 18 years old, as he sat
25  strapped in that chair, completely immobile, unable to defend

himself in any way, did not deserve to have his life reduced
to what it became. No one would deserve that.

Mark Bryant's actions that night were torturous,
callous, and heartless, and brought on months of suffering.
And, as attested by a jury of his peers, those actions are
indefensible. Thank you, Your Honor.

THE COURT: All right. Thank you for being here.
Okay.

MS. MYERS: Your Honor, I believe that that is
going to be our only victim who is going to be testifying.

THE COURT: Okay.

All right. Okay, then, why don't we have
argument. If Mr. Bryant wants to speak now, or if you want
to argue and then hear from the government, then you can have
the last word.

MS. MYERS: Excuse me, Your Honor. May I have one
minute to confer with our victim/witness coordinator?

THE COURT: Sure.

(Respite.)

MS. MYERS: Your Honor, his older sister,
Ms. Argylene Suzanne Darnell, would also like to make a
victim statement.

THE COURT: All right. Come forward.

And what's your name?

MS. DARNELL: Argylene Suzanne Darnell.

1          THE COURT:  I'm sorry?

2          MS. DARNELL:  Argylene Suzanne Darnell.

3          THE COURT:  Can you spell the first name?

4          MS. DARNELL:  Yes, A-r-g-y-l-e-n-e.

5          THE COURT:  And the last name is Darnell?

6          MS. DARNELL:  Yes, Darnell.

7          THE COURT:  Welcome.  Go ahead.

8          MS. DARNELL:  I didn't have anything prepared.

9  However, I do understand that we're all upset over him

10 possibly going to jail and my brother being gone.  I am the

11 oldest of five siblings.  I have a 28-year-old daughter that

12 adored my brother.  I have a ten-year-old daughter that would

13 have loved to got to know him more.

14          My family is shattered.  I suffer from PTSD,

15 depression, anxiety, and I've heard that brought up for

16 everybody else.  And I also understand that my brother got in

17 trouble, but I also understand, had I done the things that

18 had happened to my brother, I would be in jail.  Had I tased

19 somebody and almost killed him, I would be in jail.  And

20 that's all I want, is the same justice that I would have

21 gotten.

22          He was a good boy.  I trusted him with -- I would

23 have left him with my child.  There's nobody going to sit

24 here and tell me he was a mean and violent person, not the

25 smile that he gave me and the hugs that I had around my neck.

1   I was here when he was brought into the world, and I would
2   have loved to have spent more time with him.

3           And, like I said, my family is shattered.  And I
4   just want the same thing anybody else would have gotten.  He
5   was a good boy.  He didn't deserve this.  And I don't think
6   Mr. Bryant's family deserves all this either, but he made his
7   own choices.  We all -- we can either come up a good family
8   or a bad one and it's still the choice you make when you grow
9   up.  And he made the wrong one.

10          I can't say I've always made the right one, but
11  I've never, in the same 43 years that he's been alive, ever
12  been in trouble for violence or anything else.  However, I
13  was brought up in a violent home, but statistically, he
14  should have been a better person and I should have been a
15  worse.  So we can worry about statistics or we can just worry
16  about what we did wrong and what we didn't do wrong.

17          I don't want to see him just walk away.  It's not
18  fair to my family.  It's not fair to my brother that's no
19  longer here.  He was a good boy.  He really was.  And that's
20  all I've got to say.

21          THE COURT:  All right.  Well, thank you for being
22  here.  Okay.

23          MS. MYERS:  And, Your Honor, I believe that is the
24  final statement.

25          THE COURT:  All right.  So, Mr. Strianse, do you

1 want to make argument?

2         MR. STRIANSE:  Yes, sir.

3         THE COURT:  Then we can hear from Mr. Bryant, and

4 the government can have the last word.

5         MR. STRIANSE:  Thank you, Judge.

6         Your Honor, the Court has had the benefit of my

7 filing on the analysis of the 3553(a) factors.  And I don't

8 want to belabor that, but there are a few things that I did

9 want to bring to the Court's attention and highlight.

10         I've identified six potential bases for the Court

11 to consider for a variance from the guideline range in this

12 case, which seems to be facially a very high guideline range

13 to me.  The way the guidelines are structured, it seems like

14 there is this factor creep that gets us up to a 31.

15         The issues that I identified for the Court in my

16 papers are his outstanding work history, the wrongful conduct

17 of the victim.

18         And so the family of Mr. Norris knows, this is not

19 something that I've come up with, "wrongful conduct of the

20 victim."  It's something that's recognized in the sentencing

21 guidelines and recognized as a possible basis for a variance.

22         I tried to develop with his mother his role as an

23 irreplaceable caregiver for his 69-year-old father, who

24 suffers from anxiety and depression.

25         I've tried to identify through the letters and

testimony his good works and service to the community.

In doing my research and preparing for this sentencing, there were things that I -- I guess innately knew, but saw some case law on it in terms of being a correctional officer, possible susceptibility to abuse in prison.

And also something that I had been talking to this Court and the state court about, the successive state prosecution for the identical conduct has been identified by sentencing courts as an additional burden on a criminal defendant.

Your Honor, on the outstanding work history, I think it's pretty remarkable.  You heard the testimony of his mother.  He literally began working as a child at age seven when his parents had that contract to clean that church.  He worked through high school, and pretty remarkable -- I don't know if I've ever met anyone that was able to work, save money, make a down payment on a home at age 18, where he currently still lives.

On the whole issue of the conduct of Jordan Norris and the contributing factor that I think it has in this case, I say this respectfully, lost in all of this, these two trials and the hearings and everything that we've been through is Mr. Norris's role in this.  And I don't want to say anything to hurt the family, but I'm just talking about

what is objectively seen on the video.  And I think that what
you see is someone that really instigated all of these issues
that began at about 6:00 on November the 5th of 2016.

I think the testimony that you heard at both
trials, the letters that you've read, the testimony that you
heard today, Mark Bryant was not the kind of correctional
officer that was looking for a confrontation on November 5,
2016.  That was not his nature.  You've heard, whether they
were government witnesses, correctional officers, or people
that I advanced at both trials, that was simply not his
nature, and it's really -- runs contrary to everything that's
been said about the style that he tried to employ as a
correctional officer at the Cheatham County Jail.

And I think the Court can form a judgment about
some of the problems that existed at the Cheatham County
Jail.  A very old facility.  I think it was built in the
1940s.  It was designed to house far fewer inmates on a
Saturday night, which November 5, 2016, was.  It was really
filled to the brim, 150 to 200 inmates in a facility that was
just not equipped to handle that many inmates.  And basically
you have a handful of correctional officers who are charged
with the responsibility of trying to keep each other safe and
keep that community of almost 200 inmates safe.

You saw from the video the shabby conditions at
the jail.  You saw this restraint chair, which was really a

source of a lot of problems that night, November the 5th, 2016, because they were simply unable to get Mr. Norris under control.  And then you know the rest of the story because you've heard the proof and you saw the events of that night that lasted several hours.

Sentencing Guideline 5K2.10 allows for, in an appropriate circumstance, a downward departure, they call it -- I'm calling it a variance -- from this guideline range. And then I'm reading from 5K2.10.  Quote, if the victim's wrongful conduct contributed significantly to provoking the offense behavior.

And then there were certain factors that 5K2.10 suggests that a sentencing judge should take a look at:  The persistence of the victim's conduct; efforts by the defendant to prevent confrontation -- I think that was present in this case; the danger reasonably perceived by the defendant, including the victim's reputation for violence.

You know, they didn't know much about Jordan Norris that night, other than the way he was acting.  And the Court may remember, in advance of the first trial, I tried to get into -- I guess you could characterize it as similar act evidence, 404(b) evidence.  But the upshot was that the Court, I think, heard some proof on it and heard argument, decided it was not appropriate for the trial jury to hear, but I think it's instructive on this issue of wrongful

1    conduct.

2              You may remember a Corporal Shaffer, now a

3    Sergeant Shaffer, who had dealt with Mr. Norris, not on

4    November the 5th, but on Monday, November the 7th, on two

5    different occasions.

6              And, for the record, you're shaking your head.  So

7    I think you have some --

8              THE COURT:  I remember.

9              MR. STRIANSE:  -- recollection.

10             Then I will not belabor it.  But they --

11             THE COURT:  Oh, no.  You can argue it.  I'm just

12   saying I remember it.

13             MR. STRIANSE:  Two events on November 7th, 2016,

14   one at -- this was the early morning hours of November 7th,

15   2016.  At 3:30 a.m., Sergeant Shaffer observed Mr. Norris

16   assault another inmate, Dustin Newland -- and for the court

17   reporter, that's N-e-w-l-a-n-d -- in Cell 2.  Cell 2 is not

18   one of the cells that had the hard steel door where it's hard

19   to look into the cell; it's a cell that has bars.  He clearly

20   saw the assault.  Mr. Newland sustained a loss of a tooth; he

21   had a front tooth knocked out.

22             Later, 20 minutes later, 3:50 a.m., they were

23   transporting Mr. Norris to the Middle Tennessee Mental Health

24   Institute.  You may remember, Judge, on the 5th he was taken

25   to the local hospital, returned to the Cheatham County Jail;

they made arrangements to take him to the Middle Tennessee
Mental Health Institute, given all of his conduct, and all of
the bizarre behavior, and this was the transport morning at
3:50 a.m.

And Shaffer's report and his testimony would have
been that that morning, when they were trying to get him
transported, he was grabbing at Field Training Officer
Burney's hand.  They had to subdue him to get him into the
car.  It took five road officers to get him into the car,
again demonstrating really extreme strength, and he kicked
out the back passenger window of that vehicle.

So this is the individual that the Cheatham County
Jail was dealing with from November 5 through November the
7th.  I think that under this guideline departure and under
this theory of variance, I think the Court can take into
consideration whether this is a mitigating circumstance.  I
respectfully suggest to the Court it is a mitigating
circumstance and, in this case, a powerful mitigating
circumstance.

The other issue is the irreplaceable caregiver.
You've heard the testimony of Mrs. Bryant.  It's supported by
the case law that I cited in my papers.  The *Koon* case that I
cited to the Court talked about susceptibility to abuse for a
correctional officer as being a valid reason for a variance
or a downward departure under the guidelines.  And

remarkably, when I did my research, I found some case law that supported what I had been concerned about, the successive prosecutions.

We had in this case both sovereigns working together to prosecute both cases. I realize that there is no double jeopardy protection, but you have a situation where you have this concerted effort by both sovereigns to bring not only charges to the United States District Court, but also to the Criminal Court for Cheatham County. And in the cases that I cited, they did find that that can be a really undue burden on a criminal defendant and can be a mitigating circumstance.

Your Honor, based on all of those reasons, I would ask the Court to consider a mitigated sentence in this case. And I don't want the Court to think that I've lost leave of my senses when we're starting with a guideline range of 108 to 135 months, but you announced at the beginning of the -- this process this morning that he is statutorily eligible for probation. And I know the Court is very considerate -- very familiar with the *Gall* decision and what the Supreme Court has said about probation in cases.

Just to highlight some things from *Gall*, probation supervision, quote, is not an act of leniency, close quote, but, quote, substantial restriction of freedom. Inherent in the very nature -- and I'm still reading from *Gall* -- the

very nature of probation is that probationers do not enjoy
the absolute liberty to which every citizen is entitled.
Probationers may not leave the judicial district, move or
change jobs without notifying and in some cases receiving
permission from their probation officer or the Court.

So some courts -- some district court cases that
I've read where a district court judge will say probation is
not nothing, meaning that it is a punishment and a
substantial restriction on an individual's liberty.  The
guidelines and the presentence report speaks to this.  If the
Court was going to consider that type of a sentence, well,
there would have to be something to go along with it in terms
of some significant community service term that would be
incorporated into a probationary sentence.

Your Honor, thank you for hearing me this morning.

THE COURT:  All right.  Let's hear from the
government.

MR. SONGER:  Your Honor, may we take just a
five-minute recess before the government's argument?

THE COURT:  Okay.  Personal need?

MR. SONGER:  Yes, Your Honor.

THE COURT:  Okay.

MR. SONGER:  Thank you.

(Respite.)

THE COURT:  All right.  Be seated.

1    All right.  We'll hear from the government.

2    MR. SONGER:  Thank you, Your Honor.

3    The government recommends a sentence of ten years

4    or 120 months.  That sentence is somewhat below the midpoint

5    of the range calculated by the guidelines.  Of course, the

6    statutory maximum sentence here is 120 months based just

7    purely on the offense conduct.  As the Court knows, of

8    course, those guidelines are merely advisory, but as the

9    Supreme Court said in *Gall*, they are the starting point and

10   the initial benchmark for any sentence.

11   And the 3553 factors here weigh strongly in favor

12   of a guideline sentence.  We've laid these out in the memo

13   that we filed with the Court, but I would like to highlight

14   several of those factors that we think are most relevant

15   today.

16   And first and most importantly is the seriousness

17   of the offense.  The defendant was convicted of two violent

18   crimes, and these are not just ordinary violent offenses,

19   because Defendant Bryant held a position of public trust.  He

20   was entrusted with enormous power and enormous

21   responsibility.  He was the supervisor in charge of the

22   Cheatham County Jail the night that these incidents happened.

23   He had previously worked at the Tennessee Department of

24   Corrections.  He had been trained.  He knew right from wrong.

25   He was not some rookie officer fresh out of the academy.  He

had the responsibility to keep people who were in state
custody safe from harm and to ensure that the officers who
worked under him followed the law and that he set a good
example for them.

But he violated that public trust.  He
purposefully abused his power to torture a teenager in his
custody who was tied down and surrounded by officers, and he
taunted the teenager while he did it.

Now, that conduct caused two different types of
harm that are each very important.  The first is the harm to
Jordan Norris.  The Court heard evidence that Tasers inflict
intense, debilitating pain.  They burn the skin.  When
they're used excessively, like they were by Defendant Bryant,
they can cause serious cardiac issues, a risk even causing
death.  Testimony from one of the officers who witnessed the
defendant's assaults said that the defendant's tasing made
Jordan Norris's skin look like raw hamburger meat.

We heard from Mr. Norris's guardian earlier today
that the trauma from this incident did not end when Jordan's
wounds started to heal, that his personality was changed,
that he started having intense panic attacks.  And officers
that we heard from in trial confirmed these -- these facts.
We heard from a number of officers who testified that they
had been exposed to Tasers in training for only a few
seconds, and they still considered it some of the most

wrong

had the responsibility to keep people who were in state
custody safe from harm and to ensure that the officers who
worked under him followed the law and that he set a good
example for them.

But he violated that public trust.  He
purposefully abused his power to torture a teenager in his
custody who was tied down and surrounded by officers, and he
taunted the teenager while he did it.

Now, that conduct caused two different types of
harm that are each very important.  The first is the harm to
Jordan Norris.  The Court heard evidence that Tasers inflict
intense, debilitating pain.  They burn the skin.  When
they're used excessively, like they were by Defendant Bryant,
they can cause serious cardiac issues, a risk even causing
death.  Testimony from one of the officers who witnessed the
defendant's assaults said that the defendant's tasing made
Jordan Norris's skin look like raw hamburger meat.

We heard from Mr. Norris's guardian earlier today
that the trauma from this incident did not end when Jordan's
wounds started to heal, that his personality was changed,
that he started having intense panic attacks.  And officers
that we heard from in trial confirmed these -- these facts.
We heard from a number of officers who testified that they
had been exposed to Tasers in training for only a few
seconds, and they still considered it some of the most

1   significant pain they had felt in their lives.

2          And the defendant knew well what a Taser was

3   capable of.  He had been trained.  He had been certified.  He

4   had been tased himself.  He knew it was a tool that caused

5   intense pain and burning.  He knew that if he used a Taser

6   for more than 15 seconds -- because he had been trained on

7   this explicitly -- that if he went over 15 seconds, it could

8   cause serious cardiac issues and it could kill a person.

9          But he tased Jordan anyway.  He did it for 50

10  seconds in the assault at 8:00 and for another 11 seconds in

11  the assault at 10:20.

12         Now, the defense argued that this Court should

13  grant a downward variance under 5K2.10 of the sentencing

14  guidelines based on the victim's conduct.  And I just want to

15  quickly address that, because it's -- that type of variance

16  or departure is clearly not appropriate based on the

17  guidelines that are laid out.

18         5K2.10 applies only where the victim's conduct

19  contributed significantly to provoking the incident.  And we

20  know it didn't contribute significantly here, because in

21  both -- both assaults that the defendant was convicted of,

22  there were a number of other officers around who saw the

23  exact same conduct from Jordan Norris, and none of them

24  responded by using excessive force.  Only the defendant did.

25         We also know that the jury found the defendant

1  guilty beyond a reasonable doubt of willfully using excessive

2  force.  The jury was instructed that they had to find that

3  the defendant intentionally used more force than was

4  reasonable under the circumstances.  And they did.

5          And I'd also direct the Court's attention to a

6  couple of the factors that are spelled out in 5K2.10 for the

7  Court to consider when assessing a request for a downward

8  variance.  One is the proportionality of the defendant's

9  response to any provocation that was out there, and we heard

10  testimony in this case from officer after officer that's

11  consistent with what everyone could see in the video, that

12  the defendant's response was grossly disproportionate.  Three

13  different officers, Caitlin Marriott, Gary Ola, and Michael

14  Montgomery, each testified in court that at the time the

15  defendant assaulted Jordan Norris, there was no law

16  enforcement justification to tase him at all for even one

17  second.  Even one second.  And the defendant tased him for 50

18  seconds at 8:00 and again at 11 seconds at 10:20.

19          5K2.10 also points the Court to whether the

20  defendant made efforts to prevent the incident from occurring

21  in the first place.  And here, not only did the defendant not

22  prevent what happened, at the very end of the night, when

23  officers were preparing to transfer Jordan Norris to the

24  hospital to have him evaluated, after Jordan had calmed down,

25  he had been handcuffed, and placed in shackles, strapped back

1  into a restraint chair and had been talking calmly with

2  another officer for a full minute and a half, the defendant

3  came back, leaned down, and tased him again, punished him

4  again on the way out the door for 11 more seconds with no

5  discernible provocation whatsoever.

6          So he absolutely did not take extreme efforts to

7  prevent this from happening.  And for those reasons, the

8  downward variance is -- does not apply here.

9          Your Honor, I also want to just briefly touch on

10  that Jordan Norris was not the only person who was impacted

11  by what happened.  As a supervisor in charge of the jail, the

12  defendant put the other officers who were there that night in

13  a difficult position.  They were faced with watching their

14  supervisor violate a detainee's constitutional rights.  And

15  the defendant compounded that harm by then going to several

16  of those officers and pressuring them not to report what

17  happened, by telling them not to write reports that they were

18  required to submit.  Several officers testified that in fact

19  they didn't turn in the reports that they were required to

20  turn in for that reason.

21          Another officer, Sergeant Ola, stated that he

22  feared retaliation if he reported what the defendant did.

23  And the defendant certainly set a dangerous example for all

24  of those officers.  We saw many of them testify on the stand

25  here.  They were not happy to be here.  They didn't want to

1  be testifying against their friend and their former
2  supervisor.  But they knew what the defendant did was wrong,
3  and they did it anyway.
4          I think it's particularly notable what happened
5  with Officer Caitlin Marriott.  She's a good officer.  She's
6  now a supervisor at the Sheriff's office, but she left for a
7  period of time after this incident happened.  And when she
8  came back, she said that she was so disturbed by what had
9  happened that night that she couldn't even be around other
10 officers when they tested their Tasers, because just hearing
11 the sound of it would take her back to this traumatic
12 incident when the defendant abused a pretrial detainee.
13         So, in considering the severity of the offense
14 conduct here, it's important to remember that the defendant's
15 crimes not only inflicted pain on Jordan Norris, but also
16 impacted a number of other officers who tried to do things
17 the right way.
18         Your Honor, the 3553 factor related to providing
19 deterrence is also important here.  And the defendant argued
20 in the memo that was submitted to you that there's no need
21 for specific deterrence in this case because Defendant Bryant
22 has already lost his law enforcement position.  But I think
23 what is notable is that the defendant has not expressed any
24 remorse for what happened, even any acknowledgment that he
25 committed crimes.

1    And this has been a pattern.  On the night of the

2    assaults, as we discussed, he didn't report accurately what

3    happened.  And, in fact, he pressured other officers to cover

4    up what happened.

5    Several months later, when he met with the FBI, he

6    again didn't express any remorse for what had happened to

7    Jordan Norris.  Instead, he blamed -- when he was asked about

8    the assault at 8:00, he blamed the victim for everything.  He

9    said he was just responding to what the victim did.

10   And then, when he was asked about the assault at

11   10:20 that night, he just lied and said it didn't even

12   happen.  Said he never tased Jordan after Jordan had been

13   handcuffed and shackled.  And that was just false.

14   And even today, in the defendant's sentencing

15   positions, after he's been convicted by the jury on both

16   counts, he continues to try to put the focus on the victim

17   and said it was the victim's fault, the victim who is dead

18   and can't be here to defend himself.  He said it was his

19   conduct.  He has not acknowledged his own actions.  And

20   whether that arises in the future in the context of law

21   enforcement or in some other job the defendant has, he

22   clearly does not acknowledge that he cannot abuse his power.

23   He still thinks he's above the law, and a guideline sentence

24   is necessary to show him that that is not right.

25   But, in addition to that, Your Honor, there's also

1   the important need here for more general deterrence to show
2   other law enforcement officers and other public officials
3   that they are held to at least the same standards as other
4   members of society, that they are not above the law, but the
5   same rules apply to them, and if they commit misconduct,
6   they'll be punished.

7               And then the last 3553 factor I would like to
8   highlight, Your Honor, and it's related to the prior one, is
9   the need to promote the respect for the law.  And a guideline
10  sentence is necessary to promote respect, not just for the
11  sentence -- sentencing provisions that the Congress and the
12  U.S. Sentencing Commission have set out, but also respect for
13  the criminal justice system.  The defendant, like other law
14  enforcement officers, was trained and entrusted with enormous
15  responsibility.  A number of courts, appellate courts -- and
16  we've cited several cases in our memo -- have held that when
17  a public official or law enforcement officer abuses their
18  official authority to commit crimes, that they are held to a
19  higher standard.  And that is a factor that weighs in favor
20  of a higher sentence.

21              And there's good reason for that.  Because the
22  system of criminal justice in this country depends upon
23  people believing that when they encounter a law enforcement
24  officer in a uniform, wearing a badge, that they can trust
25  that that officer will follow the law, will act

1  appropriately, will treat them fairly.

2          And the defendant eroded trust in that system when

3  he abused his power to commit violent crimes against Jordan

4  Norris.  He did a disservice to the countless officers who

5  put on their uniform and try to do things the right way.

6  When the defendant burned the skin off Jordan Norris's body,

7  he simultaneously chipped away at that public trust in the

8  criminal justice system.  And he has shown no remorse for

9  doing it.

10         For those reasons, the government asks that you

11  impose a sentence of ten years, which is the minimum

12  necessary and appropriate.

13         THE COURT:  All right.  Thank you.

14         All right.  Mr. Strianse, Mr. Bryant, you all can

15  have the last word here.

16         MR. STRIANSE:  Your Honor, we don't have any

17  additional --

18         THE COURT:  So, Mr. Bryant, I want to make sure

19  that I've invited you to speak to the Court before sentence

20  is imposed.

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Do you care to do that?

23         THE DEFENDANT:  No, sir.

24         THE COURT:  All right.  Any further argument?

25         MR. STRIANSE:  No, Your Honor.

1          THE COURT:  Okay.

2          All right.  So let me first address what's on the

3    record here.  And technically, on the record, the defendant,

4    Mr. Bryant has made a request for a departure under 5K2.10.

5    So I want to address that and then I'll go into my analysis

6    of the 3553 factors.

7          Mr. Bryant requested a departure under 5K2.10 that

8    allows the Court to impose a sentence below the guideline

9    range when a victim's wrongful conduct contributes

10   significantly to provoking the offensive behavior of the

11   defendant.  Here, Mr. Bryant requests the Court depart

12   because of the conduct of Jordan Norris on November 5, 2016,

13   when he was in the custody of the Cheatham County Sheriff.

14         The evidence presented at both trials does show

15   that Mr. Norris's behavior on the evening of November the 5th

16   was bizarre and erratic and continued after November the 5th.

17   On three separate occasions that evening, 6:00 p.m. --

18   approximately 6:00 p.m., approximately 7:55 and 10:20,

19   Mr. Norris's behavior became unruly, uncooperative, and

20   noncompliant, requiring multiple officers to subdue him

21   through physical force and multiple tasings.  At 6:00 p.m.,

22   for example, Officer Daniel Bratton tased Norris twice and

23   then Mr. Bryant tased Norris multiple times at 7:55 and

24   10:21.

25         Mr. Norris's medical records on November the 5th

confirmed that he was to some extent under the influence of drugs and experiencing some mental challenges.  Indeed, after he was taken to the hospital on the night of November 5th, he received a referral to go to the Middle Tennessee facility for psychiatric help.

On all three occasions while he was at the jail, it took multiple officers to make Norris behave and comply with their directions.

And the Court has to consider these, what I've just mentioned, but I also have to consider all the circumstances on the evening of November 5th and those other circumstances include that Mr. Norris was, in fact, confined within the four walls of the jail; two, there were multiple jail officers and correction officials present that night, and that at various times he was, indeed, restrained.

When I look at the total circumstances, his ability to escape from the jail, his ability to do harm to himself, and even his ability to harm others, under the circumstances, was minimum, at best.  Indeed, the real danger Norris presented to Bryant and other law enforcement officials was not significant, no matter what Mr. Norris had tried to do.  Norris was acting out, and nothing suggests that he did so to provoke Bryant or anyone else.  But, more likely than not, his behavior was to some extent the product of the substances found in his body and his mental state.

1       The case -- this case is not like *U.S. v. Harris*,
2   293 F.3d 863, Fifth Circuit, 2002, or *Koon v. United States*,
3   518 U.S. 81, 1996, where the defendants there engaged in
4   combative behavior to avoid arrest.  Indeed, Norris had been
5   arrested.  He was safely within the confines of the four
6   walls of the jail.  Norris was certainly noncooperative with
7   law enforcement orders and directions while in custody, but
8   that's a far -- but that's far from the provocative behavior
9   that's contemplated in 5K2.10 to justify a departure.
10      So the Court will not exercise its discretion to
11  depart, but I will consider this as a variance.  And that
12  argument's been made both here today and in the papers.
13      All right.  So, Mr. Bryant, my responsibility is
14  to impose a sentence that's sufficient but not greater than
15  necessary to accomplish the purposes of the sentencing laws.
16  And that means a sentence that addresses all of the
17  sentencing factors that I'm about to discuss, but one that is
18  tailored to your particular criminal behavior that is not
19  harsh.
20      Here the government seeks for the reasons stated
21  in the papers and in argument here a sentence -- the maximum
22  sentence that is allowed under the statute of 120 months.
23  And I appreciate in your papers and argument from your
24  counsel you request a variance.  And that's -- I've
25  considered all of that.  But this Court can't pick and choose

1  from the 3553(a) factors.  I have to consider all of those
2  factors to tailor a sentence that's appropriate.

3           So I start with the fact you're 42 years old, have
4  a high school diploma.  And I note that, undisputed in the
5  record, you've got a very consistent work history that
6  reflects a strong work ethic, which are factors that are
7  important to the Court.

8           But in applying the factors here, I do think a
9  couple of those factors stand out for the Court.  One is,
10 indeed, the offense of conviction and the two counts the jury
11 found you guilty on.  And the second, I -- I -- I combined,
12 is the need for just punishment and respect for the law.

13          And both of those are significant here because you
14 did hold a position of public trust and responsibility.  So I
15 turn first to the nature and circumstances of the offense
16 that do reflect a serious and disturbing criminal behavior.
17 The jury found you guilty of Count One and Two, in which you
18 during the period of -- day of November the 5th engaged in
19 unreasonable, inappropriate use of force by misusing a Taser
20 to an inmate on multiple occasions to the same inmate.  The
21 inmate was in detention as a pretrial detainee, and the jury
22 determined that that constituted unconstitutional punishment.
23 It did cause bodily injury to the inmate.  And importantly to
24 the Court, the offense of conviction touches two of the --
25 two things that the Court always looks for.  And that is,

whether or not it's present -- and here two are present --
one would be violence, and that's certainly here.  And the
other is the use of a weapon.

At the same time, as I look at the offense of
conviction, I also have to look at all of the facts that were
present on November the 5th.  And important to the Court is
that twice you had been trained on the proper application and
use of a Taser, both by the Tennessee Department of
Correction when you worked for them and Cheatham County
Sheriff.  So that tells the Court that you knew better.

Next, I have to recognize that, as serious and
disturbing as the offense of conviction is, on the record
before the Court I see no prior incidents that come close to
this.  I see -- in fact, I see no prior discipline.  This
offense, while serious and disturbing and criminal, is
isolated in the record before the Court.

And then I also have to look at the specific
circumstances that do not justify the criminal behavior but
provide context for the events that lead -- that occurred on
November the 5th.  And that context is important.

Inmate Jordan Norris repeatedly engaged in what
I've described charitably as erratic and noncompliant and
combative behavior while in jail.  He even threatened his
own -- he threatened suicide.  And on three separate
occasions you and other officers needed to control this --

```
 1   this single inmate.  Medical records on November the 5th
 2   report that there were some type of drugs in his system and
 3   he was experiencing some mental challenges.
 4            And while this provides the Court context and
 5   explains the overall total circumstances, which the Court's
 6   required to look at, I -- I hasten to note it doesn't justify
 7   the criminal behavior.  But context matters in determining
 8   what's an appropriate sentence.
 9            The Court also notes that others did tasings of
10   Jordan that were not brought to -- that were not determined
11   to be inappropriate.  But at a minimum, the jury's verdict
12   states that, Mr. Bryant, you went too far.
13            And then, finally, in looking at all of the
14   circumstances here, it is an abuse of a public position.  Law
15   enforcement officers carry an important role in society.  And
16   that was abused when you used too much force with Mr. Norris.
17            I'm going to turn now to the next factor.  And
18   that is the history and characteristics of Mark Bryant.  And
19   I'll start with this transition.  When I look at the work
20   history and the personal life of Mr. Bryant coming up to
21   November the 4th, it does appear that this -- what occurred
22   on November 5th and the criminal conduct he engaged in on
23   November 5th -- is an aberration from his behavior before
24   November the 5th.
25            The law enforcement work history of Mr. Norris
```

[sic] does not reflect anything close to what he did on November the 5th.  From 2013 to 2015, he worked for the Tennessee Department of Corrections.  He received training in general law enforcement.  He went to the academy that the Tennessee Department of Corrections provides.  And as I've already noted, he got training on the use -- the proper use of a Taser.

However, from 2015 to -- 2013 to 2015, there's nothing before the Court of any disciplinary actions or any allegations of Mr. Bryant during that period of time.

He then went to the Cheatham County Sheriff's Department from 2015 to 2017.  And there again he received training on Taser use.  He was -- he was disciplined in 2017 for refusal to obey an order, but on -- but prior to that, in February of 2016, the sheriff determined he was one of the best employees.  He received a promotion and he had some limited supervisory authority.

So again, this -- this -- his law enforcement work history, except for November the 5th is -- is -- does not -- does not show a pattern of activity that led to November the 5th.

Finally, I turn to your personal characteristics, which are properly considered under this factor of 3553(a).  And specifically I note and credit the testimony of -- and the letters from many family, friends, coworkers, that -- and

your -- and your mother's testimony here today, that you were
brought up in a solid, middle class family environment with
strong values, that was close knit, and with the support of
both parents.  There's absolutely nothing in your personal
background that suggests any medical or mental issues.  There
are no substance abuse or other abuse issues that would have
impacted you prior to November the 5th.

I do note and read that you repeatedly volunteered
and performed good deeds for family and friends, and note
that family and friends describe you positively.  I've
already reflected on your work history and work ethic.  And,
finally, when I look at your history and characteristics, the
Court notes that this is your first felony conviction.
There's no other criminal behavior or arrest prior to this,
and until November the 5th, 2016, you were -- you were
otherwise a law abiding citizen.  So that takes care of that
factor under 3553(a), which the Court has considered and
gives weight to.

But I come back -- I've already discussed two --
one of the factors that stand out for the Court.  Now I want
to address in combination the factors of respect for the law
and punishment.

Respect for the law is a proper factor for the
Court to consider under 3553(a).  And indeed, as a law
enforcement officer, you are a public role model.  It's

important for law enforcement, more than anyone else -- or as much as anyone else -- at least to show respect for the law. And that did not occur on November the 5th. It also goes to the public's confidence and belief in -- in law enforcement. And when law enforcement engages in conduct that doesn't show that, then it does require some kind of appropriate just punishment, considering all the factors.

Your actions undercut and compromise public confidence in law enforcement. And the punishment has to consider this and address the need for accountability for your actions on November the 5th.

Now I turn to the issue of deterrence. And that is -- that is important here. There are two aspects, as has been already alluded to here, to deterrence. One is specific deterrence. I need to make sure that Mark Bryant doesn't engage in this again. And the second aspect is general deterrence.

Turning first to specific deterrence, the Court recognizes that your law enforcement career is over. Mr. Bryant will never be in law enforcement again or hold a position in law enforcement due to these actions. I also note for -- in -- on the role and the factor of specific deterrence, that it is a low likelihood that you will reoffend or engage in any other criminal behavior. Your age, your education, your work ethic, the criminal history all

indicate, and the Sentencing Commission's publications, which
are many, all support that when people -- when defendants
fall in the category of having a high school diploma, first
offense, age, it is a very low likelihood that you would
reoffend.

However, deterrence has that second element of
general deterrence.  So while I see a low -- I give less
weight to the need for specific deterrence, I give more
weight to the need of general deterrence.

First of all, though, the Court notes that the
prosecution, the United States, prosecuted this case twice.
One, the first trial, as you know, ended in a hung jury, and
then the second trial resulted in a conviction.  So the Court
knows that that public information will be sent to other law
enforcement officers and they will know that if they engage
in conduct, as you did, that the United States will pursue it
vigorously.  The Court believes that sends a message of
general deterrence.

Secondly, the fact that a jury has -- the fact
that your career is over and a jury has made its
determination will deter law enforcement, at least make them
think going forward of the need to make sure that their force
is commensurate with the -- with -- with the behavior they're
trying to address.  But also, the Court has an opportunity to
send a message to other law enforcement of the need to

respect and act appropriate to those who are in pretrial --
detainees, such as Mr. Norris.

Finally, I turn to -- well, next, rather, I turn
to the issue of the need to protect the public. I see less
need to protect the public from Mr. Bryant because of the
things I've just mentioned, that he'll never have such a
position of trust with this type of authority going forward,
also because of his age, education and work ethic, but
perhaps to a lesser extent there may be a need to protect the
public along the lines of general deterrence. And I
incorporate that analysis here.

I've already talked about the kinds of sentences
that are available. I've already stated the sentencing range
guideline that's advisory on the Court. And there's no issue
here for restitution.

So the Court has -- has considered -- I do
recognize the argument made by counsel on behalf of
Mr. Bryant regarding the need for caregiver, but the Court
notes that Mr. Bryant's family is -- is favored with other
family members and many family friends. I do note that -- as
well as the argument there's the potential for abuse, but
believe that Mr. -- that the Bureau of Prisons will take that
into account.

So while I disagree with the government; I think a
ten-year sentence would be too harsh for the reasons stated,

1  I do think probation is out of line because it would not
2  satisfactorily, in this Court's opinion, address the need for
3  general deterrence, just punishment, and respect for the law,
4  along with all the other 3553 factors that I've just
5  discussed.
6          So for those reasons, I'm going to commit you to
7  the custody of the Attorney General to be imprisoned for a
8  total term of 60 months.  I'm going to order that my sentence
9  run concurrent to any state sentence.  After you complete
10 that custody sentence, you'll be on supervised release for
11 one year, with the special condition being providing
12 financial records to the probation office.
13         I will impose all the standard conditions of
14 supervised release, which include not engage in any other
15 unlawful conduct, not have possession of any weapon or any
16 other destructive advice, be truthful to probation, be
17 employed, and reside in a place approved by probation.  And
18 all of those standard conditions will be set forth in the
19 judgment.
20         I will not impose a fine because I determine
21 you're financially unable to pay the fine.  But I do impose
22 the special assessment of 200 here.  That's $100 for each
23 count of conviction.  Neither restitution or forfeiture are
24 an issue in this case.
25         Finally, I note if my guideline calculation is

1  wrong, then the Court would have imposed the same sentence

2  under 18 U.S.C., Section 3553(a), and this would be

3  considering all of the factors in 3553(a) as a whole.

4        Do the parties have any objection to the sentence?

5        From the government?

6        MR. SONGER:  Just for the record, Your Honor, the

7  government does object to the significant downward variance

8  from the sentencing guidelines.

9        THE COURT:  Okay.  For the reasons stated and

10  applying all of the 3553 factors, I think the sentence is

11  appropriate.

12        Any objection to the sentence?

13        MR. STRIANSE:  No, Your Honor.

14        THE COURT:  So the sentence is hereby imposed.

15        Now, Mr. Bryant, you have 14 days to file a Notice

16  of Appeal.  I'm handing you now a blank form Notice of Appeal

17  that you can use.  You can tell your lawyer you want to

18  appeal.  You can tell the Clerk of Court you want to appeal.

19  But I urge you to talk to a lawyer before you exercise your

20  appeal rights.

21        Do you have any questions about your appeal

22  rights?

23        THE DEFENDANT:  No, Your Honor.

24        THE COURT:  Okay.  Mr. Strianse, does the -- is

25  the PSR correct, that Mr. Norris [sic] has a January 21 trial

1  date in state court?

2          MR. STRIANSE:  That's correct, Your Honor.

3          THE COURT:  Okay.

4          All right.  So with that I'm going to allow

5  Mr. Norris [sic] remain released so he can take care of his

6  business.

7          Also, the Court notes that there's no reason to

8  believe that he is likely to flee or poses a danger to anyone

9  else.

10          I will go ahead, though, and impose a report date

11  of February 22, 2021.

12          Mr. Strianse, if things change in the state court

13  proceeding, then I'm sure you know how to let me know.

14          Also, the Court is cognizant that the world is

15  experiencing a pandemic.  So Mr. Strianse, you can bring that

16  to the Court's attention if necessary.

17          MR. STRIANSE:  Yes, sir.

18          THE COURT:  All right.  I'm sorry if I misspoke.

19          All right.  Anything else from the government?

20          MS. MYERS:  No, Your Honor.

21          THE COURT:  All right.  Mr. Strianse.

22          MR. STRIANSE:  No, Your Honor.  Thank you.

23          THE COURT:  Let me just conclude, Mr. Bryant, to

24  say the Court has made its ruling.  I think it's appropriate,

25  applying all the factors, but I will end it by saying that

notwithstanding the sentence and the jury verdict to the

contrary, it will be up to you on whether or not you use this

experience so that other law enforcement officers will learn

from it as well.  And I hope you'll think about that.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

(Court adjourned.)

1    REPORTER'S CERTIFICATE

2

3         I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6         That I reported on the Stenograph machine the

7    proceedings held in open court on November 20, 2020, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 68) is a true and

12   accurate record of said proceedings.

13        This the 28th day of December, 2020.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25